Subject:  Email Memorializing Offer

From:  Suzanne Luban (lubanlaw@sbcglobal.net)

To:  Kevin.Khasigian@usdoj.gov;

Date:  Tuesday, April 1, 2014 6:30 PM

Dear Kevin,

I appreciate all your hard work and cooperation to reach what is a fair and appropriate stipulation as to restitution, and in particular goes a long way toward assuring that Zac and Zayna will have resources to pay for college. Steve is personally very grateful for that.

I just wanted to memorialize Steve's earlier offer (on 3/31/14) that if Michelle would agree limit her own personal restitution to 20% of the total dollar amount of restitution payable to her, and would commit to give the remainder to Zac and Zayna equally (40% each), Steve would not object to any amount of restitution she might seek from the Court.

I will see you in the morning.

Suzanne A. Luban
Attorney At Law
3758 Grand Ave, #4
Oakland, CA 94610
(510)832-3555
fax (510)433-1131

EX 2115



DEF.
EX.
101

s://us-mg205.mail.yahoo.com/neo/launch?.partner=sbc&.rand=8fforsmd1i1b1    /  5/8/2014

5:25-mc-30
5:25-mc-31

SUZANNE A. LUBAN, SBN 120629
Attorney At Law
3758 Grand Ave. #4
Oakland, California 94610
Telephone 510/832-3555

Attorney for Defendant
STEVEN K. ZINNEL

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA
(Sacramento)

| UNITED STATES OF AMERICA, | ) | CR. S 11-234-TLN |
|---|---|---|
| Plaintiff, | ) | STIPULATION AND ORDER |
| vs. | ) | RE: RESTITUTION |
| STEVEN K. ZINNEL, et al., | ) | |
| Defendants. | ) | Date: April 2, 2014 |
| | ) | Judge: Hon. Troy L. Nunley |

The United States and defendant Steven Zinnel stipulate to the entry of criminal restitution as set forth below. This stipulation is entered into in light of the Court's rulings at sentencing. The parties agree that none of the agreements herein waive defendant Steven Zinnel's objections prior to and at sentencing to any of the guideline enhancements or sentencing determinations already imposed by the Court, and the United States will not argue that a plain error standard of review applies as a consequence of this stipulation. This includes, but is not limited to, whether any of the persons listed below was a "victim" or suffered "loss" or the amount of the loss within the meaning of the Sentencing Guidelines.

Subject to the above proviso, defendant Steven Zinnel and the United States, by and through their attorneys, hereby stipulate and agree that the Court shall enter a restitution order as follows:

Steven Zinnel shall be ordered to pay the following restitution amounts to the persons listed

1

EX. 2121

DEF.
EX.
102

5:25-mc-30
5:25-mc-31

below in the amounts stated below:

1.    First Bank: $156,663.27, which represents the remainder owed to First Bank on all of its deeds of trust and any debt arising from its payment on indemnity bonds guaranteed by Mr. Zinnel;

2.    Michelle Zinnel: A total of $305,058.28, which comprises:

(a) $12,705.43 in attorneys' fees arising from the order to indemnify Ms. Zinnel for attorneys fees actually incurred by Ms. Zinnel in *General Ins. Co. of America et al. v. Corporate Control Inc. et al.*, CV-02-1020-WBS;

(b) $156,208.85 in child support for years 2005, 2006, 2007 and 2008;

(c) $3,773.00 in child support through March 10, 2014;

(d) $132,371, which represents attorneys' fees expended by Michelle Zinnel for family court representation from January 2000 through December 2005;

The parties reiterate that this stipulation does not waive any objections to guideline calculations or findings, such as that Michelle Zinnel is a "victim" or that any amounts she claims constitute "loss" under the Guidelines.

3.    Zac Zinnel: $150,000.00, which shall be held in trust for the benefit of the child according to terms to be jointly proposed by the parties and approved by the court.

4.    Zayna Zinnel: $150,000.00, which shall be held in trust for the benefit of the child according to terms to be jointly proposed by the parties and approved by the court.

5.    Fog Cutter Services: $10,799.35;

6.    Wells Fargo Card Services: $8,506.17;

7.    Travelers Casualty and Surety Co.: The parties agree that restitution shall be ordered in the amount of $1,000.00, which represents Travelers' actual payment on a bond claim. The parties agree that restitution of $285,000 shall be ordered for Travelers based on an Indemnity Agreement entered into by the relevant parties on July 15, 1996.

2

EX 21 22

Case 2:11-cr-00234-TLN   Document 343   Filed 04/02/14   Page 3 of 5

8. <u>Arrow Financial Services</u>: $141.50;

9. <u>MBNA America Bank</u>: $3,641.15;

10. <u>General Insurance Co. / First National Insurance Company of America / Safeco:</u> A total of $1,442,509.28 to be distributed per the claims filed in bankruptcy court, which comprises:

(a) $1,192,509.28, which represents the judgment amount stated in the Order filed on June 23, 2004 as Docket No. 247 and the Judgment filed on October 26, 2004 as Docket No. 366 in *General Ins. Co. of America et al. v. Corporate Control Inc. et al.*, CV-02-1020-WBS;

(b) $250,000.00, which represents the collateral security amount that was ordered to cover future bond payments in the Order filed on June 23, 2004 as Docket No. 247 and the Judgment filed on October 26, 2004 as Docket No. 366 in *General Ins. Co. of America et al. v. Corporate Control Inc. et al.*, CV-02-1020-WBS; and

11. <u>Stuart Allen Associates</u>: Zero because this was a duplicate claim.

IT IS SO STIPULATED:

DATED: April 1, 2014                    ___*/S/ Suzanne A. Luban*___
                                        SUZANNE A. LUBAN
                                        Counsel for Steven. K. Zinnel


DATED: April 1, 2014                    ___*/S/ Kevin Khasigian*___
                                        KEVIN KHASIGIAN
                                        Assistant United States Attorney
                                        Counsel for Plaintiff


DATED: April 1, 2014                    ___*/S/ Matthew D. Segal*___
                                        MATTHEW D. SEGAL
                                        Assistant United States Attorney
                                        Counsel for Plaintiff

3

EX 2123

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
(Sacramento)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. S-11-234-TLN |
| Plaintiff, | ) | |
| | ) | ORDER ON RESTTUTION |
| vs. | ) | |
| STEVEN K. ZINNEL, | ) | |
| Defendant. | ) | |
| | ) | Judge: Hon. Troy L. Nunley |

For Good Cause Shown and pursuant to the stipulation of the parties,

IT IS HEREBY ORDERED that defendant Steven Zinnel shall pay restitution in the following amounts to the following persons.

1.    First Bank: $156,663.27;

2.    Michelle Zinnel: $305,058.28

3.    Zac Zinnel: $150,000.00, which shall be held in trust for the benefit of the child according to terms to be jointly proposed by the parties and approved by the court;

4.    Zayna Zinnel: $150,000.00, which shall be held in trust for the benefit of the child according to terms to be jointly proposed by the parties and approved by the court;

5.    Fog Cutter Services: $10,799.35;

6.    Wells Fargo Card Services: $8,506.17;

- 1 -

DEF.
EX.  5:25-mc-30
103  5:25-mc-31

7. Travelers Casualty and Surety Co.: $286,000, as set forth in the stipulation;

8. Arrow Financial Services: $141.50;

9. MBNA America Bank: $3,641.15;

10. General Insurance Co. / First National Insurance Company of America / Safeco: $1,442,509.28, to be distributed per the claims filed in bankruptcy court.

IT IS SO ORDERED.

Dated: April 2, 2014

Troy L. Nunley
United States District Judge

AO 245C-CAED (Rev. 09/2011) Sheet 1 - Amended Judgment in a Criminal Case   Document 386   Filed 05/30/14   (NOTE: Identify Changes with Asterisks*)

# United States District Court
## Eastern District of California

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>**STEVEN ZINNEL** | **AMENDED JUDGMENT IN A CRIMINAL CASE**<br>(For Offenses Committed On or After November 1, 1987)<br>Case Number: **2:11CR00234-01** |

Date of Original Judgment:  **March 4, 2014**
(Or Date of Last Amended Judgment)

\* Suzanne Luban, Retained
Defendant's Attorney

## Reason for Amendment:

[ ] Correction of Sentence on Remand (Fed R. Crim. P. 35(a))
[ ] Reduction of Sentence for Changed Circumstances
      (Fed R. Crim. P. 35(b))
[ ] Correction of Sentence by Sentencing Court (Fed. R. Crim P. 35(c))
[ ] Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36

[ ] Modification of Supervision Conditions (18 U.S.C. §3563(c) or 3583(e))
[ ] Modification of Imposed Term of Imprisonment for Extraordinary and
      Compelling Reasons (18 U.S.C.§3582(c)(1))
[ ] Modification of Imposed Term of Imprisonment for Retroactive
      Amendment(s) to the Sentencing Guidelines (18 U.S.C.§3582(c)(2))
[ ] Direct Motion to District Court Pursuant to [ ] 28 U.S.C. §2255
      [ ] 18 U.S.C. §3559(c)(7),   [✔] Modification of Restitution Order

**THE DEFENDANT:**

[ ]      pleaded guilty to count(s): ___.
[ ]      pleaded nolo contendere to counts(s) ___ which was accepted by the court.
[✔]      was found guilty on counts 1, 2, 4-12, 15-17, and 18 of the Superseding Indictment after a plea of not guilty.

ACCORDINGLY, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| See next page. | | | |

The defendant is sentenced as provided in pages 2 through _9_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]      The defendant has been found not guilty on counts(s) ___ and is discharged as to such count(s).
[ ]      Count(s) ___ (is)(are) dismissed on the motion of the United States.
[✔]      Indictment is to be dismissed by District Court on motion of the United States.
[✔]      Appeal rights given.                          [ ]      Appeal rights waived.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 2, 2014
Date of Imposition of Judgment

Signature of Judicial Officer

**TROY L. NUNLEY**, United States District Judge
Name & Title of Judicial Officer

May 30, 2014
Date


DEF. 5:25-mc-30
EX. 5:25-mc-31
104

AO 245B-CAED (Rev. 09/2011) Sheet 1 — Judgment in a Criminal Case

CASE NUMBER:        2:11CR00234-01                                          Judgment - Page 2 of 9
DEFENDANT:          STEVEN ZINNEL

| Title & Section | Nature of Offense | Date Offense Concluded | Count Numbers |
|---|---|---|---|
| 18 U.S.C. §152(7) | Bankruptcy Fraud **(CLASS D FELONY)** | 07/20/2005 | 1 |
| 18 U.S.C. §152(1) | Bankruptcy Fraud **(CLASS D FELONY)** | 09/06/2006 | 2 |
| 18 U.S.C. §1956(a)(1)(B)(i) | Money Laundering **(CLASS C FELONY)** | 12/27/2006 | 4 |
| 18 U.S.C. §1956(a)(1)(B)(i) | Money Laundering **(CLASS C FELONY)** | 10/04/2007 | 5-6 |
| 18 U.S.C. §1956(a)(1)(B)(i) | Money Laundering **(CLASS C FELONY)** | 10/09/2007 | 7 |
| 18 U.S.C. §1956(a)(1)(B)(i) | Money Laundering **(CLASS C FELONY)** | 12/28/2007 | 8 |
| 18 U.S.C. §1956(a)(1)(B)(i) | Money Laundering **(CLASS C FELONY)** | 02/14/2008 | 9 |
| 18 U.S.C. §1956(a)(1)(B)(i) | Money Laundering **(CLASS C FELONY)** | 04/01/2008 | 10 |
| 18 U.S.C. §1956(a)(1)(B)(i) | Money Laundering **(CLASS C FELONY)** | 06/12/2008 | 11 |
| 18 U.S.C. §1956(a)(1)(B)(i) | Money Laundering **(CLASS C FELONY)** | 07/07/2008 | 12 |
| 18 U.S.C. §1957 | Transactions in Criminally Derived Property **(CLASS C FELONY)** | 01/10/2007 | 15 |
| 18 U.S.C. §1957 | Transactions in Criminally Derived Property **(CLASS C FELONY)** | 03/21/2007 | 16 |
| 18 U.S.C. §1957 | Transactions in Criminally Derived Property **(CLASS C FELONY)** | 08/28/2007 | 17 |
| 18 U.S.C. §1956(h) | Money Laundering Conspiracy **(CLASS C FELONY)** | 03/02/2009 | 18 |

CASE NUMBER:        2:11CR00234-01
DEFENDANT:          STEVEN ZINNEL                                            Judgment - Page 2 of 9

AO 245B-CAED (Rev. 09/2011) Sheet 2 - Imprisonment N    Document 386    Filed 05/30/14    Page 3 of 9

CASE NUMBER:        2:11CR00234-01                                    Judgment - Page 3 of 9
DEFENDANT:          STEVEN ZINNEL

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 60 months on each of Counts 1 and 2, 212 months on each of Counts 4-12, and 120 months on each of Counts 15-17, and 18, all to run concurrently to each other, for a TOTAL TERM of 212 months.

[ ]     No TSR: Defendant shall cooperate in the collection of DNA.

[✔]    The court makes the following recommendations to the Bureau of Prisons:
        The Court recommends that the defendant be incarcerated at FCI Terminal Island, California, but only insofar as this accords with security classification and space availability.  The Court recommends the defendant participate in the RDAP Drug Treatment Program.

[✔]    The defendant is remanded to the custody of the United States Marshal.

[ ]     The defendant shall surrender to the United States Marshal for this district.
        [ ] at ___ on ___.
        [ ] as notified by the United States Marshal.

[ ]     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
        [ ] before _ on ___.
        [ ] as notified by the United States Marshal.
        [ ] as notified by the Probation or Pretrial Services Officer.
        If no such institution has been designated, to the United States Marshal for this district.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

        Defendant delivered on_____ to _____

at _____ , with a certified copy of this judgment.


                                                    _____
                                                    UNITED STATES MARSHAL


                                            By   _____
                                                    Deputy U.S.  Marshal

AO 245B-CAED (Rev. 09/2011) Sheet 3 - Supervised Release Document 386    Filed 05/30/14    Page 4 of 9

CASE NUMBER:        2:11CR00234-01                                      Judgment - Page 4 of 9
DEFENDANT:          STEVEN ZINNEL

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 36 months on each of Counts 1, 2, 4-12, 15-17 and 18, all to run concurrently to each other, for a total term of 36 months.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed four (4) drug tests per month.

[ ]        The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

[✔]        The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

[✔]        The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

[ ]        The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.), as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. (Check, if applicable.)

[ ]        The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or a restitution obligation, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without permission of the court or probation officer;
2)    the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3)    the defendant shall answer truthfully all inquiries by the probation officer and follow instructions of the probation officer;
4)    the defendant shall support his or her dependants and meet other family responsibilities;
5)    the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons;
6)    the defendant shall notify the probation officer ten days prior to any change in residence or employment;
7)    the defendant shall refrain from excessive use of alcohol;
8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)    the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere, and shall permit confiscation of any contraband observed in plain view by the probation officer;
11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

CASE NUMBER:      2:11CR00234-01                                          Judgment - Page 5 of 9
DEFENDANT:        STEVEN ZINNEL

# SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall submit to the search of his person, property, home, and vehicle by a United States probation officer, or any other authorized person under the immediate and personal supervision of the probation officer, based upon reasonable suspicion, without a search warrant. Failure to submit to a search may be grounds for revocation. The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

2. The defendant shall not dispose of or otherwise dissipate any of his assets until the fine and/or restitution order by this Judgment is paid in full, unless the defendant obtains approval of the Court or the probation officer.

3. The defendant shall provide the probation officer with access to any requested financial information.

4. The defendant shall not open additional lines of credit without the approval of the probation officer.

5. The defendant shall apply all monies received from income tax refunds, lottery winnings, inheritance, judgments and any anticipated or unexpected financial gains to any unpaid restitution ordered by this Judgment.

6. As directed by the probation officer, the defendant shall participate in an outpatient correctional treatment program to obtain assistance for drug or alcohol abuse.

7. As directed by the probation officer, the defendant shall participate in a program of testing (i.e. breath, urine, sweat patch, etc.) to determine if he has reverted to the use of drugs or alcohol.

8. The defendant shall abstain from the use of alcoholic beverages and shall not frequent those places where alcohol is the chief item of sale.

9. As directed by the probation officer, the defendant shall participate in a co-payment plan for treatment or testing and shall make payment directly to the vendor under contract with the United States Probation Office of up to $25 per month.

AO 245B-CAED (Rev. 09/2011) Sheet 5 - Criminal Monetary Penalties

AO 245B-CAED (Rev. 09/2011) Sheet 5 - Criminal Monetary Penalties

| | |
|---|---|
| CASE NUMBER: | 2:11CR00234-01 |
| DEFENDANT: | STEVEN ZINNEL |

Judgment - Page 6 of 9

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $ 1,500.00 | $ 500,000.00 | * $ 2,513,319.00 |

[ ]  The determination of restitution is deferred until ___ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[✔]  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

CASE NUMBER:    2:11CR00234-01                                    Judgment - Page 7 of 9
DEFENDANT:      STEVEN ZINNEL

| Name of Payee | * Total Loss | * Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| First Bank<br>c/o Douglas Kraft<br>7509 Madison Avenue, Suite111<br>Citrus Heights, CA 95610 | $156,663.27 | $156,663.27 | |
| Michelle Zinnel<br>c/o Dudugjian and Maxey<br>13 Sierra Gate Plaza, Bldg. B<br>Roseville, CA 95678 | $305,058.28 | $305,058.28 | |
| Zac Zinnel<br>Attention: Dawn Akel<br>Akel Fiduciary Services<br>P.O. Box 582603<br>Elk Grove, CA 95758 | $150,000.00 | $150,000.00 | |
| Zayna Zinnel<br>Attention: Dawn Akel<br>Akel Fiduciary Services<br>P.O. Box 582603<br>Elk Grove, CA 95758 | $150,000.00 | $150,000.00 | |
| Fog Cutter Services<br>P.O. Box 2665<br>Portland, OR 97208-2665 | $10,799.35 | $10,799.35 | |
| Wells Fargo Card Services<br>P.O. Box 9210<br>Des Moines, IA 50306 | $8,506.17 | $8,506.17 | |
| Travelers Casualty and Surety Co.<br>Attention: Michelle Smith Cotto<br>1 Tower Square 4PB<br>Hartford, CT 06183 | $286,000.00 | $286,000.00 | |
| Arrow Financial Services<br>P.O. Box 3001<br>Malvern, PA 19355-0701 | $141.50 | $141.50 | |
| MBNA America Bank<br>P.O. Box 15168 MS 1423<br>Wilmington, DE 19060 | $3,641.15 | $3,641.15 | |
| General Insurance Company<br>    of America<br>c/o James D. Curran<br>555 Montgomery Street #1100<br>San Francisco, CA 94111 | $866,803.83 | $866,803.83 | |
| First National Insurance Company<br>    of America<br>c/o James D. Curran | $569,502.65 | $569,502.65 | |

** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B-CAED (Rev. 09/2011) Sheet 5 - Criminal Monetary Penalties   Document 386   Filed 05/30/14   Page 8 of 9

CASE NUMBER:       2:11CR00234-01                                                    Judgment - Page 8 of 9
DEFENDANT:         STEVEN ZINNEL

555 Montgomery Street #1100
San Francisco, CA 94111

Safeco Insurance Company
  of America                        $6,202.80              $6,202.80
c/o James D. Curran
555 Montgomery Street #1100
San Francisco, CA 94111

TOTALS:                            *$2,513,319.00         *$2,513,319.00

[ ]   Restitution amount ordered pursuant to plea agreement $ __

[ ]   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full
      before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on
      Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[✔]       The court determined that the defendant does not have the ability to pay interest and it is ordered that:

      [✔]   The interest requirement is waived for the      [✔] fine          [ ] restitution

      [ ]   The interest requirement for the              [ ] fine   [ ] restitution is modified as follows:


[✔]   If incarcerated, payment of the fine is due during imprisonment at the rate of not less than $25 per quarter
      and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

[✔]   If incarcerated, payment of restitution is due during imprisonment at the rate of not less than $25 per quarter
      and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.


** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for
offenses committed on or after September 13, 1994, but before April 23, 1996.

CASE NUMBER:    2:11CR00234-01                                    Judgment - Page 9 of 9
DEFENDANT:    STEVEN ZINNEL

# SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A    [ ] Lump sum payment of $ __ due immediately, balance due

    [ ]    not later than __ , or
    [ ]    in accordance with    [ ] C,    [ ] D,    [ ] E, or    [ ] F below; or

B    [✔]    Payment to begin immediately (may be combined with    [ ] C,    [ ] D, or [ ] F below); or

C    [ ] Payment in equal __ (e.g., weekly, monthly, quarterly) installments of $ __ over a period of __ (e.g., months or years), to commence __ (e.g., 30 or 60 days) after the date of this judgment; or

D    [ ] Payment in equal __ (e.g., weekly, monthly, quarterly) installments of $ __ over a period of __ (e.g., months or years), to commence __ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E    [ ] Payment during the term of supervised release will commence within ___ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    [ ] Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[ ]    Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate:

[ ]    The defendant shall pay the cost of prosecution.

[ ]    The defendant shall pay the following court cost(s):

[✔]    The defendant shall forfeit the defendant's interest in the following property to the United States: *The Preliminary Order of Forfeiture filed on September 20, 2013, shall be incorporated into this Judgment.*

# Foreword

The Asset Forfeiture and Money Laundering Section (AFMLS) is pleased to release the 2016 version of the *Asset Forfeiture Policy Manual*, a compilation of policies governing the Department of Justice Asset Forfeiture Program. The mission of the Asset Forfeiture Program is to disrupt and dismantle criminal enterprises, deprive criminals of the proceeds of illegal activity, deter crime, and restore property to victims. The purpose of the *Policy Manual* is to provide Department of Justice prosecutors, agents, and support staff with a reference manual containing the policies and procedures in support of that mission.

Since the *Policy Manual* was last published in 2013, the Department of Justice has been engaged in a comprehensive review of the policies governing the Department of Justice Asset Forfeiture Program. The purpose of this review is to ensure that federal asset forfeiture authorities are appropriately and effectively used consistent with civil liberties and the rule of law.

As a result of this review, the Department of Justice has issued a number of significant policy directives that are reflected in the *Policy Manual*. These include updates to the net equity thresholds and the Department of Justice's new structuring policy (Chapter 1), the recently-issued guidance pertaining to facilitating property (Chapter 2), and the Attorney General's January 16, 2015, order limiting adoptions of assets seized by state or local law enforcement under state law (Chapter 14). In addition, a new Chapter 13 on real property compiles the policies and guidance for real property that previously appeared throughout various chapters of the *Policy Manual*, while incorporating updated procedures. The remaining chapters have also been reviewed and updated.

This *Policy Manual* replaces and supersedes all previous versions of the *Policy Manual* and all Policy Directives issued by AFMLS, unless otherwise noted. The *Policy Manual* is published in hardcopy and available online at http://www.justice.gov/criminal-afmls/publications. Any future updates issued prior to the publication of the next hardcopy *Policy Manual* will be issued as Policy Directives.

The *Asset Forfeiture Policy Manual* sets forth the policies of the Department of Justice. It does not, however, create or confer any legal rights, privileges, or benefits that may be enforced in any way by private parties. *See United States v. Caceres*, 440 U.S. 741 (1979).

We recommend that the following format be used in citing this *Policy Manual: Asset Forfeiture Policy Manual* (2016), Chap. ___, Sec. ___.___. (e.g., Chap. 1, Sec. I.A).

M. Kendall Day
Chief
Asset Forfeiture and Money Laundering Section

EX 2201

DEF. 5:25-mc-30
EX. 5:25-mc-31
105

# Chapter 12:
## Forfeiture and Compensation for Victims of Crime

Forfeiture is a critical tool in the recovery of illicit gains arising from financial crimes such as fraud, embezzlement, and theft. Returning forfeited assets to victims through the remission and restoration processes is a priority of the Asset Forfeiture Program. With respect to property that is judicially forfeited under the criminal forfeiture statutes, the Attorney General has the authority to grant petitions for remission or mitigation of forfeiture and restore forfeited property to victims. *See* 21 U.S.C. § 853(i)(1).[1] In civil judicial forfeitures pursuant to section 981, the Attorney General has the authority to restore forfeited assets to the victims of any offense giving rise to forfeiture. Accordingly, remission and restoration authority now exists for virtually all offenses for which a related civil or criminal forfeiture order is obtained. The federal regulations governing the remission of civil or criminal forfeiture are found at 28 C.F.R. Part 9.



In concert with this expanded remission authority, the Criminal Division initiated a procedure in 2002 called restoration. This procedure enables the Attorney General to transfer forfeited funds to a court for satisfaction of a criminal restitution order, provided that all victims named in the order otherwise qualify for remission under the applicable regulations. While remission and criminal restitution are not directly related, they may serve similar functions. Remission is discretionary relief intended to reduce the hardship that may arise from forfeiture for persons who have incurred a monetary loss from the offense underlying the forfeiture. Restitution is an equitable remedy that is intended to make crime victims whole and prevent unjust enrichment to the perpetrator. In many cases, restoration—the use of forfeited funds to pay restitution—is desirable, since the defendant may be left without assets to satisfy his or her restitution obligation following forfeiture.

Priority in the distribution of forfeited assets is given to valid owners, lienholders, federal financial regulatory agencies, and victims (in that order), who in turn have priority over official use and equitable sharing requests. *See* 28 C.F.R. § 9.9(a).

The Treasury Forfeiture Fund (TFF) has a similar procedure for remission and restoration. Please consult the *Guidelines for Treasury Forfeiture Fund Agencies on Refunds Pursuant to Court Orders, Petitions for Remission, or Restoration Requests* ("Treasury Blue Book"), available at http://www. treasury.gov/resource-center/terrorist-illicit-finance/Asset-Forfeiture/Documents/bluebook.pdf.[2]

This chapter discusses the principal policies and procedures governing the return of forfeited assets to crime victims. Section I covers the basics of remission and restoration; and Section II discusses strategies for compensating victims of large fraud offenses.

---

[1] While section 853(i) governs forfeitures under the drug abuse prevention and control laws, it is incorporated by reference in 18 U.S.C. § 982(b)(1), which extends forfeiture authority to most other criminal offenses.

[2] Treasury Forfeiture Fund member agencies include the Internal Revenue Service-Criminal Investigations (IRS-CI), U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), U.S. Secret Service (USSS), and U.S. Coast Guard.

EX 2202

Chapter 12: Forfeiture and Compensation for Victims of Crime

## I. Returning Forfeited Assets to Victims

### A. Remission

Once assets have been judicially forfeited, the authority to distribute them to owners, lienholders, and victims rests solely with the Attorney General. *See* 28 C.F.R. Part 9. Potential victims must be notified of the opportunity to file a petition for remission. In judicial forfeitures, notification is the responsibility of the U.S. Attorney's Office (USAO). Known victims should be notified by mail, and potential unknown victims may be notified by publication. In appropriate cases, the USAO may modify the standard notice of the Victim Notification System (VNS) to incorporate notice of the forfeiture and a model petition for remission.[3] The notice should instruct the victims to file petitions with the USAO that handled the civil or criminal forfeiture.

The authority to decide petitions for remission in judicial cases has been delegated by the Attorney General to the Chief of the Asset Forfeiture and Money Laundering Section (AFMLS). 28 C.F.R. § 9.1(b)(2). Petitions are decided on the basis of written documentation; there is no right to a hearing on the petition. 28 C.F.R. § 9.4(g). Unsuccessful petitioners are entitled to one request for reconsideration, which is reviewed and decided by a different ruling official within AFMLS. 28 C.F.R. § 9.4(k)(3). Judicial review of a denial of remission is not available. *See United States v. One 1970 Buick Riviera Bearing Serial No. 494870H910774*, 463 F.2d 1168, 1170 (5th Cir.), *cert. denied*, 409 U.S. 980 (1972) (Attorney General has unreviewable discretion over remission or mitigation of forfeitures). Although the USAO and seizing agency must provide their recommendations as to the allowance or denial of a judicial petition for remission, the final determination rests with AFMLS. USAOs must take care not to make representations to the court or potential victims as to whether remission will be granted.

The determination of whether a victim is entitled to remission is governed by regulation. The breadth of options available for transfer of forfeited property to victims depends on the statute under which the property is forfeited. The options are broadest in criminal forfeiture, where the Attorney General has statutory authority not only to grant petitions for remission to victims of the offense underlying the forfeiture that is the basis for the forfeiture, but also to "*take any other action to protect the rights of innocent persons which is in the interests of justice* and which is not inconsistent with the provisions of [the applicable chapter or section]." 21 U.S.C. § 853(i)(1), incorporated by reference in 18 U.S.C. § 982 (emphasis added). In civil forfeitures, the statutory authority is less broadly stated, and the Attorney General's authority to remit forfeited assets does not appear to extend to other such "innocent persons ... ." *See, e.g.,* 18 U.S.C. § 981(d); 21 U.S.C. § 881(d).

In administrative forfeitures, the authority to decide petitions for remission or mitigation rests with the seizing agency.[4] It is the responsibility of the agency to notify potential victims of the opportunity to file a petition for remission. The remission decision is at the discretion of the forfeiting agency and not reviewable in court. Questions regarding administrative forfeiture policies and procedures should be directed to the forfeiting agency. When petitions have been filed for both administratively and judicially forfeited assets in the same case, the seizing agency must coordinate with the forfeiture Assistant U.S. Attorney (AUSA) assigned to the case.

---

[3] VNS is a free, computer-based system developed by the Department of Justice to provide important information to victims of federal crimes.

[4] *See, e.g.,* 19 C.F.R. Parts 171 and 172.2; 26 C.F.R. Part 403, Subpart D; 28 C.F.R. § 9.1(b)(1).

EX 2203

Many forfeiture cases begin administratively and become judicial when a party files a claim challenging the agency forfeiture. In such cases, the petition must be adjudicated by AFMLS. However, the petitioner need not submit a second petition. The seizing agency should forward the petition to the USAO to further submit to AFMLS.

### A.1  Standards for victims, 28 C.F.R. Part 9

The factual basis and legal theory underlying the forfeiture will determine who qualifies as a victim under 28 C.F.R. Part 9. "The term victim means a person who has incurred a pecuniary loss as *a direct result of the commission of the offense underlying a forfeiture*." 28 C.F.R. § 9.2 (emphasis added).[5] Federal agencies can qualify as a victim under the regulations.

Victims may also recover losses caused by a related offense. 28 C.F.R. § 9.8(a)(1). *Related offense* means: "(1) Any predicate offense charged in a Federal Racketeer Influenced and Corrupt Organizations Act (RICO) count for which forfeiture was ordered; or (2) An offense committed as part of the same scheme or design, or pursuant to the same conspiracy, as was involved in the offense for which forfeiture was ordered." 28 C.F.R. § 9.2.

### A.2  Qualification to file

A victim may be granted remission of the forfeiture of property if the victim satisfactorily demonstrates that:

> (1) a pecuniary loss of a specific amount has been directly caused by the criminal offense, or related offense, that was the underlying basis for the forfeiture, and the loss is supported by documentary evidence including invoices and receipts; (2) the pecuniary loss is the direct result of the illegal acts and is not the result of otherwise lawful acts that were committed in the course of the criminal offense; (3) the victim did not knowingly contribute to, participate in, benefit from, or act in a willfully blind manner towards the commission of the offense, or related offense, that was the underlying basis for the forfeiture; (4) the victim has not in fact been compensated for the wrongful loss of the property by the perpetrator or others; and (5) the victim does not have recourse reasonably available to other assets from which to obtain compensation for the wrongful loss of the property.

28 C.F.R. § 9.8(a).

"The amount of the pecuniary loss suffered by a victim for which remission may be granted is limited to the fair market value of the property of which the victim was deprived as of the date of the occurrence of the loss." 28 C.F.R. § 9.8(b). This provision presents three issues to be determined in connection with calculating a victim's loss: (1) What property did the victim lose as a direct result of the illegal activity; (2) When was the victim deprived of it; and (3) What was the fair market value of that property at that time? The term "fair market value" is not defined in 28 C.F.R. Part 9. When the loss is property other than money, the date of the victim's loss and the fair market value of the property on that date must be decided in order to determine the victim's recoverable loss.

A victim's pecuniary loss must be supported by documentary evidence. 28 C.F.R. § 9.8(a)(1) and (2). Losses that are secondary to the principal loss, such as "interest foregone or for collateral expenses incurred to recover lost property or to seek other recompense," are not eligible for remission. 28 C.F.R. § 9.8(b).

---

[5] A *person* is "an individual, partnership, corporation, joint business enterprise, estate, or other legal entity capable of owning property." 28 C.F.R. § 9.2.

EX 2204

Chapter 12: Forfeiture and Compensation for Victims of Crime

---

Losses are also ineligible for remission if they result from property damage or physical injuries, or from a tort associated with illegal activity that formed the basis for the forfeiture, unless the tort constitutes the illegal activity itself. 28 C.F.R. § 9.8(c). Victims who "knowingly contribute to, participate in, benefit from, or act in a willfully blind manner towards the commission of the offense, or related offense, that was the underlying basis for the forfeiture" are also ineligible for remission. 28 C.F.R. § 9.8(a)(3).

A victim need not show that his or her funds are among the funds that have been forfeited in order to establish eligibility for remission. Similarly, the tracing of a particular victim's funds into a forfeited account does not give that victim priority over other victims whose funds cannot be traced.

### A.3  Priority in multiple-victim remission cases

Priority in the distribution of forfeited assets is given to valid owners, lienholders, federal financial regulatory agencies,[6] and victims (in that order), who in turn have priority over official use requests and equitable sharing requests. In cases involving more than one victim, the ruling official will generally grant remission on a pro rata basis where the amount to be distributed is less than the value of the victims' losses. Additional exceptions are permitted only in rare situations, such as when pro rata distribution would result in extreme hardship to a victim or when a victim has better evidence of loss than other victims.[7] However, the tracing of a particular victim's funds into a forfeited account does not give that victim priority over the victims whose funds cannot be traced.

### A.4  Trustees

AFMLS may opt to hire a trustee/claims administrator in large, multiple-victim cases to assist in notifying potential victims of the opportunity to seek remission, in processing the petitions, and in making decision recommendations. 28 C.F.R. § 9.9(c). AFMLS will coordinate with the USAO and lead seizing agency during the selection process. In addition, if a trustee has been appointed in parallel regulatory or bankruptcy actions, AFMLS may approve transfer of funds for distribution to the trustee for ultimate payment to the identified victim pool.

USAOs and agencies interested in utilizing the services of a trustee or claims administrator to support the remission and restoration processes are encouraged to consult early with AFMLS. AFMLS awarded a contract to three vendors to provide claims administration support services in cases that will result in forfeited funds being returned to victims through the remission or restoration processes. This national contract simplifies procurement actions, and also streamlines petition review and payment distribution in victim cases where highly experienced and expert firms are required to handle the volume of petitioners.

### A.5  Additional grounds for denial of remission to victims

Remission to victims may be denied: (1) if determination of the pecuniary loss to be paid to individual victims is too difficult; (2) if the amount to be paid to victims is small compared to the expense incurred by the Government in deciding the victims' claims; or (3) if the total number of

---

[6] A federal financial regulatory agency is generally entitled to priority of distribution over non-owner victims for losses and expenses incurred in its capacity as receiver of a failed institution. This priority, codified in the federal regulations at 28 C.F.R. § 9.8(h), is applicable only for reimbursement of the Federal Deposit Insurance Corporation's payments to claimants and creditors of the institution and/or reimbursement of insurance fund losses under 18 U.S.C § 981(e)(3), and for fraud losses associated with the sale of assets held in receivership pursuant to section 981(e)(7).

[7] 28 C.F.R. § 9.8(e).

---

EX 22.05

Chapter 12: Forfeiture and Compensation for Victims of Crime

victims is large and the amount available for payment to victims is so small as to make granting payments to victims impractical. 28 C.F.R. § 9.8(d).

### A.6  Timeliness

Victims should file petitions for judicially forfeited assets generally within 30 days after receiving notice. However, when a victim fails to submit a valid petition within 30 days, exceptions may be allowed for good cause based on the particular circumstances of the case.

## B.  Restoration

In 2002, the Criminal Division issued procedures, known as the Restoration Procedures, designed to simplify and accelerate the return of forfeited property to victims. These procedures apply where (1) both restitution to compensate victims and a related forfeiture (either civil, criminal, or administrative) have been ordered, (2) the victims and amounts listed in the restitution order essentially conform to the victims and amounts that would have been paid through the forfeiture remission process; and (3) other property is not available to satisfy the order of restitution.

The Restoration Procedures enable the Government to complete the forfeiture and recover costs. This permits victims to obtain fair compensation from the forfeited assets, in accordance with the court's restitution order, without having to file petitions for remission with the Government and await decisions on the same. Restoration is a standardized alternative procedure to petitions for remission, designed to accommodate victims and the courts to the furthest extent possible, while still meeting the statutory and regulatory requirements for remission.

### B.1  Background

Because forfeited assets are property of the Government, courts and defendants lack authority to use them to satisfy a defendant's criminal debts, including fines or restitution obligations. *See United States v. Trotter*, 912 F.2d 964 (8th Cir. 1990). In many cases, defendants are left with little or no property after the forfeiture is completed. Thus, prior to the issuance of the Restoration Procedures, the Government often seized property, and then made it available to satisfy court-ordered restitution rather than complete the forfeiture. This process, while cumbersome, worked where the seized assets were cash or bank accounts, and where there were no competing claims for the property. However, where assets needed to be maintained and sold, or where third parties claimed an interest in the property, completion of the forfeiture was necessary, and victims were generally required to take the additional step of filing petitions for remission in order to recover any part of the forfeited assets. Under the Restoration Procedures, the Government may now forfeit property and transfer the proceeds to the court in satisfaction of the defendant's order of restitution. The Attorney General's restoration authority has been delegated to the Chief of AFMLS, pursuant to Attorney General Order No. 2088-97 (June 14, 1997).

### B.2  How the restoration process works

The Restoration Procedures require both a court order of restitution *and* an order (or declaration) of forfeiture. Because restoration decisions must be approved by the Chief of AFMLS (as delegated by the Attorney General), the USAO or court may not unilaterally direct forfeited assets to be applied to restitution. However, the Restoration Procedures allow, when requested by the USAO, preliminary

EX 2206

Chapter 12: Forfeiture and Compensation for Victims of Crime

---

review of the expected restitution and forfeiture order by AFMLS so that AUSAs may advise the court of the Government's intended distribution of the property.

To use the Restoration Procedures, the USAO must send the Chief of AFMLS a copy of the Judgment in a Criminal Case containing the order of restitution and a copy of the forfeiture order, along with a written request signed by the U.S. Attorney, or his or her designee, that includes the representations set forth at Section I.B.3 below. Once the Chief of AFMLS has approved the request for restoration, AFMLS notifies both the USAO and the custodian of the property. The custodian then transfers the net proceeds of the forfeiture to the clerk of court for distribution pursuant to the order of restitution.

Restoration is appropriate only when the distribution pursuant to the restitution order is essentially the same as the distribution that would be obtained through the remission process. Prosecutors wishing to use the Restoration Procedures must work with the seizing agency, probation officer and the court to make sure that the court's restitution order lists the names of all victims and the amount of restitution due to each. Prosecutors also should be cognizant that restitution is generally available for a much broader category of harms than may be satisfied through remission, which is allowed only for pecuniary losses caused by the offense underlying the forfeiture or a related offense. Moreover, 28 C.F.R. § 9.8(b) provides that the victim's loss is limited to the fair market value of the property of which the victim was deprived, as of the date of the loss. No allowance is made for interest forgone, lost profits, or collateral expenses incurred to recover lost property or to seek other recompense. Thus, restoration may not be used where a significant portion of the losses covered by the restitution order relate to bodily harm, property damage, future expenses and collateral expenses such as legal, accounting, or security expenditures incurred in trying to correct the harm caused by the crime. If the restitution order is not amenable to the restoration process, the USAO will be advised and assets may be distributed through the remission process.

### B.3  Representations

The Restoration Procedures are designed to accomplish results that are consistent with the standards that apply to the remission of forfeited assets at 28 C.F.R. § 9.8. In order to ensure that such standards are met, the U.S. Attorney, or his or her designee, must inform AFMLS of the following, in writing and accompanied by a signature, as part of the request for restoration:

- All known victims have been properly notified of the restitution proceedings and are properly accounted for in the restitution order. This representation is intended to ensure that no victims have been left out of the restitution order and that all are treated fairly in the order.

- To the best of the U.S. Attorney's, or designee's, knowledge and belief after consultation with the seizing agency, the losses described in the restitution order have been verified, comport with the remission requirements, and reflect all sources of compensation received by the victims, including returns on investments, interest payments, insurance proceeds, refunds, settlement payments, lawsuit awards, and any other sources of compensation for their losses. This is to avoid double recovery by victims who may already have been compensated for part of their losses.

---

EX 2207

- To the best of the U.S. Attorney's, or designee's, knowledge and belief after consultation with the seizing agency, reasonable efforts to locate additional assets establish that the victims do not have recourse reasonably available to obtain compensation for their losses from other assets, including those owned or controlled by the defendants. This is to ensure that restoration does not confer an undue benefit on the defendant.

- There is no evidence to suggest that any of the victims knowingly contributed to, participated in, benefitted from, or acted in a willfully blind manner, toward the commission of the offenses underlying the forfeiture or a related offense. This is to prevent the return of forfeited property to those who essentially took part in the conduct that led to the forfeiture.

The USAO must ensure that the time for filing an appeal challenging either the restitution order or the forfeiture has passed, or all relevant appeals have been adjudicated, prior to submitting the restoration request to AFMLS.

Because restitution and forfeiture are mandatory and independent parts of a criminal sentence, the forfeited assets may not be used to satisfy the restitution order if other assets are available for that purpose. Typical examples of this situation might involve corporations that have extensive holdings that are not subject to forfeiture, or individuals who have property that exceeds the amount subject to forfeiture. The statutes governing restitution permit the Government to enforce the restitution order as a final judgment against almost all of the defendant's property, not just facilitating property or fraud proceeds that may be subject to forfeiture.

### B.4  Payment

If the assets are to be restored to the victims listed in the restitution order, AFMLS will notify the USAO and property custodian in writing. The custodian will then transfer the net forfeited proceeds to the clerk of court for distribution pursuant to the restitution order. Payments will be made *only* in accordance with the court's restitution order. If the forfeited assets are not sufficient to fully satisfy the order, payment will be made on a pro rata basis, according to the losses listed in the restitution order.

### B.5  Benefits

The Restoration Procedures are intended to assist AUSAs in their use of forfeited assets to compensate victims and to assist victims in their pursuit of compensation. Victims will not need to file petitions for remission, and the process of returning funds to victims will typically be faster. The forfeiture will be completed so that costs can be recovered and third-party rights extinguished. Proceeds from civil, criminal, and administrative forfeitures[8] can be handled together and applied to restitution. Forfeiture AUSAs and agents will get credit for their work, and assets will be distributed primarily as they would have been under the remission regulations.

---

[8] In administrative forfeitures involving TFF member agencies, the USAO must obtain the written concurrence of the local and/or Headquarters TFF seizing agency before AFMLS may approve restoration of forfeited funds for purposes of criminal restitution. *See Guidelines for Treasury Forfeiture Fund Agencies on Refunds Pursuant to Court Orders, Petitions for Remission, or Restoration Requests*, sections VI.B.2.a.ii; VI.B.3.b. Treasury Executive Office for Asset Forfeiture (TEOAF) policy does not permit the release of administratively forfeited funds to crime victims without the prior approval of the TFF seizing agency. *See id.* at section VI.B.2.a.ii.2.

EX 2208

Chapter 12: Forfeiture and Compensation for Victims of Crime

## C.  Special considerations for victims of human trafficking crimes

On May 29, 2015, the Justice for Victims of Trafficking Act was enacted. As a result, 18 U.S.C. § 1594 now directs the Attorney General to pay victim restitution orders in cases where a forfeiture occurs pursuant to section 1594. *See* 18 U.S.C. § 1594(f)(1). Accordingly, AFMLS will process requests from the USAOs in accordance with this new statutory language regardless if the victims' losses are considered "pecuniary" as defined by the relevant remission regulations. If no restitution order exists in cases where a forfeiture occurs pursuant to section 1594, AFMLS will consider petitions for remission that include a claim of lost wages (based on minimum wage) as the victim's pecuniary loss.

However, section 1594 does not allow for innocent owner or lienholder priority in petition for remission cases. *See* 18 U.S.C. § 1594(f)(2). Therefore, the USAO must resolve all outstanding innocent owner and lienholder claims through the judicial forfeiture process.

## D.  Timing

Civil and administrative forfeiture actions can proceed faster than the parallel criminal case. Consequently, assets might be forfeited, equitably shared, placed into official use, or remitted to victims who file petitions long before restitution is ordered, and would not be available for application to the restitution order. To avoid this outcome, the USAO must coordinate with the seizing agency to ensure the retention of property for remission or restoration. In addition, the USAO must place a "hold" on the distribution of seized assets in the Consolidated Assets Tracking System (CATS). If assets are transferred for official use or equitable sharing prior to victim compensation, the transfer may be reversed at the discretion of the Chief of AFMLS or the Director of the Treasury Executive Office for Asset Forfeiture (TEOAF) (for seizures by TFF member agencies) to make the property available for remission or restoration.

Because CATS is not the TFF system of record, the USAO must request that the TFF preserve the asset in cases where restitution may be ordered or where remission or restoration may occur. To ensure the preservation of the forfeited property in judicial cases involving TFF agencies, the USAO must also timely notify and send a copy of the restoration request to the TFF seizing agency. *See Guidelines for Treasury Forfeiture Fund Agencies on Refunds Pursuant to Court Orders, Petitions for Remission, or Restoration Requests*, section VI.B.2.a.i.[9]

## E.  Termination of forfeiture and direct payment of assets to victims

### E.1  Overview

In some situations, it may be preferable for the USAO to move to dismiss the forfeiture proceeding and request the court to direct the property be turned over as restitution directly to the victim pursuant to 18 U.S.C. § 3663A(b)(1)(A), or be transferred to the clerk of court to be paid to the victim. This approach may be preferable to remission or restoration when the victim is entitled to restitution for non-pecuniary harm or other collateral costs that are not compensable under the remission regulations. In addition, termination of forfeiture may be desirable in multiple-victim fraud cases arising in jurisdictions with unfavorable case law concerning constructive trusts. *See* Section II, "Constructive Trusts in Multiple-Victim Fraud Cases," below. Termination of forfeiture is appropriate

---

[9] *Available at* http://www.treasury.gov/resource-center/terrorist-illicit-finance/Asset-Forfeiture/Documents/bluebook.pdf.

Ex 2209

Case 5:25-mc-00030-CBK    Document 203    Filed 11/21/25    Page 25 of 159 PageID #: 218

Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 67 of 71
Chapter 12: Forfeiture and Compensation for Victims of Crime

only if no final order of forfeiture has been entered, as once property is forfeited to the Government, the Attorney General is solely responsible for its disposition. 18 U.S.C. § 982(b)(1) (incorporating 21 U.S.C. § 853(i)). If payment is to be made to the victim through the clerk of court, the property subject to forfeiture must be liquid, as the clerk cannot liquidate real or personal property. For example, the default method of sale to execute a restitution judgment is a sale by the U.S. Marshals Service (USMS) at the courthouse.[10]



### E.2 Is a prosecutor bound, ethically or otherwise, to forego forfeiture in favor of restitution?

Forfeiture and restitution are two separate components of many criminal sentences; both are mandatory upon conviction.[11] In 1996, the Mandatory Victims Restitution Act (MVRA) made restitution mandatory for most federal crimes where a victim suffers a loss. *See* 18 U.S.C. § 3663A(a)(1).[12] If a court orders restitution, it must order full restitution for the victim's loss, regardless of the defendant's ability to pay. *See, e.g., United States v. Battles*, 745 F.3d 436, 460 (10th Cir. 2014) ("The MVRA requires 'the sentencing court [to] order a defendant convicted of a felony through fraud or deceit to pay restitution to the victims of [her] illegal conduct.' *United States v. Parker*, 553 F.3d 1309, 1323 (10th Cir. 2009)"); *United States v. Newman*, 144 F.3d 531 (7th Cir. 1998) ("Under the MVRA, a defendant's financial status is relevant only to fixing a payment schedule for the mandated restitution"). Likewise, courts must order forfeiture when a defendant is convicted of a statute that provides for forfeiture as part of the penalty. *See, e.g.,* 18 U.S.C. § 982: "The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, *shall order* that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." (emphasis added); *United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applie[s]"); *United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014) ("Forfeiture is mandatory even when restitution is also imposed."). Given the mandatory nature of the two components of a sentence, it is entirely appropriate for a defendant to pay both a forfeiture and restitution. *See Blackman*, 746 F.3d at 143; *United States v. Joseph*, 743 F.3d 1350, 1354 (11th Cir. 2014); *United States v. Kalish*, 626 F.3d 165, 169-70 (2d Cir. 2010); *United States v. Carter*, 742 F.3d 440, 447 (9th Cir. 2013); *United States v. Torres*, 703 F.3d 194, 204 (2d Cir. 2012). And defendants have no right to a credit against a restitution order for the amount forfeited. *See United States v. Newman*, 659 F.3d 1235, 1241-43 (9th Cir. 2011) (5th Cir. 2009); *United States v. Pescatore*, 637 F.3d 128, 127 (2d Cir. 2011); *United States v. Alalade*, 204 F.3d 536 (4th Cir. 2000).



The Justice for All Act, 18 U.S.C. § 3771, obligates "officers and employees of the [Department of Justice] and other departments and agencies engaged in the detection, investigation or prosecution of crime [to] make their best efforts to see that crime victims are ... accorded the rights ..." under the act,[13] including the right to full and timely restitution as provided by law. The perceived tension between forfeiture and restitution emerges when, as is often the case, a defendant lacks the financial ability to pay both the forfeiture and restitution. When a defendant lacks the resources to make full restitution, Department of Justice (Department) policy is to collect and marshal assets for the benefit

---

[10] *See* 28 U.S.C. § 3203(g)(1)(A)(i).
[11] *See, e.g.,* 18 U.S.C. § 982(a)(1) and 28 U.S.C. §2461(c); *see also* 18 U.S.C. §3663A (Mandatory Victims Restitution Act).
[12] "Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense ..."
[13] 18 U.S.C. § 3771(c)(1).

EX 2210

Chapter 12: Forfeiture and Compensation for Victims of Crime



of victims using available means.[14] These means include discontinuance of a forfeiture before a final order and asking the court to direct the custodian to turn over "liquid assets" (e.g., assets that do not require a sale to convert the property to cash) to the clerk of court to be applied to restitution; the forfeiture of the defendant's assets and the handling of victim claims through the petition for remission or mitigation process; or the completion of the forfeiture action and the restoration of forfeited assets to victims through a restoration process approved by AFMLS.

At present, there is only a limited ability to restrain assets prior to trial solely for the purpose of restitution.[15] The restraint or seizure mechanisms provided by the asset forfeiture statutes are often the only effective mechanisms to prevent a criminal defendant from dissipating assets prior to sentencing. As there are at least three means whereby restrained or forfeited property may be turned over to victims, there is nothing improper in seeking forfeiture in cases where the prosecutor knows early on that a defendant is unlikely to be able to pay restitution if the assets are forfeited. Restraint and forfeiture do not preclude those same assets from being turned over to victims. Indeed, without the restraint and seizure mechanisms of the forfeiture statutes, a victim has much less chance of ever receiving restitution.

Thus, a prosecutor who uses forfeiture tools as a means to provide remission or restoration of assets to crime victims fulfills any obligation that prosecutor may have under the Justice for All Act to crime victims.[16] Various courts have acknowledged this use of the forfeiture statutes. *See United States v. Kaley*, 134 S.Ct. 1090, 1094 (2014) ("The Government also uses forfeited property to recompense victims of crime ..."); *United States v. Lavin*, 299 F.3d 123 (2d Cir. 2002) (instead of pursuing forfeiture, Government used seized funds to satisfy restitution order); *United States v. O'Connor*, 321 F. Supp. 722 (E.D. Va. 2004) (although defendant has no right to use forfeited funds to satisfy a restitution order, the Government may, pursuant to 21 U.S.C. § 853(i)(1), apply the forfeited funds for benefit of the victims through restoration or remission).

---

[14] *See also* Attorney General's Guidelines for Victim and Witness Assistance, Art. V, Sec. H.2 (rev. May 2012).

[15] Under 18 U.S.C. § 1345(a)(1), the pre-trial restraint of assets is authorized in fraud-type cases, but only in limited circumstances.

[16] Adverse court of appeals decisions in some circuits have made the administrative and civil forfeiture of fraud proceeds impractical in cases that involve large numbers of victims and that must be filed in those circuits. *See* Sec. II.

EX 2211

## F. Comparison of judicial remission and restoration

| Petition for Remission | Restoration |
|---|---|
| There is no need for a criminal conviction of person from whom property is forfeited. Judicial forfeiture orders may be criminal or civil. Seizing agencies decide petition for remission of administratively forfeited assets. | Restoration requires a criminal conviction, an Order of Restitution, and a criminal, civil, or administrative forfeiture which is related to the victim's loss. |
| The USAO, in cooperation with the investigative agency, sends notice to all known victims of the offense underlying the forfeiture. | The USAO works with the investigative agency and probation office to identify victims and determine their losses. |
| In judicial forfeitures, the victim files petition for remission with the USAO. | The victim is not required to file a petition but may be required to submit information to the investigative agency or probation office. |
| The USAO requests the investigative agency to prepare a report and recommendation. The USAO makes a recommendation and forwards the petition package to AFMLS. | The USAO submits a restoration request, including the four required representations, to AFMLS. *See* Section I.B.3 |
| The Attorney General, through AFMLS, reviews the petition and may grant remission to eligible victims. | The Attorney General, through AFMLS, reviews the restoration request and may restore forfeited property to victims identified in the restitution order. |
| The victim must file a petition in order to receive compensation. | The victim must be named in restitution order. "Hybrid" cases with both remission and restoration are generally not acceptable. All forfeited proceeds are turned over to the court for distribution to victims. |
| The custodian of forfeited asset distributes the net proceeds directly to victims. | The custodian of the forfeited asset transfers the net proceeds directly to the clerk of the court. |

## II. Constructive Trusts in Multiple-Victim Fraud Cases

While the courts generally agree that fraud victims do not retain legal title in money paid voluntarily into a fraud scheme, the courts are increasingly recognizing constructive trusts in favor of victims. Under this equitable remedy, the perpetrator of the fraud holds title to the victim's funds in trust for the benefit of the victim. This legal theory is troublesome in forfeiture cases involving multiple victims, because it can transform the forfeiture case into a cumbersome liquidation proceeding in which all victims compete against each other and against the Government for the seized funds. The Government should generally oppose a claim of constructive trust in such cases, so that the Attorney General can return the funds to the victims through the orderly remission process.

In *United States v. $4,224,958.57 (Boylan)*, 392 F.3d 1002 (9th Cir. 2004), the Ninth Circuit held that victims of a large fraudulent investment scheme had established a sufficient legal interest in the seized proceeds through a constructive trust to confer upon them standing to contest the forfeiture. Under this holding, Government attorneys litigating forfeiture cases may be required to identify all potential victims of the fraud, notify them of the forfeiture action, and afford them an opportunity to file claims in the judicial proceeding. A related difficulty is that a constructive trust generally requires a victim to trace his or her money to the seized funds, which may warrant extensive discovery and evidentiary hearings. Some judicial circuits have followed the holding of *Boylan* in forfeiture cases. Government attorneys should therefore consult their circuit's case law in responding to constructive trust claims in

EX 2212

Chapter 12: Forfeiture and Compensation for Victims of Crime

their district. In litigating forfeiture cases in circuits that recognize constructive trusts, Government attorneys may elect to oppose victims' individual claims of constructive trust on the merits, and further argue that recognition of the trust would result in unfair priority to the claimant, contrary to the equitable principles underlying the trust. The courts should also be advised that forfeiture will enable all victims to have the opportunity to recover the funds on the pro rata basis through the Attorney General's remission authority. *See* 28 C.F.R. § 9.8(a)(1) and (e).

EX 2213

FILED IN ZINNEL'S CASE

From: "Khasigian, Kevin (USACAE)" <Kevin.Khasigian@usdoj.gov>
To: Suzanne Luban <lubanlaw@sbcglobal.net>; "Segal, Matthew (USACAE)" <Matthew.Segal@usdoj.gov>; "Hemesath, Audrey (USACAE)" <Audrey.Hemesath@usdoj.gov>
Sent: Wednesday, September 21, 2016 11:09 AM
Subject: RE: sale of Zinnel properties

Suzanne:

The sale of the Luyung Property resulted in net proceeds of $82,608.15, and the sale of 11966 Old Eureka Way netted $41,786.13. The below chart identifies the assets (and net proceeds) forfeited from your client:

| Asset Description | Net Proceeds |
|---|---|
| Vacant land – "The Luyung Property" | $82,608.15 |
| 11966 Old Eureka Way, Gold River | $41,786.13 |
| System 3, Inc. | $2,800,000.00 |
| $65,534.85 First Bank Account | $65,534.85 |
| $53,362.51 Wells Fargo Bank | $53,362.51 |
| Best Build and 3 Checks | $106,312.50 |
| Totals | $3,149,604.14 |

No funds have been applied to restitution or the fine.

The requested closing statements are attached to this email.

--Kevin

EX 2133

DEF.
EX.
106

5:25-mc-30
5:25-mc-31

In addition to the expenses of administration listed above as may be allowed by the Court, priority claims totaling $0.00 must be paid in advance of any dividend to general (unsecured) creditors.

Allowed priority claims are:

| Claim No | Claimant | Allowed Amount of Claim | Interim Payments to Date | Proposed Payment |
|---|---|---|---|---|
| None | | | | |

|  | Total to be paid for priority claims: | $ | 0.00 |
|---|---|---|---|
|  | Remaining balance: | $ | 36,807.67 |

The actual distribution to wage claimants included above, if any, will be the proposed payment less applicable withholding taxes (which will be remitted to the appropriate taxing authorities).

Timely claims of general (unsecured) creditors totaling $ 2,332,913.34 have been allowed and will be paid *pro rata* only after all allowed administrative and priority claims have been paid in full. The timely allowed general (unsecured) dividend is anticipated to be 1.6 percent, plus interest (if applicable).

Timely allowed general (unsecured) claims are as follows:

| Claim No | Claimant | Allowed Amount of Claim | Interim Payments to Date | Proposed Payment |
|---|---|---|---|---|
| 1 | Fog Cutter Services | 10,799.35 | 0.00 | 170.39 |
| 2 | Wells Fargo Card Services | 8,506.17 | 0.00 | 134.21 |
| 4 | TRAVELERS CASUALTY AND SURETY COMPANY | 3,026.48 | 0.00 | 47.75 |
| 5 | Arrow Financial Services LLC | 141.50 | 0.00 | 2.23 |
| 6 | MBNA Amercia Bank | 3,641.15 | 0.00 | 57.45 |
| 7 | General Insurance Company Of America | 1,100,780.12 | 0.00 | 17,367.62 |
| 8 | First National Insurance Company of America | 723,344.55 | 0.00 | 11,412.61 |
| 9 | Safeco Insurance Comapny of America | 7,622.43 | 0.00 | 120.26 |
| 10 | The Travelers Indemnity Company | 461,417.59 | 0.00 | 7,280.04 |
| 11 | Michelle Zinnel | 13,634.00 | 0.00 | 215.11 |

|  | Total to be paid for timely general unsecured claims: | $ | 36,807.67 |
|---|---|---|---|
|  | Remaining balance: | $ | 0.00 |

**UST Form 101-7-NFR (10/1/2010)**

EX 2141.

038206    80104038244024    5:25-mc-30
5:25-mc-31

Refused



**DEF. EX. 107**

**FILED**

DEC 05 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
　　　　　DEPUTY CLERK

STEVEN ZINNEL, USM #66138-097
Federal Correctional Institution,
Terminal Island
PO Box 3007
San Pedro, CA  90733-3007

Defendant, In Pro Se

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## (SACRAMENTO)

| UNITED STATES OF AMERICA | Case No. 2:11-cr-234-TLN |
|---|---|
| Plaintiff, | DEFENDANT STEVEN ZINNEL'S NOTICE OF MOTION AND MOTION TO |
| vs. | (1) ENFORCE JUDGMENT |
| STEVEN ZINNEL, | (2) HOLD PLAINTIFF AND ITS ATTORNEYS IN CIVIL CONTEMPT |
| Defendant. | (3) MOTION FOR ORDER DIRECTING THE BOP TO STOP TAKING $25.00 QUARTER FROM ZINNEL TO APPLY TO RESTITUTION |

(4) MOTION FOR ORDER DIRECTING THE BOP, COURT CLERK, AND/OR PLAINTIFF TO RETURN THE $325 THAT HAS BEEN TAKEN FROM ZINNEL AT THE RATE OF $25.00 QUARTER SINCE HE WAS REMANDED INTO THE CUSTODY OF THE BOP

(5) MOTION DIRECTING PLAINTIFF TO PERSONALLY SERVE DEFENDANT STEVEN ZINNEL WITH ANY PAPERS PRIOR TO COURT-FILING IN THIS CASE

(6) MOTION TO EXTEND DUE DATE OF DEFENDANT'S TIME TO ACT BY 14 DAYS

(7) MOTION FOR ORDER ISSUED TO THE BOP DIRECTING ZINNEL TO APPEAR BY TELEPHONE AT THE HEARING

(8) MOTION FOR ACCURATE ACCOUNT OF FUNDS PLAINTIFF HAS MARSHALED

[filed concurrently with defendant's Motion to Recuse District Court Judge Troy L. Nunley from presiding over any further proceedings in this case and motion for case reassignment to a new District Court Judge]

Date:　　　　December 14, 2017
Time:　　　　9:30 A.M.
Judge:　　　Hon. Troy L. Nunley
CtRm:　　　#2
　　　　　　　[subject to change]

EX 2151　　　　Page 1

5:25-mc-30
5:25-mc-31


DEF.
EX.
108

TO THE HONORABLE COURT, PLAINTIFF UNITED STATES OF AMERICA, ITS ATTORNEYS MATTHEW D. SEGAL, AUDREY B. HEMESATH, KEVIN C. KHASIGIAN, PHILLIP A. TALBERT, U.S. ATTORNEY GENERAL JEFFERSON SESSIONS, THE U.S. DEPARTMENT OF JUSTICE, DEFENDANT DERIAN EIDSON BY AND THROUGH HER ATTORNEY BECKY S. JAMES, ANY PERSON OR ENTITY THAT HAS APPEARED IN THE ABOVE-CAPTIONED CASE, JUDGMENT RESTITUTION RECIPIENTS ZAC ZINNEL AND ZAYNA ZINNEL, AND ANY OTHER INTERESTED PERSON:

PLEASE TAKE NOTICE that on December 14, 2017 at 9:30 AM, or as soon thereafter as this matter may be heard in the above-entitled Court for hearing, Defendant Steven Zinnel ("Defendant" or "Zinnel"), in pro se, will and hereby does move the Court to (1) Enforce its Judgment; (2) Hold Plaintiff United States of America and its attorneys in Civil Contempt, (3) for an order directing the BOP to stop deducting $25.00 quarter from Zinnel to apply to restitution (4) for an order directing the BOP, court clerk, and/or Plaintiff to return the $325.00 that has been taken from Zinnel at the rate of $25.00 quarter since he was remanded into the custody of the BOP (5) Direct Plaintiff to personally serve defendant Steven Zinnel with any papers, PRIOR to court-filing, in this case going forward, (6) motion to extend due date of defendant's time to act by fourteen (14) days, (7) motion for order issued to the BOP directing Zinnel to appear by telephone at the hearing, and (8) motion for accurate account of funds plaintiff has marshaled ("Motion"). The hearing is currently set in Courtroom #2 of the United States Courthouse located at 501 I Street, Sacramento, CA 95814 before the Honorable Troy L. Nunley (subject to change with judge reassignment).

The Motion should be granted for many compelling reasons. The grounds for this Motion are: The court has the inherent power to enforce its judgments. Contempt is one method of enforcing its judgment. There is currently a valid enforceable Judgment in this criminal case. The Plaintiff and its attorneys are aware of the Judgment. Plaintiff and its attorneys can comply with the Judgment because Plaintiff has marshaled, and is holding more than enough funds, to pay out the restitution ordered in the Judgment. Plaintiff and its attorneys are willfully not paying out the money they are holding as ordered by the Judgment. Plaintiff and its attorneys have violated the court order memorialized into a Judgment in the above-captioned case. The violation demonstrably fell short of substantial compliance with the Judgment. The violation was not based on a good faith and reasonable interpretation of the order. Thus, it is Plaintiff and its attorneys that are actually spiteful in this case not Zinnel. Since Plaintiff is sitting on more than enough money to satisfy the Judgment restitution and the entire Judgment is not being complied with, the court should order the BOP to stop deducting $25.00 a quarter from Zinnel and order the return of the $325.00 that has been deducted thus far from Zinnel.



EX 2152

Page 2

Case 5:25-mc-00030-CBK    Document 203    Filed 11/21/25    Page 33 of 159 PageID #: 226

Case 2:21-mc-00098-TLN-AC   Document 20   Filed 05/03/21   Page 25 of 31

Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 23 of 71
Case 2:11-cr-00234-TLN   Document 409   Filed 12/05/17   Page 3 of 237

PLEASE TAKE FURTHER NOTICE that Zinnel has concurrently filed with this Motion a Motion to Recuse District Judge Troy L. Nunley from presiding over any further proceedings in the above-captioned case including the instant Motion. Zinnel objects to Judge Troy L. Nunley deciding this motion and/or presiding over any further proceedings in the above-captioned case. Thus, the presiding Judge, Courtroom, Date, and Time may change when a new Judge is assigned to the above-captioned case. When a new Judge is assigned, either the Court or Zinnel will give notice of any changes.

PLEASE TAKE FURTHER NOTICE that because Zinnel is currently unjustly incarcerated in federal prison, not a participant in the court's CM/ECF system, and subject to institution change at any time without notice by the Bureau of Prisons ("BOP"), Zinnel further moves the court for an order directing Plaintiff and its attorneys to cause Zinnel to be personally served with any papers, including any opposition to this Motion, PRIOR to filing the papers with the court, at the BOP institution Zinnel is actually at when Plaintiff's papers/opposition are ready to be filed with the court. Prior to filing with the court, Plaintiff and its attorneys can email or fax any papers to be filed with the court, including any opposition to this Motion, to the BOP institution Zinnel is incarcerated within, so he can be personally served by a BOP staff member with any legal papers.

PLEASE TAKE FURTHER NOTICE, that Zinnel moves the court to issue an order to Plaintiff and its attorneys requiring them to concurrently file with the court a Certificate of Service reflecting that Zinnel was personally served with their papers, including any opposition to this Motion, before filing any papers and/or opposition with the court utilizing the CM/ECF system.

PLEASE TAKE FURTHER NOTICE, that Zinnel moves the court to be personally served with any and all court orders in the above-captioned case going forward which could be accomplished by ordering Plaintiff and its attorneys to personally serve Zinnel with a Notice of Entry of Order.

PLEASE TAKE FURTHER NOTICE that because Zinnel is currently unjustly incarcerated in federal prison and subject to institution change at any time, without notice by the BOP, Zinnel further moves the court for an order extending his deadline to act in this case by fourteen (14) calendar days to allow Zinnel sufficient time to review documents, perform legal research, draft any papers, and file any papers with the court by U.S. Mail. Per Local Rule 430.1(d), the Plaintiff's and its attorneys' opposition, if any, is due within seven (7) days of this filing and Zinnel's Reply will be due on the date prescribed by the court.

EX21 53                                    Page 3

PLEASE TAKE FURTHER NOTICE, because Zinnel is unjustly incarcerated, he is unable to personally attend the hearing. Therefore, Zinnel moves the court to appear by telephone at the hearing. Zinnel requests that the court provide him with written notice of a telephone number to call in on. Due to the constant and continuous Obstruction of Justice by the BOP in the form of not allowing Zinnel to participate at court hearings by telephone, preventing Zinnel from performing legal research, and preventing Zinnel from complying with court orders, Zinnel moves this court to issue an order to the Federal Bureau of Prisons and FCI Terminal Island's Warden Felicia Ponce directing the BOP and Warden Ponce to allow Zinnel to use an institution staff telephone on the date and time of the hearing so Zinnel can appear by telephone at the hearing, under the court's supervisory powers to prevent obstruction of its proceedings.

Should the court require Zinnel's physical appearance at the hearing, Zinnel requests that the court appoint the Federal Defender's Office to represent Zinnel at the hearing and Zinnel waives his physical appearance at the hearing.

Zinnel moves the court for a transcript of the hearing and if any portion of this Motion is denied, that the court's clerk be ordered to file a Notice of Appeal to the Court of Appeals for the Ninth Circuit on Zinnel's behalf.

This Motion is based on this notice, the concurrently filed memorandum of points and authorities, declaration of Steven Zinnel, index of attached exhibits, objection to Judge Troy L. Nunley from deciding this Motion, the records of this case, and any oral argument permitted at the hearing on the Motion.

Dated: October 31, 2017

Steven Zinnel
Defendant in pro se

EX 2154

STEVEN ZINNEL, USM#66138-097
Federal Correctional Institution,
Terminal Island
PO Box 3007
San Pedro, CA   90733- 3007

Defendant, Pro Se

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

(SACRAMENTO)

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 2:11-cr-234-TLN |
| Plaintiff, | **DEFENDANT STEVEN ZINNEL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE JUDGMENT AND HOLD PLAINTIFF AND ITS ATTORNEYS IN CONTEMPT** |
| vs. | |
| STEVEN ZINNEL, | |
| Defendant. | |

Date:    December 14, 2017
Time:    9:30 AM
Judge:   Hon. Troy L. Nunley
CtRm:    #2
         [subject to change]

INTRODUCTION

This motion seeks to enforce the District Court's Amended Judgment filed on May 30, 2014 in United States of America v. Steven Zinnel, U.S.D.C. ED CA case no 2:11-cr-00234 TLN ("Judgment") and hold Plaintiff United States of America and its attorneys in civil contempt for violating the court's Judgment. Plaintiff and its attorneys are willfully refusing to pay money to the recipients specified in the Judgment, even though Plaintiff United States has marshaled well in excess of the money specified to be paid in the Judgment.

Steven Zinnel ("Zinnel") was convicted of bankruptcy fraud and money laundering by a jury on July 16, 2013. The offending government lawyers immediately sought to take the Zinnel Family Home and a one acre industrial dirt lot and sell them. Zinnel agreed, subject to when his convictions and the government's claimed "victims" are reversed on appeal as Zinnel expects, to a restitution amount of $2,513,319.00. Zinnel's SOLE reason he agreed to restitution pending the outcome of his appeal, was to provide his two then high school-attending children $150,000.00 each so they had money for college. Zinnel did file a motion to stop the sale of the two unique pieces

EX 2155                                    Page 1



of real estate pending the outcome of Zinnel's appeal of his convictions and the forfeiture of the property. The government's three offending lawyers strongly opposed Zinnel's motion representing to the court that the government wanted to immediately pay the people listed in the Judgment, which includes Zinnel's children, Zac and Zayna Zinnel, who are court-ordered to receive $150,000.00 each that can be used to pay for their college education. The offending government attorneys wrote in their opposition in relevant part:

> "The only way that [Zinnel] would be prejudiced by forfeiture and liquidation of these assets would be that they could generate funds that the Attorney General could in his discretion direct to Zinnel's victims (including his ex-wife). Zinnel's SPITE is a sentencing factor, not a basis for a motion to stay."

Based on the offending government lawyers' misrepresentations, bald-faced lies to Judge Troy L. Nunley, the court denied Zinnel's motion. Since Zinnel's convictions the offending government attorneys and the court of consistently taken the position at hearings and court filings that Zinnel will not get any relief on appeal and thus his convictions, sentence, and restitution will stand on appeal.

Despite representing to the court by lying that the real estate was expensive to maintain, it took the government almost three years after conviction to sell the real estate. In a September 21, 2016 email by an offending government lawyer, it was represented to Zinnel's attorney that the government had collected $3,149,604.14 from forfeiture of assets, but no funds had been paid to any restitution recipient. Therefore the government is illegally holding $3,149,604.14 in cash, but refuses to comply with a valid court order and pay Zinnel's children Zac and Zayna Zinnel, now ages 20 and 18, respectively, $150,000.00 each so they have money for college.

The court is certainly enforcing its Judgment pending appeal against Zinnel by locking him up in prison for over four years and taking $25.00 every three months from Zinnel to pay the court-ordered $2,513,319.00 in restitution. Therefore, contrary to the offending government lawyers' disingenuous statements, it is evident that in fact the three government lawyers are SPITEFUL. The offending government lawyers opposed Zinnel's motion to stop the sale of property by representing to the court that they intended to pay the alleged victims. The government has been sitting on millions of dollars, more than enough to pay everyone, for a long time, while making representations to the court that Zinnel will not win on appeal. However, the offending government lawyers will not pay any of the court-ordered money to Zinnel's children or his ex-wife.

Zinnel is quite confident that because of the government lawyers' cheating and trying to win at all costs and the plethora of reversible errors made by Judge Troy L. Nunley during his first federal trial, ALL of Zinnel's convictions and the restitution order will be reversed on appeal. However, based on the Judgment temporarily in place, the enforcement of portions of the Judgment (i.e. locking Zinnel up and taking $25 every three months

EX 2156

from him), and the offending government lawyers' position that Zinnel will not win on appeal, this motion to enforce ALL portions of the court's Judgment and motion to hold the offending government lawyers in civil contempt of court for their willful refusal to obey a court order naturally follows.

BACKGROUND

This motion arises out of a federal criminal bankruptcy fraud case that went horribly wrong. Steven Zinnel ("Zinnel") is now 53, a father of two, highly educated including a MBA, was a holder of many professionally licenses, serial entrepreneur, and was the Chief Executive Officer of a hold company that owned various businesses including several large electrical contractors. As a result of his position and businesses, Zinnel personally guaranteed corporate construction bonds decades ago. Zinnel's wife at the time, Michelle Zinnel, also personally guaranteed the corporate construction bonds. In 2001, Enron's unprecedented massive fraud was exposed along with its top executives' many federal crimes. (see Zinnel declaration paragraphs 8 -13.) Also in 2001 Enron filed bankruptcy. This resulted in Enron's non-payment to Zinnel's electrical contractors, which in turn caused bond claims in 2002 on the corporate construction bonds that Mr. and Mrs. Zinnel had personally guaranteed during the marriage which ended in 1999 as a result of Michelle Zinnel's extramarital affair. After Mr. and Mrs. Zinnel defended themselves against the bonding companies' lawsuits against them for there yeas. they both threw in the towel and both filed bankruptcy. Mrs. Zinnel filed personal bankruptcy in January 2005 and Mr. Zinnel followed six months later filing bankruptcy in July 2005.

The bankruptcy scheduled Zinnel filed in in his bankruptcy case in August 2005, contained a "Schedule F. Creditors holding Unsecured Nonpriority Claims." Every singe creditor the government claims is a "victim" in Zinnel's Criminal Case was disputed by him on his bankruptcy schedules. In Zinnel's Reply Brief on appeal, Zinnel reproduced relevant portions of his bankruptcy schedules that reflects all debts were disputed. (see Zinnel. decl. para. 14 and Exhibit A). In Zinnel's underlying bankruptcy case, no determination was ever made that a single disputed debt on Zinnel's bankruptcy schedules was valid. (see Zinnel decl. para. 15). Both of the Zinnels' bankruptcy estates were closed by September 2006 with the bankruptcy estates fully administered.

The criminal case began based on a tip to the FBI from Mr. Zinnel's unfaithful, greedy, and vindictive ex-wife Michelle Zinnel. Based on information Michelle Zinnel provided the FBI, the government agents

EX 2157                               Page 3

found a business associate of Mr. Zinnel's, Tom Wilbert and his wife Julia, who engaged in criminal conduct, i.e. bank fraud, wire fraud, mail fraud, insurance fraud, money laundering, obstruction of justice, perjury, and tax evasion, and promised the Wilberts non-prosecution if they would advance the government's fantasy theory of bankruptcy fraud against Mr. Zinnel and collaterally Ms. Eidson. The government lawyers then staged a sting operation under the guise of confidential protected settlement negotiations in a law office conference room and circumvented that confidentiality by including attendance as those negotiations in indictment charges and as evidence at trial, even though no settlement was reached and no money changed hands.

For a more comprehensive Background, please refer to the concurrently filed Index of Attached Exhibits ("EXHIBITS") Exhibits Z and Y. In order to aid the court, parties, and the recipients of this Motion, Zinnel prepared a Definitions document to define the words, terms, and abbreviations used in this Motion (Zinnel decl. para. 4, Exhibit AA).

Mr. Zinnel was indicted for bankruptcy fraud and money laundering in June 8, 2001 which was 90 days before the five-year statute of limitations would have expired. Trial started on July 1, 2013 before Judge Troy L. Nunley who was presiding over his first trial as a newly appointed federal judge. The prosecuting lawyers created fictional theories for which they had no evidence such as "Zinnel faked his financial death," Zinnel's motive was to file bankruptcy to dodge paying child support," "Zinnel created shell companies," and Zinnel concealed millions of dollars worth of property from his bankruptcy estate. It is noteworthy that child support is not dischargeable in bankruptcy as a matter of law. See 11 U.S.C. 523(a)(15). The offending government lawyers began the case talking about child support. However, as the testimony developed, the jury and the court learned that Zinnel had not avoided any child support at any time, that child support is not dischargeable in bankruptcy, and that Zinnel has never been charged with filing a false income and expense declaration. (see Zinnel decl. para. 21 and Exhibit B).

During the trial, the Wilberts delivered what the offending government lawyers wanted. The Wilberts not only sang, but they composed as well by their lies under oath while testifying as witnesses at the trial. The government lawyers suborned perjury by allowing their witnesses to commit perjury. Further, the offending government lawyers allowed an attorney named Frank Radoslovich to testify wherein he admitted under oath that he lied to attorney Eidson during the confidential settlement negotiations in his law office conference room that were secretly recorded by the FBI. Neither Zinnel or Eidson testified at trial and no

EX 2158

new facts came out at trial.

Zinnel was convicted by a jury of bankruptcy fraud and money laundering on July 16, 2016 (ECF # 219) (see Zinnel decl. para. 22). The offending government lawyers immediately sought to take the Zinnel Family Home and a one acre industrial dirt lot via forfeiture and sell them. (ECF # 237). Zinnel agreed, subject to when his convictions and the government's claimed "victims" are reversed on appeal as Zinnel expects, to a restitution amount of $2,513,319.00. Zinnel's SOLE reason he agreed to restitution pending the outcome of his appeal, was to provide his two then high school-attending children $150,000.00 each so they had money for college. (Zinnel decl. para. 16 & 17, Index of Attached Exhibits ("EXHIBITS")Exhibits M & N).

Zinnel did file a motion to stop the sale of the two unique pieces of real estate pending the outcome of Zinnel's appeal of his convictions and the forfeiture of the property. (ECF #309). One of the reasons for the motion to stop the sale was when the convictions and forfeiture are reversed on appeal, the unique real estate could have been returned by the government to its pre-judgment owners. The government's three offending lawyers strongly opposed Zinnel's motion representing to the court that the government wanted to immediately pay the people listed in the Judgment, which included Zinnel's children, Zac and Zayna Zinnel, who are court-ordered to receive $150,000.00 each that can be used to pay for their college education. (Exhibit C)

Zinnel agreed, subject to when his convictions and the government's claimed "victims" are reversed on appeal as Zinnel expects, to a restitution amount of $2,513,319.00. Zinnel's SOLE reason he agreed to restitution pending the outcome of his appeal, was to provide his two then high school-attending children $150,000.00 each so they had money for college. (see Zinnel decl. para. 16 & 17, Exhibits M & N). Zinnel did file a motion to stop the sale of the two unique piece of real estate pending the outcome of Zinnel's appeal of his convictions and forfeiture of the property. (ECF #309). One of the reasons for the motion to stop the sale was when the convictions and forfeiture of the property are reversed on appeal, the unique real estate could have been returned by the government to its pre-judgment owners. The government's three lawyers strongly opposed Zinnel's motion representing to the court that the government wanted to immediately pay the people listed in the Judgment, which includes Zinnel's children, Zac and Zayna Zinnel, who are court-ordered to receive $150,000.00 each that can be used to

EX 2159

Page 5

pay for their college education. (Exhibit C, ECF # 314). The offending three government attorneys wrote in their opposition in relevant part:

"The only way that [Zinnel] would be prejudiced by forfeiture and liquidation of these assets would be that the could generate funds that the Attorney General could in his discretion direct to Zinnel's victims (including his ex-wife). Zinnel's SPITE is a sentencing factor, not a basis for a motion to stay." (Exhibit C, 1:22-25, ECF #314, 1:22-25).

The three offending government lawyers also represented to the court that the stay should be denied because Zinnel has a "very low likelihood of success on an appeal." (Exhibit C, 2:1-2, ECF #314, 2:1-2).

In opposing Zinnel's motion to stop the sale, the three offending government lawyers and an IRS Special Agent lied to Judge Troy L. Nunley and IRS Special Agent Jason Lamb committed perjury in his declaration. The lies and perjury are contained in the documents filed by the three offending government lawyers on March 3, 2014 (ECF #314 &314-1) and reproduced in the concurrently filed Exhibits C and D.

IRS Special Agent Jason Lamb declared under penalty of perjury that the was familiar with "the criminal investigation of Steven Zinnel" and the "VACANT land know as 'The Luyung Property' ...APN: 072-0450-015." (Exhibit D, 2:7-11, ECF #314-1, 2:7-11). IRS Special Agent Lamb also declared under penalty of perjury that the Luyung Property was going to cost $11,527.84 annually to maintain (Exhibit D, 2:27-28, ECF #314-1, 2:27-28) with the costs broken down as follows:

| | |
|---|---|
| Utilities | $1,100.00 |
| lawn/Pool Maintenance | $1,400.00 |
| Property Management Fee | $4,200.00 |
| Security Company Monitoring/Response | $1,920.00 |
| Property Taxes | $2,907.84 |
| Total Estimated Annual Costs | $8,279.84 [sic] |

[the above figures correctly add up to $11,527.84]

(Exhibit D, 3:1-5, ECF #314-1, 3:1-5)

However, on March 3, 2014, the date IRS Special Agent Jason Lamb signed the declaration and the three offending government lawyers filed the declaration with the court, the Luyung Property had always been a one acre dirt lot with no utilities, lawn, pool, tenants living on the property, or need for security monitoring. (Zinnel decl. para. 30 & Exhibit E satellite picture).

EX 2160

Zinnel has prepared a comprehensive Prosecutorial Misconduct Complaint where he fulfills his duty under 18 U.S.C. 4 to inform the Court, the Department of Justice's Office of Professional Responsibility, the State Bar of California, the media, and others of AUSAs Matthew Segal's, Audrey Hemesath's, and Kevin Khasigian's misrepresentations (bald-faced lies) to the courts and media. Exhibits Y & Z are the cover letter and background Zinnel sent to the Department of Justice's, Office of Professional Responsibility (Zinnel decl. para. 33 & 34). Exhibits I & J are the Prosecutorial Misconduct Claims concerning the perjury of IRS Special Agent Jason Lamb and the suborning of that perjury by the three offending government attorneys (Zinnel decl. para. 36 & 30).

Under Rule 11, AUSAs Matthew Segal, Audrey Hemesath, and Kevin Khasigian certified that IRS Special Agent Jason Lamb's declaration was true and had evidentiary support which it obviously does not.

In opposing Zinnel's motion to stop the sale, AUSAs Matthew Segal, Audrey Hemesath, and Kevin Khasigian lied to Judge Nunley again when they wrote: "Under oath in family court..., Zinnel has never claimed ownership of the Luyung Property [APN #072-0450-015]." (Exhibit C, 4:19-5:1, ECF #314, 4:19-5:1). In fact, as the government knows because the evidence was filed in Zinnel's Criminal Case BY THE GOVERNMENT, in his divorce, Zinnel disclosed the Luyung Property, APN #072-0450-015, in a Schedule of Assets and Debts dated April 26, 2000 (Exhibit F, Zinnel decl. para. 37), in a letter dated December 12, 2001 (Exhibit F, Zinnel decl. para. 37), the divorce Judgment awarded the Luyung Property to Zinnel (Exhibit G, Zinnel decl. para. 38), and in connection with the divorce, Michelle Zinnel transferred her interest in the Luyung Property to Zinnel. (Exhibit H, Zinnel decl. para. 39). Exhibit K is the Prosecutorial Misconduct Claim concerning the lies to Judge Nunley by AUSAs Segal, Hemesath, and Khasigian regarding the divorce disclosure of the Luyung Property.

Under Rule 11, AUSAs Mathew Segal, Audrey Hemesath, and Kevin Khasigian certified that their court-filed opposition was true and had evidentiary support which it obviously does not.

EX 2161

Based on Judge Nunley reliance on the offending government lawyers' misrepresentations, bald-faced lies, the court denied Zinnel's motion. At the court hearing denying Zinnel's motion, Judge Nunley stated:

"The government cites, as its most powerful argument, that the defendant Zinnel is very unlikely to win on appeal." (Exhibit L, 4:17-19)

"The government further argues that...Zinnel...has never claimed ownership of...the Luyung Property." (Exhibit L, 4:23-5:10)

"The government notes that the property is expensive to maintain as asserted in the declaration accompanying the government's paper filed by the IRS special agent, Jason Lamb." (Exhibit I, 5:2-5)

"I'm going to deny the request to stay these proceedings."
(Exhibit L, 5:14-15)

Later on in the March 4, 2014 sentencing proceedings, offending government lawyer AUSA Matthew Segal represented to the court, with Zinnel's ex-wife, Michelle Zinnel, her boyfriend, and parents attending, that "the government is getting a check for Zinnel's [alleged] interest in System 3 [for $2.8 million]." (Zinnel decl. para. 22, Exhibit P). On May 30, 2014, Judge Nunley signed and filed an Amended Judgment in a Criminal Case ("Judgment"). (Zinnel decl. para. 18, Exhibit O, ECF #386). The Judgment orders the Stipulated Restitution on the bankruptcy fraud convicts in the amount of $2,513,319. (Zinnel decl. para. 19, Exhibit O, ECF #386.) In addition to the Judgment, on September 20, 2013, the court entered a Preliminary Order of Forfeiture that also included a money judgment in favor of the United States in the amount of $1,297,158.20 which the government alleges was the proceeds of the money laundering offenses for which Zinnel was convicted. (Zinnel decl. para. 20, ECF #253).

On June 23, 2016 in opposing a bail motion, the offending government lawyers filed an opposition representing to the court that the defendants will lose their appeal. (Exhibit U, ECF 399). At the bail hearing on June 30, 2016, Judge Nunley again pre-judged and found that there is no likelihood of reversal on appeal. (Exhibit V). In the United States' Answering Brief filed in Zinnel's appeal on February 23, 2017, the three offending government "convictions should be affirmed." (Exhibit W). Therefore, the offending government lawyers and Judge Nunley have repeatedly taken the position over the last four years that Zinnel will not prevail on appeal. Thus,

EX 2162

there is no permissible reason for Plaintiff United States of America, by and through it attorneys, not to pay Zinnel's children $150,000.00 each so they can pay for their hard-earned college education.

Zinnel's son Zac Zinnel graduated from high school in June 2015 with a cumulative high school weighted GPA of 4.39 and a class ranking of 23 out of 400 students. In June 2016, Zinnel's daughter Zayna Zinnel graduated from high school with a weighted GPA of around 3.47. Their dad, Steven Zinnel, is so proud of his children. Zinnel's goal since his children were born was that they attend the four-year university of their choice upon graduation from high school and build life-long relationships by joining a fraternity/sorority. Again, that was the SOLE reason their dad agreed to restitution in the Criminal Case in 2014 was to provide his children each $150,000.00 for college. Zinnel believed this was assured, when the three government lawyers represented in their court-filing on March 3, 2014 that they wanted to get all the "victims" paid and they vehemently opposed Zinnel's motion to stop the sale of two pieces of property.

Zinnel was dismayed to receive, two years later after the government lawyers' representations to the court and him, an email from his daughter on April 11, 2016 informing her dad that (1) she did not have any money for college, (2) her dream was to go to Sonoma State, (3) her mom wants her to go to Sonoma State, (4) she wants to join a sorority, and (5) she needs $25,000 a year in order to attend Sonoma State. Zayna pleaded for her dad's help. Zayna poured her heart out in the email telling her dad she cries often because she does not have the money to go to college. Zayna told her dad she worked hard to have the grades and extracurricular activities to go to the modest college of her choice. Zinnel responded by emailing Zayna that she and her brother should have received $150,000.00 each for college from the Criminal Case.

Zinnel asked his daughter to check with Dawn Akel, who is the trustee of her college trust (see Exhibit O, Judgment page 7), to verify that the $150,000.00 was sitting in trust available for her to use for college when she turned 18 on November 19, 2016. After some period of time, Zayna responded that she understands "that the money is tied up in Washington" and she does not have any money on deposit in trust. This was news to Zinnel, as three offending government lawyers represented

Page 9

EX 2163

to Judge Nunley that they wanted to get the "victims" paid and in the same document called Zinnel "spiteful" for their perceived delay.

Because of the new information, on July 6, 2016, three years after conviction, Zinnel' wrote the three government lawyers demanding an accounting of the restitution disbursed by the Attorney General. (Zinnel decl. para. 42. Exhibit Q). Zinnel reminded the government lawyers of their representation to the court that they wanted to get their "manufactured victims" paid. Further, Zinnel informed the government lawyers that under USDC ED CA Local Rule 180(e), California Business and Professions Code 6068(d), (f), & (g), ABA Model Rules 3.3(a)(1), 4.1(a), & 8.4(c), and F.R.C.P. Rule 11, it is a violation to mislead a court. (Exhibit Q, p. 1). Moreover, Zinnel reminded the three government lawyers that they called him spiteful and government lawyer Matthew Segal represented to the court on March 4, 2014 that the government was getting a check for $2.8 million. (Exhibit Q, p. 1). Zinnel sought confirmation from the government lawyers that they in fact caused all the recipients in the Judgment to be paid in full. Zinnel also requested an accounting of the sales proceeds of the real property sales. Zinnel received no response form the government lawyers to his July 6, 2016 letter.

Zinnel learned two months later, that despite representing to the court by lying that the real estate was expensive to maintain, it took the government almost three years after conviction to sell the Zinnel Family Home located at 11966 Old Eureka Way, Gold River, CA 95670 and the Luyung Lot, APN 072-0450-015. (Exhibit S & T). According to the Seller's Settlement Statements, provided by the government lawyers after Zinnel's repeated requests for an accounting, the government did not sell the Luyung Lot, the one acre industrial dirt lot, until March 29, 2016 (Exhibit T) and the government did not sell the Zinnel Family Home until June 9, 2016. (Exhibit S). In an email by a government lawyer sent on September 21, 2016 to Zinnel's lawyer, the government lawyer represented to Zinnel's attorney that the government had collected $3,149,604.14 from the forfeiture of assets, but no funds had been paid to any restitution recipients. (Zinnel decl. para. 23, Exhibit R). Therefore, the government is illegally holding $3,149,604.14 in cash, but refuses to comply with a valid court order and pay Zinnel's children Zac and Zayna Zinnel, now ages 20 and 18, respectively, $150,000.00 each so they have money for college. (Zinnel decl. para. 24).

EX 2164

The court is certainly enforcing its Judgment pending appeal against Zinnel by locking him up in prison for over four years and taking $25.00 every three months from Zinnel to pay the $2,513,319.00 in restitution. Zac is now in his third year of college and Zayna is now in her second. Zinnel's children are struggling to pay for college and associated costs and even though they academically qualified, neither were able to go to the college of their choice because of financial reasons. Therefore, contrary to the government lawyers' disingenuous statements, it is evident that the three offending government lawyers are the ones SPITEFUL as they opposed Zinnel's Motion to stop the sale of property by representing to the court that they intended to pay the alleged victims, yet the government has been sitting on millions of dollars, more than enough to pay everyone, for a long time, while making representations to the court that Zinnel will not win on appeal. However, the government lawyers will not pay any of the court-ordered money to Zinnel's children or ex-wife. Further, Judge Troy L. Nunley has condoned the government lawyers' bad conduct by letting them violate his order with impunity.

Zinnel is quite confident because of the offending government lawyers cheating and trying to win at all costs, and the plethora of reversible errors ALL of Zinnel's convictions and the restitution order will be reversed on appeal. However, based on the Judgment temporarily in place, the enforcement of portions of the Judgment (i.e. locking Zinnel up and taking $25.00 every three months from him), and the government lawyers' unwavering position that Zinnel will not win on appeal and they want to pay the manufactured "victims," this motion to enforce ALL portions of the court's Judgment and motion to hold the government lawyers in civil contempt of court for their willful refusal to obey a court order naturally follows.

One of the three offending government lawyers' most egregious manufactured "victims" is Zinnel's ex-wife Michelle Zinnel. For sentencing enhancement purposes, by Michelle Zinnel claiming she is a "victim" in Zinnel's Criminal Case and the government lawyers perpetuating the lie, Zinnel is currently sentenced to an additional 3.5 years in federal prison. At the time of conviction, Michelle Zinnel had been Zinnel's ex-wife for 13 years and Zinnel was only married to Michelle Zinnel for 6.2 years. The marriage ended, because Michelle Zinnel was unfaithful with her girlfriend's husband, secretly filed for divorce, and abandon the Zinnel Family Home

EX 2165

with Zac and Zayna when Zinnel was out of town for New Years on December 31, 1999.

At the time Zinnel's criminal trial started, Zinnel was completely current on child support and the equitable division of marital assets had been stipulated by a marital settlement agreement made into a judgment eleven years earlier on April 8, 2002. (Exhibit G). This was confirmed at trial. (Zinnel decl. para. 21, Exhibit B).

In her continuing battle to extract money from Zinnel, while represented by attorney Anthony Gilly, Michelle Zinnel coped part of Zinnel's mom's confidential patient file from Gold River Dental and attempted to submit those documents to the Family Law court as am exhibit during a long-cause evidentiary proceeding. (Zinnel decl. para. 43, Exhibit CC). Zinnel's mom sent a first letter only to Michelle Zinnel's dentist employer on October 1, 2005, that was copied to Michelle Zinnel, regarding an unlawful disclosure of confidential medical records by Michelle Zinnel. The letter was not responded to. (Exhibit CC, p. 2). Because of no response, on December 19, 2005 Zinnel's mom sent a second letter to the U.S. Department of Health and Human Services ("HHS") and the dentist, that was also copied to Michelle Zinnel (Zinnel decl. para. 43, Exhibit CC). In her letter, Zinnel's mom explained that a portion of her medical records were taken from Dr. Cripe's dental office by Michelle Zinnel without Zinnel's mom's knowledge or authorization. Zinnel's mom learned that Dr. Cripe's dental hygienist, Michelle Zinnel, made a copy of a portion of her confidential records in order to file them with the Family Law court in Michelle Zinnel's continuing family law battle to extract money from her son Steven Zinnel, thereby making them public record. (Exhibit CC, p. 2, para. 1). Zinnel's mom wrote that her understanding was that The Health Insurance Portability & Accountability Act of 1996 ("HIPAA") was a federal program that requires that all medical records and other individual identifiable health information used or disclosed to a healthcare provider in any form are to be kept confidential. (Exhibit CC, p.2, para. 5). Zinnel's mom ended the letter requesting that the HHS office investigate and take all actions the Department deemed appropriate as a result of Dr. Cripe and his dental hygienist Michelle Zinnel's violations of her privacy. (Exhibit CC, p. 3, para 3). No one responded to either of Zinnel's mom's letters.

Contrary to what the offending government lawyers AUSA Matthew D. Segal, AUSA Audrey Hemesath, and AUSA Kevin Khasigian wrote in the United States' Sentencing Memorandum

EX 216E

(CR 306), Steven Zinnel HAS NOT called the FBI and ask that the FBI investigate his ex-wife Michelle Zinnel. (Zinnel decl. para. 44). In 2006, Zinnel did return a phone call from FBI Agent Laura Jones who called him and left a message. (Zinnel decl. para. 44.) Zinnel called agent Jones back, as requested by HER. Agent Jones informed Zinnel she was investigating a HIPPA violation of Michelle Zinnel and had some questions for me which I answered (Zinnel decl. para. 44). The phone call between Agent Jones and Zinnel was short.

In a publically filed document in the Criminal Case (CR 310), filed by the government lawyers, the FBI confirmed in a FBI 302 report dated November 20, 2006 that the case involving the HIPAA violation by Michelle Zinnel "was initiated by the Sacramento Division of the FBI on July 7, 2006 in reference to an HHS/OIG [Health and Human Service] referral, set out in electronic communication 209-HQ-1517272-HIPPA serial 78, regarding a Health Insurance Portability and Accountability Act (HIPPA) violation." (Exhibit DD). The government also provided the FBI 302 report to Zinnel in discovery as Bates Number ZBK037053 & ZBK037052. The FBI 302 report confirms that the FBI was notified of Michelle Zinnel's HIPPA violation by the government agency Health and Human Services, and not by a phone call from Zinnel to the FBI. Further, the FBI 302 report confirms that Michelle Zinnel was already cooperating with the the FBI before the HHS referral to the FBI, that Michelle Zinnel signed a confession (the government lawyers refused Zinnel's request to be provided with a copy of confession before trial (Zinnel decl. para. 45)), and that AUSA Matthew Segal declined to prosecute the HIPPA violation. (Exhibit DD).

I have prepared a Prosecutorial Misconduct Claim concerning the totally FALSE representation to the court and the media by AUSA Matthew Segal and AUSA Audrey Hemesath that "Zinnel was so overcome by spite that in 2006...Zinnel contacted the FBI to ask them to investigate his ex-wife." (Exhibit EE, Zinnel decl. para. 46). The government lawyers misrepresentations to the court are contained in the government's Sentencing Memorandum (CR 306, p. 4:7-9, p. 6:9-14) and the government's Press Release Issued on March 4, 2014 within hours of Zinnel's record-setting sentencing. (Exhibit FF). The Press Release falsely and maliciously claims: "the investigation began with Zinnel's call to the FBI asking that the FBI investigate [his ex-wife]." (Exhibit FF, Zinnel decl. para. 47 ). On March 5, 2014, plagiarizing

EX 2167

Page 13

the government lawyers' Sentencing Memorandum and Press Release, repeated word for word that Zinnel's motive was to avoid paying child support and that Zinnel called the FBI to have them investigate his ex-wife. (Exhibit GG, Zinnel decl. para. 48). The same false representations to the court and the public by government lawyers AUSA Mathew Segal and AUSA Audrey Hemesath are repeated ad nauseam on the internet. (Exhibits HH, Zinnel delc,. para. 49). It appears the only internet postings that got the true story and facts mostly right is Forbes Magazine. (Exhibit I I & J J).

The United States Internal Revenue Service ("IRS") surprisingly of all government organizations tracks and posts Bankruptcy Fraud cases and sentences on their web site (Zinnel decl. para. 52). On their website, the IRS posted information about Zinnel's Criminal Case including Zinnel being sentenced to 212 months in prison and the maximum $500,000.00 fine. (Exhibit KK, Zinnel decl. para. 52). On their website, the IRS also posted an almost identical bankruptcy fraud case of a Virginia Businessman being sentenced six (6) days after Zinnel to thirty (30) months in prison which dramatically demonstrates the unwarranted sentencing disparity the government lawyers asked for and Judge Nunley erroneously imposed. (Exhibit KK, Zinnel decl. para. 52).

Zinnel prepared numerous Prosecutorial Misconduct Claims concerning material representations to the District Court and the Court of Appeals for the Ninth Circuit made by Assistant United States Attorneys ("AUSA") Matthew D. Segal, Audrey B, Hemesath, and Kevin C. Khasigian. (Exhibits LL, MM, NN, OO, Zinnel decl. paras. 54, 55, 56, 57). Zinnel including supporting documentation that evidences the misrepresentations, bald-faced lies, to the court made by AUSA Segal, AUSA Hemesath, and AUSA Khasigian. (Exhibits PP, QQ, E, F, G, H, L, CC, DD, FF,& HH, Zinnel decl. paras. 58, 59, 30, 37, 38, 39, 41, 43, 45, 47, 49).

AUSA Segal, Hemesath, and Khasigian also supported lies by their manufactured "victim" Michelle Zinnel who is Zinnel's ex-wife Zinnel unfortunately married over twenty-four years ago. The Zinnels were only married for 6.2 years. (Exhibit G, p. 2, BS 6023, lines 7-10). The marriage dissolved because of Michelle Zinnel's extramarital affair with her girlfriend's husband. At the time of convictions in this Criminal Case on July 16, 2013, Michelle Zinnel had been Zinnel's ex-wife for around 13 years (Exhibit G, p.2, BS 6023, lines 7-10). On July 16, 2013, the date of the convictions, Zinnel was current on child support (Zinnel decl. para. 63) and the

EX 2168                              Page 14

equitable division of marital assets had been settled by a stipulated marital settlement agreement made into a judgment eleven years earlier on April 8, 2002. (Exhibit G).

Under the Mandatory Victim Restitution Act, Michelle Zinnel is not a victim in this Criminal Case. This is an issue on appeal. Nevertheless, undoubtedly encouraged by AUSA Matthew Segal, on September 27, 2013, Michelle Zinnel made a Claim for Restitution under penalty of perjury in the amount of $242,671.00 (Exhibit RR, Zinnel decl. para. 60). Michelle Zinnel derived at the low six figure claim amount by claiming $199,996 in additional child support on top of the tens thousands of dollars she has previously received from Zinnel and $12,700 for a judgment she does not own because the identified judgment, if valid, was part of her own bankruptcy estate because the judgment was issued prior to Michelle Zinnel filing bankruptcy in January 2005; six months before Zinnel. Further, the $30,000 in claimed legal fees are contrary to the divorce judgment that orders each party shall pay their own attorneys fees and costs (Exhibit G, p. 9, BS 6026 lines 19-20). Michelle Zinnel summarized her claims by writing: "This request is reasonable and needed for the children to receive justice for Mr. Zinnel's crimes."

On January 11, 2014, Michelle Zinnel supersized her claim by 2.6 times by submitting a second Claim for Restitution under penalty of perjury in the amount of $644,511.50. (Exhibit SS, Zinnel decl. para. 61). Michelle Zinnel's 85 page claim included the $242,671 from the first claim, but illegally added $402,968 for assets that were awarded to Steven Zinnel by the family law court in the divorce judgment (Exhibit G). Michelle Zinnel also added a claim for $8,872.50 for future children's health insurance for the next 39 months.

After Zinnel received a record-setting prison sentence and supervised release of 7,544 days for bankruptcy fraud (Exhibits BB & O), longer than Zinnel's children had been alive at the time, on March 17, 2014, Michelle Zinnel submitted a massive third Claim for Restitution under penalty of perjury in the amount of $1,039,739.00 consisting of 155 pages. (Exhibit TT, Zinnel decl. para. 62). Evidently, Michelle Zinnel wanted to be paid by the page. Michelle Zinnel's million dollar claim was 1.6 times her second claim a mere two months earlier and 4.3 times her first claim made six months earlier. In her third submission, Michelle Zinnel included all her claims in submissions 1 and 2, including improper consequential expenses, but

EX 2169

increased her claim of "unpaid child support" from $199,966 to $238,687. Further Michelle Zinnel piled on $14,394 for future child support, $32,767 for future children's health insurance that she represented covered the children's health insurance for "four (4) years after they turn 18." Michelle Zinnel piled on $10,268 for lost wages, $1,760 for counseling, and $26,488 for "the replacement cost of the vehicle Mr. Zinnel stole from me." Zinnel also knows that the one vehicle Steven and Michelle Zinnel owned when Michelle abandoned the Zinnel Family home in December 1999 and filed for divorce, was with Steven Zinnel when he was out-of-town, and that vehicle was awarded to Steven Zinnel in the divorce judgment of the Sacramento Superior Court. (Zinnel decl. para. 62).

It is noteworthy that Steven Zinnel is unaware of any police report Michelle Zinnel has ever made for a "stolen vehicle" nor is Steven Zinnel aware of any insurance claim made by Michelle Zinnel for a "stolen vehicle." (Zinnel decl. para. 62). Steven Zinnel knows that he has never been charged with steeling a vehicle. (Zinnel decl. para. 62). Nevertheless, Zinnel is surprised that government prosecutors AUSA Segal and AUSA Hemesath in their relentless drive to win at all costs, including cheating, did not allege a stolen vehicle in the federal indictment or try to further enflame the jury and judge at Zinnel's trial or sentencing by claiming Zinnel stole a vehicle.

Michelle Zinnel capstoned her submission by claiming $264,743 in family law attorneys' fees that already been decreed in the family court's judgment that she must bare herself alone. (Exhibit G, p. 9, BS 6026, lines 19-20).

Because Zinnel and his attorney knew Michelle Zinnel had made false statements under penalty of perjury in her Claims for Restitution, perjury that was suborned by ASUA Matthew Segal and AUSA Audrey Hemesath, as identified above and in Exhibits RR, SS, & TT, and Zinnel and his attorney's legal position that Michelle Zinnel was not a valid victim at all in Zinnel's Criminal Case under well-settled law, Zinnel's attorney objected to Michelle Zinnel being heard as Zinnel's sentencing on March 4, 2014 (Zinnel decl. para. 64). When Michelle Zinnel's advocate, Plaintiff United States' government attorney AUSA Matthew D. Segal, called his one and "only victim," Michelle Zinnel to testify, Zinnel's attorney objected on the grounds that Michelle Zinnel was not a valid victim" and requested to cross-examine Michelle Zinnel

EX 2170

Page 16

because "Every one of the items she asks for restitution on is contrary to a document either that she signed or that the court ordered from the family law court or is otherwise unfounded." (Exhibit UU, Zinnel decl. para. 64). Zinnel's attorney informed the court that she had a significant amount of questions for Michelle Zinnel. Judge Nunley made reversible error when he denied Zinnel's attorney's request.

MASS INCARCERATION IN AMERICA IS CAUSED IN PART, BE VENGEFUL, CHEATING, AND UNETHICAL PROSECUTORS SUCH AS AUSA MATTHEW D. SEGAL, AUDREY B. HEMESATH, AND KEVIN C. KHASIGIAN WHO THUS FAR, REMAIN UNCHECKED BY THE DOJ, STATE BAR, OR JUDGES

The United Sates purports to be the land of the free, but by far incarcerates more of its citizens, for longer periods of time, than any other nation on the planet. In support of this indisputable fact, Zinnel directs the court, and all those who read this, to Zinnel's case background contained in the concurrently filed Exhibits as Exhibit Z, pages 8 and 9.

Zinnel is not the only one rattling the cage. In a new book, "Locked In" by Fordham law professor John F. Pfaff, the author writes that mass incarceration is one of the biggest social problems the United States faces today. Professor Pfaff has a simple explanation for what makes the madness of American Incarceration: prosecutors. He explains that prosecutors are political creatures, who get political rewards for locking people up. Contained in Exhibit X is a story that appeared in "The New Yorker" on mass incarceration and the book "Locked In."

Equally disturbing is the cold hard fact that U.S. Department of Justice federal prosecutors give corporate wrongdoers a hall pass and do not charge them for massive financial frauds.

Federal prosecutors have filed no criminal indictment against major bank or senior bankers related to the mortgage crisis. As Jesse Eisinger, a reporter for ProPublica explains in his new book "The Chickenshit Club: Why the Justice Department Fails to Prosecute Executives," that the Financial Crisis Inquiry Commission referred dozens of cases to prosecutors, but there were no indictments, no trials no jail time. Under Exhibit V V, is a copy of an article that appeared in "The New Yorker" entitled "Limited Liability; Why don't corporate wrongdoers get charged?"

Ex 2171

Another example of DOJ prosecutors not going after big fish, even though they relentlessly go after small fish utilizing "Win at all Costs" prosecution tactics as they have done with Zinnel and Derian Eidson, is the case of General Motors ("GM"). Under Exhibit W W is an article entitled "GM Hides Defect that Killed 124 People, but No One Goes to Prison." The article begins with "NOT ONE EXECUTIVE OR EMPLOYEE OF General Motors Corporation will face jail time despite an admission by the company that it concealed an ignition switch defect that resulted in the deaths of at least 124 people and injured hundreds more." Georgia attorney Lance Cooper is quoted in the article stating: "Unfortunately, it's the same sad story. If you have enough power and money, you can always buy your way out of truly being held accountable." The article also quotes U.S. District Court Judge Emmet Sullivan of Washington DC calling the Department of Justice settlement with GM "a shocking example of potentially culpable individuals not being criminally charged." In an unrelated case involving bribery by government contractors, Judge Sullivan cited the GM settlement as "sweetheart deals" between federal prosecutors and large private corporations. (Exhibit W W citing United States v. Saena Tech Corp. 140 F.Supp.3d 11 (D.DC, 2015)). Judge Sullivan further opined in U.S. v. Saena Tech Corp. Id., "Despite the fact that the reprehensible conduct of its employees resulted in the deaths of many people, the agreement, merely imposes on GM an independent monitor to review and assess policies, practices, and procedures relating to GM's safety-related statements." In one of Judge Sullivan's forceful statements, that is on-point with Zinnel's criminal prosecution, Judge Sullivan wrote:

"[T]he court is disappointed that deferred prosecution agreements or other similar tools are not being used to provide the same opportunity to individual defendants to demonstrate their rehabilitation without triggering the devastating collateral consequences of a criminal conviction."

In stark contrast, Steven Zinnel and Derian Edison were prosecuted, remanded into county jail, and sentenced to prison as if they were repeats violent offenders, drug cartel, mafia, or bigger than this nations biggest financial fraudsters. In this case, no one was killed, disfigured, raped, assaulted, had their innocence stolen, poisoned by drugs, had their identity stolen, or had their house burned down. In this case, there was no trust abused, no loss of someone's livelihood, no psychological scars, no violence, no loss of reputation no life irreparably scared, no life changing

EX2172                              Page 18

event, or no life destroyed except for Zinnel's and Eidson's. Simply said, Zinnel and Eidson have unlawfully and unjustly lost their reputations, freedom, family, friends, future, life, life savings, and livelihoods.

The prison sentences and maximum fine in this case are far beyond the norm for the offenses of conviction. Something is wrong in Denmark; The convictions and record-setting draconian sentences "strike as more than probably wrong, they strike as wrong with the force of a five-week old unrefrigerated dead fish." U.S. v. Bussell, 504 F.3d 956, 962 (CA 9, 2007). Government lawyer AUSA Matthew D. Segal made a big deal in the government's Sentencing Memorandum (CR 306) that Zinnel told his son Zac on the phone his first day in jail ever, that "daddy got railroaded." Zinnel's appeal and this motion exposes how prophetic Zinnel's words were as he was "railroaded" by the Reading, Pennsylvania, B&O, and Short Line.

**KEY LAW**

**A. ENFORCING JUDGMENTS**

A federal court has the inherent power to enforce its judgments. Peacock v. Thomas, 516 U.S. 349, 356 (1996). A federal court has the authority to enforce its money judgment in accordance with the practice and procedure of the state in which it sits. Fed. R. Civ. Pro. 69(a); Paul Revere Ins. Grp. v,. U.S., 500 F.3d 957, 960 (9 CA, 2007). Civil contempt is one method of enforcing a judgment. Shillitani v. United States, 384 U.S. 367, 370 (1966). ("Courts have inherent power to enforce compliance with their lawful orders through civil contempt."); Fed. R. Civ. P. 70(a) and (e) ("If a judgment requires a party to...perform any specific act and the party fails to comply within the time specified, the court may...hold the disobedient party in contempt.")

**B. CIVIL CONTEMPT**

Civil contempt is a coercive tool. Int'l Union, United Mine Workers v. Bagwell, 512 U.S. 821, 828 (1994). As Zinnel's trial judge, the Honorable Troy L. Nunley, now knows, because he was recently reversed on appeal in In re: SK Foods, L.P., 2017 U.S. App. Lexis 12648 (9 CA, July 14, 2017), "The standard for finding a party in civil contempt is well settled:

EX 2173

The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." Id. citing FTC v. Affordable Media, 179 F.3d 1228, 1239 (9 CA, 1999). The seminal case in the Ninth Circuit regarding civil contempt is In re Dual-Deck Video Cassette Recorder Antitrust Litigation, 10 F.3d 693, 695 (9 CA, 1993) which holds: "Civil contempt consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." The party's failure to comply need not be willful. In Re Crystal Palace Gambling Hall, Inc., 817 F.2d 1361, 1365 (9th CA, 1987).

To succeed on a motion for contempt, a moving party must show by clear and convincing evidence that (1) the alleged contemptors violated the court order, (2) the violation demonstrably fell short of substantial compliance with the court order, and (3) the violation was no based on a good faith and reasonable interpretation of the order. Wolferd Glassblowing Company v. Vanbragt, 118 F.3d 1320, 1322 (9 CA, 1997). Generally, a violation is shown by the party's "failure to take all reasonable steps within the party's power to comply." Reno Air Racing Ass'n., Inc. v. McCord, 452 F.3d 1126, 1130 (9 CA , 2006).

C. SANCTIONS FOR CIVIL CONTEMPT

Should a court find a party in contempt, it has discretion in deciding whether to impose sanctions. Distributors Association, 2009 U.S. Dist. Lexis 133036 (citing Shillitani v. United States, 384 U.S. 364, 370 (1966)). Sanctions for civil contempt are imposed to coerce compliance with a court order. United States v. United Mine Workers of America, 330 U.S. 258, 303-04 (1947). Coercive sanctions take into account the "character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction." General Signal Corp., v. Donallco, Inc. 787 F.2d 1376, 1380 (9 CA, 1985). If a court finds coercive sanctions appropriate, it may order the contemnor to pay sanctions to the court or order contemnor incarcerated until he has substantially complied with the court's order. SEC v. Elmas Trading Corp., 824 F.2d 732, 732-33 (9 CA, 1987).

EX 2174

D. CRIMINAL CONTEMPT AND CRIMINAL OBSTRUCTION OF COURT ORDERS

The court may choose to consider criminal contempt and/or referral of the matter to a special prosecutor for a violation of obstruction of a court order.

1. Civil v. Criminal Contempt

As the Supreme Court has recognized, "whether a contempt is civil or criminal turns on the character and purpose of the sanction involved." Bagwell, 512 U.S. at 827. As a general rule, civil contempt is imposed "to compel compliance with an order of the court." Cobell v. Norton, 334 F.3d 112, 1145 (D.C. CA, 2003). "By contrast, criminal contempt is used to punish, that is, to vindicate the authority of the court following a transgression rather than compel future compliance. Id. at 1145.

2. Obstruction of Court Orders

Obstruction of court orders codified, in 18 U.S.C. 1509, states in relevant part that "whoever... willfully prevents, obstructs, impedes, or interferes with...the due exercise of rights or performance of duties under an order, judgment, or decree of a court of the United States, shall be fined under this title or imprisoned not more than one year, or both." To convict for violation of 18 U.S.C. 1509, evidence must be introduced from which it can be inferred that the defendant(s) had actual knowledge of existence of a court order at the time of his alleged activities. Further, the defendants must have intent for there to be requisite intentional obstruction of justice. U.S. v. Griffin, 525 F.2d 710 (1 CA, 1976).

ex 2175

ARGUMENT

I. THE DISTRICT COURT SHOULD ENFORCE ALL PORTIONS OF ITS JUDGMENT OR NONE

On May 30, 2014, this Court issued and filed an Amended Judgment in a Criminal Case ("Judgment") that orders in relevant part: Zinnel imprisoned for 212 months (17.67 years) for bankruptcy fraud, Zinnel's children shall receive $150,000.00 each in restitution, total restitution is $2,513,319.00, and Zinnel while incarcerated is to pay restitution at the rate of $25.00 per quarter through the Bureau of Prisons Inmate Responsibility Program. (Exhibit O, Zinnel decl. paras. 16, 17, 18, 19). The court is enforcing PART of its Judgment as Zinnel has been in prison for 52 months, a fourth of his draconian prison sentence, and the Bureau of Prisons is taking $25.00 per quarter from Zinnel. (Zinnel decl. para. 3). Therefore, the court must either enforce ALL of its Judgment and order Plaintiff to pay the victims they represented to the court March 3 & 4, 2014 they wanted to pay right away, OR the court must enforce NONE of its Judgment and immediately release Zinnel and Derian Eldson and stop the $25.00 per quarter from being deducted and refund the the $325.00 that has been deducted from Zinnel to date. Equity, Fairness, and Justice demands this.

II. PLAINTIFF AND ITS ATTORNEYS SHOULD BE HELD IN CIVIL CONTEMPT TO COERCE COMPLIANCE WITH THE COURT'S JUDGMENT

A. PLAINTIFF AND ITS ATTORNEYS HAVE VIOLATED A COURT ORDER

Turning to the elements that must be established before an contempt order issues, based on the facts detailed in the preceding Background, Declaration of Zinnel, and the Index of Attached Exhibits ("Exhibits"), Zinnel has established by clear and convincing evidence that Plaintiff and its attorneys have violated an order of the court; to wit the Judgment. There is currently a valid and enforceable Judgment in this Criminal Case. (Exhibit O). The Plaintiff and its attorneys are aware of the order as they were in court when the order was made and because they are participants to the court's CM/ECF system, they received written notice of the filed order electronically via the court's CM/ECF system. Plaintiff and its attorneys can comply with the Judgment because Plaintiff has marshaled, and is holding more than enough money (Exhibit R), to pay out the restitution ordered in the Judgment. (Exhibit O, p. 8).

EX 2176

Case 5:25-mc-00030-CBK    Document 203    Filed 11/21/25    Page 57 of 159 PageID #: 250

Case 2:11-cr-00234-TLN  Document 586-4  Filed 02/21/19  Page 47 of 71
Case 2:11-cr-00234-TLN  Document 409  Filed 12/05/17  Page 29 of 237

Plaintiff and its attorneys are willfully not paying out the money as its attorneys have represented to the court that they want to pay the victims, called Zinnel spiteful for filing a motion to stay the sale of property pending appeal (Exhibit C, p. 1), and Plaintiff and its attorneys are holding $3,149,604.14 in cash (Exhibit R), but are refusing to pay the $2,513,319.00 court-ordered restitution, which includes $300,000.00 to be paid to Zinnel's children. (Exhibits Q & R).

However, a party's failure to comply need not be willful. In Re Crystal Palace Gambling Hall, 817 F.2d 1361, 1365 (9 CA, 1987). Plaintiff and its attorneys have violated the court order memorialized into a Judgment in the above-captioned case. (Exhibit O, Q, & R). The violation was not based on good faith or a reasonable interpretation of the order, because Plaintiff and its attorneys have taken the position many times in court that Zinnel will not prevail on appeal (Exhibits C, L, & U), Plaintiff wants to pay the alleged "victims" (Exhibit C, p. 1), and Plaintiff and its attorneys have represented to Zinnel and his attorney that Plaintiff has marshaled significantly more funds, $3,149,604.00 (Exhibits R & P, Zinnel decl. paras. 22 & 23 ), than the $2,513,318.00 ordered in the Judgment (Exhibit O).

The Judgment is clear that the restitution ordered is $2,513,316.00 and Zinnel's children are to receive $150,000.00 each forthwith. (Exhibit O, pgs. 7 & 8). Thus, the Judgment is not subject to any other reasonable interpretation. As a result, the court must find that defendant Zinnel has met his burden to establish clear and convincing evidence that Plaintiff and its attorneys have violated the Judgment (Exhibit O). The court must further find that Plaintiff and its attorneys have not taken reasonable steps to comply with the Judgment and compliance is easily possible as Plaintiff is sitting on millions of dollars of other people's money.

B. PLAINTIFF AND ITS ATTORNEYS HAVE NOT COMPLIED WITH THE JUDGMENT

Generally, a violation is shown by the party's "failure to take all reasonable steps within the party's power to comply." Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1130 (9 CA, 2006). Here, by Plaintiff's and its own attorneys admissions, Plaintiff has not taken all reasonable steps to comply as Plaintiff has marshaled $3,149,604.14, but for over three yeas now, refuses to pay

EX 217.7

a single dollar out to any of the restitution recipients including Zinnel's children so they have money to go to college. (Zinnel decl. para. 23 and Exhibit R).

C. THE COURT SHOULD ISSUE COERCIVE SANCTIONS TO FORCE COMPLIANCE

Sanctions for civil contempt should be imposed to coerce compliance with the Judgment. United States v. United Mine Workers, supra. at 303-04. The court has a choice to order Plaintiff and its attorneys to pay monetary sanctions to the court or the restitution recipients. Zinnel requests that the court order Plaintiff and its attorneys to pay Zinnel's children Zac and Zayna Zinnel each $41.00 dollars a day for each day they have not been in compliance with the Judgment. Zinnel calculated the $41.00 by multiply $150,000.00 times ten (10) percent interest and dividing by 365 days. As Plaintiff's lawyer AUSA Matthew D. Segal represented to the Court at Zinnel's sentencing on March 4, 2014 that "the government is getting a check for Zinnel's interest in System 3. That's 2.8 million dollars that we're getting," Plaintiff and its lawyers had the ability to instantly comply with the the May 30, 2014 Judgment (Exhibit O). Plaintiff's attorney AUSA Kevin Khasigian confirmed in an email that Plaintiff and its attorneys did indeed receive $2.8 million dollars as AUSA Segal represented to the Court. As of October 31, 2017, 1,277 days have gone by since the the May 30, 2014 Judgment and Zinnel has spent over two million minutes in prison with the enforcement of that portion of the court's order, thus the court should order Plaintiff and its attorneys to pay Zinnel's children $104,714.00 (2 X $41 X 1,277 days) for all the days the Plaintiff and its attorneys have spitefully refused to pay restitution to Zinnel's children. Further, the court should order Plaintiff and its attorneys to pay Zinnel's children $82.00 per day from October 31, 2017 forward until they comply with the Judgment as a coercive sanction as Zinnel's quoted law allows.

EX 217.8

Case 5:25-mc-00030-CBK    Document 203    Filed 11/21/25    Page 59 of 159 PageID #: 252

Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 49 of 71
Case 2:11-cr-00234-TLN   Document 409   Filed 12/05/17   Page 31 of 237

**D. THE COURT SHOULD CONSIDER WARNING PLAINTIFF AND ITS ATTORNEYS THAT IF COMPLIANCE IS NOT ACHIEVED BY JANUARY 30, 2018, THE COURT WILL CONSIDER CRIMINAL CONTEMPT TO PUNISH PLAINTIFF AND ITS ATTORNEYS AND VINDICATE THE COURT'S AUTHORITY**

As Zinnel has cited, case law and 18 U.S.C. 1509 (Obstruction of Court Orders) gives the court authority to punish via criminal contempt. Zinnel requests that Plaintiff and its attorneys be ordered to give notice to the court and Zinnel when they pay the restitution plus interest which includes paying Zinnel's children. If the Plaintiff and its attorneys do not give notice by January 30, 2018, the court should issue an Order to Show Cause re Criminal Contempt.

**III. THE COURT SHOULD ORDER THE BOP TO STOP DEDUCTING $25.00 PER QUARTER FROM ZINNEL AND ORDER THAT THE $325.00 THAT HAS BEEN TAKEN FROM ZINNEL BY THE BOP BE RETURNED**

Plaintiff United States and its attorneys are sitting on $3,149,604.14 in cash (Exhibit R), but refuse to comply with a valid court order to pay $2,513,319.00 (Exhibit O). Plaintiff is currently holding $636,285.14 in excess funds. From his mandatory prison job, Zinnel is currently paid $1.08 per month by the BOP for digging through trash to recycle cans, plastic bottles, cardboard, and paper. Therefore, Zinnel has gone from Chief Executive Officer to unjustly incarcerated trash digger. Even though with Amendment 782, Drugs - 2, the BOP's total inmate population has decreased by 13%, Terminal Island's inmate population has increased by 25% during the same time period. Currently Terminal Island is at maximum capacity of 1,208 inmates without a single bed open. In fact, new arrivals, including self-surrenders, immediately go to the SHU for several weeks where they are locked in a cell 23 hours a day and handcuffed every time they leave their concrete box. Because every inmate has to have a job, Terminal Island staff claim because of budget cuts, they can only pay Zinnel $1.08 per month. Even though the government attorneys have marshaled $3,149,604.14, way more than they need to pay their manufactured victims, Zinnel has $8.33 taken each month to pay the $25.00 per quarter. Therefore, the court should order the BOP to stop deducting $25.00 per quarter from Zinnel and order that the $325.00 that has been previously taken from Zinnel be returned to him.

EX2179

Page 25

IV. THE COURT SHOULD ORDER PLAINTIFF AND ITS ATTORNEYS TO PERSONALLY SERVE STEVEN ZINNEL WITH ANY DOCUMENTS THEY INTEND TO FILE WITH THE COURT, PRIOR TO FILING WITH THE COURT, AND EXTEND THE DUE DATE OF ZINNEL'S RESPONSE FROM THIS POINT ON IN THIS CASE

Zinnel is incarcerated and has been for 52 months. (Zinnel decl. para. 3). Therefore, Zinnel is subject to being moved by the BOP from one institution to another at anytime. This can result in Zinnel being "on the road" for weeks on end. Zinnel currently represents himself in pro se in this case. Therefore, with this motion, Zinnel seeks an order form the court directing Plaintiff, or any other case participant, to personally serve Zinnel with any documents PRIOR to filing them with the court. Further, Zinnel requests an order that Plaintiff, or any other case participant, concurrently file a Certificate of Service evidencing that Zinnel was personally served with documents before filing them with the court. Zinnel also requests an order that Plaintiff personally serve Zinnel with any orders issued in this case going forward and file a Notice of Entry of Order with the court and personally serve the Notice on Zinnel. Moreover, Zinnel

EX 2| 8.0

## V. THE COURT SHOULD ORDER PLAINTIFF AND ITS ATTORNEY TO PROVIDE AN ACCURATE ACCOUNT OF THE FUNDS PLAINTIFF HAS MARSHALED

After repeated written requests and over three years after conviction, Plaintiff's counsel finally provided an accounting, although inaccurate, of the $3,149,604.14 in funds Plaintiff has marshaled to pay the $2,513,319.00 in restitution (Exhibits R, S, & T). The inaccuracy in the account is that AUSA Kevin Khasigian's September 21, 2016 email to Zinnel's attorney erroneously states that the Zinnel Family home located at 11966 Old Eureka Way, Gold River netted "$41,786.13" in proceeds. (Exhibit R). However, the Seller's Settlement Statement for the Zinnel Family Home located at 11966 Old Eureka Way, Gold River that AUSA Khasigian concurrently emailed Zinnel's attorney details that the "Buyer paid directly to Seller (Plaintiff United States) $50,900 and at close of escrow received Seller Proceeds of $23,485.45. (Exhibit S). Thus, the Seller's Statement from the title company evidences that Plaintiff United States received $74,385.45 ($50,900 + $23,485.45) for the sale of the Zinnel Family Home. However, AUSA Khasigian's email only shows a $41,786.13 with no explanation for the $32,599.32 discrepancy. Therefore, the court should grant Zinnel's motion that the government provide an accurate accounting of funds along with all backup/supporting documentation by January 30, 2018 and provide notice to the court that it has done so.

Dated: October 3\, 2017

Steven Zinnel
Defendant, in pro se

PHILLIP A. TALBERT
Acting United States Attorney
LYNN TRINKA ERNCE
KURT A. DIDIER
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: |
| Plaintiff, | APPLICATION FOR WRIT OF CONTINUING GARNISHMENT (BANK, IRA, STOCKS OR BROKERAGE ACCOUNTS) |
| v. | |
| STEVEN ZINNEL, | Criminal Case No.: 2:11-cr-00234-TLN |
| Defendant and Judgment Debtor. | |
| TD AMERITRADE CLEARING, INC., (and its Successors and Assignees) | |
| Garnishee. | |

The United States submits this Application for Continuing Writ of Garnishment for the issuance of the Writ of Continuing Garnishment and Clerk's Notice and Instructions to Judgment Debtor. These documents are being filed pursuant to 28 U.S.C. § 3004(c), which permits the United States to serve documents effecting a post-judgment remedy on a debtor "[a]t such time as counsel for the United States deems appropriate, but not later than the time a pre-judgment or post-judgment remedy is put into effect under this chapter, . . . ."

The United States, in accordance with the Federal Debt Collection Procedures Act of 1990 ("FDCPA"), 28 U.S.C. § 3205(b)(1), requests that the Clerk of the United States District Court issue a Writ of Continuing Garnishment (Bank, IRA, Stocks or Brokerage Accounts), against any and all

APPLICATION FOR WRIT OF CONTINUING GARNISHMENT                                    1

**DEF. EX. 111**

5-25-mc-30
5-25-mc-31

property or accounts identified below, in which defendant Steven Zinnel (also known as "Defendant" and "Judgment Debtor") has an interest. Upon information and belief, Zinnel has an interest in a bank, IRA, stock or brokerage account(s) and property as defined in 28 U.S.C. § 3002(12), that are in the possession, custody, or control of TD Ameritrade Clearing, Inc.

On March 4, 2014, Zinnel was sentenced in case number 2:11-cr-00234-TLN and ordered to pay a $1,500.00 statutory assessment and a $500,000.00 fine and on May 30, 2014, he was ordered to pay $2,513,319.00 in restitution (the Judgment Amount). Zinnel has paid a portion of the Judgment Amount, but still owes $3,014,294.00 as of March 24, 2021. And, despite the United States' demand for payment, made more than 30 days before the date of this application, Zinnel has failed to satisfy the debt in full. In addition to the unpaid judgment balance, the United States seeks to recover a litigation surcharge of ten percent (10%) of the amount of the debt ($301,429.40) pursuant to 28 U.S.C. § 3011(a). The total amount sought by this garnishment action is thus $3,315,723.40. No interest accrues on this debt.

Zinnel's social security number is ***-**-9073.[1] His last known address is Sheridan Federal Correctional Institution, Post Office Box 5000, Sheridan, OR 97378.

When the Court sentenced Zinnel and ordered him to pay restitution, a lien arose in favor of the United States on all property and rights to property as if his liability "were a liability for a tax assessed under the Internal Revenue Code of 1986," pursuant to 18 U.S.C. § 3613(c).

Garnishee, TD Ameritrade Clearing Inc.'s, (the Garnishee) location for service of legal process is Incorporating Service, LTD., 7801 Folsom Blvd., #202, Sacramento, CA 95826. The Garnishee has in its possession, custody or control, property, or accounts in which Zinnel has an interest. This includes, but is not limited to any and all bank, IRAs, stocks, brokerage, individual, joint, and/or commercial/business savings and checking accounts in which they have signatory rights (including any remaining overdraft protection balances and lines of credit), certificates of deposit, safety deposit accounts, lock boxes, money market accounts, pledged securities, notes and all other property as defined by 28 U.S.C. § 3002(12).

///

---

[1] This information has been redacted in compliance with Fed. R. Civ. P. 5.2.

Accordingly, the United States respectfully requests that the Clerk issue a Writ of Continuing Garnishment (Bank, IRA, Stocks or Brokerage Accounts) against Zinnel's property interest in property and account(s), which are in the custody and/or control of the Garnishee. Any and all monies received from said account(s), shall be applied towards the restitution, fine, interest, and surcharge, if applicable, owed by Zinnel.

Dated: April 2, 2021

PHILLIP A. TALBERT
Acting United States Attorney

By:  /s/ *Lynn Trinka Ernce*
LYNN TRINKA ERNCE
Assistant United States Attorney

APPLICATION FOR WRIT OF CONTINUING GARNISHMENT

3

Steven Zinnel,   #66138-097

Federal Correctional Institution
FPC Sheridan
P.O. Box 6000
Sheridan, OR  97378-6000

Defendant in Pro Se

**FILED**

MAY - 3 2021

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>            v.<br><br>STEVEN ZINNEL,<br><br>        Defendant and Judgment Debtor.<br><br>TD AMERITRADE CLEARING, INC.,<br>(and its Successors and Assignees)<br><br>        Garnishee. | Case No.: 2:21-mc-00098-TLN<br><br>STEVEN ZINNEL'S REQUEST FOR HEARING<br><br>Criminal Case No.: 2:11-cr-00234-TLN |

TO THE CLERK OF THE COURT:

I, Steven Zinnel, the Defendant and Judgment Debtor, hereby request a hearing on the Writ of Continuing Garnishment (Bank, IRA, Stocks or Brokerage Accounts) be scheduled within 10  days of or as soon as practical after the court appoints counsel, the date the Clerk of Court receives this request. I request a hearing based upon the following reason(s):

XXX  The property the United States is seeking is exempt under an applicable exemption. I have completed the attached Exemptions Claim Form.

XXX   The United States has not complied with the following statutory requirement(s) for the issuance of post-judgment remedy granted by the Court:   The United States failed to give Steven Zinnel notice of the enforcement proceedings and failed to serve Steven Zinnel in the above-captioned action.

Page 1

DEF. 5:25-mc-30
EX. 5:25-mc-31
113

XXX I do not owe the money.  I am attaching documents to this request that I have paid the judgment in full.   See   Attached  Memorandum of Points and Authorities and the attached Exhibits.

Dated: 4/26/21

Signature: _____

Printed Name: __Steven Zinnel_____

Street Address: _P.O. Box 6000_____

City: _____Sheridan_____

State: _____Oregon_____

Zip Code: _____97378-6000_____

Home Phone: _____

Daytime Phone: _____

Cellular Phone: _____

RETURN ORIGINAL OF THIS REQUEST TO:

United States District Court
Eastern District of California
Clerk of the Court
501 I Street, Room 4-200
Sacramento, CA 95814

SEND A COPY TO:

United States Attorney's Office
KURT A. DIDIER
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA  95814

REQUEST FOR HEARING

2

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
STEVEN ZINNEL'S REQUEST
FOR HEARING

## I.   INTRODUCTION

To paraphrase Adlai Stevenson, "If the government lawyers stop lying about me, I will stop telling the truth about them." Both in this case, and the underlying criminal case, the government lawyers, now at six, have lied to this court, cheated, and tried to win at all costs.  (for example, see case no. 2:11-cr-234-TLN, ECF nos. ECF #615, pgs. 244:14-248:4; ECF #560, pgs 24:26-31:11; ECF #586-7, pgs. 26-71). There is a Latin legal principle that says "False in uno, falsus in omnibus," which translates to "False in one thing, false in everthing."  As demonstrated herein, this Latin legal principle applies in Zinnel's cases.

Zinnel opposes the government's latest specious actions for many compelling reasons.  First, the property the government is seeking is likely exempt.  Zinnel has concurrently filed a Notice of Claim of Exemption.  Second, the government has failed to give notice of this action and failed to serve papers its filed in this action.  In aggravation, the government has provided the court and garnishee TD Ameritrade with the wrong address for Zinnel.  (the government falsely stated Zinnel's mailing address is "P.O. Box 5000" when it is P.O. Box 6000. (see ECF# 5-1, pg. 2, line 14 and compare to Zinnel's concurrently filed Notice of Special Appearance.

1

Third, Zinnel does not owe any money in the underlying criminal case and the government has actually over-collected $135,310.14 in the criminal case that should be returned to Zinnel. Fourth, goverment attorney AUSA Kurt A. Didier and AUSA Lynn Trinka Ernce, have blatently lied to this court in his court-filings.

On a clarification matter, as this Memorandum cites court filings in three (3) different cases pending in the United States District Court, Eastern District of California, (Sacramento), Zinnel will refer to filings in the cases as follows:

United States v. Steven Zinnel / TD Ameritrade,
ED CA case no. 2:21-mc-00098-TLN    as "Misc. Case" ECF #___

United States v. Steven Zinnel,
ED CA case no. 2:11-cr-00234-TLN   as "Criminal Case" ECF#___

United States v. Steven Zinnel / David Zinnel,
ED CA case no. 2:19-mc-00242-TLN   as "Subpoena Case" ECF#___

Based on this Memorandum, the attached exhibits, and Zinnel's concurrent filings, the court should stop all collection efforts by the government, order the government to return to Zinnel the $135,310.14 that it has over-collected in the Criminal Case, order the Bureau of Prisons to stop collecting Inmate Financial Responsibility Payments from Zinnel, withdraw the Writ of Continuing Garnishment issued to TD Ameritrade on April 5, 2021, and take appropriate action against the government attorneys, including AUSA Kurt A. Didier for their bald-faced lies to this court and their specious actions in all three of the above-referenced cases.

Under the FDCPA, the government is required to provide an alleged judgment debtor with notice but has utterly failed to do so here. 28 U.S.C 3202(b).       2

II.    SOME OF THE PROPERTY THE GOVERNMENT IS SEEKING IS LIKELY EXEMPT FROM ENFORCEMENT

To protect his interests, in the abundance of caution, Zinnel has concurrently filed a Notice of Claim of Exemption asserting that if any assets exist of Zinnel, which he does not know after almost 8 years of unjust incarceration, some of those assets are exempt from enforcement.

III.    THE UNITED STATES HAS NOT COMPLIED WITH STATUTORY REQUIREMENTS OF ENFORCEMENT

The government and its lawyers have failed to give Zinnel notice of this action or serve him with process. Further, the government has provided the court and garnishee TD Ameritrade with the wrong mailing address for Zinnel. The government falsely stated Zinnel's mailing address is "P.O. Box 5000" when it is P.O. Box 6000. (see Misc. Case ECF#5-1, pg. 2, line 14 and compare to Zinnel's concurrently filed Notice of Special Appearance.

The only way Zinnel even knows about the government's specious actions is that as a courtesy, Zinnel's appeal attorney, Michael Tanaka, who is CJA appointed mailed some of the documents filed in this case. Michael Tanaka only represents Zinnel on appeal and does not represent Zinnel in this Misc. Case. Further, attorney Michael Tanaka is not authorized to accept service of process on Zinnel's behalf.

Attorney Michael Tanaka mailed Zinnel some, but not all, of the documents filed thus far in this case on April 8, 2021. Attached hereto as Exhibit A is a true and correct copy of the United States Postal Service envelope reflecting Mr. Tanaka mailing documents to Zinnel on April 8, 2021.

3

It is noteworthy that even though the envelope arrived at FCP Sheridan on April 12, 2021, Zinnel did not receive his legal mail until April 22, 2021. (see Exhibit A). This means Zinnel's legal mail sat in the FPC Sheridan mail room for 10 days. This has been on ongoing problem at FPC Sheridan. Inmates mail is delayed by up to a month. Zinnel moves this court to order that the goverment personally serve all documents filed in this case, including all documents filed in this Misc. Case so Zinnel is not prejudiced by the FPC Sheridan mail room.

Some of the documents Zinnel received from attorney Michael Tanaka reference a "Clerk's Notice of Instructions to Judgment Debtor." However, Zinnel has never received any such documents from the Court Clerk. Likewise, documents Zinnel has received reference that garnishee TD Ameritrade Clearing, Inc. is required by law to complete an "Acknowledgement of Service and Answer of Garnishee"and file and serve on Zinnel within ten (10) days of April 5, 2021. As of April 24, 2021, Zinnel has never received any documents from TD Ameritrade in connection with this proceeding.

Steven Zinnel has not been given legal notice of these proceedings nor has he been served with the documents filed in this case. Therefore, Zinnel is specially appearing in this action and Zinnel's special appearance shall not be construed as his personal appearance and Zinnel does not waive service of any defects in service. (see concurrently filed Notice of Special Appearance). Further, Zinnel does not live within the boundries of the Eastern District of California which the government lawyers are well aware of.

4

Zinnel has reviewed Misc. Case ECF #5-3, pg. 3, lines 8-11. Zinnel has concurrently filed his Request that the Proceedings, Property, Funds, and Account(s) and this Action be transferred to the Federal Judicial District of Oregon. (see concurrently filed Request to Transfer).

IV.   STEVEN ZINNEL DOES NOT OWE ANY MONEY IN THE UNDERLYING CRIMINAL CASE AND THE GOVERNMENT HAS ACTUALLY OVER-COLLECTED $135,310.14 IN THE CRIMINAL CASE WHICH SHOULD BE RETURNED TO ZINNEL

Preliminarily, any Judgments entered in the Criminal Case on either March 4, 2014 or May 30, 2014 are NOT the operative judgments in the underlying Criminal Case. On February 8, 2018, the Court of Appeals for the Ninth Circuit reversed the 2014 judgments. (see Criminal Case ECF #431).

On May 6, 2019, Zinnel was resentenced for a second time to the longest sentence in the history of the United States for Bankruptcy Fraud. Zinnel's 152-month prison sentence exceeds the longest sentence ever for bankruptcy fraud by 25% Similarly situated defendants were sentenced to an average of 19 months imprisonment with the highest sentence being 78 months. (see Criminal Case ECF #585-7, pgs. 3-26 and ECF#615, pgs. 11-14). Nevertheless, on May 15, 2019 the district court filed a Second Amended Judgment in a criminal case. (see Criminal Case ECF #653). The Second Amended Judgment ordred Zinnel to pay a Special Penalty Assessment of $1,500, Victim Restitution of $2,513,319, and a fine of $500,000. Criminal Case ECF #653. The total ordered is thus $3,014,819. Attached hereto as Exhibit B is a true and correct copy of

U.S. Courts Case Inquiry printed on 1/11/21 that reflects that the total ordered is $3014,819. The printout relects that since Zinnel has been incarcerated through 1/11/21, the Bureau of Prisons has collected $525 from Zinnel through the Inmate Financial Responsibility Program pursuant to the operative judgment. Exhibit B, Criminal Case ECF #653. On September 21, 2016, government lawyer AUSA Kevin Khasigian sent an email to Zinnel's lawyer Suzanne Luban admitting the government had marshalled $3,149,604.14 in assets in Zinnel's case, but "No funds have been applied to restitution or the fine." Attached hereto as Exhibit C is a true and correct copy of AUSA Kevin Khasigian's Septemeber 21, 2016 email. The September 16, 2016 was a sentencing exhibit and was brought the court's attention in Zinnel's Sentencing Memorandum and during the sentencing proceedings. (see Criminal Case ECF #586-4; page 19; ECF #615, pg. 360). Attached hereto as Exhibit E are relevant portions of Zinnel's Sentencing Memorandum, Criminal Case ECF #615, informing the court and the government that the restitution, fine, and special assessment in this case is in fact paid. (see also Criminal Case ECF #615, pgs 359-360).

Here is the proper accounting:

| | |
|---|---|
| Total funds with the U.S. Attorney's Office & Court | $3,150,129.14 |
| Total ordered in Judgment | -$3,014,819.00 |
| Total Amount the government has over-collected | $ 135,310.14 |

6

When Zinnel moved to stay the sale of real property forfeited on February 25, 2014 prior to Zinnel's first sentencing, (Criminal Case ECF #309), the government opposed the motion to stay. (Criminal Case ECF #314). Zinnel informed the court and the government lawyers of this at Zinnel's resentencing in May of 2019. (see Exhibit E, Criminal Case ECF nos. 686-4, pgs. 2-8, 615 pgs. 359-360). The government's opposition filed on March 3, 2014 stated: "The only way that [Zinnel] would be prejudiced by forfeiture and liquidation of these assets would be that they could generate funds that the Attorney General could in his discretion direct to Zinnel's victims (including his ex-wife). Zinnel's spite is a sentencing factor, not a basis for a motion to stay." (Criminal Case ECF nos. 314, pg. 1; 586-4, p.2).

Zinnel agreed to restitution so that Zinned could get his children for college. (Criminal Case ECF #586-4, pg. 10). The government and Zinnel stipulated to $150,000 each to Zac and Zayna Zinnel. (Criminal Case ECF nos. 343; 586-4, pgs. 11-13). The Judgment awarded Zac and Zayna Zinnel a $150,000 each. (Criminal Case ECF #586-4, pg. 15). However, contrary to the government lawyer's lofty representations to the court about "getting the victims paid," it took the government until March and June of 2016 to sell Zinnel's property. (Exhibit E; Criminal Case ECF #586-4, pgs. 17 & 18). Therefore, it took the government 756 days to sell the property that the government represented to the court on March 3, 2014 was "expensive to maintain." (see Exhibit E; Criminal Case ECF nos. 586-4, pgs. 2-8; 314).

As previously stated above, on September 21, 2016, government lawyer AUSA Kevin Khasigian sent an email to Zinnel's lawyer Suzanne Luban admitting the government was sitting on $3,149,604.14 rather than submitting the millions of dollars it collected in Zinnel's case to the court clerk to disburse to the restitution recipients and apply towards the fine. (see Exhibit C attached hereto). Over the next year, Zinnel wrote several letters to the government trying to get the government to pay Zinnel's children $150,000 each per the judgment. (see Exhibit E; Criminal Case ESF #615, pg. 360). The goverment lawyers failed to respond. Id. Therefore, on December 5, 2017, Zinnel filed a Motion to Enforce the Judgment and Hold Plaintiff and its lawyers in contempt of court for failing to pay the restitution recipients including Zinnel's children. (see Exhibit E; Criminal Case ESF nos. 409; 586-4, pgs 21-51.) The government opposed the motion which is no surprise. (Criminal Case ECF nos. 421; 586-4, pgs 52-53). Without ruling on the merits of Zinnel's motion, biased Judge Troy L. Nunley "Terminated" Zinnel's motion to get the restitution recipients paid. (Criminal Case ECF #428). Attached hereto as Exhibit D, is a true and correct copy of Zinnel's Notice of Motion to Enforce the Judgment and hold Plaintiff and its counsel in contempt. In his motion, Zinnel also moved for a court order directing the BOP to stop deducting FRP payments from Zinnel and return all the money previously collected because thje government had over-collected from Zinnel.

Even though the government has over-collected $135,310.14, and thus has marshalled more than enough funds to pay to the court clerk for the benefit of the restitution recipients, the government's position in its opposition to Zinnel's motion too enforce the judgment is:  "The USAO must ensure that the time for filing an appeal challenging either the restitution order or the forfeiture has passed, or all relevant appeals have been adjuducated, prior to submitting the restoration request to AFMLS."  (see Criminal Case ECF nos. 421, pg. 5 & ECF #586-4, pg. 53.

In the Criminal Case, Zinnel still has a direct appeal pending.  (see Court of Appeals for the Ninth Circuit case no. 19-10159).

Therefore, it is the government that is spiteful in opposing Zinnel's motion to stay and continuing their harrassing of Zinnel. Zinnel requests that the court order the government to STOP all collection efforts in this case, release the "Writ of Continuing Garnishment issued to TD Ameritrade (Misc. Case ECF #5-2), and terminate this case.

///
///
///
///
///
///
///
///

9

V.    THE GOVERNMENT LAWYERS CONTINUE TO LIE TO THE COURT

Many times in the Criminal Case, Zinnel has informed the court that the government lawyers continue to lie to the court in an attempt to win at all costs and malign Zinnel with the court. (for example, se Criminal Case ECF # 562, pgs. 11-18). The government attorneys are not only lawyers and officers of the court, but they have even a higher duty of candor as federal prosecutors.

Prosecutors, as servants of the law, are subject to constraints and responsibilities that do not apply to other lawyers; they must serve truth and justice first. United States v. Kojayan, 8 F.3d 1315, 1323 (9th Cir. 1993). There job is not just to win, but to win fairly, staying within the rules. Berger v. United States, 295 U.S. 78,88 (1935). The government lawyers continue to willfully advance facts prejudicial to the honor or reputation of a party; to wit Steven Zinnel.

Under the State Bar Act, an attorney may only use arguments and methods that "are considtent with truth, and may never seek to mislead the judge or any judicial officer by an artiface or false statement of fact or law." Cal. Bus. & Prof. Code 6068(d). Likewise, and attorney is prohibited "to advance facts prejudicial to the honor or reputation of a party. Cal. Bus. & Prof. Code 6068(f). Cal. Bus. & Prof. Code 6128 makes it a crime for an attorney to deceive a court or party. Rule 11 of the Federal Rules of Civil Procedure states by presenting a pleading, written motion, or other paper to the

10

court, the attorney certifies that (1) it is not being presented for any improper purpose such as to harras and (3) the factual contentions have evidentiary support. Zinnel filed exhaustive papers on an attorney's duty of candor in support of his resentencing. (see Criminal Case ECF #586-7, pgs 74). In their specious collection efforts, government lawyers AUSA Kurt A. Didier and AUSA Lynn Trinka Ernce ignore their duty of candor and lie to this court.

**The misrepresentations in the Application for Writ of Continuing Garnishment (Misc. Case ECF #5-1)**

The lawyers represent that Zinnel has an interest in accounts at TD Ameritrade Clearing Inc. (ECF #5-1, pg. 2). However, the government lawyers do not identify any account. Zinnel is unaware of any account that he still has at TD Ameritrade with any signifcant money in it.

The government lawyers represent to the court that Zinnel "still owes $3,014,294" in the Criminal Case. However, Zinnel has demonstrated herein and at his resentencing in May of 2019 that he does not.

The government lawyers state Zinnel's address is P.O. Box 5000, but it is not.

**The misrepresentations in the Ex Parte Application for an asset restraining order in aid of judgment enforcement (Criminal Case ECF #670)**

On March 24, 2021, AUSA Kurt A. Didier filed an Ex Parte Application in the Criminal Case that was chalked-full of lies. Againg, a government lawyer misrepresented to the court that "[Zinnel] owes over $3M in unpaid criminal monetary penalties." (Criminal Case ECF #670, pg. 1). Lawyer Didier continued with

11

his lies by stating Zinnel "is the sole beneficiary of an account with a current balance of over $1.3 M." (Criminal Case ECF #670, pf. 1). This is a bald-faced lie. In the government's opposition to Zinnel's recent bail motion, the government attached a copy of Zinnel's mother's Trust entitled "Castana Trust. (Criminal Case ECF #668-1, pgs. 18-40). The government also filed Zinnel's mom's Last Will and Testament. (Criminal Case ECF #668-1, pgs. 41-49). Both the Castana Trust and will were executed in March 2009. As of March 2009, the Castana Trust owned all of Ardith Ferris's assets. However, attorney Kurt Didier ignores this by filing an exhibit for a TD Ameritrade account in the name of Ardith Ferris that was signed on August 12, 2005. (Criminal Case ECF #670-1, pg. 8). Thus, the TD Ameritrade account document pre-dates the creation of the Castana Trust by almost four (4) years. Compare Criminal Case ECF nos. 670-1, pg. 8 to 668-1, pg. 39.

In aggravation, AUSA Kurt Didier filed the Ex Parte Application AFTER Zinnel filed his Reply to the Government's Opposition to Zinnel's bail motion which cites binding law that Zinnel as a "trust beneficiar has no legal title or ownership interest in trust assets." (Criminal Case ECF #669, pg. 4 citing Saks v. Damon Raike & Co., 7 Cal. App. 4th 419, 427 (1992). As the Reply states, Zinnel owns none of of the Castana Trust Assets and Zinnel is not the Trustee of the Castana Trust. (ECF #669).

12

AUSA Kurt Didier continues his lies by claiming Zinnel "failed to disclose his future interest in an account." (Criminal Case ECF #670, pg. 3). That's absurd. That would be like saying Zinnel should have disclosed in 2019, that he was going to win the California mega-millions lottery on April 3, 2061! Zinnel has received no assets from the Castana Trust and Zinnel has essentially no contact whatsoever with the sole Trustee of the Castana Trust.

AUSA Kurt A. Didier also lies to the Court when he writes "The United States recently discovered he is the sole beneficiary..." (Criminal Case ECF 670, pg. 1.) On December 19, 2019, AUSA Kurt A. Didier filed an Application to take the deposition of the Trustee of the Castana Trust Trustee. (see Subpoena Case ECF #1). Kurt Didier subpoened 27 catagories of documents. (Subpoena Case ECF #1, pgs. 7-10). Document requests numbers 26 and 27 requested documents relating to any inheritance or money payable to Steven Zinnel. (ECF #1, pg. 10). Again, in the Application for Subpoena, Kurt Didier lied to the court and represented that Zinnel owed over $3,000,000 when in fact lawyer knew Zinnel owed nothing. (Subpoena Case ECF #1, pg.2). According to the application, the Trust's Trustee's deposition was set for January 3, 2020. Id. Thus, the United States did not just discover the Trust's, as opposed to Zinnel's, TD Ameritrade Account.

Zinnel requests that the Court admonish the government lawyers and report the misconduct of AUSA Kurt A. Didier to the State Bar of California and the DOJ's Office of Professional Responsibility.

Steven Zinnel          Dated: _____ 4/28/21_____

13

# EXHIBIT

# "A"

Case 2:21-mc-00098-TLN-AC    Document 20    Filed 05/03/21    Page 17 of 31



# UNITED STATES POSTAL SERVICE®

# PRIORITY® MAIL

- Date of delivery specified*
- USPS TRACKING™ included to many major international destinations.
- Limited international insurance.
- Pick up available.*
- Order supplies online.*
- When used internationally, a customs declaration label may be required.

* Domestic only



EP14F Oct 2018
OD: 12 1/2 x 9 1/2

PS00001000014



LEGAL MAIL RECEIVED

MAIL ROOM
DATE  TIME  INIT

UNIT STAFF: 4-22-21  2:00 P
DATE  TIME  INIT

INMATE
DATE  TIME  INIT

To schedule free Package Pickup, scan the QR code.



USPS.COM/PICKUP



UNITED STATES POSTAL SERVICE®    Click-N-Ship®

**P**

usps.com
$7.95
US POSTAGE
Flat Rate Env

9405 5036 9930 0341 4068 74 0079 5000 0059 7378

U.S. POSTAGE PAID

04/08/2021    Mailed from 90025

## PRIORITY MAIL 3-DAY™

MICHAEL TANAKA
LAW OFFICE OF MICHAEL TANAKA
12400 WILSHIRE BLVD
STE 400
LOS ANGELES CA 90025-1030

Expected Delivery Date: 04/12/21

0004

B900

SHIP TO: STEVE ZINNEL
REG. NO. 66138-097 - FCI SHERIDAN SATELLITE
PO BOX 6000
SHERIDAN OR 97378-6000

### USPS TRACKING #

9405 5036 9930 0341 4068 74

# EXHIBIT

# "B"

01/11/2021 01:40 PM

Version 7.0.1   Page 1   of 8

**U.S. Courts**
**Case Inquiry Report**
**Case Number: DCAE211CR000234; Party Number: N/A; Payee Code: N/A**
**Show Party Details: N/A; Show Payee Details: N/A; Show Transactions: Y**

Case Number   DCAE211CR000234       Case Title   USA SV DERIAN EIDSON

**Summary Party Information:**

| Party# | Party Code | Party Name | Account Code | Debt Type | JS Account # | Total Owed | Total Collected | Total Outstanding |
|--------|-----------|------------|--------------|-----------|--------------|-----------|-----------------|-------------------|
| 001 | CAEA029557 | STEVEN ZINNEL | CAEAPA18463 | SPECIAL PENALTY ASSESSMENT | | 1,500.00 | 525.00 | 975.00 |
| 001 | CAEA029557 | STEVEN ZINNEL | CAEAPA18463 | VICTIM RESTITUTION | | 2,513,319.00 | 0.00 | 2,513,319.00 |
| 001 | CAEA029557 | STEVEN ZINNEL | CAEAPA18463 | FINE-CRIME VICTIMS FUND | | 500,000.00 | 0.00 | 500,000.00 |
| | | | | | | 3,014,819.00 | 525.00 | 3,014,294.00 |

# EXHIBIT

# "C"

FILED IN ZINNEL'S CASE

From: "Khasigian, Kevin (USACAE)" <Kevin.Khasigian@usdoj.gov>
To: Suzanne Luban <lubanlaw@sbcglobal.net>; "Segal, Matthew (USACAE)" <Matthew.Segal@usdoj.gov>;
"Hemesath, Audrey (USACAE)" <Audrey.Hemesath@usdoj.gov>
Sent: Wednesday, September 21, 2016 11:09 AM
Subject: RE: sale of Zinnel properties

Suzanne:

The sale of the Luyung Property resulted in net proceeds of $82,608.15, and the sale of 11966 Old
Eureka Way netted $41,786.13. The below chart identifies the assets (and net proceeds) forfeited
from your client:

| Asset Description | Net Proceeds |
| --- | --- |
| Vacant land - "The Luyung Property" | $82,608.15 |
| 11966 Old Eureka Way, Gold River | $41,786.13 |
| System 3, Inc. | $2,800,000.00 |
| $65,534.85 First Bank Account | $65,534.85 |
| $53,362.51 Wells Fargo Bank | $53,362.51 |
| Best Build and 3 Checks | $106,312.50 |
| Totals | $3,149,604.14 |

No funds have been applied to restitution or the fine.

The requested closing statements are attached to this email.

--Kevin

EX 2133

# EXHIBIT

# "D"

*FILED ON ZINNEL'S CASE*

STEVEN ZINNEL, USM #66138-097
Federal Correctional Institution,
Terminal Island
PO Box 3007
San Pedro, CA 90733-3007

Defendant, In Pro Se

**FILED**

DEC 05 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF CALIFORNIA

#### (SACRAMENTO)

| UNITED STATES OF AMERICA | Case No. 2:11-cr-234-TLN |
|---|---|
| Plaintiff, | DEFENDANT STEVEN ZINNEL'S NOTICE OF MOTION AND MOTION TO |
| vs. | (1) ENFORCE JUDGMENT |
| STEVEN ZINNEL, | (2) HOLD PLAINTIFF AND ITS ATTORNEYS IN CIVIL CONTEMPT |
| Defendant. | (3) MOTION FOR ORDER DIRECTING THE BOP TO STOP TAKING $25.00 QUARTER FROM ZINNEL TO APPLY TO RESTITUTION |

(4) MOTION FOR ORDER DIRECTING THE BOP, COURT CLERK, AND/OR PLAINTIFF TO RETURN THE $325 THAT HAS BEEN TAKEN FROM ZINNEL AT THE RATE OF $25.00 QUARTER SINCE HE WAS REMANDED INTO THE CUSTODY OF THE BOP
(5) MOTION DIRECTING PLAINTIFF TO PERSONALLY SERVE DEFENDANT STEVEN ZINNEL WITH ANY PAPERS PRIOR TO COURT-FILING IN THIS CASE
(6) MOTION TO EXTEND DUE DATE OF DEFENDANT'S TIME TO ACT BY 14 DAYS
(7) MOTION FOR ORDER ISSUED TO THE BOP DIRECTING ZINNEL TO APPEAR BY TELEPHONE AT THE HEARING
(8) MOTION FOR ACCURATE ACCOUNT OF FUNDS PLAINTIFF HAS MARSHALED

[filed concurrently with defendant's Motion to Recuse District Court Judge Troy L. Nunley from presiding over any further proceedings in this case and motion for case reassignment to a new District Court Judge]

Date: December 14, 2017
Time: 9:30 A.M.
Judge: Hon. Troy L. Nunley
CtRm: #2
[subject to change]

EX 2151          Page 1

TO THE HONORABLE COURT, PLAINTIFF UNITED STATES OF AMERICA, ITS ATTORNEYS MATTHEW D. SEGAL, AUDREY B. HEMESATH, KEVIN C. KHASIGIAN, PHILLIP A. TALBERT, U.S. ATTORNEY GENERAL JEFFERSON SESSIONS, THE U.S. DEPARTMENT OF JUSTICE, DEFENDANT DERIAN EIDSON BY AND THROUGH HER ATTORNEY BECKY S. JAMES, ANY PERSON OR ENTITY THAT HAS APPEARED IN THE ABOVE-CAPTIONED CASE, JUDGMENT RESTITUTION RECIPIENTS ZAC ZINNEL AND ZAYNA ZINNEL, AND ANY OTHER INTERESTED PERSON:

PLEASE TAKE NOTICE that on December 14, 2017 at 9:30 AM, or as soon thereafter as this matter may be heard in the above-entitled Court for hearing, Defendant Steven Zinnel ("Defendant" or "Zinnel"), in pro se, will and hereby does move the Court to (1) Enforce its Judgment; (2) Hold Plaintiff United States of America and its attorneys in Civil Contempt, (3) for an order directing the BOP to stop deducting $25.00 quarter from Zinnel to apply to restitution (4) for an order directing the BOP, court clerk, and/or Plaintiff to return the $325.00 that has been taken from Zinnel at the rate of $25.00 quarter since he was remanded into the custody of the BOP (5) Direct Plaintiff to personally serve defendant Steven Zinnel with any papers, PRIOR to court-filing, in this case going forward, (6) motion to extend due date of defendant's time to act by fourteen (14) days, (7) motion for order issued to the BOP directing Zinnel to appear by telephone at the hearing, and (8) motion for accurate account of funds plaintiff has marshaled ("Motion"). The hearing is currently set in Courtroom #2 of the United States Courthouse located at 501 I Street, Sacramento, CA 95814 before the Honorable Troy L. Nunley (subject to change with judge reassignment).

The Motion should be granted for many compelling reasons. The grounds for this Motion are: The court has the inherent power to enforce its judgments. Contempt is one method of enforcing its judgment. There is currently a valid enforceable Judgment in this criminal case. The Plaintiff and its attorneys are aware of the Judgment. Plaintiff and its attorneys can comply with the Judgment because Plaintiff has marshaled, and is holding more than enough funds, to pay out the restitution ordered in the Judgment. Plaintiff and its attorneys are willfully not paying out the money they are holding as ordered by the Judgment. Plaintiff and its attorneys have violated the court order memorialized into a Judgment in the above-captioned case. The violation demonstrably fell short of substantial compliance with the Judgment. The violation was not based on a good faith and reasonable interpretation of the order. Thus, it is Plaintiff and its attorneys that are actually spiteful in this case not Zinnel. Since Plaintiff is sitting on more than enough money to satisfy the Judgment restitution and the entire Judgment is not being complied with, the court should order the BOP to stop deducting $25.00 a quarter from Zinnel and order the return of the $325.00 that has been deducted thus far from Zinnel.



EX 2152                                             Page 2

PLEASE TAKE FURTHER NOTICE that Zinnel has concurrently filed with this Motion a Motion to Recuse District Judge Troy L. Nunley from presiding over any further proceedings in the above-captioned case including the instant Motion. Zinnel objects to Judge Troy L. Nunley deciding this motion and/or presiding over any further proceedings in the above-captioned case. Thus, the presiding Judge, Courtroom, Date, and Time may change when a new judge is assigned to the above-captioned case. When a new Judge is assigned, either the Court or Zinnel will give notice of any changes.

PLEASE TAKE FURTHER NOTICE that because Zinnel is currently unjustly incarcerated in federal prison, not a participant in the court's CM/ECF system, and subject to institution change at any time without notice by the Bureau of Prisons ("BOP"), Zinnel further moves the court for an order directing Plaintiff and its attorneys to cause Zinnel to be personally served with any papers, including any opposition to this Motion, PRIOR to filing the papers with the court, at the BOP institution Zinnel is actually at when Plaintiff's papers/opposition are ready to be filed with the court. Prior to filing with the court, Plaintiff and its attorneys can email or fax any papers to be filed with the court, including any opposition to this Motion, to the BOP institution Zinnel is incarcerated within, so he can be personally served by a BOP staff member with any legal papers.

PLEASE TAKE FURTHER NOTICE, that Zinnel moves the court to issue an order to Plaintiff and its attorneys requiring them to concurrently file with the court a Certificate of Service reflecting that Zinnel was personally served with their papers, including any opposition to this Motion, before filing any papers and/or opposition with the court utilizing the CM/ECF system.

PLEASE TAKE FURTHER NOTICE, that Zinnel moves the court to be personally served with any and all court orders in the above-captioned case going forward which could be accomplished by ordering Plaintiff and its attorneys to personally serve Zinnel with a Notice of Entry of Order.

PLEASE TAKE FURTHER NOTICE that because Zinnel is currently unjustly incarcerated in federal prison and subject to institution change at any time, without notice by the BOP, Zinnel further moves the court for an order extending his deadline to act in this case by fourteen (14) calendar days to allow Zinnel sufficient time to review documents, perform legal research, draft any papers, and file any papers with the court by U.S. Mail. Per Local Rule 430.1(d), the Plaintiff's and its attorneys' opposition, if any, is due within seven (7) days of this filing and Zinnel's Reply will be due on the date prescribed by the court.

EX21 53                              Page 3

PLEASE TAKE FURTHER NOTICE, because Zinnel is unjustly incarcerated, he is unable to personally attend the hearing. Therefore, Zinnel moves the court to appear by telephone at the hearing. Zinnel requests that the court provide him with written notice of a telephone number to call in on. Due to the constant and continuous Obstruction of Justice by the BOP in the form of not allowing Zinnel to participate at court hearings by telephone, preventing Zinnel from performing legal research, and preventing Zinnel from complying with court orders, Zinnel moves this court to issue an order to the Federal Bureau of Prisons and FCI Terminal Island's Warden Felicia Ponce directing the BOP and Warden Ponce to allow Zinnel to use an institution staff telephone on the date and time of the hearing so Zinnel can appear by telephone at the hearing, under the court's supervisory powers to prevent obstruction of its proceedings.

Should the court require Zinnel's physical appearance at the hearing, Zinnel requests that the court appoint the Federal Defender's Office to represent Zinnel at the hearing and Zinnel waives his physical appearance at the hearing.

Zinnel moves the court for a transcript of the hearing and if any portion of this Motion is denied, that the court's clerk be ordered to file a Notice of Appeal to the Court of Appeals for the Ninth Circuit on Zinnel's behalf.

This Motion is based on this notice, the concurrently filed memorandum of points and authorities, declaration of Steven Zinnel, index of attached exhibits, objection to Judge Troy L. Nunley from deciding this Motion, the records of this case, and any oral argument permitted at the hearing on the Motion.

Dated: October 31, 2017

Steven Zinnel
Defendant in pro se

EX 2154

# EXHIBIT

# "E"

STEVEN ZINNEL, X-1858541

Sacramento County Main Jail

651 I Street

Sacramento, CA 95814

Defendant in Pro Se

**FILED**

APR 18 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  v.<br><br>STEVEN ZINNEL,<br><br>        Defendant. | Case No. 2:11-cr-234-TLN<br><br>**DEFENDANT STEVEN ZINNEL'S SENTENCING MEMORANDUM AFTER REMAND**<br><br><u>SENTENCING DATE</u><br><br>Date: May 2, 2019<br>Time: 1:30 PM<br>Court: Hon. Troy L. Nunley |

Defendant Steven Zinnel ("Zinnel") hereby submits his Sentencing Memorandum after remand from the Ninth Circuit Court of Appeals, in Support of his forthcoming resentencing: [1]

- *Because we can:*

    *The motto of power since the idea of power over others was born in our kind.*

- *Distrust all in whom the impulse to punish is strong.* Friedrich Nietzsche
- *The degree of civilization in a society can be judged by entering its prisons.*

    Russian writer Fyodor Dostoevsky

---

[1] Zinnel has filed twenty-two (22) volumes of Exhibits in support of this Sentencing Memorandum. (see ECF nos. 585, 586, and the exhibits concurrently filed). Herein, Zinnel will refer to the Exhibits by Volume number and the exhibit number on the bottom left of each page of the exhibits. e.g. (Vol. ___, Ex. ___).

**25. Provide restitution to any victims of the offense - 18 U.S.C. § 3553 (a)(7)**

Congress has mandated that sentencing judges **shall** consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553 (a)(7). The Ninth Circuit teaches "the district court's goal of obtaining restitution for the victims of Defendant's offense, 18 U.S.C. § 3553(a)(7), is better served by a non-incarcerated and employed defendant." *United States v. Menyweather*, 447 F.3d 625, 634 (9 CA, 2006) (en banc).

When Zinnel moved to stay the sale of real property forfeited prior to sentencing, the government opposed the motion to stay. (Vol. 15, Ex. 2101-2107). The government's opposition filed March 3, 2014, stated: *"The only way that he would be prejudiced by forfeiture and liquidation of these assets would be that they could generate funds that the Attorney General could in his discretion direct to Zinnel's victims (including his ex-wife). Zinnel's spite is a sentencing factor, not a basis for a motion to stay."* (Vol. 15, Ex. 2101, lines 22-25). Zinnel agreed to restitution so that Zinnel could get his children Zac and Zayna Zinnel money for college. (Vol. 15, Ex. 2115). The government and Zinnel stipulated to $150,000 each to Zac and Zayna Zinnel (Vol. 15, Ex. 2121-2123). The Judgment awarded Zac and Zayna Zinnel $150,000 each. (Vol. 15, Ex. 2125). However, contrary to the government lawyers' lofty representations to the Court about "getting the victims paid," it took the government until March and June of 2016 to sell the property. (Vol. 15, Ex. 2131 & 2132). Therefore it took the government 756 days to sell the property that the government represented to the Court on March 3, 2014 was "expensive to maintain." (Vol. 15, Ex. 2101-2107).

On September 21, 2016, government lawyer AUSA Kevin Khasigian sent an email to Zimmel's lawyer Suzanne Luban admitting the government was sitting on $3,149,604.14. (Vol. 15, Ex. 2133). Over the next year, Zimmel wrote several letters to the government trying to get the government to pay his children $150,000 each per the Judgment. The government lawyers failed to respond. Therefore, on December 5, 2017, Zimmel filed a Motion to Enforce the Judgment and Hold Plaintiff and its lawyers in contempt of court for failing to pay the restitution recipients including Zimmel's children. (Vol. 15, Ex. 2151-2181). AUSA Matthew D. Segal opposed the motion which is no surprise. (Vol. 15, Ex. 2190-2191). Even though the government opposed Zimmel's motion to stay calling Zimmel "spiteful," AUSA Matthew D. Segal talked out of the other side of his mouth in opposing Zimmel's Motion to Enforce the Judgment by writing that the U.S. Dept. of Justice Asset Forfeiture Policy Manual states: *"The USAO must ensure that the time for filing an appeal challenging either the restitution order or the forfeiture has passed, or all relevant appeals have been adjudicated, prior to submitting the restoration request to AFMLS."* (Vol. 15, Ex. 2191). Therefore, it is the government that is spiteful in opposing Zimmel's motion to stay pending appeal when they claim that it is DOJ policy not to pay out restitution money the government is sitting on during the pendency of appeal.

## CERTIFICATION OF SERVICE

### By United States Mail

I hereby certify that at the time of service, I was over the age of 18. I further certify that

on ___4/28/21_____ I served a true and correct copy of the foregoing on:

AUSA Kurt A. Didier
AUSA Matthew D. Segal                    TD Ameritrade Clearing, Inc.
United States Attorney's Office, ED CA   Incorporating Service, LTD
501 I Street, Suite 10-100               7801 Folsom Blvd., #202
Sacramento, CA 95814                     Sacramento, CA   95826

Attorney for Plaintiff

by United States Mail, in a sealed envelope with the postage thereon fully prepaid, and then

depositing the foregoing with prison authorities

Pursuant to *Houston v. Lack*, 487 U.S. 266, 270-271, 108 S.Ct. 2379, 101 L.Ed.2d

245 (1988), a Pro Se prisoner's filing is deemed filed with the Court on the date of delivery to

prison authorities for filing with the Court.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

_____
**Steven Zinnel,   #66138-097**
Federal Correctional Institution
P.O. Box 6000
Sheridan, OR   97378-6000

Steven Zinnel, #66138-097
Federal Correctional Institution
FPC Sheridan
P.O. Box 6000
Sheridan, OR 97378-6000

**FILED**

JUL 0 2 2021

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

Defendant in Pro Se

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

Plaintiff,

v.

STEVEN ZINNEL,

Defendant and Judgment Debtor.

TD AMERITRADE CLEARING, INC.,
(and its Successors and Assignees)

Garnishee.

Case No.: 2:21-mc-00098-TLN

Criminal Case No.: 2:11-cr-00234-TLN

**DEFENDANT STEVEN ZINNEL'S REPLY TO UNITED STATES OF AMERICA'S RESPONSE TO STEVEN ZINNEL'S CLAIM OF EXEMPTIONS AND REQUEST FOR HEARING [ECF #47]**

Defendant and alleged judgment debtor Steven Zinnel ("Zinnel") hereby Replies to the United States of America's Response to Steven Zinnel's Claim of Exemptions and Request for Hearing [ECF #47] as follows:

///

///

///

///

Page 1

5:25-mc-30
5:25-mc-31

DEF.
EX.
114

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

To paraphrase Adlai Stevenson, "If the government lawyers stop lying about me, I will stop telling the truth about them." Both in this case, and the underlying criminal case, the government lawyers, now at six, have lied to this court, cheated, and tried to win at all costs.  There is a Latin legal principle that says "False in uno, falsus in omnibus," which translates to "False in one thing, false in everything." As demonstrated herein, this Latin legal principle applies in Zinnel's cases.

Zinnel opposes the government's latest specious actions for many compelling reasons.  First, Zinnel does not owe any money in the underlying Criminal Case and the government has actually over-collected $135,310.14 in the Criminal Case that should be returned to Zinnel. Second, Zinnel as a trust beneficiary, has no legal title or ownership interest in trust assets.  Third, the criminal monetary penalties assessed in the underlying criminal case have not become a debt yet under the FDCPA until Zinnel's available challenges are resolved.  Fourth, Plaintiff United States of America and its attorneys have not complied with statutory requirements for the issuance of the post judgment remedy.  Fifth, the property the United States is seeking is exempt under an applicable exemption.  Sixth, the Sacramento Superior, Probate Division will decide the question of the Castana Trust's ownership of assets.

2

On a clarification matter, as this Memorandum cites court-filings in four (4) different cases filed in the United States District Court, Eastern District of California, (Sacramento), Zinnel will refer to court-filings in the cases:

United States v. Steven Zinnel,
Case No. 2:11-cr-00234-TLN        as "Criminal Case"

United States v. Steven Zinnel / TD Ameritrade,
Case No. 2:21-mc-00098-TLN-AC    as "Misc. Case #1"

United States v. Steven Zinnel / David Zinnel, Castana,
Case No. 2:21-mc-00143-TLN-CKD   as "Misc. Case #2"

United States v. Steven Zinnel / David Zinnel,
Case No. 2:19-mc-00242-TLN       as "Subpoena Case"

Based on this Memorandum, the attached exhibits, and all the court-filings in the above deliniated cases, the court should stop all collection efforts by the government, order the government to return to Zinnel the $135,310.14 that it has over-collected in the Criminal Case, order the Bureau of Prisons to stop collecting Inmate Financial Responsibility Payments from Zinnel, and terminate the Writ of Continuing Garnishment issued in this case.

///
///
///
///
///
///
///
///

3

II.    ZINNEL DOES NOT OWE ANY MONEY IN THE UNDERLYING "CRIMINAL CASE" AND THE GOVERNMENT HAS ACTUALLY OVER-COLLECTED $135,310.14 THAT SHOULD BE RETURNED

On May 6, 2019, Zinnel was resentenced for a second time to the longest sentence in the history of the United States for Bankruptcy Fraud. Zinnel's 152-month prison sentence exceeds the longest sentence ever in a bankruptcy fraud case by 25%. (see Criminal Case ECF #585-9, pgs. 2-5). Similarly situated bankruptcy fraud defendants were sentenced to an average of 19 months imprisonment with the longest prison sentence being 78 months. (see Criminal Case ECF nos. 585-7, pgs. 3-26 and 615, pgs. 11-14). Nevertheless, on May 15, 2019 the district court filed a Second Amended Judgment in Criminal Case. (see Criminal Case ECF #653). The Second Amended Judgment ordered Zinnel to pay a Special Penalty Assessment of $1,500, Victim Restitution of $2,513,319, and the statutory maximum fine of $500,000. (Criminal Case ECF #653). The total ordered is thus $3,014,819. Attached hereto as Exhibit A is a true and correct copy of the U.S. Courts Case Inquiry printed on 1/11/21 that reflects the Total Ordred was $3,014,819. The printout reflects that since Zinnel has been incarcerated, for almost eight (8) years now, the Bureau of Prisons has collected $25 from Zinnel as of 1/11/21, through the Inmate Financial Responsibility Program pursuant to the operative judgment. (Criminal Case ECF #653).

In April of 2014, Zinnel and the government agreed and stipulated to restitution so that the funds the government

4

had marshalled to date, $3,025,210 as of April 2014, would be immediately paid to the restitution recipients including $150,000 to each of Zinnel's children so they both had money for college. (see Criminal Case ECF #615, pg. 359; Exhibit B). On April 1, 2014, Zinnel's attorney Suzanne Luban sent an email to government attorney AUSA Kevin Khasigian memorializing the agreement. (see Criminal Case ECF #586-4, pg. 10). Attached hereto as Exhibit B is a true and correct copy of Suzanne Luban's April 1, 2014 email. The same day, Zinnel's attorney and two of the government attorneys entered into a fromal Stipulation and Order Re: Restitution that provided Zinnel's children with $150,000 each for college. (see Criminal Case ECF nos. 343 and 586-4, pgs. 11-13). Attached hereto as Exhibit C is a true and correct copy of the Resitution Stipulation.

When Zinnel moved to stay the sale of real property forfeited prior to sentencing, the government opposed the motion to stay. (Criminal Case ECF nos. 314, 586-4, pgs. 2-5) Attached hereto as Exhibit D is a true and correct copy of relvant portions of the government's opposition to the Motion to Stay. Plaintiff's Opposition filed on March 3, 2014 stated:

> "The only way that he would be prejudiced by forfeiture and liquidation of these assetes would be that they could generate funds that the Attorney General could in his discretion direct to Zinnel's victims (including his ex-wife). Zinnel's spite is a sentencing factor, not a basis for a motion to stay." (Exhibit D, p. 1)

5

The court-filed Opposition to the Motion to Stay was signed by and filed by Plaintiff's lawyer AUSA Kevin Khasigian. (Criminal Case ECF #314).

Rule 11 of the Federal Rules of Civil Procedure imposes a duty upon lawyers who sign court-filings. With each court-filing by a lawyer for the government, Rule 11 creates a certification that the "legal contensions are warranted by existing law" and that "the factual contensions have evidentiary support." Barrels of ink have been spilt in judicial opinions, scholarly journals, trade publications, and legal education conferences on Rule 11 and Zinnel will not spill any more ink regarding the Rule 11 certification and sanctions that may be imposed here.

In Plaintiff's Opposition to the Motion to Stay, AUSA Kevin Khasigian represented to the court, restitution recipients, and Zinnel that any funds forfeited from Zinnel can be used to pay restitution recipients and the government and its lawyers wanted to use forfeited funds to pay the restitution recipients right away. However, contrary to the government lawyers' lofty representations to the court about getting the victims paid, it took the government until March and June of 2016 to sell the property. Therefore, it took the government 756 days to sell the property that the government lawyers represented to the court on March 3, 2014 was "expensive to maintian." (Criminal Case ECF nos. 615, p. 359; 314).

///

6

Additionally, in Plaintiff's Opposition to Zinnel's Motion to Stay Forfeiture, AUSA Kevin Khasigian wrote, and four government attorneys certified under Rule 11 the following:

"After all, forfeiture is designed to create a pool of assets from which victims can be reimbursed."

"Delaying forefeiture 'will only prolong the ability of [Defendant's] victims to receive distributions... and would serve to further harm [them].' See United States v. Davis, No. 07-cr-011, 2009 WL 2475340, at *3 (D. Conn. June 15, 2009)."

"Simply put, the sooner the properties are sold the better off Zinnel's victims will be."

[Exhibit D, Criminal Case ECF #314, p. 5]

Therefore, four (4) government lawyers have represented and certified under Rule 11 in April of 2014, that all forfeited funds in the Criminal Case would be used to pay the restitution recipients including $150,000 to each of Zinnel's children for college. Zinnel's two children have now graduated from college but yet the government lawyers who are sitting on $3,149,604.14 in marshalled funds, refuse to pay the restitution recipients. In agravation, the same government lawyers are attempting double-dip by trying to collect in two peniding garnishment proceedings.

Four government lawyers have represented to Judge Troy L. Nunley, Zinnel's lawyers, and to Zinnel in a court-filing in April 2014 that "forfeiture is designed to create a pool of assets from which victims can be reimbursed" and that the government lawyers wanted to get the restition recipients paid right away. (Exhbit D; Criminal Case ECF #314). The same government lawyers should be stopped from taking a contrary position here.

7

On September 21, 2016, Plaintiff's lawyer AUSA Kevin Khasigian sent an email to Zinnel's attorney Suzanne Luban admitting Plaintiff United States had marshalled $3,149,604 in assets in Zinnel's Criminal Case, but "No funds have been applied to restitution or the fine." (emphasis added). (Criminal Case ECF #586-4, p. 19). Attached hereto as Exhibit E is a true and correct copy of AUSA Kevin Khasigian's September 21, 2016 email. The September 16, 2016 email was a sentencing exhibit and was brought to the court's attention in Zinnel's Sentencing Memorandum. (Criminal Case ECF nos. 586-4, p. 19, 615, p. 360).

After Zinnel received AUSA Khasigian's representations to another lawyer in an email regarding the funds Plaintiff had marshalled for the restitution and fine, over the next year, Zinnel wrote several letters to Plaintiff's lawyers trying to get Plaintiff United States to pay the restitution recipients, including Zinnel's children paid. Plaintiff's counsel did not respond to Zinnel's letters. Therefore, on December 5, 2017, Zinnel filed a Motion to Enforce the Judgment and Hold Plaintiff and its lawyers in contempt of court for failing to pay the restitution recipients including Zinnel's children $150,000 for college. (Criminal Case ECF nos. 409, 586-4, pgs 21-40). Attached hereto as Exhibit F is a true and correct copy of Zinnel's Notice of Motion and Motion to Enforce the Judgment and hold Plaintiff and its attorneys in contempt of court.

8

The Department of Justice, Asset Forfeiture and Money Laundering Section ("AFMLS") published in 2016 an "Asset Forfeiture Policy Manual" that is a compilation of policies governing the Department of Justice Asset Forfeiture Program.  The purpose of the Policy Manual is to provide Department of Justice prosecutors with a reference manual containing the policies and procedures of the DOJ.  For his resentencing in May 2019, Zinnel filed relevant portions of the AFMLS "Asset Forfeiture Policy Manual" as a sentencing exhibit.  (Criminal Case ECF #586-4, pgs. 58-68),  Attached hereto as Exhibit G is a true and correct copy of the relevant portions of the Policy Manual that Zinnel filed with the court with Zinnel's hand-written notations on the pages.  The DOJ "Asset Forfeiture Policy Manual" states in relevant part:

> This procedure enables the Attorney General to transfer forfeited funds to a court for satisfaction of a criminal restitution order.  (Exhibit G; 586-4 p. 59)
>
> Potential victims must be notified of the opportunity to file a petition for remission.  (Ex. G; 586-4 p. 60)
>
> Restoration...The Restoration Procedures enable the government to complete the forfeiture.  This permits victims to obtain fair compensation from the forfeited assets, in accordance with the court's restituion order.  (Ex. G; 586-4 p. 63)
>
> Payment will be made only in accordance with the court's restitution order.  (Ex C; 586-4 p. 65)
>
> Is a prosecutor bound, ethically or otherwise, to forego forfeiture in favor of restitution? (586-4 p. 67)

9

Department of Justice policy is to collect and marshall assets for the benefit of victims. (586-4 p.67)

Thus, a prosecutor who uses forfeiture tools as a means to provide remission or restoration of assets to crime victims fulfills any oblegation that the prosecutor may have under the Justice for All Act to crime victims.  (Ex. G; 586-4 p. 68)

The government uses forfeited property to recompense victims of crime.  (Ex G; 586-4 p. 68)

Attached hereto as Exhibit H are relevant portions of Zinnel's Sentencing Memorandum (Criminal Case ECF #615), informing the court and Plaintiff's counsel that the restitution, fine, and special assessment in this case are paid.

An attorney can never lie to another attorney

Plaintiff's attorney AUSA Kevin Khasigian's representations to Zinnel and his attorney in the September 21, 2016 email (Exhibit E; Criminal Case ECF #586-4 p. 19) and Opposition to Motion to Stay (Exhibit D; Criminal Case ECF #314) are party-opponent admissions which is a hearsay exception under Federal Rules of Evidence 801(d)(2)

Not only is AUSA Kevin Khasigian an attorney, but he is a federal prosecutor with a heightened duty to be honest.

In the Criminal Case, for Zinnel's May 2019 resentencing, Zinnel briefed that an attorney can never lie to another attorney.  (Criminal Case ECF nos. 615, pgs. 244-248; 586-7, pgs. 27-66).

* Rules of professional conduct impose a duty of candor to the court and opposing counsel;

* In its simplest application, Rule 4.1(a) merely codifies a simple proposition: although lawyers are supposed to be zealous partisians of their clients, they must draw the line at lying. A lawyer must not make misrepresentations to a court or another lawyer. Rule 4.1(a) recodifies the traditional rule that a lawyer's word is his bond. (Criminal Case ECF nos. 615, p. 245; 586-7, p. 3).

* The failure to disclose a material fact is an ethical violation...A lawyer's responsibility to act with candor and honesty necessarily requires disclosure of significant facts, even though the disclosure might not be in the interest of the client. (Criminal Case ECF nos. 615, p. 245; 586-7, p. 43).

Here is the propper accounting:

| | |
|---|---|
| Total funds with U.S. Attorney's Office and the Court | $3,150,129.14 |
| Total ordered in judgment | -$3,014,819.00 |
| Total Amount Plaintiff has over-collected | $ 135,310.14 |

**Zinnel addressed getting the victims paid at his resentencing on May 3 & 6, 2019**

During his resentencing proceeding, Zinnel told the court and Plaintiff's counsel that "if the litigation ends today, then there is no execuse for the Government or for AUSA Matthew Segal not to get the victims paid." Attached hereto as Exhibit I are true and correct copies of relevant pages of Zinnel's resentencing in the Criminal Case for May 3, 2019 and May 6, 2019 with Zinnel's hand-written notations on them. Zinnel told the court that he wants to stop litigating. (Ex I, p. 315). However, Zinnel also stated his resolve to fight for what's right is still strong and Zinnel will litigate if necessary. Ex, I, p. 315).

11

Zinnel told the court that this litigation can end today at this resentencing if just punishment is imposed and the sentence promotes respect for the law. And if Zinnel was sentenced to what similarly situated bankruptcy fraud defendants receivd which was between 19 and 36 months of imprisonment. (Ex. I, p. 315).

Zinnel further stated:

"If this right sentence is imposed, the litigation will stop. This case will end today. I will be unhappy. I will be angry. I will grumble loudly. I will have a bitter taste in my mouth for the rest of my life of how justice was served in this case, but I will go away. I will live a law abiding life. I will do everything in my power not to be in the United States Government's cross hairs again. I will stay out of any United States Courthouse." (Exhibit I, p. 315 & 316)

\*\*\*

"I want my life, my work, my family to mean somehting. My present circumstances don't determine where I can go. They merely determine where I can start. I plead with you to end this case today. Stop the horror that's been inflicted on me and my loved ones. My incarcerationg has been long and wrong." (Exhibit I, p. 316)

"Your Honor, every saint has a past, every sinner has a future. I plea for compassion. I plea for a just sentence. I plea to end this case today. Justice is not the way we punish those who do wrong. It is the way we try to save them." (Exhibit I, p. 317)

"Courage and conviction are rare qualities in a man. God has blessed me with both. I trust God's perfect plan and timing. I believe that suffering is part of something bigger. My children, my family, and I have sufferec excessively in this case for a long time now. However, justice, like the will of God, does not always manifest itself in the spur of the moment. You've got to wait it out, and when it does, I will still be standing without a doubt. I implore you to end this case today with a sentence that is reasonable, rational, and right." (Ex. I, p. 317 & 318)

12

Thereafter, Judge Troy L. Nunley sentenced Zinnel to almost thirteen (13) years in prison which is the longest sentence in the history of the United States for Bankruptcy Fraud by 25%. The litigation continues unabated.

III.   ZINNEL, AS AN ALLEGED TRUST BENEFICIARY, HAS NO LEGAL TITLE OR OWNERSHIP INTEREST IN TRUST ASSETS

In this case, Plaintiff improperly seeks to garnish property now held by Castana Trust. This includes a TD Ameritrade IRA account ending in *0613. This, the government cannot do. Under California law, a trust beneficiary has no legal title or ownership interest in trust assets. Saks v. Damon Raike & Co., 7 Cal.App. 4th 419, 427 (1992). Therefore, Steven Zinnel owns none of the Castana Trust Assets and Steven Zinnel is not the Trustee of the Castana Trust.

IV.   THE CRIMINAL MONETARY PENALTIES ASSESSED IN THE UNDERLYING CRIMINAL CASE HAVE NOT BECOME DEBT

The Criminal Case monetary penalties assesed in the have not become debt yet under the FDCPA until Zinnel's available judicial challenges are resolved. Gonzalez v. Department of Labor, 603 F. Supp. 2d, 137, 2009 U.S. Dist. LEXIS 25921, (U.S.D.C., D. D.C March 26, 2009) (Because "the Court has concluded that Gonzalez's FECA obligation is not a debt pursuant to 28 U.S.C. 3002(3)(B) until Gonzalez's judicial challenges are exhausted," the district court denied the United States' debt collection claim under the Federal Debt Collection Procedures Act.

13

Here, Zinnel's convictions in the Criminal Case are not final. Zinnel is still exercising his right to challenge his convictions, sentence, restitution, and forfeiture on direct appeal before the Ninth Circuit, via a Supreme Court Petition, and via a habeas corpus petition under 28 U.S.C. 2255.

V.    PLAINTIFF UNITED STATES OF AMERICA AND ITS ATTORNEYS HAVE NOT COMPLIED WITH STATUTORY REQUIREMENTS FOR THE ISSUANCE OF THE POST JUDGMENT REMEDY

Contrary to the government lawyer's representations, any Judgments entered in the Criminal Case on either March 4, 2014 or May 30, 2014 are NOT the operative judgment in the Criminal Case. On February 8, 2018, the Court of Appeals for the Ninth Circuit reversed the 2014 judgment. (see Criminal Case ECF #431). On May 6, 2019, Zinnel was resentenced. On May 15, 2019, the district court filed the operative judgment in the Criminal Case. (Criminal Case ECF #653). However, since May 6, 2019, Zinnel is not aware of Plaintiff United States ever perfecting the criminal judgment against Zinnel. This is supported by the fact that in Misc. Case #1, the government lawyer filed a declaration and attached as Exhibit A a document entitled "United States Department of Justice Notice of Lien for Fine/Restitution Imposed" that was filed with the Sacramento County Recorder's office on November 7, 2014. (Misc. Case #1, ECF # 53-1, p. 4).

14

The Notice of Lien was signed by AUSA Kurt Didier. AUSA Kurt Didier misrepresented on the Notice of Lien that Zinnel's Residence was 11966 Old Eureka Way, Gold River, CA when the government lawyer knew Zinnel's address was his place of incarceration which was FCI Terminal Island in San Pedro, CA at the time the Notice of Lien was filed. Not only was Zinnel never given notice of the lien filing, but the Notice of Lien pre-dates the operative judgment in the Criminal Case by almost five (5) years.

Therefore, Plaintiff United States and its army of attorneys have not complied with statutory requirements for the issuance of the post judgment remedy.

## VI. THE PROPERTY THE UNITED STATES IS SEEKING IS EXEMPT UNDER AN APPLICABLE EXEMPTION

To protect his interests, in the abundance of caution, Zinnel has concurrently filed a Notice of Claim of Exemption asserting that if any assets exist of Zinnel, which he does not know after almost eight (8) years of unjust incarceration, some of those assets are exempt from enforcement.

## VII. THE SACRAMENTO SUPERIOR COURT, PROBATE DIVISION WILL DECIDE THE QUESTION OF THE CASTANA TRUST'S OWNERSHIP OF ASSETS

The Sacramento Superior Court, Probate Division is the proper court to determine the rights of all of the relevant parties. In the Misc. Case #1, Zinnel has filed a Notice of Joinder giving notice that he joins and adopts by reference David Zinnel's Reply to United States' Opposition.

15

VIII. THE GOVERNMENT LAWYERS CONTINUE TO LIE TO THE COURT

Many times in the Criminal Case, Zinnel has informed the court that the government lawyers continue to lie to the court in an attempt to win at all costs and malign Zinnel with the court. (for example, se Criminal Case ECF # 562, pgs. 11-18). The government attorneys are not only lawyers and officers of the court, but they have even a higher duty of candor as federal prosecutors.

Prosecutors, as servants of the law, are subject to constraints and responsibilities that do not apply to other lawyers; they must serve truth and justice first. United States v. Kojayan, 8 F.3d 1315, 1323 (9th Cir. 1993). There job is not just to win, but to win fairly, staying within the rules. Berger v. United States, 295 U.S. 78,88 (1935). The government lawyers continue to willfully advance facts prejudicial to the honor or reputation of a party; to wit Steven Zinnel.

Under the State Bar Act, an attorney may only use arguments and methods that "are considtent with truth, and may never seek to mislead the judge or any judicial officer by an artiface or false statement of fact or law." Cal. Bus. & Prof. Code 6068(d). Likewise, and attorney is prohibited "to advance facts prejudicial to the honor or reputation of a party. Cal. Bus. & Prof. Code 6068(f). Cal. Bus. & Prof. Code 6128 makes it a crime for an attorney to deceive a court or party. Rule 11 of the Federal Rules of Civil Procedure states by presenting a pleading, written motion, or other paper to the

16

court, the attorney certifies that (1) it is not being presented for any improper purpose such as to harras and (3) the factual contentions have evidentiary support. Zinnel filed exhaustive papers on an attorney's duty of candor in support of his resentencing. (see Criminal Case ECF #586-7, pgs 74). In their specious collection efforts, government lawyers AUSA Kurt A. Didier and AUSA Lynn Trinka Ernce ignore their duty of candor and lie to this court.

**The misrepresentations in the Application for Writ of Continuing Garnishment (Misc. Case ECF #5-1)**

The lawyers represent that Zinnel has an interest in accounts at TD Ameritrade Clearing Inc. (ECF #5-1, pg. 2). However, the government lawyers do not identify any account. Zinnel is unaware of any account that he still has at TD Ameritrade with any signifcant money in it.

The government lawyers represent to the court that Zinnel "still owes $3,014,294" in the Criminal Case. However, Zinnel has demonstrated herein and at his resentencing in May of 2019 that he does not.

The government lawyers state Zinnel's address is P.O. Box 5000, but it is not.

**The misrepresentations in the Ex Parte Application for an asset restraining order in aid of judgment enforcement (Criminal Case ECF #670)**

On March 24, 2021, AUSA Kurt A. Didier filed an Ex Parte Application in the Criminal Case that was chalked-full of lies. Againg, a government lawyer misrepresented to the court that "[Zinnel] owes over $3M in unpaid criminal monetary penalties." (Criminal Case ECF #670, pg. 1). Lawyer Didier continued with

17

his lies by stating Zinnel "is the sole beneficiary of an account with a current balance of over $1.3 M." (Criminal Case ECF #670, pf. 1). This is a bald-faced lie. In the government's opposition to Zinnel's recent bail motion, the government attached a copy of Zinnel's mother's Trust entitled "Castana Trust. (Criminal Case ECF #668-1, pgs. 18-40). The government also filed Zinnel's mom's Last Will and Testament. (Criminal Case ECF #668-1, pgs. 41-49). Both the Castana Trust and will were executed in March 2009. As of March 2009, the Castana Trust owned all of Ardith Ferris's assets. However, attorney Kurt Didier ignores this by filing an exhibit for a TD Ameritrade account in the name of Ardith Ferris that was signed on August 12, 2005. (Criminal Case ECF #670-1, pg. 8). Thus, the TD Ameritrade account document pre-dates the creation of the Castana Trust by almost four (4) years. Compare Criminal Case ECF nos. 670-1, pg. 8 to 668-1, pg. 39.

In aggravation, AUSA Kurt Didier filed the Ex Parte Application AFTER Zinnel filed his Reply to the Government's Opposition to Zinnel's bail motion which cites binding law that Zinnel as a "trust beneficiar has no legal title or ownership interest in trust assets." (Criminal Case ECF #669, pg. 4 citing <u>Saks v. Damon Raike & Co.</u>, 7 Cal. App. 4th 419, 427 (1992). As the Reply states, Zinnel owns none of of the Castana Trust Assets and Zinnel is not the Trustee of the Castana Trust. (ECF #669).

18

AUSA Kurt Didier continues his lies by claiming Zinnel "failed to disclose his future interest in an account." (Criminal Case ECF #670, pg. 3). That's absurd. That would be like saying Zinnel should have disclosed in 2019, that he was going to win the California mega-millions lottery on April 3, 2061! Zinnel has received no assets from the Castana Trust and Zinnel has essentially no contact whatsoever with the sole Trustee of the Castana Trust.

AUSA Kurt A. Didier also lies to the Court when he writes "The United States recently discovered he is the sole beneficiary..." (Criminal Case ECF 670, pg. 1.) On December 19, 2019, AUSA Kurt A. Didier filed an Application to take the deposition of the Trustee of the Castana Trust Trustee. (see Subpoena Case ECF #1). Kurt Didier subpoened 27 catagories of documents. (Subpoena Case ECF #1, pgs. 7-10). Document requests numbers 26 and 27 requested documents relating to any inheritance or money payable to Steven Zinnel. (ECF #1, pg. 10). Again, in the Application for Subpoena, Kurt Didier lied to the court and represented that Zinnel owed over $3,000,000 when in fact lawyer knew Zinnel owed nothing. (Subpoena Case ECF #1, pg.2). According to the application, the Trust's Trustee's deposition was set for January 3, 2020. Id. Thus, the United States did not just discover the Trust's, as opposed to Zinnel's, TD Ameritrade Account.

Zinnel requests that the Court admonish the government lawyers and report the misconduct of AUSA Kurt A. Didier to the State Bar of California and the DOJ's Office of Professional Responsibility.

19

Steven Zinnel

Dated: 6/29/21

# EXHIBIT

# "A"

Case 5:25-mc-00030-CBK   Document 203   Filed 11/21/25   Page 116 of 159 PageID #: 309

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 21 of 64

01/11/2021 01:40 PM

**U.S. Courts**
**Case Inquiry Report**
Case Number: DCAE21JCR000234; Party Number: N/A; Payee Code: N/A
Show Party Details: N/A; Show Payee Details: N/A; Show Transactions: Y



Case Number   DCAE211CR000234      Case Title   USA SV DERIAN EIDSON

Summary Party Information:

| Party# | Party Code | Party Name | | Account Code | Debt Type | JS Account # | Total Owed | Total Collected | Total Outstanding |
|---|---|---|---|---|---|---|---|---|---|
| 001 | CAEA029557 | STEVEN ZINNEL | | CAEAPA18463 | SPECIAL PENALTY ASSESSMENT | | 1,500.00 | 525.00 | 975.00 |
| 001 | CAEA029557 | STEVEN ZINNEL | | CAEAPA18463 | VICTIM RESTITUTION | | 2,513,319.00 | 0.00 | 2,513,319.00 |
| 001 | CAEA029557 | STEVEN ZINNEL | | CAEAPA18463 | FINE-CRIME VICTIMS FUND | | 500,000.00 | 0.00 | 500,000.00 |
| | | | | | | | 3,014,819.00 | 525.00 | 3,014,294.00 |

# EXHIBIT

# "B"

Subject:   Email Memorializing Offer

From:   Suzanne Luban (lubanlaw@sbcglobal.net)

To:   Kevin.Khasigian@usdoj.gov;

Date:   Tuesday, April 1, 2014 6:30 PM

Dear Kevin,

I appreciate all your hard work and cooperation to reach what is a fair and appropriate stipulation as to restitution, and in particular goes a long way toward assuring that Zac and Zayna will have resources to pay for college. Steve is personally very grateful for that.

I just wanted to memorialize Steve's earlier offer (on 3/31/14) that if Michelle would agree limit her own personal restitution to 20% of the total dollar amount of restitution payable to her, and would commit to give the remainder to Zac and Zayna equally (40% each), Steve would not object to any amount of restitution she might seek from the Court.

I will see you in the morning.

Suzanne A. Luban
Attorney At Law
3758 Grand Ave, #4
Oakland, CA 94610
(510)832-3555
fax (510)433-1131

EX 2115

# EXHIBIT

# "C"

SUZANNE A. LUBAN, SBN 120629
Attorney At Law
3758 Grand Ave. #4
Oakland, California 94610
Telephone 510/832-3555

Attorney for Defendant
STEVEN K. ZINNEL

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA
(Sacramento)

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. S 11-234-TLN |
| Plaintiff, | STIPULATION AND ORDER RE: RESTITUTION |
| vs. | |
| STEVEN K. ZINNEL, et al., | Date: April 2, 2014 |
| Defendants. | Judge: Hon. Troy L. Nunley |

The United States and defendant Steven Zinnel stipulate to the entry of criminal restitution as set forth below. This stipulation is entered into in light of the Court's rulings at sentencing. The parties agree that none of the agreements herein waive defendant Steven Zinnel's objections prior to and at sentencing to any of the guideline enhancements or sentencing determinations already imposed by the Court, and the United States will not argue that a plain error standard of review applies as a consequence of this stipulation. This includes, but is not limited to, whether any of the persons listed below was a "victim" or suffered "loss" or the amount of the loss within the meaning of the Sentencing Guidelines.

Subject to the above proviso, defendant Steven Zinnel and the United States, by and through their attorneys, hereby stipulate and agree that the Court shall enter a restitution order as follows:

Steven Zinnel shall be ordered to pay the following restitution amounts to the persons listed

1

EX 2121

Case 2:21-mc-00⬛⬛-TLN-AC   Document 84   Filed 0⬛⬛2/21   Page 26 of 64
Case 2:11-c.-⬛⬛23⬛TLN   Document 586-4   Filed 02/21/19   Page 12 of 71

Case 2:11-cr-00234-TLN   Document 343   Filed 04/02/14   Page 2 of 5

below in the amounts stated below:

1.   First Bank: $156,663.27, which represents the remainder owed to First Bank on all of its deeds of trust and any debt arising from its payment on indemnity bonds guaranteed by Mr. Zinnel;

2.   Michelle Zinnel: A total of $305,058.28, which comprises:

(a) $12,705.43 in attorneys' fees arising from the order to indemnify Ms. Zinnel for attorneys fees actually incurred by Ms. Zinnel in *General Ins. Co. of America et al. v. Corporate Control Inc. et al.*, CV-02-1020-WBS;

(b) $156,208.85 in child support for years 2005, 2006, 2007 and 2008;

(c) $3,773.00 in child support through March 10, 2014;

(d) $132,371, which represents attorneys' fees expended by Michelle Zinnel for family court representation from January 2000 through December 2005;

The parties reiterate that this stipulation does not waive any objections to guideline calculations or findings, such as that Michelle Zinnel is a "victim" or that any amounts she claims constitute "loss" under the Guidelines.

3.   Zac Zinnel: $150,000.00, which shall be held in trust for the benefit of the child according to terms to be jointly proposed by the parties and approved by the court.

4.   Zayna Zinnel: $150,000.00, which shall be held in trust for the benefit of the child according to terms to be jointly proposed by the parties and approved by the court.

5.   Fog Cutter Services: $10,799.35;

6.   Wells Fargo Card Services: $8,506.17;

7.   Travelers Casualty and Surety Co.: The parties agree that restitution shall be ordered in the amount of $1,000.00, which represents Travelers' actual payment on a bond claim. The parties agree that restitution of $285,000 shall be ordered for Travelers based on an Indemnity Agreement entered into by the relevant parties on July 15, 1996.

2

EX 21 22

Case 2:11-cr-00234-TLN   Document 580-4   Filed 02/21/19   Page 13 of 71

8. <u>Arrow Financial Services</u>: $141.50;

9. <u>MBNA America Bank</u>: $3,641.15;

10. <u>General Insurance Co. / First National Insurance Company of America / Safeco</u>: A total of $1,442,509.28 to be distributed per the claims filed in bankruptcy court, which comprises:

(a) $1,192,509.28, which represents the judgment amount stated in the Order filed on June 23, 2004 as Docket No. 247 and the Judgment filed on October 26, 2004 as Docket No. 366 in *General Ins. Co. of America et al. v. Corporate Control Inc. et al.*, CV-02-1020-WBS;

(b) $250,000.00, which represents the collateral security amount that was ordered to cover future bond payments in the Order filed on June 23, 2004 as Docket No. 247 and the Judgment filed on October 26, 2004 as Docket No. 366 in *General Ins. Co. of America et al. v. Corporate Control Inc. et al.*, CV-02-1020-WBS; and

11. <u>Stuart Allen Associates</u>: Zero because this was a duplicate claim.

IT IS SO STIPULATED:

DATED: April 1, 2014          ___/S/ *Suzanne A. Luban*___
                             SUZANNE A. LUBAN
                             Counsel for Steven. K. Zinnel

DATED: April 1, 2014          ___/S/ *Kevin Khasigian*___
                             KEVIN KHASIGIAN
                             Assistant United States Attorney
                             Counsel for Plaintiff

DATED: April 1, 2014          ___/S/ *Matthew D. Segal*___
                             MATTHEW D. SEGAL
                             Assistant United States Attorney
                             Counsel for Plaintiff

3

EX 2123

# EXHIBIT

# "D"

Case 2:21-mc-00098-TLN-AC    Document 84    Filed 07/02/21    Page 29 of 64
Case 2:11-cr-00234-TLN    Document 586-4    Filed 02/21/19    Page 2 of 71
Case 2:11-cr-00234-TLN    Document 314    Filed 03/03/14    Page 1 of 6

BENJAMIN B. WAGNER
United States Attorney
MATTHEW D. SEGAL
AUDREY B. HEMESATH
KEVIN C. KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN ZINNEL and<br>DERIAN EIDSON,<br><br>Defendants. | 2:11-CR-00234 TLN<br><br>UNITED STATES' OPPOSITION TO<br>DEFENDANT ZINNEL'S MOTION FOR STAY OF<br>FORFEITURE PENDING APPEAL<br><br>Date: March 4, 2014<br>Time: 9:00 a.m.<br>Ctrm: Hon. Troy L. Nunley |

## I.    INTRODUCTION

Trial proved that Defendant Zinnel wrongly held and used certain assets for over a decade. His motion to stay forfeiture seeks to further extend the period during which those assets will be unavailable to liquidate and use to make his victim(s) whole. Zinnel has never claimed under oath that System 3, Done Deal, or the Luyung Property were even his. The only way that he would be prejudiced by forfeiture and liquidation of these assets would be that they could generate funds that the Attorney General could in his discretion direct to Zinnel's victims (including his ex-wife). Zinnel's spite is a sentencing factor, not a basis for a motion to stay.

Zinnel does not even bother to address the factors to determine whether a stay is appropriate. He has failed even to attempt to make his required showing and his motion is without merit.

It is possible that Zinnel does not acknowledge the test for a stay because it does not favor him.

United States' Opposition to Zinnel's Motion    1
to Stay Forfeiture Proceedings

EX 2101                                                          BS 6002

Case 2:11-cr-00234-TLN   Document 314   Filed 03/03/14   Page 2 of 6

Even assuming Zinnel acknowledged the legal standards for a stay, the stay motion should be denied given the very low likelihood of success of an appeal, the burden on the United States to maintain the forfeited assets, the lack of any asset's intrinsic value, the value of providing this money to benefit the victims, and the fact that the monetary value of the forfeited items could be returned to the defendant if necessary.

## II.   BACKGROUND

In light of this Court's extensive familiarity with this case, the United States will not reiterate the relevant facts here but rather incorporates by reference the forfeiture briefs filed in this matter. The only event that the United States will address here is the September 20, 2013 Preliminary Order of Forfeiture as to Zinnel, forfeiting:

(1) All right, title, and interest in Done Deal, Inc., a California Corporation, entity number C2659844;

(2) All right, title, and interest in System 3, Inc., a California Corporation, entity number C2360455;

(3) Vacant land known as "The Luyung Property" located in Rancho Cordova, Sacramento County, CA, APN: 072-0450-015-0000;

(4) Real property located at 11966 Old Eureka Way, Gold River, CA, APN: 069-0620-054-0000; and

(5) A personal forfeiture money judgment of $1,297,158.20.

ECF No. 253.

Zinnel filed this motion to stay forfeiture proceedings on February 25, 2014. ECF No. 309.

## III.   ANALYSIS

Courts consider four factors to determine whether a forfeiture order should be stayed: "(1) the likelihood of success on appeal; (2) whether the forfeited asset is likely to depreciate over time; (3) the forfeited asset's intrinsic value to defendant; and (4) the expense of maintaining the forfeited property." United States v. Riedl, 214 F. Supp. 2d 1079, 1082 (D. Haw. 2001). A stay pending appeal is an extraordinary remedy for which the moving party bears a heavy burden. See e.g. Nken v. Holder, 556 U.S. 418, 439 (2009).[1]

---

[1] District courts across the country have routinely denied a defendant's request to stay a forfeiture order pending appeal in a criminal case. See generally United States. v. Phillips, 2013 WL.

United States' Opposition to Zinnel's Motion to Stay Forfeiture Proceedings

2

BS 6003

EX 2102

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 31 of 64
Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 4 of 71
Case 2:11-cr-00234-TLN   Document 314   Filed 03/03/14   Page 4 of 6

To be clear, System 3 was separately forfeited as bankruptcy fraud proceeds <u>and</u> property *involved in* money laundering crimes. The Eighth Amendment applies to the latter. Even assuming that the *involved in* framework was the exclusive means of forfeiture, Zinnel's vast criminal dealings involving System 3 dispose of any Eighth Amendment concerns. <u>See United States v. Wyly</u>, 193 F.3d 289, 303 (5th Cir. 1999) (forfeiture of a $4 million business used to facilitate money laundering offense was not grossly disproportional to an offense involving only $175,000; Eighth Amendment analysis looks not just to the value of the forfeited property in comparison to the amount laundered, but to the scope and duration of the scheme, the harm caused, and the relationship of the property to the scheme).[2]

As to the second factor, although the local real estate market is in a period of recovery, holding the real properties will harm the United States. The loan/penalties on one property continue to swell.[3] Also, the United States will be required to incur expenses to maintain the property during the pendency of the appeal, as well as pay for liability insurance and property taxes. These costs add to overall depreciation because they will be deducted from any net equity calculation. Regarding System 3,[4] it grew in the mid-to-late 2000s, but growth has stalled this decade as competition increased and clients brought electrical work back in-house to cut costs. Finality in this forfeiture case would lift the cloud of ownership and end the many rounds of Zinnel-led litigation, allowing System 3 to focus on satisfying its client's electrical needs.

The third factor weighs heavily against a stay. The intrinsic value of the forfeited assets to Zinnel is zero. Under oath in family court and bankruptcy, Zinnel has never claimed ownership of

---

[2] An independent appraisal valued the 46% minority interest in System 3 at $3,030,000. Continuing the exclusive *involved in* forfeiture hypothetical (disregarding that System 3 was forfeited as fraud proceeds), a forfeiture consistent with that valuation is not disproportional given the depth of the fraud and money laundering schemes, which included laundering over $1 million dollars and the $4 million demand for the minority interest in System 3. <u>See United States v. Aguasvivas-Castillo</u>, 668 F.3d 7, 16–17 (1st Cir. 2012) (the forfeiture of $20 million, three-fourths of which comprised untainted funds forfeited under the facilitation theory, was not grossly disproportional to the gravity of a $4.4 million food stamp fraud offense); <u>see also</u> <u>Riedl</u>, 164 F. Supp. 2d at 1200 (D. Haw. 2001) (forfeiture of real property worth $1.2 million, which was 12 times the maximum fine under the sentencing guidelines, not grossly disproportional where defendant intended to launder $2.6 million in drug proceeds), aff'd, 82 F. App'x 538 (9th Cir. 2003).

[3] The loan on Old Eureka Way has been in default since September 2010. See ECF No. 274. As of October 29, 2013, the loan balance was approximately $291,000. Id.

[4] The United States does not believe Done Deal, Inc. has any value other than as a shell company to launder money. Its corporate form will be terminated once the forfeiture order is final.

United States' Opposition to Zinnel's Motion    4
to Stay Forfeiture Proceedings

EX 2103

BS 6009

Case 5:25-mc-00030-CBK    Document 203    Filed 11/21/25    Page 127 of 159 PageID #: 320

Case 2:21-mc-00098-TLN-AC    Document 84    Filed 07/02/21    Page 32 of 64
Case 2:11-cr-00234-TLN    Document 586-4    Filed 02/21/19    Page 5 of 71
Case 2:11-cr-00234-TLN    Document 314    Filed 03/03/14    Page 5 of 6

System 3 or the Luyung Property.[5] While Old Eureka Way was Zinnel's residence, he no longer resides there, having been in custody since his convictions in this case. That property has no particular historical or familial significance to Zinnel – it was not passed down from prior generations, for example. Rather, Zinnel purchased Old Eureka in 1995 and, not surprisingly, used launder money to retire a bank loan on the property in 2006.[6] See United States v. Evanson, No. 2:05-CR-805, 2008 WL 4335549, at *1 (D. Utah Sept. 22, 2008) (stay unwarranted where defendant failed to show that real property was "unique and cannot be replaced through reimbursement from the government if he succeeds on appeal").

Fourth factor: As the attached Declaration of IRS Special Agent Jason Lamb makes clear,[7] there can be no serious dispute that real property is expensive to maintain. Expenditures for heating costs, real-estate taxes, insurance, and general maintenance all continue to accrue in the absence of forfeiture and sale, money that would otherwise go to Zinnel's victims. The costs associated with maintaining/monitoring System 3 would likely be stratospheric; costs in the first year of the stay would exceed $20,000. This Court would need to appoint a professional receiver to perform such tasks as reviewing System 3's finances/operations and preparing monthly reports. Paying for such efforts would be nonsensical in this case. After all, forfeiture is designed to create a pool of assets from which victims can be reimbursed. Delaying forfeiture "will only prolong the ability of [Defendant's] victims to receive distributions ... and would only serve to further harm [them]." See United States v. Davis, No. 07-cr-011, 2009 WL 2475340, at *3 (D. Conn. June 15, 2009). Simply put, the sooner the properties are sold, the better off Zinnel's victims will be. Thus, this factor also weighs in favor of denying the motion for stay.

///

///

[5] As the trial evidence established, Zinnel hid and concealed his ownership of the Luyung Property. See Trial Exhibit 2001.

[6] See Trial Exhibit 2008. Defendant Zinnel was convicted of laundering the proceeds connected to the payoff of the mortgage on the Old Eureka property. See ECF No. 22, Verdict Form as to Zinnel, Count 16.

[7] See Exhibit A, estimating $41,707.04 in annual costs (year 1) to the United States to maintain the forfeited assets.

United States' Opposition to Zinnel's Motion                5
to Stay Forfeiture Proceedings

EX 2104

BS 6005

# EXHIBIT

# "E"

From: "Khasigian, Kevin (USACAE)" <Kevin.Khasigian@usdoj.gov>
To: Suzanne Luban <lubanlaw@sbcglobal.net>; "Segal, Matthew (USACAE)" <Matthew.Segal@usdoj.gov>; "Hemesath, Audrey (USACAE)" <Audrey.Hemesath@usdoj.gov>
Sent: Wednesday, September 21, 2016 11:09 AM
Subject: RE: sale of Zinnel properties

Suzanne:

The sale of the Luyung Property resulted in net proceeds of $82,608.15, and the sale of 11966 Old Eureka Way netted $41,786.13. The below chart identifies the assets (and net proceeds) forfeited from your client:

| Asset Description | Net Proceeds |
| --- | --- |
| Vacant land - "The Luyung Property" | $82,608.15 |
| 11966 Old Eureka Way, Gold River | $41,786.13 |
| System 3, Inc. | $2,800,000.00 |
| $65,534.85 First Bank Account | $65,534.85 |
| $53,362.51 Wells Fargo Bank | $53,362.51 |
| Best Build and 3 Checks | $106,312.50 |
| Totals | $3,149,604.14 |

No funds have been applied to restitution or the fine.

The requested closing statements are attached to this email.

--Kevin

EX 2133

# EXHIBIT

# "F"

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 36 of 64
Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 21 of 71
Case 2:11-cr-00234-TLN   Document 409   Filed 12/05/...   Page 1 of 237

**FILED**

STEVEN ZINNEL, USM #66138-097
Federal Correctional Institution,
Terminal Island
PO Box 3007
San Pedro, CA   90733-3007

DEC 05 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

Defendant, In Pro Se

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

### (SACRAMENTO)

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Case No. 2:11-cr-234-TLN |
| Plaintiff, | DEFENDANT STEVEN ZINNEL'S NOTICE OF MOTION AND MOTION TO |
| vs. | (1) ENFORCE JUDGMENT |
| STEVEN ZINNEL, | (2) HOLD PLAINTIFF AND ITS ATTORNEYS IN CIVIL CONTEMPT |
| Defendant. | (3) MOTION FOR ORDER DIRECTING THE BOP TO STOP TAKING $25.00 QUARTER FROM ZINNEL TO APPLY TO RESTITUTION |

(4) MOTION FOR ORDER DIRECTING THE BOP, COURT CLERK, AND/OR PLAINTIFF TO RETURN THE $325 THAT HAS BEEN TAKEN FROM ZINNEL AT THE RATE OF $25.00 QUARTER SINCE HE WAS REMANDED INTO THE CUSTODY OF THE BOP

(5) MOTION DIRECTING PLAINTIFF TO PERSONALLY SERVE DEFENDANT STEVEN ZINNEL WITH ANY PAPERS PRIOR TO COURT-FILING IN THIS CASE

(6) MOTION TO EXTEND DUE DATE OF DEFENDANT'S TIME TO ACT BY 14 DAYS

(7) MOTION FOR ORDER ISSUED TO THE BOP DIRECTING ZINNEL TO APPEAR BY TELEPHONE AT THE HEARING

(8) MOTION FOR ACCURATE ACCOUNT OF FUNDS PLAINTIFF HAS MARSHALED

[Filed concurrently with defendant's Motion to Recuse District Court Judge Troy L. Nunley from presiding over any further proceedings in this case and motion for case reassignment to a new District Court Judge]

Date:       December 14, 2017
Time:       9:30 A.M.
Judge:      Hon. Troy L. Nunley
CtRm:       #2
            [subject to change]

Ex 2151                         Page 1

Case 5:25-mc-00030-CBK   Document 203   Filed 11/21/25   Page 132 of 159 PageID #: 325

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 37 of 64
Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 22 of 71

Case 2:11-cr-00234-TLN   Document 409   Filed 12/05/17   Page 2 of 237

TO THE HONORABLE COURT, PLAINTIFF UNITED STATES OF AMERICA, ITS ATTORNEYS MATTHEW D. SEGAL, AUDREY B. HEMESATH, KEVIN C. KHASIGIAN, PHILLIP A. TALBERT, U.S. ATTORNEY GENERAL JEFFERSON SESSIONS, THE U.S. DEPARTMENT OF JUSTICE, DEFENDANT DERIAN EIDSON BY AND THROUGH HER ATTORNEY BECKY S. JAMES, ANY PERSON OR ENTITY THAT HAS APPEARED IN THE ABOVE-CAPTIONED CASE, JUDGMENT RESTITUTION RECIPIENTS ZAC ZINNEL AND ZAYNA ZINNEL, AND ANY OTHER INTERESTED PERSON:

PLEASE TAKE NOTICE that on December 14, 2017 at 9:30 AM, or as soon thereafter as this matter may be heard in the above-entitled Court for hearing, Defendant Steven Zinnel ("Defendant" or "Zinnel"), in pro se, will and hereby does move the Court to (1) Enforce its Judgment; (2) Hold Plaintiff United States of America and its attorneys in Civil Contempt, (3) for an order directing the BOP to stop deducting $25.00 quarter from Zinnel to apply to restitution (4) for an order directing the BOP, court clerk, and/or Plaintiff to return the $325.00 that has been taken from Zinnel at the rate of $25.00 quarter since he was remanded into the custody of the BOP (5) Direct Plaintiff to personally serve defendant Steven Zinnel with any papers, PRIOR to court-filing, in this case going forward, (6) motion to extend due date of defendant's time to act by fourteen (14) days, (7) motion for order issued to the BOP directing Zinnel to appear by telephone at the hearing, and (8) motion for accurate account of funds plaintiff has marshaled ("Motion"). The hearing is currently set in Courtroom #2 of the United States Courthouse located at 501 I Street, Sacramento, CA 95814 before the Honorable Troy L. Nunley (subject to change with judge reassignment).

The Motion should be granted for many compelling reasons. The grounds for this Motion are: The court has the inherent power to enforce its judgments. Contempt is one method of enforcing its judgment. There is currently a valid enforceable Judgment in this criminal case. The Plaintiff and its attorneys are aware of the Judgment. Plaintiff and its attorneys can comply with the Judgment because Plaintiff has marshaled, and is holding more than enough funds, to pay out the restitution ordered in the Judgment. Plaintiff and its attorneys are willfully not paying out the money they are holding as ordered by the Judgment. Plaintiff and its attorneys have violated the court order memorialized into a Judgment in the above-captioned case. The violation demonstrably fell short of substantial compliance with the Judgment. The violation was not based on a good faith and reasonable interpretation of the order. Thus, it is Plaintiff and its attorneys that are actually spiteful in this case not Zinnel. Since Plaintiff is sitting on more than enough money to satisfy the Judgment restitution and the entire Judgment is not being complied with, the court should order the BOP to stop deducting $25.00 a quarter from Zinnel and order the return of the $325.00 that has been deducted thus far from Zinnel.

EX 2152                              Page 2

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 38 of 64
Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 23 of 71
Case 2:11-cr-00234-TLN   Document 409   Filed 12/05/17   Page 3 of 237

PLEASE TAKE FURTHER NOTICE that Zinnel has concurrently filed with this Motion a Motion to Recuse District Judge Troy L. Nunley from presiding over any further proceedings in the above-captioned case including the instant Motion. Zinnel objects to Judge Troy L. Nunley deciding this motion and/or presiding over any further proceedings in the above-captioned case. Thus, the presiding Judge, Courtroom, Date, and Time may change when a new judge is assigned to the above-captioned case. When a new Judge is assigned, either the Court or Zinnel will give notice of any changes.

PLEASE TAKE FURTHER NOTICE that because Zinnel is currently unjustly incarcerated in federal prison, not a participant in the court's CM/ECF system, and subject to institution change at any time without notice by the Bureau of Prisons ("BOP"), Zinnel further moves the court for an order directing Plaintiff and its attorneys to cause Zinnel to be personally served with any papers, including any opposition to this Motion, PRIOR to filing the papers with the court, at the BOP institution Zinnel is actually at when Plaintiff's papers/opposition are ready to be filed with the court. Prior to filing with the court, Plaintiff and its attorneys can email or fax any papers to be filed with the court, including any opposition to this Motion, to the BOP institution Zinnel is incarcerated within, so he can be personally served by a BOP staff member with any legal papers.

PLEASE TAKE FURTHER NOTICE, that Zinnel moves the court to issue an order to Plaintiff and its attorneys requiring them to concurrently file with the court a Certificate of Service reflecting that Zinnel was personally served with their papers, including any opposition to this Motion, before filing any papers and/or opposition with the court utilizing the CM/ECF system.

PLEASE TAKE FURTHER NOTICE, that Zinnel moves the court to be personally served with any and all court orders in the above-captioned case going forward which could be accomplished by ordering Plaintiff and its attorneys to personally serve Zinnel with a Notice of Entry of Order.

PLEASE TAKE FURTHER NOTICE that because Zinnel is currently unjustly incarcerated in federal prison and subject to institution change at any time, without notice by the BOP, Zinnel further moves the court for an order extending his deadline to act in this case by fourteen (14) calendar days to allow Zinnel sufficient time to review documents, perform legal research, draft any papers, and file any papers with the court by U.S. Mail. Per Local Rule 430.1(d), the Plaintiff's and its attorneys' opposition, if any, is due within seven (7) days of this filing and Zinnel's Reply will be due on the date prescribed by the court.

EX 2153

Case 2:21-mc-00098-TLN-AC    Document 84    Filed 07/02/21    Page 39 of 64
Case 2:11-cr-00234-TLN    Document 586-4    Filed 02/21/19    Page 24 of 71
Case 2:11-cr-00234-TLN    Document 409    Filed 12/05/17    Page 4 of 237

PLEASE TAKE FURTHER NOTICE, because Zinnel is unjustly incarcerated, he is unable to personally attend the hearing. Therefore, Zinnel moves the court to appear by telephone at the hearing. Zinnel requests that the court provide him with written notice of a telephone number to call in on. Due to the constant and continuous Obstruction of Justice by the BOP in the form of not allowing Zinnel to participate at court hearings by telephone, preventing Zinnel from performing legal research, and preventing Zinnel from complying with court orders, Zinnel moves this court to issue an order to the Federal Bureau of Prisons and FCI Terminal Island's Warden Felicia Ponce directing the BOP and Warden Ponce to allow Zinnel to use an institution staff telephone on the date and time of the hearing so Zinnel can appear by telephone at the hearing, under the court's supervisory powers to prevent obstruction of its proceedings.

Should the court require Zinnel's physical appearance at the hearing, Zinnel requests that the court appoint the Federal Defender's Office to represent Zinnel at the hearing and Zinnel waives his physical appearance at the hearing.

Zinnel moves the court for a transcript of the hearing and if any portion of this Motion is denied, that the court's clerk be ordered to file a Notice of Appeal to the Court of Appeals for the Ninth Circuit on Zinnel's behalf.

This Motion is based on this notice, the concurrently filed memorandum of points and authorities, declaration of Steven Zinnel, index of attached exhibits, objection to Judge Troy L. Nunley from deciding this Motion, the records of this case, and any oral argument permitted at the hearing on the Motion.

Dated: October 31, 2017

Steven Zinnel
Defendant in pro se

EX 2154

# EXHIBIT
# G

# Foreword

The Asset Forfeiture and Money Laundering Section (AFMLS) is pleased to release the 2016 version of the *Asset Forfeiture Policy Manual*, a compilation of policies governing the Department of Justice Asset Forfeiture Program. The mission of the Asset Forfeiture Program is to disrupt and dismantle criminal enterprises, deprive criminals of the proceeds of illegal activity, deter crime, and restore property to victims. The purpose of the *Policy Manual* is to provide Department of Justice prosecutors, agents, and support staff with a reference manual containing the policies and procedures in support of that mission.

Since the *Policy Manual* was last published in 2013, the Department of Justice has been engaged in a comprehensive review of the policies governing the Department of Justice Asset Forfeiture Program. The purpose of this review is to ensure that federal asset forfeiture authorities are appropriately and effectively used consistent with civil liberties and the rule of law.

As a result of this review, the Department of Justice has issued a number of significant policy directives that are reflected in the *Policy Manual*. These include updates to the net equity thresholds and the Department of Justice's new structuring policy (Chapter 1), the recently-issued guidance pertaining to facilitating property (Chapter 2), and the Attorney General's January 16, 2015, order limiting adoptions of assets seized by state or local law enforcement under state law (Chapter 14). In addition, a new Chapter 13 on real property compiles the policies and guidance for real property that previously appeared throughout various chapters of the *Policy Manual*, while incorporating updated procedures. The remaining chapters have also been reviewed and updated.

This *Policy Manual* replaces and supersedes all previous versions of the *Policy Manual* and all Policy Directives issued by AFMLS, unless otherwise noted. The *Policy Manual* is published in hardcopy and available online at http://www.justice.gov/criminal-afmls/publications. Any future updates issued prior to the publication of the next hardcopy *Policy Manual* will be issued as Policy Directives.

The *Asset Forfeiture Policy Manual* sets forth the policies of the Department of Justice. It does not, however, create or confer any legal rights, privileges, or benefits that may be enforced in any way by private parties. *See United States v. Caceres*, 440 U.S. 741 (1979).

We recommend that the following format be used in citing this *Policy Manual: Asset Forfeiture Policy Manual* (2016), Chap. ___, Sec. ___.___. (e.g., Chap. I, Sec. I.A).

M. Kendall Day
Chief
Asset Forfeiture and Money Laundering Section

EX 2201

## Chapter 12:
## Forfeiture and Compensation for Victims of Crime

Forfeiture is a critical tool in the recovery of illicit gains arising from financial crimes such as fraud, embezzlement, and theft. Returning forfeited assets to victims through the remission and restoration processes is a priority of the Asset Forfeiture Program. With respect to property that is judicially forfeited under the criminal forfeiture statutes, the Attorney General has the authority to grant petitions for remission or mitigation of forfeiture and restore forfeited property to victims. *See* 21 U.S.C. § 853(i)(1).[1] In civil judicial forfeitures pursuant to section 981, the Attorney General has the authority to restore forfeited assets to the victims of any offense giving rise to forfeiture. Accordingly, remission and restoration authority now exists for virtually all offenses for which a related civil or criminal forfeiture order is obtained. The federal regulations governing the remission of civil or criminal forfeiture are found at 28 C.F.R. Part 9.

 In concert with this expanded remission authority, the Criminal Division initiated a procedure in 2002 called restoration. This procedure enables the Attorney General to transfer forfeited funds to a court for satisfaction of a criminal restitution order, provided that all victims named in the order otherwise qualify for remission under the applicable regulations. While remission and criminal restitution are not directly related, they may serve similar functions. Remission is discretionary relief intended to reduce the hardship that may arise from forfeiture for persons who have incurred a monetary loss from the offense underlying the forfeiture. Restitution is an equitable remedy that is intended to make crime victims whole and prevent unjust enrichment to the perpetrator. In many cases, restoration—the use of forfeited funds to pay restitution—is desirable, since the defendant may be left without assets to satisfy his or her restitution obligation following forfeiture.

Priority in the distribution of forfeited assets is given to valid owners, lienholders, federal financial regulatory agencies, and victims (in that order), who in turn have priority over official use and equitable sharing requests. *See* 28 C.F.R. § 9.9(a).

The Treasury Forfeiture Fund (TFF) has a similar procedure for remission and restoration. Please consult the *Guidelines for Treasury Forfeiture Fund Agencies on Refunds Pursuant to Court Orders, Petitions for Remission, or Restoration Requests* ("Treasury Blue Book"), available at http://www.treasury.gov/resource-center/terrorist-illicit-finance/Asset-Forfeiture/Documents/bluebook.pdf.[2]

This chapter discusses the principal policies and procedures governing the return of forfeited assets to crime victims. Section I covers the basics of remission and restoration; and Section II discusses strategies for compensating victims of large fraud offenses.

---

[1] While section 853(i) governs forfeitures under the drug abuse prevention and control laws, it is incorporated by reference in 18 U.S.C. § 982(b)(1), which extends forfeiture authority to most other criminal offenses.

[2] Treasury Forfeiture Fund member agencies include the Internal Revenue Service-Criminal Investigations (IRS-CI), U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), U.S. Secret Service (USSS), and U.S. Coast Guard.

EX 2202

Case 5:25-mc-00030-CBK   Document 203   Filed 11/21/25   Page 138 of 159 PageID #: 331

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 43 of 64
Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 60 of 71

Chapter 12: Forfeiture and Compensation for Victims of Crime

## I.   Returning Forfeited Assets to Victims

### A.   Remission

Once assets have been judicially forfeited, the authority to distribute them to owners, lienholders, and victims rests solely with the Attorney General. *See* 28 C.F.R. Part 9. Potential victims must be notified of the opportunity to file a petition for remission. In judicial forfeitures, notification is the responsibility of the U.S. Attorney's Office (USAO). Known victims should be notified by mail, and potential unknown victims may be notified by publication. In appropriate cases, the USAO may modify the standard notice of the Victim Notification System (VNS) to incorporate notice of the forfeiture and a model petition for remission.[3] The notice should instruct the victims to file petitions with the USAO that handled the civil or criminal forfeiture.

The authority to decide petitions for remission in judicial cases has been delegated by the Attorney General to the Chief of the Asset Forfeiture and Money Laundering Section (AFMLS). 28 C.F.R. § 9.1(b)(2). Petitions are decided on the basis of written documentation; there is no right to a hearing on the petition. 28 C.F.R. § 9.4(g). Unsuccessful petitioners are entitled to one request for reconsideration, which is reviewed and decided by a different ruling official within AFMLS. 28 C.F.R. § 9.4(k)(3). Judicial review of a denial of remission is not available. *See United States v. One 1970 Buick Riviera Bearing Serial No. 494870H910774*, 463 F.2d 1168, 1170 (5th Cir.), *cert. denied*, 409 U.S. 980 (1972) (Attorney General has unreviewable discretion over remission or mitigation of forfeitures). Although the USAO and seizing agency must provide their recommendations as to the allowance or denial of a judicial petition for remission, the final determination rests with AFMLS. USAOs must take care not to make representations to the court or potential victims as to whether remission will be granted.

The determination of whether a victim is entitled to remission is governed by regulation. The breadth of options available for transfer of forfeited property to victims depends on the statute under which the property is forfeited. The options are broadest in criminal forfeiture, where the Attorney General has statutory authority not only to grant petitions for remission to victims of the offense underlying the forfeiture that is the basis for the forfeiture, but also to *"take any other action to protect the rights of innocent persons which is in the interests of justice* and which is not inconsistent with the provisions of [the applicable chapter or section]." 21 U.S.C. § 853(i)(1), incorporated by reference in 18 U.S.C. § 982 (emphasis added). In civil forfeitures, the statutory authority is less broadly stated, and the Attorney General's authority to remit forfeited assets does not appear to extend to other such "innocent persons ... ." *See, e.g.*, 18 U.S.C. § 981(d); 21 U.S.C. § 881(d).

In administrative forfeitures, the authority to decide petitions for remission or mitigation rests with the seizing agency.[4] It is the responsibility of the agency to notify potential victims of the opportunity to file a petition for remission. The remission decision is at the discretion of the forfeiting agency and not reviewable in court. Questions regarding administrative forfeiture policies and procedures should be directed to the forfeiting agency. When petitions have been filed for both administratively and judicially forfeited assets in the same case, the seizing agency must coordinate with the forfeiture Assistant U.S. Attorney (AUSA) assigned to the case.

---

[3] VNS is a free, computer-based system developed by the Department of Justice to provide important information to victims of federal crimes.

[4] *See, e.g.*, 19 C.F.R. Parts 171 and 172.2; 26 C.F.R. Part 403, Subpart D; 28 C.F.R. § 9.1(b)(1).

EX 2203

Case 2:21-mc-00098-TLN-AC  Document 84  Filed 07/02/21  Page 44 of 64
Case 2:11-cr-00234-TLN  Document 586-4  Filed 02/21/19  Page 61 of 71
Chapter 12: Forfeiture and Compensation for Victims of Crime

Many forfeiture cases begin administratively and become judicial when a party files a claim challenging the agency forfeiture. In such cases, the petition must be adjudicated by AFMLS. However, the petitioner need not submit a second petition. The seizing agency should forward the petition to the USAO to further submit to AFMLS.

### A.1 Standards for victims, 28 C.F.R. Part 9

The factual basis and legal theory underlying the forfeiture will determine who qualifies as a victim under 28 C.F.R Part 9. "The term victim means a person who has incurred a pecuniary loss as *a direct result of the commission of the offense underlying a forfeiture.*" 28 C.F.R § 9.2 (emphasis added).[5] Federal agencies can qualify as a victim under the regulations.

Victims may also recover losses caused by a related offense. 28 C.F.R. § 9.8(a)(1). *Related offense* means: "(1) Any predicate offense charged in a Federal Racketeer Influenced and Corrupt Organizations Act (RICO) count for which forfeiture was ordered; or (2) An offense committed as part of the same scheme or design, or pursuant to the same conspiracy, as was involved in the offense for which forfeiture was ordered." 28 C.F.R. § 9.2.

### A.2 Qualification to file

A victim may be granted remission of the forfeiture of property if the victim satisfactorily demonstrates that:

(1) a pecuniary loss of a specific amount has been directly caused by the criminal offense, or related offense, that was the underlying basis for the forfeiture, and the loss is supported by documentary evidence including invoices and receipts; (2) the pecuniary loss is the direct result of the illegal acts and is not the result of otherwise lawful acts that were committed in the course of the criminal offense; (3) the victim did not knowingly contribute to, participate in, benefit from, or act in a willfully blind manner towards the commission of the offense, or related offense, that was the underlying basis for the forfeiture; (4) the victim has not in fact been compensated for the wrongful loss of the property by the perpetrator or others; and (5) the victim does not have recourse reasonably available to other assets from which to obtain compensation for the wrongful loss of the property.

28 C.F.R. § 9.8(a).

"The amount of the pecuniary loss suffered by a victim for which remission may be granted is limited to the fair market value of the property of which the victim was deprived as of the date of the occurrence of the loss." 28 C.F.R. § 9.8(b). This provision presents three issues to be determined in connection with calculating a victim's loss: (1) What property did the victim lose as a direct result of the illegal activity; (2) When was the victim deprived of it; and (3) What was the fair market value of that property at that time? The term "fair market value" is not defined in 28 C.F.R. Part 9. When the loss is property other than money, the date of the victim's loss and the fair market value of the property on that date must be decided in order to determine the victim's recoverable loss.

A victim's pecuniary loss must be supported by documentary evidence. 28 C.F.R. § 9.8(a)(1) and (2). Losses that are secondary to the principal loss, such as "interest foregone or for collateral expenses incurred to recover lost property or to seek other recompense," are not eligible for remission. 28 C.F.R. § 9.8(b).

---

[5] A *person* is "an individual, partnership, corporation, joint business enterprise, estate, or other legal entity capable of owning property." 28 C.F.R § 9.2.

EX 2204

Case 5:25-mc-00030-CBK    Document 203    Filed 11/21/25    Page 140 of 159 PageID #: 333

Case 2:21-mc-00098-TLN-AC    Document 84    Filed 07/02/21    Page 45 of 64
Case 2:11-cr-00234-TLN    Document 586-4    Filed 02/21/19    Page 62 of 71

Chapter 12: Forfeiture and Compensation for Victims of Crime

Losses are also ineligible for remission if they result from property damage or physical injuries, or from a tort associated with illegal activity that formed the basis for the forfeiture, unless the tort constitutes the illegal activity itself. 28 C.F.R. § 9.8(c). Victims who "knowingly contribute to, participate in, benefit from, or act in a willfully blind manner towards the commission of the offense, or related offense, that was the underlying basis for the forfeiture" are also ineligible for remission. 28 C.F.R. § 9.8(a)(3).

A victim need not show that his or her funds are among the funds that have been forfeited in order to establish eligibility for remission. Similarly, the tracing of a particular victim's funds into a forfeited account does not give that victim priority over other victims whose funds cannot be traced.

### A.3 Priority in multiple-victim remission cases

Priority in the distribution of forfeited assets is given to valid owners, lienholders, federal financial regulatory agencies,[6] and victims (in that order), who in turn have priority over official use requests and equitable sharing requests. In cases involving more than one victim, the ruling official will generally grant remission on a pro rata basis where the amount to be distributed is less than the value of the victims' losses. Additional exceptions are permitted only in rare situations, such as when pro rata distribution would result in extreme hardship to a victim or when a victim has better evidence of loss than other victims.[7] However, the tracing of a particular victim's funds into a forfeited account does not give that victim priority over the victims whose funds cannot be traced.

### A.4 Trustees

AFMLS may opt to hire a trustee/claims administrator in large, multiple-victim cases to assist in notifying potential victims of the opportunity to seek remission, in processing the petitions, and in making decision recommendations. 28 C.F.R. § 9.9(c). AFMLS will coordinate with the USAO and lead seizing agency during the selection process. In addition, if a trustee has been appointed in parallel regulatory or bankruptcy actions, AFMLS may approve transfer of funds for distribution to the trustee for ultimate payment to the identified victim pool.

USAOs and agencies interested in utilizing the services of a trustee or claims administrator to support the remission and restoration processes are encouraged to consult early with AFMLS. AFMLS awarded a contract to three vendors to provide claims administration support services in cases that will result in forfeited funds being returned to victims through the remission or restoration processes. This national contract simplifies procurement actions, and also streamlines petition review and payment distribution in victim cases where highly experienced and expert firms are required to handle the volume of petitioners.

### A.5 Additional grounds for denial of remission to victims

Remission to victims may be denied: (1) if determination of the pecuniary loss to be paid to individual victims is too difficult; (2) if the amount to be paid to victims is small compared to the expense incurred by the Government in deciding the victims' claims; or (3) if the total number of

---

[6] A federal financial regulatory agency is generally entitled to priority of distribution over non-owner victims for losses and expenses incurred in its capacity as receiver of a failed institution. This priority, codified in the federal regulations at 28 C.F.R. § 9.8(h), is applicable only for reimbursement of the Federal Deposit Insurance Corporation's payments to claimants and creditors of the institution and/or reimbursement of insurance fund losses under 18 U.S.C § 981(e)(3), and for fraud losses associated with the sale of assets held in receivership pursuant to section 981(e)(7).

[7] 28 C.F.R. § 9.8(e).

EX 22.05

Case 5:25-mc-00030-CBK    Document 203    Filed 11/21/25    Page 141 of 159 PageID #: 334

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 46 of 64
Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 63 of 71
Chapter 12: Forfeiture and Compensation for Victims of Crime

victims is large and the amount available for payment to victims is so small as to make granting payments to victims impractical. 28 C.F.R. § 9.8(d).

### A.6  Timeliness

Victims should file petitions for judicially forfeited assets generally within 30 days after receiving notice. However, when a victim fails to submit a valid petition within 30 days, exceptions may be allowed for good cause based on the particular circumstances of the case.

### B.  Restoration

In 2002, the Criminal Division issued procedures, known as the Restoration Procedures, designed to simplify and accelerate the return of forfeited property to victims. These procedures apply where (1) both restitution to compensate victims and a related forfeiture (either civil, criminal, or administrative) have been ordered, (2) the victims and amounts listed in the restitution order essentially conform to the victims and amounts that would have been paid through the forfeiture remission process; and (3) other property is not available to satisfy the order of restitution.

The Restoration Procedures enable the Government to complete the forfeiture and recover costs. This permits victims to obtain fair compensation from the forfeited assets in accordance with the court's restitution order, without having to file petitions for remission with the Government and await decisions on the same. Restoration is a standardized alternative procedure to petitions for remission, designed to accommodate victims and the courts to the furthest extent possible, while still meeting the statutory and regulatory requirements for remission.

### B.1  Background

Because forfeited assets are property of the Government, courts and defendants lack authority to use them to satisfy a defendant's criminal debts, including fines or restitution obligations. *See United States v. Trotter*, 912 F.2d 964 (8th Cir. 1990). In many cases, defendants are left with little or no property after the forfeiture is completed. Thus, prior to the issuance of the Restoration Procedures, the Government often seized property, and then made it available to satisfy court-ordered restitution rather than complete the forfeiture. This process, while cumbersome, worked where the seized assets were cash or bank accounts, and where there were no competing claims for the property. However, where assets needed to be maintained and sold, or where third parties claimed an interest in the property, completion of the forfeiture was necessary, and victims were generally required to take the additional step of filing petitions for remission in order to recover any part of the forfeited assets. Under the Restoration Procedures, the Government may now forfeit property and transfer the proceeds to the court in satisfaction of the defendant's order of restitution. The Attorney General's restoration authority has been delegated to the Chief of AFMLS, pursuant to Attorney General Order No. 2088-97 (June 14, 1997).

### B.2  How the restoration process works

The Restoration Procedures require both a court order of restitution *and* an order (or declaration) of forfeiture. Because restoration decisions must be approved by the Chief of AFMLS (as delegated by the Attorney General), the USAO or court may not unilaterally direct forfeited assets to be applied to restitution. However, the Restoration Procedures allow, when requested by the USAO, preliminary

EX 2206

Chapter 12: Forfeiture and Compensation for Victims of Crime

review of the expected restitution and forfeiture order by AFMLS so that AUSAs may advise the court of the Government's intended distribution of the property.

To use the Restoration Procedures, the USAO must send the Chief of AFMLS a copy of the Judgment in a Criminal Case containing the order of restitution and a copy of the forfeiture order, along with a written request signed by the U.S. Attorney, or his or her designee, that includes the representations set forth at Section I.B.3 below. Once the Chief of AFMLS has approved the request for restoration, AFMLS notifies both the USAO and the custodian of the property. The custodian then transfers the net proceeds of the forfeiture to the clerk of court for distribution pursuant to the order of restitution.

Restoration is appropriate only when the distribution pursuant to the restitution order is essentially the same as the distribution that would be obtained through the remission process. Prosecutors wishing to use the Restoration Procedures must work with the seizing agency, probation officer and the court to make sure that the court's restitution order lists the names of all victims and the amount of restitution due to each. Prosecutors also should be cognizant that restitution is generally available for a much broader category of harms than may be satisfied through remission, which is allowed only for pecuniary losses caused by the offense underlying the forfeiture or a related offense. Moreover, 28 C.F.R. § 9.8(b) provides that the victim's loss is limited to the fair market value of the property of which the victim was deprived, as of the date of the loss. No allowance is made for interest forgone, lost profits, or collateral expenses incurred to recover lost property or to seek other recompense. Thus, restoration may not be used where a significant portion of the losses covered by the restitution order relate to bodily harm, property damage, future expenses and collateral expenses such as legal, accounting, or security expenditures incurred in trying to correct the harm caused by the crime. If the restitution order is not amenable to the restoration process, the USAO will be advised and assets may be distributed through the remission process.

### B.3  Representations

The Restoration Procedures are designed to accomplish results that are consistent with the standards that apply to the remission of forfeited assets at 28 C.F.R. § 9.8. In order to ensure that such standards are met, the U.S. Attorney, or his or her designee, must inform AFMLS of the following, in writing and accompanied by a signature, as part of the request for restoration:

- All known victims have been properly notified of the restitution proceedings and are properly accounted for in the restitution order. This representation is intended to ensure that no victims have been left out of the restitution order and that all are treated fairly in the order.

- To the best of the U.S. Attorney's, or designee's, knowledge and belief after consultation with the seizing agency, the losses described in the restitution order have been verified, comport with the remission requirements, and reflect all sources of compensation received by the victims, including returns on investments, interest payments, insurance proceeds, refunds, settlement payments, lawsuit awards, and any other sources of compensation for their losses. This is to avoid double recovery by victims who may already have been compensated for part of their losses.

EX 2207

Case 5:25-mc-00030-CBK    Document 203    Filed 11/21/25    Page 143 of 159 PageID #: 336

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 48 of 64
Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 65 of 71

Chapter 12: Forfeiture and Compensation for Victims of Crime

- To the best of the U.S. Attorney's, or designee's, knowledge and belief after consultation with the seizing agency, reasonable efforts to locate additional assets establish that the victims do not have recourse reasonably available to obtain compensation for their losses from other assets, including those owned or controlled by the defendants. This is to ensure that restoration does not confer an undue benefit on the defendant.

- There is no evidence to suggest that any of the victims knowingly contributed to, participated in, benefitted from, or acted in a willfully blind manner, toward the commission of the offenses underlying the forfeiture or a related offense. This is to prevent the return of forfeited property to those who essentially took part in the conduct that led to the forfeiture.

The USAO must ensure that the time for filing an appeal challenging either the restitution order or the forfeiture has passed, or all relevant appeals have been adjudicated, prior to submitting the restoration request to AFMLS.

Because restitution and forfeiture are mandatory and independent parts of a criminal sentence, the forfeited assets may not be used to satisfy the restitution order if other assets are available for that purpose. Typical examples of this situation might involve corporations that have extensive holdings that are not subject to forfeiture, or individuals who have property that exceeds the amount subject to forfeiture. The statutes governing restitution permit the Government to enforce the restitution order as a final judgment against almost all of the defendant's property, not just facilitating property or fraud proceeds that may be subject to forfeiture.

### B.4 Payment

If the assets are to be restored to the victims listed in the restitution order, AFMLS will notify the USAO and property custodian in writing. The custodian will then transfer the net forfeited proceeds to the clerk of court for distribution pursuant to the restitution order. Payments will be made only in accordance with the court's restitution order. If the forfeited assets are not sufficient to fully satisfy the order, payment will be made on a pro rata basis, according to the losses listed in the restitution order.

### B.5 Benefits

The Restoration Procedures are intended to assist AUSAs in their use of forfeited assets to compensate victims and to assist victims in their pursuit of compensation. Victims will not need to file petitions for remission, and the process of returning funds to victims will typically be faster. The forfeiture will be completed so that costs can be recovered and third-party rights extinguished. Proceeds from civil, criminal, and administrative forfeitures[4] can be handled together and applied to restitution. Forfeiture AUSAs and agents will get credit for their work, and assets will be distributed primarily as they would have been under the remission regulations.

---

[4] In administrative forfeitures involving TFF member agencies, the USAO must obtain the written concurrence of the local and/or Headquarters TFF seizing agency before AFMLS may approve restoration of forfeited funds for purposes of criminal restitution. See Guidelines for Treasury Forfeiture Fund Agencies on Refunds Pursuant to Court Orders, Petitions for Remission, or Restoration Requests, sections VI.B.2.a.ii; VI.B.3.b. Treasury Executive Office for Asset Forfeiture (TEOAF) policy does not permit the release of administratively forfeited funds to crime victims without the prior approval of the TFF seizing agency. See id. at section VI.B.2.a.ii.2.

EX 2208

Chapter 12: Forfeiture and Compensation for Victims of Crime

## C. Special considerations for victims of human trafficking crimes

On May 29, 2015, the Justice for Victims of Trafficking Act was enacted. As a result, 18 U.S.C. § 1594 now directs the Attorney General to pay victim restitution orders in cases where a forfeiture occurs pursuant to section 1594. *See* 18 U.S.C. § 1594(f)(1). Accordingly, AFMLS will process requests from the USAOs in accordance with this new statutory language regardless if the victims' losses are considered "pecuniary" as defined by the relevant remission regulations. If no restitution order exists in cases where a forfeiture occurs pursuant to section 1594, AFMLS will consider petitions for remission that include a claim of lost wages (based on minimum wage) as the victim's pecuniary loss.

However, section 1594 does not allow for innocent owner or lienholder priority in petition for remission cases. *See* 18 U.S.C. § 1594(f)(2). Therefore, the USAO must resolve all outstanding innocent owner and lienholder claims through the judicial forfeiture process.

### D. Timing

Civil and administrative forfeiture actions can proceed faster than the parallel criminal case. Consequently, assets might be forfeited, equitably shared, placed into official use, or remitted to victims who file petitions long before restitution is ordered, and would not be available for application to the restitution order. To avoid this outcome, the USAO must coordinate with the seizing agency to ensure the retention of property for remission or restoration. In addition, the USAO must place a "hold" on the distribution of seized assets in the Consolidated Assets Tracking System (CATS). If assets are transferred for official use or equitable sharing prior to victim compensation, the transfer may be reversed at the discretion of the Chief of AFMLS or the Director of the Treasury Executive Office for Asset Forfeiture (TEOAF) (for seizures by TFF member agencies) to make the property available for remission or restoration.

Because CATS is not the TFF system of record, the USAO must request that the TFF preserve the asset in cases where restitution may be ordered or where remission or restoration may occur. To ensure the preservation of the forfeited property in judicial cases involving TFF agencies, the USAO must also timely notify and send a copy of the restoration request to the TFF seizing agency. *See Guidelines for Treasury Forfeiture Fund Agencies on Refunds Pursuant to Court Orders, Petitions for Remission, or Restoration Requests*, section VI.B.2.a.i.[9]

### E. Termination of forfeiture and direct payment of assets to victims

#### E.1 Overview

In some situations, it may be preferable for the USAO to move to dismiss the forfeiture proceeding and request the court to direct the property be turned over as restitution directly to the victim pursuant to 18 U.S.C. § 3663A(b)(1)(A), or be transferred to the clerk of court to be paid to the victim. This approach may be preferable to remission or restoration when the victim is entitled to restitution for non-pecuniary harm or other collateral costs that are not compensable under the remission regulations. In addition, termination of forfeiture may be desirable in multiple-victim fraud cases arising in jurisdictions with unfavorable case law concerning constructive trusts. *See* Section II, "Constructive Trusts in Multiple-Victim Fraud Cases," below. Termination of forfeiture is appropriate

---

[9] *Available at* http://www.treasury.gov/resource-center/terrorist-illicit-finance/Asset-Forfeiture/Documents/bluebook.pdf.

EX 2209

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 50 of 64
Case 2:11-cr-00234-TLN   Document 533-4   Filed 02/21/19   Page 67 of 71

Chapter 12: Forfeiture and Compensation for Victims of Crime

---

only if no final order of forfeiture has been entered, as once property is forfeited to the Government, the Attorney General is solely responsible for its disposition. 18 U.S.C. § 982(b)(1) (incorporating 21 U.S.C. § 853(i)). If payment is to be made to the victim through the clerk of court, the property subject to forfeiture must be liquid, as the clerk cannot liquidate real or personal property. For example, the default method of sale to execute a restitution judgment is a sale by the U.S. Marshals Service (USMS) at the courthouse.[10]

### E.2 Is a prosecutor bound, ethically or otherwise, to forego forfeiture in favor of restitution?

Forfeiture and restitution are two separate components of many criminal sentences; both are mandatory upon conviction.[11] In 1996, the Mandatory Victims Restitution Act (MVRA) made restitution mandatory for most federal crimes where a victim suffers a loss. See 18 U.S.C. § 3663A(a)(1).[12] If a court orders restitution, it must order full restitution for the victim's loss, regardless of the defendant's ability to pay. See, e.g., United States v. Battles, 745 F.3d 436, 460 (10th Cir. 2014) ("The MVRA requires 'the sentencing court [to] order a defendant convicted of a felony through fraud or deceit to pay restitution to the victims of [her] illegal conduct.' United States v. Parker, 553 F.3d 1309, 1323 (10th Cir. 2009)"); United States v. Newman, 144 F.3d 531 (7th Cir. 1998) ("Under the MVRA, a defendant's financial status is relevant only to fixing a payment schedule for the mandated restitution"). Likewise, courts must order forfeiture when a defendant is convicted of a statute that provides for forfeiture as part of the penalty. See, e.g., 18 U.S.C. § 982: "The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." (emphasis added); United States v. Monsanto, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applie[s]"); United States v. Blackman, 746 F.3d 137, 143 (4th Cir. 2014) ("Forfeiture is mandatory even when restitution is also imposed."). Given the mandatory nature of the two components of a sentence, it is entirely appropriate for a defendant to pay both a forfeiture and restitution. See Blackman, 746 F.3d at 143; United States v. Joseph, 743 F.3d 1350, 1354 (11th Cir. 2014); United States v. Kalish, 626 F.3d 165, 169-70 (2d Cir. 2010); United States v. Carter, 742 F.3d 440, 447 (9th Cir. 2013); United States v. Torres, 703 F.3d 194, 204 (2d Cir. 2012). And defendants have no right to a credit against a restitution order for the amount forfeited. See United States v. Newman, 659 F.3d 1235, 1241-43 (9th Cir. 2011) (5th Cir. 2009); United States v. Pescatore, 637 F.3d 128, 127 (2d Cir. 2011); United States v. Alalade, 204 F.3d 536 (4th Cir. 2000).

The Justice for All Act, 18 U.S.C. § 3771, obligates "officers and employees of the [Department of Justice] and other departments and agencies engaged in the detection, investigation or prosecution of crime [to] make their best efforts to see that crime victims are ... accorded the rights ..." under the act,[13] including the right to full and timely restitution as provided by law. The perceived tension between forfeiture and restitution emerges when, as is often the case, a defendant lacks the financial ability to pay both the forfeiture and restitution. When a defendant lacks the resources to make full restitution, Department of Justice (Department) policy is to collect and marshal assets for the benefit

---

[10] See 28 U.S.C. § 3203(g)(1)(A)(i).

[11] See, e.g., 18 U.S.C. § 982(a)(1) and 28 U.S.C. §2461(c); see also 18 U.S.C. §3663A (Mandatory Victims Restitution Act).

[12] "Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense ..."

[13] 18 U.S.C. § 3771(c)(1).

EX 2210

Chapter 12: Forfeiture and Compensation for Victims of Crime



of victims using available means.[14] These means include discontinuance of a forfeiture before a final order and asking the court to direct the custodian to turn over "liquid assets" (e.g., assets that do not require a sale to convert the property to cash) to the clerk of court to be applied to restitution; the forfeiture of the defendant's assets and the handling of victim claims through the petition for remission or mitigation process; or the completion of the forfeiture action and the restoration of forfeited assets to victims through a restoration process approved by AFMLS.

At present, there is only a limited ability to restrain assets prior to trial solely for the purpose of restitution.[15] The restraint or seizure mechanisms provided by the asset forfeiture statutes are often the only effective mechanisms to prevent a criminal defendant from dissipating assets prior to sentencing. As there are at least three means whereby restrained or forfeited property may be turned over to victims, there is nothing improper in seeking forfeiture in cases where the prosecutor knows early on that a defendant is unlikely to be able to pay restitution if the assets are forfeited. Restraint and forfeiture do not preclude those same assets from being turned over to victims. Indeed, without the restraint and seizure mechanisms of the forfeiture statutes, a victim has much less chance of ever receiving restitution.

Thus, a prosecutor who uses forfeiture tools as a means to provide remission or restoration of assets to crime victims fulfills any obligation that prosecutor may have under the Justice for All Act to crime victims.[16] Various courts have acknowledged this use of the forfeiture statutes. See United States v. Kaley, 134 S.Ct. 1090, 1094 (2014) ("The Government also uses forfeited property to recompense victims of crime ..."); United States v. Lavin, 299 F.3d 123 (2d Cir. 2002) (instead of pursuing forfeiture, Government used seized funds to satisfy restitution order); United States v. O'Connor, 321 F. Supp. 722 (E.D. Va. 2004) (although defendant has no right to use forfeited funds to satisfy a restitution order, the Government may, pursuant to 21 U.S.C. § 853(i)(1), apply the forfeited funds for benefit of the victims through restoration or remission).

[14] See also Attorney General's Guidelines for Victim and Witness Assistance, Art. V, Sec. H.2 (rev. May 2012).

[15] Under 18 U.S.C. § 1345(a)(1), the pre-trial restraint of assets is authorized in fraud-type cases, but only in limited circumstances.

[16] Adverse court of appeals decisions in some circuits have made the administrative and civil forfeiture of fraud proceeds impractical in cases that involve large numbers of victims and that must be filed in those circuits. See Sec. II.

EX 2211

# EXHIBIT
# H

Case 5:25-mc-00030-CBK   Document 203   Filed 11/21/25   Page 148 of 159 PageID #: 341

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 53 of 64
Case 2:11-cr-00234-TLN   Document 615   Filed 04/18/19   Page 1 of 378

STEVEN ZINNEL, X-1858541
Sacramento County Main Jail
651 I Street
Sacramento, CA 95814

Defendant in Pro Se

**FILED**

APR 1 8 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                  DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

Plaintiff,

v.

STEVEN ZINNEL,

Defendant.

Case No. 2:11-cr-234-TLN

**DEFENDANT STEVEN ZINNEL'S SENTENCING MEMORANDUM AFTER REMAND**

SENTENCING DATE

Date: May 2, 2019
Time: 1:30 PM
Court: Hon. Troy L. Nunley

Defendant Steven Zinnel ("Zinnel") hereby submits his Sentencing Memorandum after remand from the Ninth Circuit Court of Appeals, in Support of his forthcoming resentencing:[1]

- *Because we can:*

    *The motto of power since the idea of power over others was born in our kind.*

- *Distrust all in whom the impulse to punish is strong.* Friedrich Nietzsche

- *The degree of civilization in a society can be judged by entering its prisons.*

    Russian writer Fyodor Dostoevsky

---

[1] Zinnel has filed twenty-two (22) volumes of Exhibits in support of this Sentencing Memorandum. (see ECF nos. 585, 586, and the exhibits concurrently filed). Herein, Zinnel will refer to the Exhibits by Volume number and the exhibit number on the bottom left of each page of the exhibits. e.g. (Vol ____, Ex ____).

the government including California *Business and Professions Code* § 6068(d) and § 6068(f). (Vol. 18, Ex. 2625-2663).

**25. Provide restitution to any victims of the offense** - 18 U.S.C. § 3553 (a)(7)

Congress has mandated that sentencing judges **shall** consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553 (a)(7). The Ninth Circuit teaches "the district court's goal of obtaining restitution for the victims of Defendant's offense, 18 U.S.C. § 3553(a)(7), is better served by a non-incarcerated and employed defendant." *United States v. Menyweather*, 447 F.3d 625, 634 (9 CA, 2006) (en banc).

When Zinnel moved to stay the sale of real property forfeited prior to sentencing, the government opposed the motion to stay. (Vol. 15, Ex. 2101-2107). The government's opposition filed March 3, 2014, stated: *"The only way that he would be prejudiced by forfeiture and liquidation of these assets would be that they could generate funds that the Attorney General could in his discretion direct to Zinnel's victims (including his ex-wife). Zinnel's spite is a sentencing factor, not a basis for a motion to stay."* (Vol. 15, Ex. 2101, lines 22-25). Zinnel agreed to restitution so that Zinnel could get his children Zac and Zayna Zinnel money for college. (Vol. 15, Ex. 2115). The government and Zinnel stipulated to $150,000 each to Zac and Zayna Zinnel (Vol. 15, Ex. 2121-2123). The Judgment awarded Zac and Zayna Zinnel $150,000 each. (Vol. 15, Ex. 2125). However, contrary to the government lawyers' lofty representations to the Court about "getting the victims paid," it took the government until March and June of 2016 to sell the property. (Vol. 15, Ex. 2131 & 2132). Therefore it took the government 756 days to sell the property that the government represented to the Court on March 3, 2014 was "expensive to maintain." (Vol. 15, Ex. 2101-2107).

On September 21, 2016, government lawyer AUSA Kevin Khasigian sent an email to Zimel's lawyer Suzanne Luban admitting the government was sitting on $3,149,604.14. (Vol. 15, Ex. 2133). Over the next year, Zimel wrote several letters to the government trying to get the government to pay his children $150,000 each per the Judgment. The government lawyers failed to respond. Therefore, on December 5, 2017, Zimel filed a Motion to Enforce the Judgment and Hold Plaintiff and its lawyers in contempt of court for failing to pay the restitution recipients including Zimel's children. (Vol. 15, Ex. 2151-2181). AUSA Matthew D. Segal opposed the motion which is no surprise. (Vol. 15, Ex. 2190-2191). Even though the government opposed Zimel's motion to stay calling Zimel "spiteful," AUSA Matthew D. Segal talked out of the other side of his mouth in opposing Zimel's Motion to Enforce the Judgment by writing that the U.S. Dept. of Justice Asset Forfeiture Policy Manual states: *The USAO must ensure that the time for filing an appeal challenging either the restitution order or the forfeiture has passed, or all relevant appeals have been adjudicated, prior to submitting the restoration request to AFMLS."* (Vol. 15, Ex. 2191). Therefore, it is the government that is spiteful in opposing Zimel's motion to stay pending appeal when they claim that it is DOJ policy not to pay out restitution money the government is sitting on during the pendency of appeal.

# EXHIBIT
# I

Case 2:21-mc-00008-TLN-AC    Document 84    Filed 07/02/21    Page 57 of 64

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

STEVEN ZINNEL,

        Defendant.

_____ /

Case No. 2:11-cr-00234

Sacramento, California
May 3, 2019
1:30 p.m.

JUDGMENT AND SENTENCING - VOLUME TWO - P.M. SESSION
BEFORE THE HONORABLE TROY L. NUNLEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:

UNITED STATES ATTORNEY
501 I Street, Suite 10-100
Sacramento, California 95814
BY:  MATTHEW M. SEGAL
     AUDREY HEMESATH
     Assistant U.S. Attorneys

For the Defendant:

Steven Zinnel
(Appearing pro se)

Court Reporter:

DIANE J. SHEPARD, CSR 6331, RPR
Official Court Reporter
501 I Street, Rm 4-200
Sacramento, California 95814
(916) 554-7460

Proceedings reported by mechanical stenography, transcript
produced by computer-aided transcription.

259

sitting some place to hold for my children. I simply said that there is a fiduciary that will hold the money in trust.

So on getting the victims paid, one thing it goes to ending litigation. I know there is no doubt in anybody in this courtroom or most other people that know about this case that if I don't get a sentence that allows me to be released from the courtroom and/or within days and no supervised release, there is no doubt there's going to be a Zinnel VI direct appeal. It's not out of spite. I just know when I look at those bankruptcy fraud tables and what these -- Andrew Fastow got -- by the way, the Ninth Circuit didn't reach substantively reasonableness last time but they may very well this time. I briefed that extensively.

But my point is on this is if the litigation ends today, then there is no excuse for the Government or for Matt Segal not to get the victims paid.

I do know in Jeff Skilling's case, one of the reasons why that the Government agreed to end the litigation was there was about $50 million in victim money that had been tied up for 14 years, something like that. That's a number that sticks in my head. But I'm not making that representation if it's exactly 14 years.

MR. SEGAL: Your Honor, he's inviting bargaining in front of you.

THE DEFENDANT: I'm not --

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

STEVEN ZINNEL,

        Defendant.

_____/

Case No. 2:11-cr-00234

Sacramento, California
May 6, 2019
8:30 a.m.

JUDGMENT AND SENTENCING - VOLUME THREE
BEFORE THE HONORABLE TROY L. NUNLEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:

UNITED STATES ATTORNEY
501 I Street, Suite 10-100
Sacramento, California 95814
BY:  MATTHEW M. SEGAL
      AUDREY HEMESATH
      Assistant U.S. Attorneys

For the Defendant:

Steven Zinnel
(Appearing pro se)

Court Reporter:

DIANE J. SHEPARD, CSR 6331, RPR
Official Court Reporter
501 I Street, Rm 4-200
Sacramento, California 95814
(916) 554-7460

Proceedings reported by mechanical stenography, transcript
produced by computer-aided transcription.

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 60 of 64

315

my life to start today.  It's more than past time.  I want to create new happy memories.

[This case for all intents and purposes has been in continuous litigation since June 8, 2011.  92.8 months. 7.7 years.]  There's been a trial.  There's been multiple appeals there.  There is still a pending Supreme Court petition, lots of law and motion, lots of court filings.  There's been two sentencing proceedings.  [There can be another appeal]  [There can be a 2255.]  [There can be a new trial]  [there could be a third resentencing.]  [There could be a new judge.]

[In other words, lots of past litigation and potential for future litigation.]  [I want to make it clear.  I do not want to litigate anymore,]  but my resolve to fight for what's right as I've demonstrated is still strong, and I will litigate if necessary.]

[It is possible that this litigation can end today at this resentencing if just punishment is imposed.]  The sentence promotes respect for the law.  [And I'm sentenced to what similarly situated bankruptcy fraud defendants receive which is between 19 and 36 months of imprisonment.]  And based on my 69 months of incarceration to date, no term of supervised release.

[If this right sentence is imposed, the litigation will stop.  This case will end today.]  I will be unhappy.  I will be angry.  I will grumble loudly.  [I will have a bitter taste in my mouth

316

for the rest of my life of how justice was served in this case, but I will go away. I will live a law abiding life. I will do everything in my power to not be in the United States Government's cross hairs again. I will stay out of any United States courthouse.

I seek your mercy, Your Honor. I told you what has happened to my loved ones. I'm humiliated. I'm humbled. I have shame. I have regret. I do not want my life to be defined by what is on the internet right now based upon the Government's misrepresentations and lies. That is not who I am.

Your Honor, I am a difference maker. I know it is my purpose in life to make a positive difference. I hope that God's purpose for me is to make a positive difference outside of prison. But if need so, I will. But I trust God. I've done some really good things in the first 55 years of my life, but now I've had a whole first half life fired. My life right now is smoldering ashes. I, like many men and women who have had terms of incarceration, am seeking to live my second-half life productively and law abiding. I want the world to be better because I was here.

I want my life, my work, my family to mean something. My present circumstances don't determine where I can go. They merely determine where I can start. I plead with you to end this case today. Stop the horror that's been inflicted on me and my loved ones. My incarceration has been long and wrong.

Your Honor, every saint has a past, every sinner has a future. I plea for your compassion. I plea for a just sentence. I plea to end this case today. Justice is not the way we punish those who do wrong. It is the way we try to save them.

While locked in a six-by-eight concrete box at the Sacramento County Main Jail, I read a devotional that said when you're wondering what to do with your worst nightmare -- and this case, at this juncture, is certainly my worst nightmare -- you have to choose faith or fear. I choose faith. I choose to believe that God is up to something good even though I can't see it. I believe God will sustain you and whatever problem you have. It's a two-part test -- or two-part proposition. Trust God and do your best. I trust God and I've done my best.

I drafted a Supreme Court petition. I filed objections to the PSR. I filed a sentencing memorandum. I filed exhibits. I've argued my case. I've finally been able to allocute. I've done my best, and that is who I am.

Courage and conviction are rare qualities in a man. God has blessed me with both. I trust God's perfect plan and timing. I believe that suffering is part of something bigger. My children, my family and I have suffered excessively in this case for a long time now. However, justice, like the will of God, does not always manifest itself in the spur of the moment. It doesn't come when you think it should. You've got to wait it

out, and when it does, I will still be standing without a doubt. Your Honor, I seek your mercy. I seek some measure of justice. I implore you to end this case today with a sentence that is reasonable, rational and right.

I end where I began. Where I am is not who I am. I am Steve Zinnel, and I have something to say.

THE COURT: All right. Thank you, Mr. Zinnel. Mr. Segal.

MR. SEGAL: Thank you, Your Honor.

Your Honor, I want to begin by apologizing to Court for trying to be heard while the defendant was arguing yesterday.

THE COURT: You mean Friday.

MR. SEGAL: Earlier in the proceeding. And I've tried to be quiet today as the Court has noticed.

I want to say that at the beginning of this whole thing the Court indicated to the defendant that you were particularly interested in whether he had any remorse or essentially understanding of the wrongfulness of his actions.

And because he got to speak his heart for all of these hours, and it's now 9:41, we know that the defendant does not have any understanding that what he did with Done Deal, with System 3, with Derian Eidson, with the Wilberts was wrong or illegal.

He talks about the suffering of his mother. I think the Court remembers that at the beginning of the stream of checks

## CERTIFICATION OF SERVICE

### By United States Mail

I hereby certify that at the time of service, I was over the age of 18.  I further certify that on  6/29/21

I served a true and correct copy of the foregoing on:
AUSA Lynn Trinka Ernce
AUSA Kurt A. Didier
U.S. Attorney's Office, ED CA
501 I Street, Suite 10-100
Sacramento, CA  95814

Attorney for Plaintiff


K. Greg Peterson
K. Greg Peterson, A Professional Law Corporation
455 Capitol Mall, Suite 325
Sacramento, CA  95814

Attorney for Third-Party Claimant David Zinnel


by United States Mail, in a sealed envelope with the postage thereon fully prepaid, and then depositing the foregoing with prison authorities at FPC Sheridan, 27072 Ballston Road, Sheridan, OR  97378.

Under the "mailbox rule," when a pro se prisoner gives prison authorities a pleading to mail to a court, the court deems the pleading constrctively "filed" on the date it is signed.  Roberts v. Marshall, 627 F.3d 768, 770 n.1 (9th Cir. 2010); Houston v. Lack, 487 U.S. 266, 270-271, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988).

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Steven Zinnel, #66138-097
FPC Sheridan
P.O. Box 6000
Sheridan, OR  97378-6000