IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES,
          Plaintiff,

                                    Sacramento, California
vs.                                 No. 2:21-mc-00098-TLN-AC
                                    Friday, June 3, 2022
ZINNEL,                             12:50 p.m.
          Defendants.
                          /


                    TRANSCRIPT OF PROCEEDINGS
                    SETTLEMENT CONFERENCE
      BEFORE THE HONORABLE KENDALL J. NEWMAN, CHIEF MAGISTRATE JUDGE
              (Proceedings held via videoconference.)
                        ---oOo---


APPEARANCES:

  For the Government:          UNITED STATES ATTORNEY'S
                              OFFICE
                              501 I Street, Suite 10-100
                              Sacramento, CA  95814
                              By:  LYNN TRINKA ERNCE
                              Assistant U.S. Attorney


  For the Defendants:         STEVEN ZINNEL, PRO SE
                              420 S. Center Street
                              Orange, CA  92866


(Appearances continued on following page)

  Official Court Reporter:    Thresha Spencer,
                              CSR, RPR
                              501 I Street
                              Sacramento, CA 95814


      Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription

DEF.
EX.
115

APPEARANCES CONTINUED

For David Zinnel:                    K. GREG PETERSON
                                     455 Capitol Mall, Suite 325
                                     Sacramento, CA 95814
                                     By: KENNETH GREGORY PETERSON
                                     Attorney at Law

SACRAMENTO, CALIFORNIA, Friday, June 3, 2022, 12:50 p.m.

--o0o--

(Proceedings were held via the Zoom application.)

THE CLERK: Please come to order, this court is now in session. The United States Chief Magistrate Judge Kendall J. Newman presiding.

Calling miscellaneous case number 21-mc-0098; United States versus Zinnel. This matter is on for settlement conference, your Honor.

THE COURT: And good afternoon. I am Judge Newman. The parties have reached an agreement -- not a complete resolution of this case -- but an agreement on a path forward, and we're here to put the terms of that path forward on the record; make sure everyone understands and agrees.

So if I could get appearances for the record, starting with government's counsel.

MS. ERNCE: Good afternoon, your Honor. Assistant United States Attorney Lynn Ernce for the United States.

THE COURT: Okay, good afternoon.

And defendant?

MR. STEVE ZINNEL: Good morning, your Honor, and the parties. Steve Zinnel, defendant and alleged judgment creditor in this action.

THE COURT: Mr. Zinnel, good afternoon. I'm going to say Steven Zinnel, though. Again, I don't confuse people here.

4

MR. STEVE ZINNEL:  That would be fine, your Honor.

THE COURT:  And a third party here, if I could get appearances, please.

MR. PETERSON:  Greg Peterson for David Zinnel, who is with me.  And he is both the successor and trustee of the Castana Trust and a third party, beneficiary.

THE COURT:  And again, Mr. Peterson, good afternoon to you.

David Zinnel, good afternoon to you.

So what I'm going to do is I'm going to take a crack at stating the material terms; what I understand everyone has agreed to today.

I will ask each of you to please correct any misstatements I make or omissions I make about the material terms.  And then once we have all those laid out, I'm going to ask everyone if they understand and agree to those terms.

I do want to make clear that while none of us are in the courthouse right now, for all practical purposes, it's as if we were in the courthouse.  I am wearing my robe, we have a court reporter, we are now on the record.

So in this case Mr. Zinnel -- I'm sorry -- Steven Zinnel continues to take the position -- and it's been David's position -- that it was their mother's desire to leave all of her assets equally to her two boys and through a trust, but there is a recognition that that may not have been fully

accomplished when setting up the Ameritrade account.

But recognition that that is really an issue between Steven and the government as a result of his criminal conviction and the amounts that the government asserts he owes for restitution, fine, and litigation surcharge.

So David Zinnel agrees to dismiss any third party claims he has in this case and withdraw any claims asserting undue influence, fraud, anything else -- or any claims essentially as to the amount the government is seeking from Steve Zinnel out of the Ameritrade account and saying "That is between Mr. Zinnel and the government."

Steve Zinnel agrees that any amount that goes to satisfy the government is his responsibility and not David's, so Steve Zinnel doesn't agree he owes the government any additional money, he believes that that may have already been satisfied.

Or if there is any money owed, it may be for a fine but not for any restitution. But that is for him to litigate with the government.

And he agrees that any amount necessary to satisfy the government is solely his obligation and not an obligation of the trust or to be partially shared by David.

And one of the most simple math examples I gave is if there were a million dollars of trust assets -- apart from the Ameritrade account -- and a million dollars in the Ameritrade account and the government was entitled to the entire million

6

dollars in the Ameritrade account, the entire million dollars remaining in the trust account would go to David because there was a total of $2 million in assets, Steven's one half million dollars went fully to the government and David would be entitled to everything that remains. So that will be between Steven and the government moving forward.

There was -- there is -- the government asserts a maximum exposure from the Ameritrade account of $513,056 in restitution, $500,000 in fine.

The government was seeking a litigation surcharge of $301,429, but as part of the agreement here today and the resolution, the government agrees the maximum exposure for Steven Zinnel on that Ameritrade account, they're reducing their litigation surcharge to $150,000.

So the total exposure is $1,163,056. Again, no agreement by Steve Zinnel that the government is entitled to that amount, and the government agrees that would be the maximum they're seeking from the Ameritrade account.

And the parties then agree that whatever remains from the Ameritrade account, whether it's all of that, whether it's the government gets part of it or all of it, whatever remains is then an asset of the Castana Trust.

And the parties will agree on the record today that any remaining amounts as well as if there's any documentation that needs to be done. And, you know, the government agrees that

7

they really don't have a dog in that fight once their issue with Steve Zinnel has been resolved, but the parties agreed that this transcript could be sent to Ameritrade.

And if there's any documentation that needs to be done, that no one will be seeking any assets from the Ameritrade account, Ameritrade is not to distribute any assets until it gets an order from the federal court as to what, if anything, the federal government is entitled to.

From that, Ameritrade can satisfy that federal court judgment. And the balance then gets sent to the Castana Trust. And, in fact, the Ameritrade account can be converted to a Castana Trust account.

The government is not at this point dismissing its action against the Castana Trust. There is an action in federal court, 21-mc-143, but the government agrees to stay any proceedings in that action until this case involving the Ameritrade account has been resolved.

And if that fully satisfies the government's judgment against Mr. Zinnel, they will then move to promptly dismiss any claim the government has asserted in the Castana Trust as well as remove any lien against any real property.

Someone informed me that the most recent look at the Ameritrade account, it's actually gone up in value, so it's about a million 5. At one point it was a million 8, then it went down to a million 4.

8

I do want to mention a worse case situation possibility if it was to go below the $1,163,000, the government could then assert a claim in the Castana Trust for whatever wasn't satisfied to their action against the Ameritrade account, but everyone is hoping the market doesn't take that bad of a downturn.

Additionally, Steven Zinnel agrees that he is entitled to accounting from the Castana Trust, agrees not to file any petitions, he's not seeking to have any distributions from the Castana Trust, any liquidations of any real property or anything else, again, until this entire matter involving the Ameritrade account is resolved.

Mr. Steven Zinnel also agrees that the Court and the parties have authority to enter into these agreements and stipulations on the record today, but wants to make clear by doing so he's not waiving any arguments he has, and has inserted the venue over this matter is more appropriately in a different federal court.

Let me start -- I'm hoping that's everything, but let me ask each of the parties.

Let me start with Ms. Ernce. Did I accurately state the material terms as you understand the material terms?

MS. ERNCE: Yes, your Honor. Just a couple of clarifications. I want to confirm and ask that you have David Zinnel confirm on the record that he'll dismiss his entire

9

: third party claim and that he'll file a notice of dismissal as soon as possible.

THE COURT:  Correct.

MS. ERNCE:  Second, with respect to what happened to any remainder of the account after the United States is fully satisfied, we prefer not to agree it is an asset of the Castana Trust based on what the probate court said.  I'd be comfortable saying that the money should be transferred to the probate court to be determined by the probate court as to what happens to that money.

THE COURT:  Well, and I think I want to make clear that, and that's also why I mentioned that it is the government's position -- it is the government's position that once its action is satisfied with regard to Steven Zinnel, it's up to Steven and David and other courts as to whether or not that is a trust asset, whether or not it has to go to probate.

The government is just not taking a position on that.  The government is fine, if otherwise agreed, that it is a trust asset.

But we're going to get David and Steven to agree today that it is a Castana Trust asset.

MS. ERNCE:  That's fine.  The United States won't agree that it is a trust asset, but that is between the brothers.  And agree that we have no claim to it as -- once the United States is paid in full.

THE COURT: Correct. And that's what I'm saying. Because at that point the government has no interest in that money whether it is set up as a trust asset or not a trust asset. Correct, Ms. Ernce?

MS. ERNCE: Yes, correct.

THE COURT: What else, Ms. Ernce?

MS. ERNCE: I believe that's it, your Honor.

THE COURT: Mr. Peterson, any corrections, misstatements, anything else, sir?

MR. PETERSON: Well, the part about the payments from the IRA. Assuming that is done upon resolution of the disputes between the U.S. and Steve Zinnel would apply as a credit against any interest Steve Zinnel has as a beneficiary under the trust, and that he agrees to that.

And I'm assuming that the stay in action 143 assumes that the resolution of the government's position against Steve Zinnel is limited to the agreements that we're making as to the amount of the IRA recovery in the existing 1098, and that the number is not going to change because there is a separate action or something like that.

In other words, the resolution of the government's claim is limited to what we agreed to today that will come from the IRA, and that needs to be confirmed.

THE COURT: Well, I'm --

MR. PETERSON: I assume you were going to resolve

11

both cases.  Now I'm hearing 143 is going to stay in limbo out there, and I don't want to agree to settle on a specific figure, leave a second action that is sort of open, and then all of a sudden we've got a new conversation going about, "Well, there is more money owed over here in the second case."

THE COURT:  Well, I guess I was trying to make it clear -- which is I think Ms. Ernce is agreeing -- that if -- if the government recovers its $1,163,056 in this Ameritrade action, that will completely resolve the government's claim. Even if they've asserted larger amounts in the Castana Trust or in 143, they're not going to be pursuing any difference.

Ms. Ernce and the government is agreeing that a satisfaction of that $1,163,056 would fully satisfy the government's claims against Mr. Zinnel as well as any liens they've asserted against the trust or otherwise.

Am I correct about that, Ms. Ernce?

MS. ERNCE:  That is correct.  But if the United States doesn't get the full 1.1, then, yes, the United States will pursue the Castana Trust for whatever the shortfall is.

MR. PETERSON:  And the last part is the -- I think you addressed this in your comments, your Honor, but I'm looking for as soon as the United States has received resolution, has been paid the full amount agreed to, it no longer has an interest in any of the remaining IRA funds, and at that point the remaining parties -- so now there is, the

12

brothers would agree, that's characterized in trust assets, and that the Court will issue an order to TD Ameritrade that the entitlement is such so that the account is held for David Zinnel, that it doesn't go to the Castana Trust as to whatever remaining balance is there.

THE COURT: And part of what -- I agree with part of what you said but not the latter part. The Court will be issuing that order if the parties -- but it would include that Steven and David Zinnel, putting on the record today that that is their agreement.

And also I'm happy that if the parties, the two brothers, if the stipulation on the record today by them, including ordering a transcript isn't sufficient, if they want to put together a stipulation that says, "Could you please agree to this, Judge, you know, here is the transcript attached so we have something to send to Ameritrade," that's fine, I'm happy to do that.

But I'm not going to otherwise be issuing an order saying, "Yes, it becomes an asset of the trust." That's subject to the brother's agreement; and I'm fine with that as long as the two brothers agree to that regard.

And I think the government's position, that's between the brothers, Ameritrade, and whether or not a probate court then accepts that; PETERS(                / does no
                      . PETERS!                / does no
        MR. PETERSON: And the money does not come out of the

TD Ameritrade account absent a court order.

THE COURT: Yeah. Either a court order or an agreement of the trustee if once the two brothers have agreed this is now a trust asset, correct.

You know probate or the resolution of the trust account better than I do or Ms. Ernce does, but nothing is coming out of that account until there is a court order in this federal court action as to what proceeds get paid to the government or not.

And then the two brothers are agreeing it then becomes a trust asset. And working with Ameritrade you can even rename the account if this transcript of this on the record isn't sufficient with both of them agreeing to that. And then I don't know enough about trust account distributions and payouts, whether that's a court order or an order from David --

MR. PETERSON: We're simply talking about this asset, what happens with it when the government satisfies what they are seeking --

THE COURT: Correct.

MR. PETERSON: -- and then that balance would stay in the account absent a court order or a stipulation that would allow for their moneys to be moved into the Zinnel Trust.

But we're going to agree between David and Steven today as part of the settlement that at that point it would be a trust asset.

THE COURT: Correct.

MR. PETERSON: Okay.

THE COURT: And the only reason I -- I don't know if you need a court order, is if Steven and David both sign documents and then say it is a trust, and they both sign something saying it is now paid to put this into the trust. You know better than I do whether you need a court order. At that point --

MR. PETERSON: Court order is always the gold standard.

THE COURT: Okay. That's fine.

MS. ERNCE: Well, I guess my two cents on this is -- well, the concerns that any order of this Court providing that that's an asset of the trust would be a determination of -- that might be better suited for the probate court.

The way I envisioned this is that money would go to the United States, and then the other money would go to the probate court for a determination.

And the brothers can assert and take the position in the probate court that that is a trust asset and they can do whatever they want with the document.

MR. PETERSON: We're not going to agree to a settlement to reserve that fight for later, and after the United States has been paid, it does not have a dog in this fight at that point.

15

THE COURT: Wait, wait, stop: I want to make clear two things. Number one of which, the government is not agreeing today that the Ameritrade account is a trust asset. It is the government's position that it wasn't set in the trust, and that's not set up that way.

Instead, it is my understanding that Steve Zinnel and David Zinnel don't have a disagreement amongst the two of them that it was their mother's desire to have money paid into a trust. There's even a pour-over provision, and that's where assets get distributed from.

And so it is -- to be clear, when you talked about a court order and the standard, I don't know whether you're talking about an order from this court, the probate court, what you're talking about.

What it's making clear is once the government's claim against Steve Zinnel has been satisfied from the Ameritrade account, they no longer have any claim to the remainder of the money; no dog in that fight.

If Steven and David want to say that that's a trust asset, that's between them, as far as the government is concerned. If they want to say it's part of Elvis Presley's estate, the government doesn't care, that's between them.

I just want to make clear here that to avoid later disputes, while we're here on the record, Steven and David will both, on the record in front of a federal court, agree that the

remainder, once the government has been satisfied, will be a trust asset and will do whatever paperwork is necessary to effectuate that.

If it's an order from a probate court, fine. If it is the two of them just signing something with Ameritrade saying, "Please rename this account," but that's between them, the government is not involved in this, this Court is not making a determination whether or not it is a trust asset, just that the brothers are agreeing that that's what it is once the government is satisfied.

Does that make it clear? I see a yes from Ms. Ernce.

MS. ERNCE: Yes, your Honor.

THE COURT: Mr. Peterson?

MR. PETERSON: Yes. How about Mr. Zinnel?

THE COURT: I'm going to get to him on that, but I just want to make -- Mr. Peterson, one of the things that I misstated or need clarification.

Mr. Peterson, anything else?

MR. PETERSON: No.

THE COURT: Steven Zinnel, anything I've misstated or need clarification before we agree to all of this on the record?

MR. STEVEN ZINNEL: Three things, your Honor, quickly. Again, I just want to clarify. I agree -- I'm stipulating that the Court has jurisdiction -- limited

jurisdiction to make this settlement, but I strongly dispute that the Eastern District has jurisdiction, and I will continue to litigate that by me consenting today, I am not consenting and waiving my jurisdictional and venue argument.

THE COURT:  Wait, wait, wait.  Let's just stop each one, and I understood.  I thought I had stated that, but I agree, Ms. Ernce, do you recognize and agree with that as well? You're not agreeing the venue is somewhere else, but you're agreeing he's not giving up his venue argument by entering into this agreement today?

MS. ERNCE:  I agree that he's not giving up his venue argument.  But, I mean, the Court will have jurisdiction to adjudicate the TD Ameritrade garnishment so we can bring this to a close.

THE COURT:  Well, that's between -- Mr. Zinnel can continue to make his argument if the Court doesn't have jurisdiction to do that.  Yeah, okay.

MR. STEVEN ZINNEL:  That's correct, your Honor, and I intend to.

THE COURT:  Go ahead, next.

MR. STEVEN ZINNEL:  If I win on this, then this is for nothing.

THE COURT:  No, no, not necessarily.  No, and I want to make clear.  Because wait, wait, wait.  I think it was Orange, if I wasn't mistaken.  At some point you said the

you say, "Well, the rest of the case should be adjudicated there," everything agreed to here is still enforceable.

Do you understand that?

MR. STEVEN ZINNEL: I agree, your Honor.

THE COURT: Okay. Point number two, Mr. Zinnel.

MR. STEVEN ZINNEL: Okay. Not only do I want an accounting from David Zinnel, but I want an accounting from the government.

THE COURT: And that's a separate issue that we purposefully haven't gotten into. That is still your right in the action against the government, and I'm sure that is part of agreed bone of contention. To be ultimately decided by Judge Claire is the evidence and issues sufficient, and ultimately Judge Nunley is --

MR. STEVEN ZINNEL: I think the goal is --

THE COURT: I get that, and you're not giving up -- I understand that -- I'm sorry, what?

MR. STEVEN ZINNEL: I believe under the law the

MR. STEVEN ZINN: That's where I am.

THE COURT: All right. Well, you're down in Central District. Everything that's been agreed here is still part of the court justice and will go to the Central District and would

that jurisdiction is more appropriate. Let's assume I'm picking

it government owes me an accounting.

THE COURT: And that, again, I'm not deciding that right no legal issue right now.

MR. STEVEN ZINNEL: Okay.

THE COURT: I'm sorry. I don't agree whether or not you are or are not entitled. I agree that's an issue for another day for you and Ms. Ernce to litigate and decide, let Judge Claire and Judge Nunley decide.

MR. STEVEN ZINNEL: Thank you. The third thing I want to clarify is the government's statement that if they get there -- I'm just rounding your number up. What was the final number between 513, 500,000, and 150 on the surcharge?

THE COURT: Well, it's $1,163,056.

MR. STEVEN ZINNEL: Okay. The government said that if they get that $1,163,056, that the 0143 case goes away. That's what I understood that she said, okay?

THE COURT: Wait, wait, let me stop. Wait, wait. Stop, stop, stop, stop.

Ms. Ernce, is that -- am I correct about that? If you satisfy this total amount through this action, through this Ameritrade money, you'll be dismissing -- the government will be dismissing any claim or dismissing the 21-mc-143?

MS. ERNCE: Yes. Because there will be no more fine, restitution, or litigation surcharge owed.

THE COURT: Correct.

20

MR. STEVEN ZINNEL: No, thank you, your Honor. So here is the clarification point. Conversely, if I am correct, which I strongly can assert I am. If the government gets zero in this case, they also have to dismiss 143. They don't get a second bite of the apple.

THE COURT: And I didn't talk to you about this. I actually talked to Mr. Peterson and your brother about this. It depends on what the circumstances are.

And the reason I say that. If, as a matter of law, Judge Claire/Judge Nunley determines that the government is not entitled to any other money, they've been fully satisfied, then, again, as a matter of law, that's called res judicata, I don't think they'd have a leg to stand on in the 143.

If for some reason the government -- the Court just says, "Hey, we're not going there. We think this is an asset of the trust." The government should be pursuing any actions it's got against the trust even though they technically didn't get any money from the Ameritrade account, there was also no determination that they weren't entitled to any money, then the 143 may still be going forward.

Do you see those two distinctions?

MR. STEVEN ZINNEL: Your Honor, I agree with that. I agree with that.

THE COURT: Well, that's all I wanted to clarify so people didn't have a misunderstanding.

THE COURT: What else, Mr. Zinnel?

MR. STEVEN ZINNEL: That's it.

THE COURT: All right.

Let me start with you, Steven.

So do you understand everything that's being agreed to here today?

MR. STEVEN ZINNEL: I do, your Honor.

THE COURT: And do you understand that I am now wearing my robe, there is a court reporter, we are on the record before a federal court so everything that's agreed to here is binding in this action, in any actions going forward, whether that includes trust, accountings, whether that's probate, whether your action gets transferred to the Central District. All of the agreements by the parties here are binding.

Do you understand that?

MR. STEVEN ZINNEL: I do, your Honor.

THE COURT: And are you currently taking any drugs or medication, whether over-the-counter, illegal, prescription, or otherwise, that affect your ability to think clearly or understand what's happening here today?

MR. STEVEN ZINNEL: I am not, your Honor.

THE COURT: Any reason why the parties shouldn't go forward with these agreements here today?

MR. STEVEN ZINNEL: Not that I'm aware of, your

Case 5:25-mc-00030-CBK   Document 203-1   Filed 11/21/25   Page 24 of 187 PageID #: 376

Honor.

THE COURT: And you understand that the terms laid out in this agreement -- and the parties can get a transcript -- will be binding, but if there are documents necessary to effectuate this?

For example, if down the road there is a document necessary to make sure that the Ameritrade -- the remainder of the Ameritrade account becomes an asset of the trust, you'll agree to sign whatever is necessary to effectuate that, it is not a basis to refuse to sign that or to later try and set aside and agree to here today, or because you've had second thoughts or you thought, "No, I should have never agreed to all of this." No, we'll have an agreement as of today.

Do you understand all of that?

MR. STEVEN ZINNEL: I do, your Honor.

THE COURT: And with all that said, do you agree with everything that we have laid out on the record here today?

MR. STEVEN ZINNEL: Yes, your Honor.

THE COURT: Mr. Peterson, do you understand the material terms of the settlement?

MR. PETERSON: I believe so, your Honor.

THE COURT: And you understand, sir, and I want to make clear today --

MR. PETERSON: Hold on, your Honor. May I?

THE COURT: Sure. And you can mute if you want to

23

...talk to him for a moment.

MR. DAVID ZINNEL:  Your Honor, I think I need to clarify.

THE COURT:  No, no.  But I think it is a point worth making.  And I know it is the government's position, it is not a trust asset.  And it may have been the parties' desire, but it is the government's position as a matter of law, it wasn't set up that way.

But am I correct between you and your brother and the trust, that you would agree that this ultimately becomes a trust asset, even if you're successful at prevailing against the government?

MR. DAVID ZINNEL:  Yes, your Honor.

THE COURT:  Okay.  Very good.

All right.  Mr. Peterson, do you understand all of the material terms that have been laid out on the record?

MR. PETERSON:  Yes, your Honor.

THE COURT:  And you understand that there are no --- each side, between you and Steve Zinnel and the government, each side is responsible for its own attorney's fees and costs?

MR. PETERSON:  Oh, yes.

THE COURT:  And to the extent that you would have your claim -- your own claim for attorney's fees and costs, and to the extent that David Zinnel and the trust have sought your advice and recommendation, do you both agree to and recommend the terms of the settlement?

MR. PETERSON: Yes.

THE COURT: All right. David Zinnel, do you understand the material terms of the settlement?

MR. DAVID ZINNEL: Yes.

THE COURT: And both as an individual and as a successor trustee for the Castana Trust, have you had enough time to talk to Mr. Peterson about what is being agreed to here today?

MR. DAVID ZINNEL: Yes. I just do have one more question. Can we mute real quick?

MR. PETERSON: Sure. Can you excuse us for just one minute?

THE COURT: Go ahead and mute. Go ahead.

(Break.)

MR. PETERSON: Your Honor, I'm back. That clarification with regard to the attorney's fees, each party is bearing their own fees in connection with the federal court action, but that does not have anything to do with how they're characterized in the probate court proceeding.

THE COURT: Correct. And the government takes no position at this point whether or not that is an appropriate charge for David Zinnel individually versus --

MR. PETERSON: Right.

THE COURT: A- a charge against --

MS. ERNCE: Agreed, your Honor.

Case 5:25-mc-00030-CBK    Document 203-1    Filed 11/21/25    Page 26 of 187    PageID #: 378

25

THE COURT: David Zinnel, are you currently taking any drugs, medications, over-the-counter, illegal, otherwise, that affect your ability to think clearly or understand what's happening here today?

MR. DAVID ZINNEL: No.

THE COURT: Any reason we shouldn't go forward with agreeing to all of these terms on the record here today?

MR. DAVID ZINNEL: No.

THE COURT: And with all of that said, do you agree to all of these terms?

MR. DAVID ZINNEL: Yes.

THE COURT: Ms. Ernce, do you understand the material terms of the settlement?

MS. ERNCE: Yes, your Honor.

THE COURT: To the extent your office would have its own claims for attorney's fees and costs and to the extent you can bind the government to the terms, do you agree to the terms in this case?

MS. ERNCE: Yes, your Honor.

THE COURT: Very good. All right. Folks, we have an agreement. Anything that helps with a path forward. You can contact my courtroom deputy in terms of ordering a transcript of today's proceedings.

You can also let me know if there is any documentation that otherwise needs to be done.

26

Mr. Peterson, am I correct you are going to promptly file whatever is necessary to dismiss any claims that your client is asserting in the 21-mc-098-TLN-AC, as well as to make clear that between Steve Zinnel and the government, your client is not asserting any claims to any of those proceeds, correct?

MR. PETERSON:  Yes.

THE COURT:  Okay.  And when do you envision being able to file the necessary documentation?

MR. PETERSON:  Monday.

THE COURT:  Okay, excellent.  I don't know -- one thing I wanted to make clear while we're still on the record, and this is important for Steven Zinnel to understand as well and Ms. Ernce.  Which is, Mr. Peterson, if you want to send any documents to Steven Zinnel to have him sign for Ameritrade purposes, clarifying that once the government's action is resolved between the government and Steven Zinnel, that the account would then be converted to a Castana Trust account, you are welcome to do so.

But I also want to make clear for Steven Zinnel, that was in furtherance of a settlement and as part of these terms that have been laid out today.  And even if there is such a signed document between you and your brother, it's not something that can be introduced in the action against the government that says, "Oh, see, see, this account is really intended to be a Castana Trust, and we've now signed documents converting it to

27

"...a trust."

Again, that conversion is only effective once your action is resolved between the government.

Steven Zinnel, do you understand that, sir?

MR. STEVEN ZINNEL: I do, your Honor.

THE COURT: Okay. And that's the only reason. If you want to send him documents now, you can't submit those to Ameritrade at this point. But then you've got them signed and dated and stuff once the actions resolve between Ms. Ernce and Steven Zinnel.

MR. PETERSON: And is the 143 action stayed for all purposes? And I assume that means no discovery or anything that my client --

THE COURT: Correct. And I will have a -- my courtroom deputy issue a minute order that's saying that the parties agreed to a number of material terms in this case, 21-mc-098-TLN-AC, which help set forth a path forward between government and defendant Steven Zinnel.

As part of that third party, claimant will promptly file a dismissal of any claim or assertion to entitlement to those proceeds in that case. And the case of 21-mc-143 is hereby stayed and all dates vacated until a resolution of case 21-mc-098.

Does that sound appropriate?

MS. ERNCE: Your Honor, can I just say one thing?

28

THE COURT: Certainly.

MS. ERNCE: I don't envision that there's any discovery that's going to be necessary to resolve the TD Ameritrade account, but I don't want to be excluded from seeking discovery from Mr. Zinnel -- David Zinnel in that case if for some reason it is.

Just because the Castana Trust case is stayed, it doesn't mean that the United States can't seek any appropriate discovery in the TD Ameritrade case.

THE COURT: Nothing is stayed in the Ameritrade case. And, yes, so there still could be discovery in that.

MS. ERNCE: Uh-huh.

THE COURT: I'd ask to have the parties cooperate. "Oh, David is a third party" -- I mean -- "yes, an uninvolved third party, you're not entitled to discovery."

No, I assume you all will cooperate, and if you need me to get involved, let me know that.

MS. ERNCE: Thank you, your Honor.

THE COURT: Mr. Peterson, that's all agreeable?

MR. PETERSON: The concept of more discovery isn't, but I understand the reason.

THE COURT: Right.

MR. PETERSON: We'll see what shakes out.

THE COURT: Okay. Any other documentation, Ms. Ernce, that you can think of necessary to effectuate all of

Case 5:25-mc-00030-CBK    Document 203-1    Filed 11/21/25    Page 31 of 187 PageID #: 383

these terms?

MS. ERNCE: No, your Honor, not at the moment. We'll be proceeding to seek our final order of garnishment, and that will tee everything up.

THE COURT: Mr. Peterson, any other documentation you can think is necessary at this point?

MR. PETERSON: No.

THE COURT: Mr. Steven Zinnel, anything else you can think of at this point? I know you want an accounting, but, again, that's for you to file in the 21 -- and I think you already had certain of those accounts. 21-mc-098, if and when Ms. Ernce files for order to final. That would be nice; I think you're welcome to file something saying final garnishment. That's when you can then say, "Oh, you can't do that until I get a final accounting."

Again, that's between you, Judge Claire, and Judge Nunley.

But anything else --

MR. STEVEN ZINNEL: Yes.

THE COURT: -- to further these terms, sir?

MR. STEVEN ZINNEL: Nothing to further these terms. But one thing since everybody is here. I have the means to file electronically now. I have the means and ability to receive service. There has been a huge problem of me timely receiving service in both the 098 case and the 143 case.

Local Rule 143(b) allows me to have the Court allow me to

30

use the CM/ECF system.  It refers to that the parties are supposed to stipulate, and I intend to file the motion, but I'm asking that the parties stipulate to let me electronically file and receive notice by electronic file both in the 098 case and in the 143 case.

I have gotten documents way after orders are issued, and neither Mr. Peterson nor the government counsel can claim any prejudice because they get electronic -- every time my stuff is scanned, they get it electronically anyway.  So I'm asking the Court --

THE COURT:  Here's my suggestion going forward for that, which is the one thing you just touched on, which is what you should promptly do is file a request in the action or actions asking for authority to do electronic filing and citing the local order.

At which point, again, I doubt that Mr. Peterson files something -- he probably doesn't have much of a dog in that fight.

Ms. Ernce can file either a statement of non-opposition or why she thinks it's not appropriate.  Typically, it's left to the judge, and what I don't know, and I haven't looked at enough of this is, as a judge who often decides these issues, what I look at is what a person has filed previously.

And I will pick just one example of something that could hurt you in that request.  The settlement statement I got from

31

you, and this is in plaintiff's side of the settlement, but the settlement statement I got from you when a whole bunch of issues when we went to settlement, and it started off with a -- "Have the government leave us the F alone."

It's the kind of thing that causes the judge to go, "Nah, I'm not going to give this authorization to file things."

It's when you have shown the Court, "Hey, I get it. I'm filing only what's necessary. I'm not inundating you with stuff." But so that's why -- I'm not putting someone on the spot at this point. I think you file your request, and then Ms. Ernce and/or Mr. Peterson can submit.

MR. PETERSON: Hopefully, file something so you can say, "Hey, no opposition, or here is why it has been abused," yeah.

MR. STEVEN ZINNEL: So two things, and I'll say this and we can move on.

THE COURT: Sure.

MR. STEVEN ZINNEL: Number one, no matter what I put in paper filings, that gets filed. So your first concern is I don't quite understand, and the court clerk has to file whatever I submit in paper form. And then the rule says --

THE COURT: Wait, I'll answer that for you. Because we have found it's a reason pro ses were not included in this. We found that the easier it is for somebody -- and they don't even have to print or mail things -- the more they sometimes

abuse the system. That's why.

MR. STEVEN ZINNEL: Okay. Well, between the criminal case 098 and 143, it is obvious I have the ability to file paper, okay? And now I have a word processor and unlimited printing so I can really file paper.

THE COURT: And, Mr. Zinnel, you and I have gotten -- go ahead.

MR. STEVEN ZINNEL: Let me say one last thing, your Honor --

THE COURT: Sure.

MR. STEVEN ZINNEL: -- while you're here just because I'm letting them know what's coming.

The Local Rule says you cannot submit that request to the Court first, you have to seek a stipulation and order from the parties first, okay?

So I've already drafted that, and I'm going to send it to counsel. But if we can stipulate now, then it eliminates that step.

But I am going to do -- I'm going to follow the Local Rule 133(b) that states that before you file the request with the Court, you have to seek a stipulation of the parties. And I can see no way that the parties are prejudiced. They'd probably throw away my paper. The court clerk rules say that once they scan my papers, they throw them away. It is a complete waste of trees. But, believe me, postage will not

33

stop me from filing this, so...

THE COURT: Thresha, we can go off the record. You don't have to take all this down.

(Proceedings adjourned:  1:35 p.m.)

---oOo---

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Thresha Spencer
THRESHA SPENCER
CSR No. 11788, RPR

# Settlement Agreement and Mutual Release

1.    Parties.

This Settlement Agreement and Mutual Release ("Agreement") is entered into by the following parties and entities—collectively referred to herein as the "Parties":

> 1.1.    Michael Brumbaugh;

1.2.    Michael Brumbaugh, Administrator of the Estate of David P. Zinnel (the "Estate");

> 1.3.    Michael Brumbaugh, Trustee of the Castana Trust, dated March 4, 2009 (the "Trust");

> 1.4.    Steven Zinnel; and

1.5.    Jennifer Zinnel.

2.    Summary of Disputes. The following actions, identified by Matter Name, Jurisdiction, and Case Number, and all allegations and claims made therein by Steven Zinnel against Jennifer Zinnel and Michael Brumbaugh, individually, in his capacity as Administrator of the Estate, and/or in his capacity as Trustee of the Trust, and all allegations and claims made therein by Jennifer Zinnel or Michael Brumbaugh individually, in his capacity as Administrator of the Estate, or in his capacity as Trustee of the Trust, against Steven Zinnel, shall be referred to collectively as the "Dispute".

2.1.    Matter Name: *In the Matter of the Castana Trust Dated March 4, 2009.*

2.1.1.    Jurisdiction: Sacramento County Superior Court.

2.1.2.    Case Number: 34-2016-00200990.

2.2.    Matter Name: *Estate of David P. Zinnel.*

2.2.1.    Jurisdiction: Sacramento County Superior Court.

2.2.2.    Case Number: 34-2023-00336772.



DEF.
EX.
116

5:25-mc-30
5:25-mc-31

2.3.    Matter Name: *Steven Zinnel v. Estate of David P. Zinnel, Michael Brumbaugh, Jennifer Zinnel et. al.*

   2.3.1.  Jurisdiction: Sacramento County Superior Court.

   2.3.2.  Case Number: 24CV002915.

2.4.    Matter Name: *United States v. Steven Zinnel / TD Ameritrade.*

   2.4.1.  Jurisdiction: United States District Court, Eastern District of California.

   2.4.2.  Case Number: 2:21-mc-00098-TLN-AC.

2.5.    Matter Name: *United States v. Steven Zinnel / David Zinnel, Castana Trust.*

   2.5.1.  Jurisdiction: United States District Court, Eastern District of California.

   2.5.2.  Case Number: 2:21-mc-00143-TLN-AC.

2.6.    Matter Name: *United States v. Steven Zinnel.*

   2.6.1.  Jurisdiction: United States District Court, Eastern District of California.

   2.6.2.  Case Number: 2:19-mc-00241-TLN-EFB.

2.7.    Matter Name: *Steven Zinnel v. United States of America and Jennifer Zinnel / Michael Brumbaugh.*

   2.7.1.  Jurisdiction: United States Court of Appeals in and for the Ninth Circuit.

   2.7.2.  Case Number: 22-16128.

2.8.    Matter Name: *Steven Zinnel v. Michael Brumbaugh and Jennifer Zinnel.*

   2.8.1.  Jurisdiction: California Third District Court of Appeal

> 4.14. Waiver of Potential Claims for Recovery by Jennifer Zinnel, the Estate, and the Trust. Jennifer Zinnel, Michael Brumbaugh in his capacity as Trustee of the Trust, and Michael Brumbaugh in his capacity as Administrator of the Estate, shall make no claim to any money or proceeds that Steven Zinnel may obtain as a result of his continued litigation with the United States in the Matters identified in Section 2.4, Section 2.5, or Section 2.7.

4.15. Fees and Costs. The Parties agree that each of the Parties must bear their own attorney fees and costs in each of the Matters identified in Section 2. This provision shall not prevent Michael Brumbaugh from making and/or seeking payment of his attorney fees from the Trust or the Estate. In the event Michael Brumbaugh pays any attorney's fees or costs from the Trust or the Estate, nothing in this Agreement shall be construed as a consent or waiver on the part of Jennifer Zinnel regarding such attorney's fees and costs.

5. Mutual Release of Claims. Excepting the obligations that are expressly set forth in this Agreement, Jennifer Zinnel, Michael Brumbaugh, Michael Brumbaugh in his capacity as Trustee of the Trust, and Michael Brumbaugh in his capacity as Personal Representative of the Estate on one hand, and Steven Zinnel on the other hand, shall and do hereby mutually release and forever discharge the other, and the other's predecessors, successors, heirs, assigns, executors, administrators, trustees, partners, former partners, agents, employees, former employees, officers, former officers, directors, former directors, shareholders, former shareholders, representatives, attorneys, affiliates, insurers, spouses, children, and all other persons acting by, under, through or in concert with them, living or deceased, from any and all claims, damages, actions, causes of action, claims of indemnity, claims of contribution, liabilities, judgments, liens, contracts, agreements, rights, debts, suits, obligations, promises, acts, costs and expenses, fees, attorneys' fees, damages, losses, personal injury claims and charges of whatever nature, whether known or

22.    No Admission.  By entering into this Agreement the Parties do not admit any fact, conclusion of law, or liability as to any matters contained in this Agreement.

Dated: 11/15/2024

— Signed by:
*Steven Zinnel*
C01C42884EB4445
Steven Zinnel

Dated: 11/18/2024

— DocuSigned by:
*Michael Brumbaugh*
FA19D52BAC94400
Michael Brumbaugh, individually, in his capacity as Administrator of the Estate, and as Trustee of the Trust.

Dated: 11/19/2024

— DocuSigned by:
*Jennifer Zinnel*
F8835F44EA84440
Jennifer Zinnel

K. Greg Peterson, Esq. (SBN: 118287)
K. GREG PETERSON, a Professional Law Corporation
455 Capitol Mall, Suite 325
Sacramento, California 95814
Telephone:    (916) 443-3010
Facsimile:    (916) 492-2680
Email:    greg@kgregpeterson.com

Attorney for Michael Brumbaugh, Administrator of the Estate
of David P. Zinnel and Trustee of the Castana Trust, dtd Mar. 4, 2009

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>STEVEN ZINNEL<br><br>Defendant and Judgment Debtor.<br><br>DAVID ZINNEL, SUCCESSOR TRUSTEE OF THE CASTANA TRUST, DATED MARCH 4, 2009,<br><br>Garnishee. | Case No.: 2:21-mc-00098 TLN AC<br><br>**STIPULATION AND ORDER RE DISPOSITION OF REMAINING BALANCE OF TD AMERITRADE IRA ACCOUNT (\*0613) PURSUANT TO SETTLEMENT AGREEMENT** |

IT IS HEREBY STIPULATED AND AGREED UPON by and between Third-Party Michael Brumbaugh, Administrator of the Estate of David P. Zinnel and as successor Trustee of the Castana Trust, dated March 4, 2009, by and through K. Greg Peterson, his attorney of record, and STEVEN ZINNEL, appearing Pro Se, as follows:

## RECITALS

This action involves an Application for Writ of Garnishment filed on April 2, 2021, by Plaintiff UNITED STATES OF AMERICA ("USA") in connection with criminal monetary penalties totaling $3,014,294 assessed against STEVEN ZINNEL ("Steven") in criminal case

-1-

DEF.
EX. 117

5:25-mc-30
5:25-mc-31

number 2:11–CR–00234–TLN;

The Garnishee, TD AMERITRADE CLEARING, INC. ("**TD Ameritrade**"), responded in this action by disclosing its possession of Rollover IRA Accounts 787–727536 and 72–830613 (together, the "**TD Ameritrade IRA**") in which it claimed Steven has an interest;

Third Party Claimant DAVID ZINNEL ("**David**"), who was served with a copy of the USA's Application for Writ of Garnishment, responded in his capacity as Successor Trustee of The Castana Trust, Dated March 4, 2009 (the "**Castana Trust**") and in his capacity as a 50% beneficiary of the Castana Trust by claiming an interest in the entirety of the TD Ameritrade IRA as an asset of the Castana Trust.

1.     On June 3, 2022, the USA agreed to limit the total amount of its criminal monetary penalties owed by Steven to $1,013,056.06 ($513,056.06 restitution; $500,000.00 penalty) and its litigation surcharge to $150,000.00, for a total amount of $1,163,056.06 (the "**Agreed Amount**") [Transcript 6:15][1];

2.     David and Steven previously agreed that David is then entitled to everything that remains in the TD Ameritrade IRA [Transcript 5:22-6:5] as an asset of the Castana Trust [Transcript 6:19-22, 9:20-21], and any balance remaining is to be sent to the Castana Trust [Transcript 7:10] or the account may be converted to a Castana Trust account [Transcript 7:11-12]. Steven and David agreed, prior to David's death, that any remaining balance of the TD Ameritrade IRA will be a Castana Trust asset and that they will agree to execute whatever paperwork is necessary to effectuate their agreement [Transcript 15:23-16:3, 16:7-12, 26:13-18];

3.     The parties acknowledge that the USA has been paid in full from the TD Ameritrade IRA;

4.     On October 14, 2022, David passed away.

---

[1] All references to Transcript are to the Transcript of Proceedings of the Settlement Conference held on June 3, 2022, before the Hon. Kendall J Newman, Chief Magistrate Judge in this matter and as transcribed Thresha Spencer, CSR (ECF **134**).

STIPULATION AND ORDER RE DISPOSITION OF REMAINING BALANCE OF TD AMERITRADE IRA ACCOUNT (*0613) PURSUANT TO SETTLEMENT AGREEMENT

**firsthalfsteve@gmail.com**

| | |
|---|---|
| **From:** | Coleman, Keisha <colemank@ballardspahr.com> |
| **Sent:** | Monday, July 21, 2025 4:56 PM |
| **To:** | firsthalfsteve@gmail.com |
| **Cc:** | Vartabedian, Melanie J.; Taryle, Adam |
| **Subject:** | RE: United States v. Zinnel - TD Ameritrade Account |

Mr. Zimmel,

I received the email you sent, below. Apologies that you did not receive our substitution papers as that was certainly not intentional. We have made a note of your address for any future mailings so this isn't an issue again. Also, with respect to whether you may use the e-filing system, Schwab would not oppose that.

Melanie's address is:
Ballard Spahr LLP
201 South Main Street, Suite 800
Salt Lake City, UT 84111-2221

Additionally, I confirmed that the account is closed.

Regards,
Keisha

**Keisha O. Coleman**

## Ballard Spahr

999 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-4421
678.420.9320 DIRECT
678.420.9301 FAX

770.833.5289 MOBILE | colemank@ballardspahr.com
VCARD

www.ballardspahr.com

**From:** firsthalfsteve@gmail.com <firsthalfsteve@gmail.com>
**Sent:** Monday, July 21, 2025 1:41 PM
**To:** Vartabedian, Melanie J. <vartabedianm@ballardspahr.com>
**Subject:** United States v. Zinnel - TD Ameritrade Account

⚠ **EXTERNAL**

Ms. Vartabedian:



STEVEN ZINNEL
11 Verdin Lane
Aliso Viejo, CA 92656

In pro se

**[ FILED ]**

JUL 5 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 2:11-cr-00234-TLN |
| Plaintiff, | |
| v. | **DEFENDANT STEVEN ZINNEL'S NOTICE OF MOTION AND MOTION FOR JUDICIAL DETERMINATION OF AMOUNT DUE AND CONTINUED OBJECTIONS; MEMORANDUM OF POINTS AND AUTHORITIES AND EXHIBITS** |
| STEVEN ZINNEL, | |
| Defendant. | |

Hearing

Date:   August 4, 2022
Time:   9:30 AM
Judge:  Troy L. Nunley
Ct. Rm: 2

To the Court, the United States of America, and any interested persons and organizations:

**PLEASE TAKE NOTICE** that on August 4, 2022 at 9:30 AM in Courtroom 2, of the United States District Court located in the Robert T. Matsui United States Courthouse, 501 I Street, Sacramento, CA 95814, a hearing will be held on Defendant and **alleged** judgment debtor Steven Zinnel's ("Zinnel") MOTION FOR JUDICIAL DETERMINATION OF AMOUNT DUE AND CONTINUED OBJECTIONS.

The grounds for the motion are that after eight (8) years, for the first time on June 3, 2022 during a Settlement Conference on-the-record stipulation before Chief Magistrate Judge Kendall J. Newman, Plaintiff United States of America ("government") claims and agrees on the record that

Steven Zinnel's Motion for Judicial Determination Amount Due and Continued Objections
- 1 -

5:25-mc-30 **DEF.**
5:25-mc-31 **EX. 119**

**the maximum amount Steven Zinnel owes** in the case entitled *United States v. Steven Zinnel*, U.S.D.C. ED CA Case No. 2:11-cr-00234-TLN ("Criminal Case") is **$1,163,056.06** instead of **$3,315,723.40**; an admission and stipulation by the government and its lawyers that the government and its officers-of-the-court lawyers have been **overstating**, for almost a decade, the amount owed by Steven Zinnel in the Criminal Case by at least **$2,152,667.34** which Zinnel maintains is a fraud on the Court and blatant lying by the government lawyers including AUSA Matthew Dean Segal, AUSA Audrey Benison Hemesath, former AUSA Kurt Didier (now practicing at The Law firm of Knapp, Petersen & Clarke), and AUSA Lynn Trinka Ernce [1] to the Court, Steven Zinnel, David Zinnel, and TD Ameritrade Clearing, Inc.

For over eight (8) years, Steven Zinnel has consistently and emphatically maintained that the government has **marshalled $3,150,129.14 that the government has been sitting on for almost a decade,** to be applied against $3,014,819.00 in court-ordered restitution, and fine resulting in Zinnel being owed **$ 135,310.14** by the government for its over-collecting of the court-ordered restitution and fine. This is a position that Zinnel has never waivered on including during the Settlement Conference on June 3, 2022 before Chief Magistrate Judge Kendall J. Newman in *United States v. Steven Zinnel / TD Ameritrade*, U.S.D.C. ED CA Case No. 2:21-mc-00098-TLN-AC ("Misc. Case #1). The Settlement Conference parties, to wit; the United States of America, Steven Zinnel, and David Zinnel, and their respective counsel, stipulated and agreed on the record on June 3, 2022 that that maximum the United States of America may now seek in the underlying Criminal Case is **$1,163,056.06** and Steven Zinnel continues to maintain he owes nothing and the government and in fact, the government has over-collected **$135,310.14** that is owed by the government to Steven Zinnel.

This Motion seeks a judicial determination, based on the government's recent judicial admission [2], and before any appeal to the Ninth Circuit Court of Appeals, of the amount Steven

---

[1] Steven Zinnel will be reporting the Offending Attorneys conduct unbecoming a member of the State Bar and blatant misrepresentations to a Court to the State Bar of California and the Department of Justice's Office of Professional Responsibility.

[2] Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. The government lawyers previously citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).

Zinnel actually owes in the criminal case entitled *United States v. Steven Zinnel*, U.S.D.C. ED CA Case No. 2:11-cr-00234-TLN. Further, this court-filing is Steven Zinnel's continued objection that he does not owe any money in the Criminal Case and in fact that the government has over-collected **$135,310.14** that is owed by the government to Steven Zinnel.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities and Exhibits, the stipulation and agreement reached on the record during Settlement Conference on June 3, 2022 before Chief Magistrate Judge Kendall J. Newman in *United States v. Steven Zinnel / TD Ameritrade*, U.S.D.C. ED CA Case No. 2:21-mc-00098-TLN-AC ("Misc. Case #1), ), all the filings in *United States v. Steven Zinnel / TD Ameritrade*, U.S.D.C. ED CA Case No. 2:21-mc-00098-TLN-AC ("Misc. Case #1), all the filings in *United States v. Steven Zinnel / David Zinnel, Castana Trust*, U.S.D.C. ED CA Case No. 2:21-mc-00143-TLN-AC ("Misc. Case #2") , all the filings in *United States v. Steven Zinnel*, U.S.D.C. ED CA Case No. 2:11-cr-00234-TLN, and any oral argument at the hearing.

NOTICE IS FURTHER GIVEN that Steven Zinnel continues his objection to the amount the government claims is due in the underlying Criminal Case entitled *United States v. Steven Zinnel*, U.S.D.C. ED CA Case No. 2:11-cr-00234-TLN.

NOTICE IS FURTHER GIVEN that Steven Zinnel continues his objection that District Court Judge Troy L. Nunley cannot hear or decide this Motion and Objection because on May 23, 2021, over a year ago, Zinnel filed an OBJECTION to Judge Troy L. Nunley presiding over this case, Misc. Case #1, #ECF #18, that has still not been ruled on by District Court Judge other than Judge Troy L. Nunley.

Respectfully submitted,

Steven Zinnel

Dated: July 1, 2022

Steven Zinnel's Motion for Judicial Determination Amount Due and Continued Objections

- 3 -

<b><u>MEMORANDUM OF POINTS AND AUTHORITIES</u></b>

## I. <u>KEY LAW</u>

The right to adjudication before an Article III judge is an important constitutional right. *United States v. Mortensen*, 860 F.2d 948, 950 (9th Cir. 1988); *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.*, 725 F.2d 537, 541 (9th Cir. 1984) (en banc). Critically, under the magistrate judge system, even though a magistrate judge may be designated to determine most pretrial matters directly, the parties can ask the district court to reconsider any such matter if "the magistrate judge's order is clearly erroneous ·or contrary to law." 28 U.S.C. 636(b)(l)(A); *Louis Branch v. D. Umphenour*, 936 F.3d 994 (9th Cir. 2019) (**reversing an Eastern District of California judicial decision**). Under the magistrate judge system, no party will be denied independent review by an Article III judge. *Louis Branch. Id.* This includes Zinnel who in fact is the named defendant in this case. Any denial would lack the requisite supervision by an Article III officer.

## 2. <u>DOCKET CITATIONS IN THIS OBJECTION</u>

On a clarification matter, as this Motion cites court-filings in five (5) different cases filed in the United States District Court, Eastern District of California, (Sacramento) and the Superior Court of California, County of Sacramento, Zinnel will refer to court-filings in the cases:

- *United States v. Steven Zinnel*, Case No. 2:11-cr-00234-TLN as "**Criminal Case**;"
- *United States v. Steven Zinnel / TD Ameritrade*, Case No. 2:21-mc-00098-TLN-AC as "**Misc. Case #1**;"
- *United States v. Steven Zinnel / David Zinnel, Castana Trust* Case No. 2:21-mc-00143-TLN-AC as "**Misc. Case #2**;"
- *United States v. Steven Zinnel / David Zinnel*, Case No. 2:19-mc-00242-TLN as "**Subpoena Case**;"
- *In The Matter of The Castana Trust Dated March 4, 2009*, Superior Court of California, County of Sacramento Case No. 34-2016-00200990-PR-TR-FRC as "**Probate Case**."

## 3.  ANALYSIS

**3.1** **Steven Zinnel does not owe any money in the underlying Criminal Case and the government has actually over-collected $135,310.14 in the Criminal Case that should be returned to Zinnel**

During the Settlement Conference on June 3, 2022, on the record the parties stipulated that Steven Zinnel maintains that Plaintiff has over-collected from Zinnel in the Criminal Case thus the government owes Zinnel **$135,310.14.** (Misc. Case #1. ECF nos. 128 & 134). The parties further stipulated on the record that now, the absolute maximum, the government can attempt to collect in the underlying Criminal Case and Misc. Cases #1 and #2 is capped at **$1,163,056.06.** (Misc. Case #1. ECF nos. 128 & 134). The agreement reached between the parties at the Settlement Conference on June 3, 2022 was that the Court would have an evidentiary hearing to make a judicial determination, before Zinnel appeals to the Ninth Circuit, as to what amount the District Court believes Zinnel owes in the Criminal Case <u>and</u> the stipulated range between the parties is between a negative $135,310.14 and a positive $1,163,056.06 which is a **delta of $1,298,366.14** for either the District Court or the Ninth Circuit Court of Appeals to adjudicate. During the June 3, 2022 Settlement Conference there was no agreement between the parties, especially Steven Zinnel, that Plaintiff United States would simply be able to garnish the government's stipulated cap of $1,163,056.06. It was never agreed to or contemplated by Steven Zinnel that after the June 3, 2022 Settlement Conference that either the Magistrate Court or the District Court would simply enter a garnishment order for the government's stipulated cap of $1,163,056.06.

To provide background to the Court, Steven Zinnel's position, and preserve the appellate record, Zinnel attaches hereto, as Attachment #1, STEVEN ZINNEL'S NON-CONFIDENTIAL SETTLEMENT CONFERENCE STATEMENT submitted to Chief Magistrate Judge Kendall J. Newman, and the parties, on or about May 31, 2022 and incorporates STEVEN ZINNEL'S NON-CONFIDENTIAL SETTLEMENT CONFERENCE STATEMENT into this Objection as if fully set forth herein.

On May 6, 2019, Zinnel was resentenced for a second time to the longest sentence in the history of the United States for Bankruptcy Fraud. Zinnel's 152-month prison sentence exceeds the longest sentence ever in a bankruptcy fraud case by 25%. (see Criminal Case, ECF #585-9, pgs. 2-5).   Similarly situated bankruptcy fraud defendants were sentenced to an average of 19 months imprisonment with the longest prison sentence being 78 months. (see Criminal Case ECF nos. 585-7, pgs. 3-26 and 615, pgs. 11-14). Nevertheless, on May 15, 2019 the district court filed a Second Amended Judgment in Criminal Case. (see Criminal Case, ECF #653).

The Second Amended Judgment ordered Zinnel to pay a Special Penalty Assessment of $1,500, Victim Restitution of $2,513,319, and the statutory maximum fine of $500,000. (Criminal Case, ECF #653). The total ordered is thus $3,014,819. A U.S. Courts Case Inquiry printed on 1/11/21 that reflects the Total Ordered was $3,014,819. (Misc. Case #1, ECF #84, pg. 21). U.S. Courts Case Inquiry printout details a "balance" of $3,014,819 **because the government refuses to deposit the marshalled $3,150,129.14 that the government has been sitting on for almost a decade with the Court leaving $ 135,310.14 to be returned to Steve Zinnel**. The printout reflects that since Zinnel has been incarcerated for almost nine (9) years now, the Bureau of Prisons has collected $525 from Zinnel as of 1/11/21, through the Inmate Financial Responsibility Program pursuant to the operative judgment. (Misc. Case #1, ECF #84, pg. 21).

In April of 2014, Zinnel and the government agreed and stipulated to restitution so that the funds the government had marshalled to date, $3,025,209.86 as of March 3, 2014, would be immediately paid to the restitution recipients including $150,000 to each of Zinnel's children so they both had money for college. (see Criminal Case ECF #615, pg. 359; Misc. Case #1, ECF #84, pg. 23). Both of Zinnel's children are college graduates now and they never received the money for college **because the government refuses to deposit with the Court the marshalled $3,150,129.14 that the government has been sitting on for almost a decade.** On April 1, 2014, Zinnel's attorney Suzanne Luban sent an email to government attorney AUSA Kevin Khasigian memorializing the agreement. (see Misc. Case #1, ECF #84, pg. 21; Criminal Case, ECF #586-4, pg. 10). The same day, Zinnel's attorney and two of the government attorneys entered into a formal Stipulation and

Order Re: Restitution that provided Zinnel's children with $150,000 each for college. (see Misc. Case #1, ECF #84, pgs. 25-27; Criminal Case ECF nos. 343 and 586-4, pgs. 11-13).

When Zinnel moved to stay the sale of real property forfeited prior to sentencing, the government opposed the motion to stay (Misc. Case #1, ECF #84, pgs. 29-32; Criminal Case ECF nos. 314, 586-4., pgs. 2-5). Plaintiff's Opposition filed on March 3, 2014 stated:

> "The only way that he would be prejudiced by forfeiture and liquidation of these assets would be that they could generate funds that the Attorney General could in his discretion direct to Zinnel's victims (including his ex-wife). **Zinnel's spite is a sentencing factor, not a basis for a motion to stay.**"
> (Misc. Case #1, ECF #84, pg. 29)

The court-filed Opposition to the Motion to Stay was signed by and filed by Plaintiff's lawyer AUSA Kevin Khasigian. (Criminal Case ECF #314).

Rule 11 of the *Federal Rules of Civil Procedure* imposes a duty upon lawyers who sign court-filings. With each court-filing by a lawyer for the government, Rule 11 creates a certification that the "legal contentions are warranted by existing law" and that "the factual contentions have evidentiary support." Barrels of ink have been spilled in judicial opinions, scholarly journals, trade publications, and legal education conferences on Rule 11 and Zinnel will not spill any more ink regarding the Rule 11 certification and sanctions that may be imposed here.

In Plaintiff's Opposition to the Motion to Stay, AUSA Kevin Khasigian represented to the court, restitution recipients, and Zinnel that any funds forfeited from Zinnel can be used to pay restitution recipients and the government and its lawyers wanted to use forfeited funds to pay the restitution recipients right away. However, contrary to the government lawyers' lofty representations to the court about getting the victims paid, it took the government until March and June of 2016 to sell the property. Therefore, it took the government 756 days to sell the property that the government lawyers represented to the court on March 3, 2014 was "expensive to maintain." (Misc. Case #1, ECF #84, pgs. 29-32; Criminal Case ECF nos. 615, 26 p. 359; 314).

Additionally, in Plaintiff's Opposition to Zinnel's Motion to Stay Forfeiture, AUSA Kevin Khasigian wrote, and four government attorneys certified under Rule 11 the following:

"After all, forfeiture is designed to create a pool of assets from which victims can be reimbursed."

"Delaying forfeiture will only prolong the ability of [Zinnel's] victims to receive distributions and would serve to further harm [them]."
See *United States v. Davis*, No. 07-cr-011, 2009 WL 2475340, at \*3 (D. Conn. June 15, 2009)."

"Simply put, the sooner the properties are sold the better off Zinnel's victims will be." [Misc. Case #1, ECF #84, pg. 32; Criminal Case ECF #314, p. 5]

**The government lawyers have made judicial admissions that they must be forced to abide by**. The Court must find the statements made by the government lawyers in a court filing in the Criminal Case on March 3, 2014 (Criminal Case, ECF #314; Misc. Case #1, ECF #84, pgs. 29-32) that the government will be applying the **$3,025,209.86** marshalled by the government from Zinnel as of **March 3, 2014**, over eight (8) years ago, to pay Zinnel's court-ordered financial obligations. See *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("**Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact**") (emphasis added, internal citation omitted); id. at 227. ("[S]tatements of fact contained in a brief may be considered admissions of the party in the discretion of the district court").

Further, four (4) government lawyers have represented and certified under Rule 11 in April of 2014, that all forfeited funds in the Criminal Case would be used to pay the restitution recipients including $150,000 to each of Zinnel's children for college. Zinnel's two children have now graduated from college, but yet the government lawyers who are sitting on $3,149,604.14 in marshalled funds and refuse to pay the restitution recipients. In aggravation, the same government lawyers are attempting double-dip by trying to collect in State Court in this matter.

Four government lawyers have represented to Judge Troy Nunley, Zinnel's lawyers, and to Zinnel in a court-filing April 2014 that "forfeiture is designed to create a pool of assets from which victims can be reimbursed" and that the government lawyers wanted to get the restitution recipients paid right away. (Misc. Case #1, ECF #84, pgs. 29-32; Criminal Case ECF #314).

The same government lawyers should be stopped from taking a contrary position here.

On September 21, 2016, Plaintiff's lawyer AUSA Kevin Khasigian sent an email to Zinnel's attorney Suzanne Luban admitting Plaintiff United States had marshalled $3,149,604 in assets in Zinnel's Criminal Case, but "**No funds have been applied to restitution or the fine**." (emphasis added). (Misc. Case #1, ECF #84, pg. 34; Criminal Case ECF #586-4, p. 19). The September 16, 2016 email was a sentencing exhibit and was brought to the court's attention in Zinnel's Sentencing Memorandum. (Criminal Case ECF nos. 586-4, p. 19, 615, p. 360).

After Zinnel received AUSA Khasigian's representation to another lawyer in an email regarding the funds Plaintiff had marshalled for the restitution and fine, over the next year, Zinnel wrote several letters to Plaintiff's lawyers trying to get Plaintiff United States to pay the restitution recipients, including Zinnel's children paid. Plaintiff's counsel did not respond to Zinnel's letters. Therefore, on December 5, .2017, Zinnel filed a Motion to Enforce the Judgment and Hold Plaintiff and its lawyers in contempt of court for failing to pay the restitution recipients including Zinnel's children $150,000 for college. (Misc. Case #1, ECF #84, pgs. 36-39; Criminal Case ECF nos. 409, 586-4, pgs 21-40).

The Department of Justice, Asset Forfeiture and Money Laundering Section ("AFMLS") published in 2016 an "Asset Forfeiture Policy Manual" that is a compilation of policies governing the Department of Justice Asset Forfeiture Program. The purpose of the Policy Manual is to provide Department of Justice prosecutors with a reference manual containing the policies and procedures of the DOJ. For his resentencing in May 2019, Zinnel filed relevant portions of the AFMLS "Asset Forfeiture Policy Manual" as a sentencing O exhibit. (Criminal Case ECF #586-4, pgs. 58-68), In this Misc. Case #1, Zinnel has previously filed with the Court the relevant portions of the Policy

Manual with Zinnel's hand-written notations on the pages. (Misc. Case #1, ECF #84, pgs. 41-51). The DOJ "Asset Forfeiture Policy Manual" states in relevant part:

This procedure enables the Attorney General to transfer forfeited funds to a court for satisfaction of a criminal restitution order. (Misc. Case #1, ECF #84, pg. 42; Criminal Case ECF #586-4 p. 59). Potential victims must be notified of the opportunity to file a petition for remission. (Misc. Case #1, ECF #84, pg. 43; Criminal Case ECF #586-4 p. 60). The Restoration Procedures enable the government to complete the forfeiture. This permits victims to obtain fair compensation from the forfeited assets, in accordance with the court's restitution order. (Misc. Case #1, ECF #84, pg. 46; Criminal Case, ECF #586-4 p. 63). Payment will be made only in accordance with the court's restitution order. (Misc. Case #1, ECF #84, pg. 48; Criminal Case, ECF #586-4 p. 65). Is a prosecutor bound, ethically or otherwise, to forego forfeiture in favor of restitution? (Misc. Case #1, ECF #84, pg. 50; Criminal Case, ECF #586-4 p. 67). Department of Justice policy is to collect and marshal assets for the benefit of victims. (Misc. Case #1, ECF #84, pg. 50; Criminal Case, ECF #586-4 p.67). Thus, a prosecutor who uses forfeiture tools as a means to provide remission or restoration of assets to crime victims fulfills any obligation that the prosecutor may have under the Justice for All Act to crime victims. (Misc. Case #1, ECF #84, pg. 51; Criminal Case, ECF #586-4 p. 68). The government uses forfeited property to recompense victims. (Misc. Case #1, ECF #84, pg. 51; Criminal Case, ECF #586-4, pg. 68). At Zinnel's resentencing in May of 2019, Zinnel informed the Court and Plaintiff's counsel that the restitution, fine, and special assessment in this case are paid. (Misc. Case #1, ECF #84, pgs. 53-55; Criminal Case, ECF #615, pgs. 359-360).

An attorney can never lie to another attorney Plaintiff's attorney AUSA Kevin Khasigian's representations to Zinnel and his attorney in the September 21, 2016 email (Misc. Case #1, ECF #84, pg. 34; Criminal Case ECF #586-4 p. 19) and Opposition to Motion to Stay (Misc. Case #1, ECF #84, pgs. 29-32; Criminal Case ECF #314) are party-opponent admissions which is a hearsay exception under *Federal Rules of Evidence* 801(d)(2). Further, the Court must find the statements made by the government lawyers in the court filing in the Criminal Case on March 3, 2014 (Criminal Case, ECF #314; Misc. Case #1, ECF #84, pgs. 29-32) as judicial admissions that now cannot be

changed. See *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("**Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact**") (emphasis added, internal citation omitted); id. at 227. ("[S]tatements of fact contained in a brief may be considered admissions of the party in the discretion of the district court").

Not only is AUSA Kevin Khasigian an attorney, but he is a federal prosecutor with a heightened duty to be honest. In the Criminal Case, for Zinnel's May 2019 resentencing, Zinnel briefed that an attorney can never lie to another attorney. (Criminal Case ECF nos. 615, pgs. 244-248; 586-7, pgs. 27-66).

- Rules of professional conduct impose a duty of candor to the court and opposing counsel;
- In its simplest application, Rule 4.l(a) merely codifies a simple proposition: although **lawyers** are supposed to be zealous partisans of their clients, they **must draw the line at lying. A lawyer must not make misrepresentations to a court or another lawyer**. Rule 4.l (a) recodifies the traditional rule that a lawyer's word is his bond. (Criminal Case ECF nos. 615, p. 245; 586-7, p. 3).
- The failure to disclose a material fact is an ethical violation ... A lawyer's responsibility to act with candor and honesty necessarily requires disclosure of significant facts, even though the disclosure might not be in the interest of the client. (Criminal Case ECF nos. 615, p. 245; 586-7, p. 43).

Additionally, in Misc. Case #2, Zinnel requested that the Court take Judicial Notice that in the criminal case entitled *United States v. Keith Raniere*, U.S.D.C. ED NY case number 18-cr-204-NGG, Plaintiff United States of America, by and through its Department of Justice attorneys, take the position that criminal forfeited funds in the criminal case will be used to pay defendant Keith Raniere's victims $3.4 million. (Misc. Case #2, ECF #50). Again, this is a Judicial Admission by government lawyers that forfeited funds must be used to satisfy Zinnel's restitution windfall recipients.

Here is the proper accounting of Criminal Case funds with the U.S. Attorney's Office and the amount government lawyers for the United States have over-collected:

> $3,150,129.14
> -$3,014,819.00
> **$ 135,310.14 (the amount the government owes Zinnel)**

Thus, when the government filed its first garnishment action, Misc. Case #1, Steven Zinnel owed no restitution, fine, or special assessment and Zinnel was actually owed the $135,310.14 the government lawyers had over-collected.

However, after sleeping on its perceived rights for around seven (7) years, on April 2, 2021, the government initiated its first garnishment proceeding, Misc. Case #1, by filing an APPLICATION FOR WRIT OF CONTINUING GARNISHMENT (BANK, IRA, STOCKS OR BROKERAGE ACCOUNTS). ("Application"). (Misc. Case #1, ECF #1). In its application, the government lawyers misrepresented to the Court, Zinnel, and TD Ameritrade Clearing, Inc. that as of April 2, 2021, in the underlying Criminal Case Zinnel owes $3,014,294.00 as of March 24, 2021. (Misc. Case #1, ECF #1, pg. 2). The government lawyers further misrepresented that Plaintiff United States of America is entitled to litigation surcharge of ten percent (10%) of the amount of the debt ($301,429.40) pursuant to 28 U.S.C. § 3011(a). The total amount sought by the government in Misc. Case #1 was thus **$3,315,723.40** on April 2, 2021.

The government's math was as follows:

| | |
|---|---|
| Restitution | $2,513,319.00 |
| Fine | $ 500,000.00 |
| Special Assessment | $ 1,500.00 |
| 10% Litigation Surcharge | $ 301,429.40 |
| Less BOP IFRP payments | <$ 525.00> |
| Total Claimed Owed | **$3,315,723.40** |

After stead fasting maintaining its specious position for over a year of constant litigation in both Federal Court and State Probate Court, including the two garnishment cases Misc. Case #1 and Misc. Case #2, during the Settlement Conference on June 3, 2022, government lawyer AUSA Lynn Trinka Ernce, in a binding admission on behalf of her client Plaintiff United States of America, admits that at least **$2,152,667.34 has magically disappeared.** Further, the government refuses to

explain why the $3,150,129.14 the government has marshalled in the Criminal Case as of September 16, 2016 has not satisfied ALL of the restitution, fine, and special assessment. Nor has the government provided any accounting. Nor does the government explain why they now think they are entitled to a Litigation Surcharge pursuant to 28 U.S.C. § 3011(a) of an arbitrary **$150,000.00** instead of the original claimed amount of **$301,429.40**. Under the law and facts, the government is not entitled to a Litigation Surcharge $301,429.00 because when the government filed this garnishment action on April 2, 2021, Zinnel's outstanding debt was $0.00. This is because by March 3, 2014, over eight (8) years ago, the government had marshalled $3,025,209.86. (Criminal Case, ECF #313; Misc. Case #1, ECF #84, pg. 34) and by September 16, 2016, the government had marshalled $3,149,604.14.

During the Settlement Conference on June 3, 2022, government lawyer AUSA Lynn Trinka Ernce, stipulated on the record on behalf of her client Plaintiff United States of America, that the maximum Plaintiff United States could attempt to collect is now capped at **$1,163.056.00.**

The government's math and cap is as follows:

| | | |
|---|---|---|
| Restitution | $ 513,056.06 | (no explanation how govt. determined) |
| Fine | $ 500,000.00 | |
| Special Assessment | $ 0.00 | (no explanation how govt. determined) |
| 10% Litigation Surcharge | $ 150,000.00 | (no explanation how govt. determined) |
| Total Maximum | **$1,163,056.06** | |
| The government | | |
| Can argue for | | |

Therefore, Plaintiff United States of America has stipulated on the record that its position is restitution is reduced from $2,513,319.00 to $513,056.06; a **$2,000,262.94 reduction without explanation or an accounting**, Special Assessment is reduced from $1,500 to $0.00; a $1,500.00 reduction without explanation or an accounting, and the claimed 10% Litigation Surcharge is reduced from 301,429.40 to **$150,00.00 without explanation or accounting**.

Again, after taking an absurd position for over a year in garnishment litigation, Plaintiff United States of America, admits that at least **$2,152,667.34 has magically disappeared** from the alleged amount owing by Zinnel. Zinnel also understands that recently government lawyer AUSA

Lynn Trinka Ernce has made an admission on behalf of her client that *the Attorney General (acting through the DOJ Money Laundering and Asset Section) exercised discretion to transfer some forfeited funds to __some victims__. See 28 C.F.R. § 9.8;* an admission previously made by another government lawyer on March 3, 2014. (see Criminal Case ECF #314). **The Court should ask why** for many years now, the government lawyers, including AUSA Lynn Trinka Ernce, have represented to the Court that Zinnel's outstanding debt was $3,014,294.00?

**Zinnel requests that Court order the government, including it lawyer AUSA Lynn Trinka Ernce, provide Zinnel and the Court with an accounting of all funds that have been recently paid to the restitution windfall recipients and provide Zinnel with all documents that evidence said payments forthwith.** Further, Zinnel requests that the government lawyers explain why "some victims" were paid, but not all.

The District Court should **hold an evidentiary hearing to make a judicial determination** on how much Plaintiff United States owes Zinnel or how much Zinnel owes in the underlying Criminal Case and how much the government can garnish in Misc. Case #1 and Misc. Case #2.

**3.2      The United States is not entitled to any 10% Litigation Surcharge and the $150,000 the United States now claims it is entitled to is pulled from thin air**

Zinnel incorporates all the law and facts contained in Section 3.1 above as of fully set forth herein.

Even though Zinnel owed nothing in the Criminal Case when this garnishment action, Misc. Case #1, was filed on April 2, 2021, for over a year of constant litigation in both Federal Court and State Probate Court, the government lawyers have misrepresented that Plaintiff United States of America is entitled to litigation surcharge of ten percent (10%) of the amount of the debt ($301,429.40) pursuant to 28 U.S.C. § 3011(a). The government evidently calculated this fictitious amount by taking 10% of an alleged outstanding balance in the Criminal Case for restitution, fine, and special assessment of $3,014,294.00.

During the Settlement Conference on June 3, 2022, on the record the parties stipulated that Steven Zinnel maintains that Plaintiff is not entitled to any 28 U.S.C. §3011(a) Litigation Surcharge and the maximum the government can claim is $150,000. (Misc. Case #1. ECF nos. 128 & 134).

The agreement reached between the parties at the Settlement Conference on June 3, 2022 was that the Court would have an evidentiary hearing to make a judicial determination, before Zinnel appeals to the Ninth Circuit, as to what amount the District Court believes Zinnel owes in 28 U.S.C. §3011(a) Litigation Surcharge.

During the Settlement Conference on June 3, 2022, the government provided no explanation or rational for its claim now that it is entitle to $150,000 surcharge. **It appears the government has pulled the $150,000 figure out of thin air**.

If Zinnel is correct that he owes nothing in the underlying Criminal Case, the 10%, 28 U.S.C. §3011(a) Litigation Surcharge, is zero. If Zinnel owes a $500,000 fine, the 10%, 28 U.S.C. §3011(a) Litigation Surcharge is $50,000. If Zinnel owes $513,056.06 in restitution and a $500,000 fine, for a total of $1,013,056.06, the 10%, 28 U.S.C. §3011(a) Litigation Surcharge, is $101,305.60. There is no way it can be $150,000 as government lawyers claim and a Magistrate Judge recommends.

The District Court should hold an evidentiary hearing to make a judicial determination on how much 3011(a) Litigation Surcharge Plaintiff United States is entitled to if any.

### 3.3    Objection to Judge Troy L. Nunley ruining on any matter in this case

On May 3, 2021, Zinnel filed an Objection to Judge Troy L. Nunley presiding over the garnishment case. (Misc. Case #1, ECF #18). To date, over a year has passed since Zinnel's objection, but his objection has never been ruled on. Zinnel continues his objection to Judge Troy L. Nunley making any rulings in this case including ruling this motion.

Fighting for what is Right…Seeking Justice in an unjust case,

_____
Steven Zinnel, In Pro Se                                        Dated: July 1, 2022

PHILLIP A. TALBERT
United States Attorney
AUDREY B. HEMESATH
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:11-cr-234 TLN |
| Plaintiff, | **GOVERNMENT'S OPPOSITION TO MOTION FOR JUDICIAL DETERMINATION OF AMOUNT DUE** |
| v. | |
| STEVEN ZINNEL, | |
| Defendant. | |

Defendant Steven Zinnel has filed a motion for judicial determination of amount due (CR 705) that is entirely duplicative of a motion he previously filed in the garnishment action that this Court has already resolved. In related case *United States v. Zinnel*, 2:21-mc-98 TLN AC, Zinnel filed objections to the magistrate judge's findings and recommendations for an order of garnishment (CR 138, docket 2:21-mc-98) that is identical[1] to the motion for judicial determination that Zinnel has now filed in this case. On July 18, 2022, this Court overruled Zinnel's objections and adopted the magistrate judge's findings and recommendations. CR 149. Zinnel filed an appeal with the Ninth Circuit, which is currently pending.

"The law of the case doctrine requires that when a court decides on a rule, it should ordinarily follow that rule during the pendency of the matter." *Mayweathers v. Terhune*, 136 F. Supp. 2d 1152,

---

[1] The only variation between the motions is that (1) CR 138 contains some language that is not present in the motion Zinnel filed in this case; and (2) the language of some of the argument headings has been changed, but the substance of the arguments are identical.

1

1153–54 (E.D. Cal. 2001), *citing Arizona v. California*, 460 U.S. 605 (1983).  Zinnel has provided no reason or authority for this Court to discard its previous determination, particularly where there is a pending Ninth Circuit appeal in the garnishment action.

Thus, this Court should deny the motion for judicial determination.

Dated:  August 12, 2022

PHILLIP A. TALBERT
United States Attorney

By:  /s/ *Audrey B. Hemesath*
AUDREY B. HEMESATH
Assistant United States Attorney

2

**FILED**

STEVEN ZINNEL
11 Verdin Lane
Aliso Viejo, CA 92656

In pro se

AUG 19 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK



## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>STEVEN ZINNEL,<br><br>       Defendant. | Case No.: 2: 11-cr-00234-TLN<br><br>**DEFENDANT STEVEN ZINNEL'S REPLY TO OPPOSITION [ECF #713] TO MOTION FOR JUDICIAL DETERMINATION OF AMOUNT DUE**<br><br><u>Hearing</u><br><br>Taken under submission<br><br>Judge:  Troy L. Nunley |

Defendant Steven Zinnel ("Zinnel") hereby Replies to the Government's Opposition to Motion for Judicial Determination of Amount Due (ECF #713) as follows:

On a clarification matter, as this Reply cites court-filings in different cases filed in the United States District Court, Eastern District of California, (Sacramento), Zinnel will refer to court-filings in the cases:

- *United States v. Steven Zinnel*, Case No. 2:11-cr-00234-TLN as "**Criminal Case**;"

- *United States v. Steven Zinnel / TD Ameritrade*, Case No. 2:21-mc-00098-TLN-AC as "**Misc. Case #1**;"

- *United States v. Steven Zinnel / David Zinnel, Castana Trust* Case No. 2:21-mc-00143-TLN-AC as "**Misc. Case #2**;"



DEF EX. 121

5:25-mc-30
5:25-mc-31

Further, so the appellate record is clear, it must be clear that biased Judge Troy L. Nunley ruled on the government's motion for extension of time to file an opposition the same day on July 29, 2022 (see Criminal Case ECF nos. 710 & 710), but yet biased Judge Troy L. Nunley has not ruled on Zinnel's Motion to E-File filed on July 6, 2022; 40 days ago. (See Criminal Case, ECF #706).

## ARGUMENT

The government ignores that at any time, alleged judgment debtor Zinnel can and will, file motions for a judicial determination for the amount outstanding in this Criminal Case. The government cites no authority to the contrary. The government is correct that Zinnel filed a Notice of Appeal in the first Garnishment case that is still pending. (See Misc. Case #1, ECF nos. 151, 152 & 153). Zinnel is quite confident that District Court Judge Troy L. Nunley and Magistrate Judge Allison Claire will be completely reversed on appeal by the Ninth Circuit Court of Appeals. As Zinnel told Judge Troy L. Nunley and the government lawyers at his resentencing in May 2019, this case could have and would have ended in May 2019 if the right sentence of time-served was imposed, but it could and would be litigated for the next decade or so if necessary. Zinnel will be filing a 28 U.S.C. 2255 to vacate the convictions in this Criminal Case, within the statutory time provided, and seek again to seek the Disqualification Judge Troy L. Nunley under 28 U.S.C. § 455 based on his bias against Zinnel and in favor of the government and Zinnel will fully prosecute the pending appeal in Misc. Case #1. (See Misc. Case #1, ECF nos. 151, 152 & 153).

Nevertheless, Zinnel's Motion for Judicial Determine of Amount Due in this Criminal Case remains ripe for a court order **and** an appeal of that order.

On July 18, 2022, Judge Troy L. Nunley issued an order, **albeit erroneously**, titled "Order Adopting Findings and Recommendations for Final Order of Garnishment." (See Misc. Case #1, ECF 149 and Exhibit A attached hereto). wherein Judge Nunley Found and Ordered in relevant part:

- TD Ameritrade Clearing, Inc. ("Garnishee") shall pay the Clerk of the United States District Court $1,012,047.08 of the funds held by Garnishee within fifteen (15) days of the filing of this Order [by August 2, 2022];

- Garnishee shall pay $150,000.00 to the United States Department of Justice via a single payment within fifteen (15) days of the filing of this Order and send the payment in the form of a cashier's check, money order, or company draft made payable to "United States Department of Justice" [by August 2, 2022];

- The garnishment shall terminate when Garnishee has paid the **$1,162,047.08** as directed in paragraphs 2-4 above [by August 2, 2022];

- The Court shall retain jurisdiction to resolve matters through ancillary proceedings in the case, if necessary. (see Misc. Case #1, ECF 149).

As detailed in Zinnel's Motion for Judicial Determination, during the Settlement Conference on June 3, 2022 in Misc. Case #1, the government stipulated that the Maximum that Zinnel owes in this Criminal Case, subject to further litigation and judicial review, is **$1,162,047.08.** (see Misc. Case #1, ECF #134).

All parties agree that there was sufficient funds in the subject TD Ameritrade Clearing, Inc. IRA of Ardith Ferris to pay the $1,162,047.08 ordered. TD Ameritrade Clearing, Inc. was ordered to pay the government **$1,162,047.08** by August 2, 2022. (See Misc. Case #1, ECF 149 and Exhibit A attached hereto).

As of the date of this Reply of August 15, 2022, thirteen (13) days have past since the August 2, 2022 court-ordered deadline that TD Ameritrade, Inc, was ordered to pay the **$1,162,047.08** which fully satisfies the Maximum Amount the government agreed on the record is owed in the Criminal Case. As stated on the record, during the June 3, 2022 Settlement Conference, Zinnel maintains, and continues to litigate that he does not owe $1,162,047.08 and in fact the government owes Zinnel **$ 135,310.14** because the government has over-collected of the court-ordered restitution and fine.

Notwithstanding, Zinnel's current Motion (ECF# 705) seeks a judicial determination that as of August 15, 2022, the government has collected the absolute maximum that it agreed on the record on June 3, 2022 that is owed of **$1,162,047.08** and that **as of August 15, 2022, Zinnel owes no restitution, fine, forfeiture, or special assessment in this Criminal Case**.

---

Fighting for what is Right…Seeking Justice in an unjust case,

Steven Zinnel, In Pro Se

Dated:  August 15, 2022

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

STEVEN ZINNEL,

Defendant.

No. 2:11-cr-00234-TLN

**ORDER**

The Court has reviewed Defendant's Motion for Judicial Determination of Amount Due and related briefing thereto. (ECF No. 705.) The Court DENIES Defendant's motion as it is duplicative of a motion Defendant filed in his related garnishment action that the Court already resolved and Defendant appealed. (*See* 2:21-mc-00098-TLN-AC.)

The Court has also reviewed Defendant's *Ex Parte* Application to Use the Court's Electronic Filing System. (ECF No. at 706.) Under the Court's Local Rules, any person appearing *pro se* may not use electronic filing except with permission of the assigned Judge or Magistrate Judge. E.D. Cal. L.R. 133(b)(2). Defendant has not persuaded the Court that there is good cause to allow him to use the Court's electronic filing system. The Court also notes that an identical request was denied in the related garnishment action. Accordingly, the Court DENIES Defendant's *ex parte* application.

///

1

DEF. EX. 122  5:25-mc-30  5:25-mc-31

IT IS SO ORDERED.

**DATED:  September 8, 2022**

Troy L. Nunley
United States District Judge

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 29 of 64
Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 2 of 71
Case 2:11-cr-00234-TLN   Document 314   Filed 03/03/14   Page 1 of 6

BENJAMIN B. WAGNER
United States Attorney
MATTHEW D. SEGAL
AUDREY B. HEMESATH
KEVIN C. KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    v.<br><br>STEVEN ZINNEL and<br>DERIAN EIDSON,<br><br>              Defendants. | 2:11-CR-00234 TLN<br><br>UNITED STATES' OPPOSITION TO DEFENDANT ZINNEL'S MOTION FOR STAY OF FORFEITURE PENDING APPEAL<br><br>Date: March 4, 2014<br>Time: 9:00 a.m.<br>Ctrm: Hon. Troy L. Nunley |

## I.   INTRODUCTION

Trial proved that Defendant Zinnel wrongly held and used certain assets for over a decade. His motion to stay forfeiture seeks to further extend the period during which those assets will be unavailable to liquidate and use to make his victim(s) whole. Zinnel has never claimed under oath that System 3, Done Deal, or the Luyung Property were even his. The only way that he would be prejudiced by forfeiture and liquidation of these assets would be that they could generate funds that the Attorney General could in his discretion direct to Zinnel's victims (including his ex-wife). Zinnel's spite is a sentencing factor, not a basis for a motion to stay.

Zinnel does not even bother to address *the factors* to determine whether a stay is appropriate. He has failed even to attempt to make his required showing and his motion is without merit.

It is possible that Zinnel does not acknowledge the test for a stay because it does not favor him.

United States' Opposition to Zinnel's Motion   1
to Stay Forfeiture Proceedings

EX 2101



DEF.   BS 6002
EX 123   5:25-mc-30
5:25-mc-31

Even assuming Zinnel acknowledged the legal standards for a stay, the stay motion should be denied given the very low likelihood of success of an appeal, the burden on the United States to maintain the forfeited assets, the lack of any asset's intrinsic value, the value of providing this money to benefit the victims, and the fact that the monetary value of the forfeited items could be returned to the defendant if necessary.

## II.    BACKGROUND

In light of this Court's extensive familiarity with this case, the United States will not reiterate the relevant facts here but rather incorporates by reference the forfeiture briefs filed in this matter. The only event that the United States will address here is the September 20, 2013 Preliminary Order of Forfeiture as to Zinnel, forfeiting:

(1) All right, title, and interest in Done Deal, Inc., a California Corporation, entity number C2659844;

(2) All right, title, and interest in System 3, Inc., a California Corporation, entity number C2360455;

(3) Vacant land known as "The Luyung Property" located in Rancho Cordova, Sacramento County, CA, APN: 072-0450-015-0000;

(4) Real property located at 11966 Old Eureka Way, Gold River, CA, APN: 069-0620-054-0000; and

(5) A personal forfeiture money judgment of $1,297,158.20.

ECF No. 253.

Zinnel filed this motion to stay forfeiture proceedings on February 25, 2014.  ECF No. 309.

## III.    ANALYSIS

Courts consider four factors to determine whether a forfeiture order should be stayed: "(1) the likelihood of success on appeal; (2) whether the forfeited asset is likely to depreciate over time; (3) the forfeited asset's intrinsic value to defendant; and (4) the expense of maintaining the forfeited property." United States v. Riedl, 214 F. Supp. 2d 1079, 1082 (D. Haw. 2001). A stay pending appeal is an extraordinary remedy for which the moving party bears a heavy burden. See e.g. Nken v. Holder, 556 U.S. 418, 439 (2009).[1]

---

[1] District courts across the country have routinely denied a defendant's request to stay a forfeiture order pending appeal in a criminal case. See generally United States. v. Phillips, 2013 WL.

BS 6003

EX 2102

Case 2:21-mc-00098-TLN-AC   Document 84   Filed 07/02/21   Page 31 of 64
Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/19   Page 4 of 71
Case 2:11-cr-00234-TLN   Document 314   Filed 03/03/14   Page 4 of 6

To be clear, System 3 was separately forfeited as bankruptcy fraud proceeds and property involved in money laundering crimes. The Eighth Amendment applies to the latter. Even assuming that the *involved in* framework was the exclusive means of forfeiture, Zinnel's vast criminal dealings involving System 3 dispose of any Eighth Amendment concerns. See United States v. Wyly, 193 F.3d 289, 303 (5th Cir. 1999) (forfeiture of a $4 million business used to facilitate money laundering offense was not grossly disproportional to an offense involving only $175,000; Eighth Amendment analysis looks not just to the value of the forfeited property in comparison to the amount laundered, but to the scope and duration of the scheme, the harm caused, and the relationship of the property to the scheme).[2]

As to the second factor, although the local real estate market is in a period of recovery, holding the real properties will harm the United States. The loan/penalties on one property continue to swell.[3] Also, the United States will be required to incur expenses to maintain the property during the pendency of the appeal, as well as pay for liability insurance and property taxes. These costs add to overall depreciation because they will be deducted from any net equity calculation. Regarding System 3,[4] it grew in the mid-to-late 2000s, but growth has stalled this decade as competition increased and clients brought electrical work back in-house to cut costs. Finality in this forfeiture case would lift the cloud of ownership and end the many rounds of Zinnel-led litigation, allowing System 3 to focus on satisfying its client's electrical needs.

The third factor weighs heavily against a stay. The intrinsic value of the forfeited assets to Zinnel is zero. Under oath in family court and bankruptcy, Zinnel has never claimed ownership of

---

[2] An independent appraisal valued the 46% minority interest in System 3 at $3,030,000. Continuing the exclusive *involved in* forfeiture hypothetical (disregarding that System 3 was forfeited as fraud proceeds), a forfeiture consistent with that valuation is not disproportional given the depth of the fraud and money laundering schemes, which included laundering over $1 million dollars and the $4 million demand for the minority interest in System 3. See United States v. Aguasvivas-Castillo, 668 F.3d 7, 16-17 (1st Cir. 2012) (the forfeiture of $20 million, three-fourths of which comprised untainted funds forfeited under the facilitation theory, was not grossly disproportional to the gravity of a $4.4 million food stamp fraud offense); see also Riedl, 164 F. Supp. 2d at 1200 (D. Haw. 2001) (forfeiture of real property worth $1.2 million, which was 12 times the maximum fine under the sentencing guidelines, not grossly disproportional where defendant intended to launder $2.6 million in drug proceeds), aff'd, 82 F. App'x 538 (9th Cir. 2003).

[3] The loan on Old Eureka Way has been in default since September 2010. See ECF No. 274. As of October 29, 2013, the loan balance was approximately $291,000. Id.

[4] The United States does not believe Done Deal, Inc. has any value other than as a shell company to launder money. Its corporate form will be terminated once the forfeiture order is final.

United States' Opposition to Zinnel's Motion    4
to Stay Forfeiture Proceedings

Ex 2103                                        BS 6004

Case 2:21-mc-00098-TLN-AC    Document 84    Filed 07/02/21    Page 32 of 64
Case 2:11-cr-00234-TLN    Document 586-4    Filed 02/21/19    Page 5 of 71
Case 2:11-cr-00234-TLN    Document 314    Filed 03/03/14    Page 5 of 6

System 3 or the Luyung Property." While Old Eureka Way was Zinnel's residence, he no longer resides there, having been in custody since his convictions in this case. That property has no particular historical or familial significance to Zinnel – it was not passed down from prior generations, for example. Rather, Zinnel purchased Old Eureka in 1995 and, not surprisingly, used launder money to retire a bank loan on the property in 2006.[6] See United States v. Evanson, No. 2:05-CR-805, 2008 WL 4335549, at *1 (D. Utah Sept. 22, 2008) (stay unwarranted where defendant failed to show that real property was "unique and cannot be replaced through reimbursement from the government if he succeeds on appeal").

Fourth factor: As the attached Declaration of IRS Special Agent Jason Lamb makes clear,[7] there can be no serious dispute that real property is expensive to maintain. Expenditures for heating costs, real-estate taxes, insurance, and general maintenance all continue to accrue in the absence of forfeiture and sale, money that would otherwise go to Zinnel's victims. The costs associated with maintaining/monitoring System 3 would likely be stratospheric; costs in the first year of the stay would exceed $20,000. This Court would need to appoint a professional receiver to perform such tasks as reviewing System 3's finances/operations and preparing monthly reports. Paying for such efforts would be nonsensical in this case. After all, forfeiture is designed to create a pool of assets from which victims can be reimbursed. Delaying forfeiture "will only prolong the ability of [Defendant's] victims to receive distributions ... and would only serve to further harm [them]." See United States v. Davis, No. 07-cr-011, 2009 WL 2475340, at *3 (D. Conn. June 15, 2009). Simply put, the sooner the properties are sold, the better off Zinnel's victims will be. Thus, this factor also weighs in favor of denying the motion for stay.

///

///

[5] As the trial evidence established, Zinnel hid and concealed his ownership of the Luyung Property. See Trial Exhibit 2001.

[6] See Trial Exhibit 2008. Defendant Zinnel was convicted of laundering the proceeds connected to the payoff of the mortgage on the Old Eureka property. See ECF No. 22, Verdict Form as to Zinnel, Count 16.

[7] See Exhibit A, estimating $41,707.04 in annual costs (year 1) to the United States to maintain the forfeited assets.

United States' Opposition to Zinnel's Motion    5
to Stay Forfeiture Proceedings

EX 2104

BS 6005

BENJAMIN B. WAGNER
United States Attorney
MATTHEW D. SEGAL
AUDREY B. HEMESATH
KEVIN C. KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:11-CR-00234 TLN |
| Plaintiff, | DECLARATION OF JASON LAMB IN SUPPORT OGF UNITED STATES' OPPOSITION TO DEFENDANT ZINNEL'S MOTION FOR STAY OF FORFEITURE PENDING APPEAL |
| v. | |
| STEVEN ZINNEL, and DERIAN EIDSON, | Date: March 4, 2014 Time: 9:00 a.m. Ctrm: Hon. Troy L. Nunley |
| Defendants. | |

DECLARATION OF IRS SPECIAL AGENT JASON LAMB

I, Jason Lamb, declare the following to be true and correct

1.     I am a Special Agent with the Internal Revenue Service – Criminal Investigations. From March of 2007, I served as an asset forfeiture coordinator in the Sacramento, California post of duty. In that capacity, I have been responsible the seizure, maintenance and disposal of assets subject to forfeiture by the U.S. Government. During my time serving in this role, I have seized and forfeited more than one hundred assets including bank accounts, vehicles, business ownership interests and real property. As part of the infrastructure to manage and dispose of these assets, the U.S. Department of Treasury Executive Office of Asset Forfeiture entered into a contract with the company CWS Marketing Group. CWS Marketing Group provides support during the processing of the seized assets including

Declaration of Jason Lamb ISO United
States' Opposition to Stay Motion                    1

X 2105

DEF
EX
124

BS 6006
5:25-mc-30
5:25-mc 31

pre-seizure analysis such as title searches and appraisals, post seizure management for storage and maintenance as well as post-forfeiture needs to include day to day management of a business and disposal of property through public auctions. As part of the pre-seizure analysis of seizing real property, CWS Marketing also submits a Net Equity Analysis along with a Cost Benefit review. The Cost Benefit analysis identifies standard ongoing costs of holding a property such as utilities, property taxes and homeowner's management fees.

2.　I am familiar with the criminal investigation of Steve Zinnel and Derian Eidson and the assets included in the preliminary orders of forfeiture, specifically, Done Deal, Inc., a California Corporation, entity number C2659844; System 3, Inc., a California Corporation, entity number C2360455; Vacant land known as "The Luyung Property" located in Rancho Cordova, Sacramento County, CA, APN: 072-0450-015-0000; and real property located at 11966 Old Eureka Way, Gold River, CA, APN: 069-0620-054-0000. This declaration is based on my personal knowledge, gained through that investigation.

3.　As part of determining potential expenditures associated to the seizure and maintenance of assets in this case, CWS Marketing was tasked with developing an estimate of costs associated to the properties reference above in this investigation. A cost analysis was prepared by CWS Marketing and is attached. In addition to the CWS Marketing estimate, a review was made of the original pre-seizure Cost Benefit analysis along with relevant title search documents.

4.　After review of the analysis, I believe that the United States will incur annual costs of $15,325.20 to maintain 11966 Old Eureka Way, Gold River, CA, APN: 069-0620-054-0000, with costs broken down as follows:

| | |
|---|---|
| Homeowner's Association Dues ($130/month) | $ 1,560.00 |
| Utilities | $ 1,100.00 |
| Lawn/Pool Maintenance | $ 1,400.00 |
| Property Management Fee | $ 4,200.00 |
| Security Company Monitoring/Response | $ 1,920.00 |
| Property Taxes | $ 5,145.20 |
| Total Estimated Annual Costs | $ 12,077.20 |

5.　After review of the analysis, I believe that the United States will incur annual costs of $11,527.84 to maintain vacant land known as "The Luyung Property" located in Rancho Cordova,

Declaration of Jason Lamb ISO United
States' Opposition to Stay Motion

2

EX 2106

BS 6007

Sacramento County, CA, APN: 072-0450-015-0000, with costs broken down as follows:

| | |
|---|---|
| Utilities | $ 1,100.00 |
| Lawn/Pool Maintenance | $ 1,400.00 |
| Property Management Fee | $ 4,200.00 |
| Security Company Monitoring/Response | $ 1,920.00 |
| Property Taxes | $ 2,907.84 |
| Total Estimated Annual Costs | $ 8,279.84 |

DIFF mnoti
$11,527.84

6.      After review of the analysis, I believe that the United States will incur an initial cost of $8,750 for a receiver to accept management of their role in System 3, Inc., and will incur annual costs of $12,600 to monitor the business on a monthly basis. I have attached the costs analysis for a receiver to my declaration.

7.      Based on the above, I believe the United States, in year one, will incur costs of approximately $41,707.04 for maintaining the property forfeited from Defendants Zinnel and Eidson.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

/s/ Jason Lamb
JASON LAMB
Special Agent, IRS-CI

Declaration of Jason Lamb ISO United States' Opposition to Stay Motion

3

BS 6008

EX 2107



3151 Luyung Dr

WHITE ROCK
BUSINESS PARK

3151 Luyung Drive

APN# 072-0450-015

LUYUNG PROPERTY

3151 Luyung Dr
RANCHO CORDOVA, CA 95742

EX 2111

DEF
EX
125

BS6011
5:25-mc-30
5:25-mc-31













**NORTH AMERICAN TITLE COMPANY**

1504 Eureka Road, Suite 110
Roseville, CA 95661

Phone: (916) 783-1130
Fax: (916) 783-3860

## SELLER'S FINAL SETTLEMENT STATEMENT

ESCROW NO.: 54806-70001926-JMM
PROPERTY:

Parcel #   072 0450 015

DATE: May 3, 2002

CLOSING DATE: May 3, 2002

SELLER:
Steve K. Zinnell

BUYER:
Thomas A. Cologna and Linda A. Cologna

| | DEBIT $ | CREDIT $ |
|---|---|---|
| **FINANCIAL CONSIDERATION** | | |
| Total Consideration | | 161,000.00 |
| | | |
| **PAYOFF CHARGES - Louise J. Ferris** | | |
| [Total Payoff $153,041.30] | | |
| Principal Balance | 150,015.00 | |
| Interest on Principal Balance to 04/30/2002 | 2,877.00 | |
| Interest on Principal Balance at 10.0000% from 05/01/2002 to 05/04/2002 | 123.30 | |
| Abstract of Judgment Issuance Fee | 7.00 | |
| Recording Fee(s) | 19.00 | |
| | | |
| **PRORATIONS/ADJUSTMENTS** | | |
| Taxes at $2230.79/semi-annually from 05/03/2002 to 07/01/2002 | | 718.81 |
| | | |
| **OTHER DEBITS/CREDITS** | | |
| Sacramento County Tax Collector for Property Taxes 2nd install. + penalty | 2,463.87 | |
| | | |
| **TITLE/TAXES/RECORDING CHARGES** | | |
| Owners Title Policy Fee to North American Title Company | 637.60 | |
| Recording Satisfaction/Release to North American Title Company | 15.00 | |
| Documentary Transfer Tax to North American Title Company | 177.10 | |
| | | |
| **ESCROW CHARGES** | | |
| Escrow Fee to North American Title Company | 531.25 | |
| Document Preparation Fee to North American Title Company | 100.00 | |
| Notary Fee to North American Title Company | 10.00 | |
| | | |
| Net Proceeds | 4,742.69 | |
| | | |
| TOTAL | $ 161,718.81 | $ 161,718.81 |

SAVE THIS STATEMENT FOR INCOME TAX PURPOSES

GOVERNMENT EXHIBIT 117a
2:11-CR-234 TLN

Zinnel, Def. - 200725 0018

EX 1.020

DEF EX 132

5:25-mc-30
5:25-mc-31

IRL15838 As of 3/30/2016 2:02:5█ █M

Case 2:11-cr-00234-TEN    Document 586-4    Filed 02/21/19    Page 17 of 74

Page 1

 Lawyers Title Company
16755 Von Karman Avenue Suite 100 Irvine CA 92606
Phone: (800) 800-2582
Fax: ()
Escrow Officer: Linda Lasielic


IRL15838-LL

## Seller's Settlement Statement - Final

Property: vacant land Luyung Drive
Rancho Cordova, CA 95742

Seller:    The United States of America

| | Closed Date: | 3/29/2016 |

Disbursement Date: 3/30/2016
Escrow Number:    IRL15838-LL

| | Debits | Credits |
|---|---|---|
| **Purchase Price** | | |
| Purchase Price | | $114,000.00 |
| **Prorations** | | |
| Buyer Deposit paid to Seller Out of Escrow | $11,400.00 | |
| **Escrow Fees** | | |
| Escrow Fees | $478.00 | |
| **Recording Fees / Transfer Taxes** | | |
| County Transfer Taxes | $125.40 | |
| **Additional Settlement Fees** | | |
| All 2015-16 County Property Tax to Sacramento County Tax Collector | $99.73 | |
| **Proceeds or Balance Due** | | |
| Cash From/To Seller | $101,896.87 | |
| **Balance Due** | | $0.00 |
| **Totals:** | $114,000.00 | $114,000.00 |

Save this Statement for Income Tax purposes.

EX 2131

5:25-mc-30
5:25-mc-31



RL17759 As of 6/9/2016 11:59:03 AM

Case 2:11-cr-00234-TLN   Document 586-4   Filed 02/21/20   Page 18 of 71

Pa:

## Lawyers Title

Lawyers Title Company
16755 Von Karman Avenue Suite 100 Irvine CA 92606
Phone: (800) 800-2582
Fax: ()
Escrow Officer: Linda Lastelic

IRL17759-LI

### Seller's Settlement Statement - Final

Property: 11966 Old Eureka Way, Gold River, CA 95670

Closed Date: 6/9/2016

Seller: United States of America, Pursuant to Final Order of Forfeiture and Order Thereon Case Number 2:11-CR-00234-TLN, recorded October 29, 2014 in Book 20141029 Page 564 of Official Records

Disbursement Date: 6/9/2016
Escrow Number: IRL17759-LL

| | Debits | Credi |
|---|---|---|
| **Purchase Price** | | |
| Purchase Price | | $509,000. |
| **Payoff 1 (Total Payoff: $400,923.41)** | | |
| Principal to Aldridge Pite LLP | $229,324.41 | |
| Interest to 05/27/16 | $108,557.15 | |
| Interest from 5/27/2016 thru 6/9/2016 @51.8336/day | $725.67 | |
| Paid Forclosure Fees | $455.00 | |
| Apopraisal/BPO | $16.00 | |
| Inspections | $675.00 | |
| Escrow Advances | $27,715.30 | |
| Servicing Fees | $3,454.88 | |
| Paid reasonable Attornye's fees | $30,000.00 | |
| **Payoff 2 (Total Payoff: $31,926.92)** | | |
| Principal to Sacramento County DCSS | $31,926.92 | |
| **Prorations** | | |
| HOA Dues paid by Seller thru July 30th, 2016 153.00/mo for 6/9/2016 to 7/1/2016 | | $112. |
| Credit Balance held by HOA to apply toward July Dues | | $137. |
| Buyer Deposit paid Direct to Seller | $50,900.00 | |
| **Escrow Fees** | | |
| Escrow Fees | $1,268.00 | |
| **Recording Fees / Transfer Taxes** | | |
| County Transfer Taxes | $559.90 | |
| Record Release | $21.00 | |
| **Additional Settlement Fees** | | |
| Utility Lien to County of Sacramento | $165.22 | |
| **Proceeds or Balance Due** | | |
| Seller Proceeds | $23,485.45 | |
| **Balance Due** | | $0.( |
| **Totals:** | $509,249.90 | $509,249.9 |

**Save this Statement for Income Tax purposes.**

EX. 2132

5.25-mc-30
5.25-mc-31

DEF
EX
134

Case 5:25-mc-00030-CBK    Document 203-1    Filed 11/21/25    Page 83 of 187 PageID #: 435

Case 2:11-cr-00234-TLN    Document 585-5    Filed 02/21/19    Page 67 of 99

BENJAMIN B. WAGNER
United States Attorney
MATTHEW D. SEGAL
AUDREY B. HEMESATH
Assistant U.S. Attorneys
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2729

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.   2:11-cr-234 MCE (GGH) |
| Plaintiff, | PLEA AGREEMENT |
| v. | DATE:<br>TIME:<br>COURT: |
| STEVEN ZINNEL, | |
| Defendant(s). | |

I.

INTRODUCTION

A.  Scope of Agreement:  The superseding indictment in this case charges defendants Steven Zinnel and Derian Eidson with violations of 18 U.S.C. §§ 152(7) - bankruptcy fraud, 152(1) bankruptcy fraud, 1956(h) - money laundering conspiracy (2 counts), and 1956 - money laundering (10 counts), 1957 - transactions in criminally derived property (5 counts), and 981(a)(1)(c) and 28 U.S.C. § 2461(c) - criminal forfeiture.  This document contains the complete plea agreement between the United States Attorney's Office for the Eastern

2

District of California (the "government") and defendant Steven Zinnel regarding this case.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

B.  Court Not a Party:  The Court is not a party to this plea agreement.  Sentencing is a matter solely within the discretion of the Court, the Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.  If the Court should impose any sentence up to the maximum established by the statute, the defendants cannot, for that reason alone, withdraw their guilty pleas, and they will remain bound to fulfill all of the obligations under this plea agreement.  The defendants understand that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence they will receive.

C.  Simultaneous Pleas: Defendants Steven Zinnel and Derian Eidson must plead guilty simultaneously.  The defendants understand that this Plea Agreement is part of a "package" including the Plea Agreement of Steven Zinnel and Derian Eidson.  The government's agreement to enter into this Plea Agreement is conditioned upon both Steven Zinnel and Derian Eidson entering a plea under the terms set forth in each's respective Plea Agreement and abiding by its terms.  Each Defendant also understands and agrees that if the other moves to withdraw his or her plea prior to sentencing, the government shall have the right (1) to prosecute both defendants on the count to which

2

PLEA OFFER DTD 6/12/12

DEF DX 136

5:25-mc-30
5:25-mc-31

EX 1013

BENJAMIN B. WAGNER
United States Attorney
MATTHEW D. SEGAL
AUDREY B. HEMESATH
Assistant U.S. Attorneys
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2729

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  2:11-cr-234 MCE (GGH) |
| Plaintiff, | PLEA AGREEMENT |
| v. | DATE: |
| | TIME: |
| STEVEN ZINNEL, | COURT: |
| Defendant(s). | |

I.

INTRODUCTION

A.   Scope of Agreement:  The superseding indictment in this case charges defendants Steven Zinnel and Derian Eidson with violations of 18 U.S.C. §§ 152(7) - bankruptcy fraud, 152(1) bankruptcy fraud, 1956(h) - money laundering conspiracy (2 counts), and 1956 - money laundering (10 counts), 1957 - transactions in criminally derived property (5 counts), and 981(a)(1)(c) and 28 U.S.C. § 2461(c) - criminal forfeiture.  This document contains the complete plea agreement between the United States Attorney's Office for the Eastern

1

District of California (the "government") and defendant Steven Zinnel regarding this case.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

B.   Court Not a Party:  The Court is not a party to this plea agreement.  Sentencing is a matter solely within the discretion of the Court, the Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.  If the Court should impose any sentence up to the maximum established by the statute, the defendants cannot, for that reason alone, withdraw their guilty pleas, and they will remain bound to fulfill all of the obligations under this plea agreement.  The defendants understand that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence they will receive.

C.   Simultaneous Pleas: Defendants Steven Zinnel and Derian Eidson must plead guilty simultaneously.  The defendants understand that this Plea Agreement is part of a "package" including the Plea Agreement of Steven Zinnel and Derian Eidson.  The government's agreement to enter into this Plea Agreement is conditioned upon both Steven Zinnel and Derian Eidson entering a plea under the terms set forth in each's respective Plea Agreement and abiding by its terms.  Each Defendant also understands and agrees that if the other moves to withdraw his or her plea prior to sentencing, the government shall have the right (1) to prosecute both defendants on the count to which

2

they pleaded guilty; (2) to reinstate any counts against them that may be dismissed (or pending dismissal) pursuant to any Plea Agreement; and (3) to file new charges that might otherwise be barred by any Plea Agreement. The decision to pursue any of these options is solely within the discretion of the U.S. Attorney's Office. By signing this Plea Agreement, the defendant waives any objections, motions, and defenses to the government's decision. In particular, the defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment

## II.

### DEFENDANT'S OBLIGATIONS

A. Guilty Plea: The defendant will plead guilty to the sole count of an information charging 18 U.S.C. § 371 - conspiracy to commit at least one offense against the United States, to wit, bankruptcy concealment (18 U.S.C. § 152(a)) and money laundering (18 U.S.C. § 1956). The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis For Plea attached hereto as Exhibit A are accurate.

1. Waiver of Indictment: The defendant agrees that at any time called upon by a magistrate or district court judge he will sign a written waiver of prosecution by indictment and consent to proceed by information rather than by indictment.

B. Restitution: The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses. Conspiracy to commit bankruptcy concealment and money laundering

3

requires mandatory restitution. The defendant agrees to pay full restitution to the following victim in the amounts below.

| Victim | Amount |
|---|---|
| Steven Zinnel Bankruptcy Estate | $260,000 (assessment value of Luyung estate) [value of the assets concealed/laundered] |

C. Fine: The defendant agrees to pay any amount that the Court might order as a criminal fine. The defendant understands that this plea agreement is voidable by the government he fails to pay the stipulated fine as required by this plea agreement.

D. Special Assessment: The defendant agrees to pay a special assessment of $100.00 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing. The defendant understands that this plea agreement is voidable by the government if he fails to pay the assessment prior to that hearing.

E. Forfeiture: The defendant agrees to forfeit to the United States voluntarily and immediately all of his right title and interest to any and all assets subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c), and Fed. R. Crim. P 32.2(b). Those assets include, but are not limited to, the following:

1. A money judgment, in the amount concealed/laundered;

2. Vacant land known as "The Luyung Property" located in Rancho Cordova, Sacramento County, CA, APN: 072-0450-015-000; and

4

3.    Real property located at 11966 Old Eureka Way, Gold River, CA, APN: 069-0620-054-0000.

The defendant agrees that the listed assets are property, real or personal, which constitute or are derived from proceeds traceable to a violation of 18 U.S.C. § 371 - conspiracy to commit at least one offense against the United States, to wit, bankruptcy concealment (18 U.S.C. § 152) and money laundering (18 U.S.C. § 1956).

The defendant agrees to fully assist the government in the forfeiture of the listed assets and to take whatever steps are necessary to pass clear title to the United States. The defendant shall not sell, transfer, convey, or otherwise dispose of any of his assets, including but not limited to, the above-listed assets.

The defendant agrees not to file a claim to any of the listed property in any civil proceeding, administrative or judicial, which may be initiated. The defendant agrees to waive his right to notice of any forfeiture proceeding involving this property, and agrees to not file a claim or assist others in filing a claim in that forfeiture proceeding.

The defendant knowingly and voluntarily waives his right to a jury trial on the forfeiture of assets. The defendant knowingly and voluntarily waives all constitutional, legal and equitable defenses to the forfeiture of these assets in any proceeding. The defendant agrees to waive any jeopardy defense, and agrees to waive any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of the assets by the United States, the States of California or its subdivisions.

The defendant waives oral pronouncement of forfeiture at the time of sentencing, and any defects that may pertain to the forfeiture.

F.    Waiver of Financial Privacy: The defendant agrees not to assert any personal right to financial privacy, including under the Right to Financial Privacy Act, 12 U.S.C. § 3401 et seq., against the government or any victim in this case. He agrees to complete Exhibits B and C hereto and return them to the government. He agrees that the government may, as soon as the Court enters its judgment, give a copy of the completed Exhibit C to any person whom the Court determines is entitled to restitution in this case. If the Court finds any materially untrue statement on Exhibit C, the government shall be relieved of all its obligations under this plea agreement.

III.

THE GOVERNMENT'S OBLIGATIONS

A.    Dismissals: The government agrees to move, at the time of sentencing, to dismiss without prejudice the all counts in the pending superseding indictment. The government also agrees not to reinstate any dismissed count except as provided in paragraphs II.E., II.F., and VII.B. above.

B.    Recommendations: The government agrees to recommend a five-year sentence.

IV.

ELEMENTS OF THE OFFENSE

A.    Elements of the Offense: At a trial, the government would have to prove beyond a reasonable doubt the following elements of 18 U.S.C. § 371 - Conspiracy to Commit and Offense Against the United States, to which the defendant is pleading guilty:

5

6

First, there was an agreement between one or more persons to commit bankruptcy fraud and/or money laundering.

Second, the defendant became a member of the conspiracy knowing at least one of its objectives and intending to help accomplish it; and

Third, after the conspiracy was agreed to, one of the members of the conspiracy performed an overt act for the purpose of carrying out the conspiracy.

## V.

## MAXIMUM SENTENCE

A. **Maximum Penalty:** The maximum sentence that the Court can impose is 5 years of incarceration, a fine of the greatest of $250,000, twice the gain from the offense, or twice the loss from the offense; a three-year period of supervised release, and a special assessment of $100. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific counts to which the defendant is pleading guilty. The defendant further agrees he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

B. **Violations of Supervised Release:** The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to two additional years imprisonment.

## VI.

7

## SENTENCING DETERMINATION

A. **Statutory Authority:** The defendant understands that the Court must consult the Federal Sentencing Guidelines (as promulgated by the Sentencing Commission pursuant to the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551-3742 and 28 U.S.C. §§ 991-998, and as modified by United States v. Booker and United States v. Fanfan, 543 U.S. 220 (VI), 125 S.Ct. 738 (2005)) and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

B. **Stipulations Affecting Guidelines Calculation:** The parties agree that the appropriate sentence in this case is 5 years and agree to argue no higher or lower.

## VII.

## WAIVERS

A. **Waiver of Constitutional Rights:** The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial

8

by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be compelled to incriminate himself.

B. Waiver of Appeal and Collateral Attack: The defendant understands that the law gives him a right to appeal his conviction and sentence. He agrees as part of his plea, however, to give up the right to appeal the conviction and the right to appeal any aspect of the sentence imposed in this case so long as his sentence is no longer than the statutory maximum for the offense to which he is pleading guilty. He specifically gives up his right to appeal any order of restitution the Court may impose.

Regardless of the sentence he receives, the defendant also gives up any right he may have to bring a post-appeal attack on his conviction or his sentence. He specifically agrees not to file a motion under 28 U.S.C. § 2255 or § 2241 attacking his conviction or sentence.

Notwithstanding the agreement in paragraph III. A. above that the government will move to dismiss counts against the defendant, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or reduce or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office. By signing this plea agreement, the

defendant agrees to waive any objections, motions, and defenses he might have to the government's decision. In particular, he agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

IX.

APPROVALS AND SIGNATURES

A. Defense Counsel: I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

DATED: _____     _____

TOM A. JOHNSON

Attorney for Defendant

B. Defendant: I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

defendant agrees to waive any objections, motions, and defenses he might have to the government's decision. In particular, he agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

## IX.

## APPROVALS AND SIGNATURES

A. Defense Counsel: I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

DATED: _____    _____

TOM A. JOHNSON

Attorney for Defendant

B. Defendant: I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

10

DATED: _____    _____

STEVEN ZINNEL, Defendant

C. Attorney for United States: I accept and agree to this plea agreement on behalf of the government.

DATED: _____    BENJAMIN B. WAGNER
United States Attorney

By:_____
MATTHEW D. SEGAL
AUDREY B. HEMESATH
Assistant U.S. Attorney

11

EXHIBIT "A"

Factual Basis for Plea

This case arises out of the personal bankruptcy of Steven Zinnel. On July 20, 2005, Steven Zinnel filed a voluntary Chapter 7 petition for bankruptcy in the Eastern District of California. In an email authored on July 15, 2001, Zinnel stated that he anticipated filing for personal bankruptcy. In his schedules and examination in the bankruptcy proceeding, Zinnel failed to disclose an ownership interest in significant assets:

- an ownership interest in System 3
- an ownership interest in 4Results, LLC
- an ownership interest in the Auto and Boat Store
- real property on Luyung Drive, Sacramento APN: 072-0450-015-000

At all times material, System 3 was an electrical infrastructure contractor Steven Zinnel formed in 2001 with partners T.W. and D.Z.. Steven Zinnel agreed with his partners that he or his designated entity or individual would own shares of common stock according to the agreement. Zinnel's was a "silent" partnership – he and T.W. took steps to represent to the world that Wilbert was the sole owner of System 3. System 3 was quite successful, worth $8-10 million at the time Zinnel filed for bankruptcy.

In order to conceal his assets from the bankruptcy court, Zinnel conspired with co-defendant (and girlfriend) Derian Eidson to launder the proceeds of System 3 through a shell company called Done Deal, Inc. Done Deal, Inc. was incorporated in July 2004 with Derian Eidson listed as the President. Zinnel purported to assign his rights in System 3 to Done Deal, but no consideration was reflected in the instrument. System3 paid Zinnel distribution and other payments through Done Deal for things like consulting, co-defendant Eidson's legal services, and the sale of equipment by Done Deal and Eidson. In truth and in fact, these were Zinnel's System 3 distributions, and Zinnel maintained a spreadsheet listing the amount, date, and false invoice for each distribution. Through a Done Deal bank account and a Done Deal E*Trade account, Zinnel and Eidson were able to access this money and spend it. The Luyung Property and the home on Old Eureka Way are example of this expenditure of proceeds from the conspiracy.

The distributions from System 3 – invoiced by Done Deal as payments for consulting, legal services, and equipment – continued for several years. Then in 2008, T.W. and Zinnel discussed ending their business relationship. Zinnel proposed ending the relationship via a $4 million payout, labeled as the termination of a consulting agreement. Zinnel then negotiated toward this end, ostensibly represented by Eidson both as his lawyer and as the lawyer for Done Deal, in addition to her claimed role as Done Deal president. The purpose of the negotiations was to gain T.W.'s agreement to conceal the fact that Zinnel was being paid for his ownership interest System 3. On March 2, 2009, Eidson met with an attorney for System3. She threatened to inform bonding companies that System 3 lied when it said

A-1

that T.W. was the sole owner, threatened to report the company to the IRS, and threatened a lawsuit. At the time of this conversation, System3 was Eidson's former client.

Regarding the bankruptcy, Eidson said, during a February 17, 2009 meeting with the System 3 attorney, that Zinnel had assigned to Done Deal his interest in System 3 in consideration for about $30,000, but she refused to produce a copy of the assignment agreement. Because this alleged assignment occurred more than one year before Zinnel's bankruptcy, Eidson represented that she was not a part of the bankruptcy proceedings.

Zinnel never revealed any of his System 3 or System 3-related assets to the bankruptcy court, and his Chapter 7 bankruptcy was discharged on September 6, 2006. In obtaining bankruptcy, Zinnel avoided creditors and avoided support obligations for his ex-wife.

A-2



Administrative Office of the United States Courts,
Annual Reports of the Director,

Criminal Defendants Sentenced After Conviction by Offense,
Table D-5

### Conspiracy to Defraud the United States

Sweet Spot

| Year | Total Defendants Sentenced | Total Imprisoned Percent Imprisoned | 6 Months or Less | 7 to 12 Months | 13 to 36 Months | 37 to 72 Months | 73 to 144 Months | 145 Months or More | Median Sentence in Months | Ex. Nos. |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 1757 | 1192 / 67% | 125 | 203 | 427 | 273 | 50 | | 28 | 1328 |
| 2011 | 1745 | 1214 / 69% | 135 | 164 | 456 | 283 | 59 | | 29 | 1334 |
| 2012 | 1970 | 1344 / 68% | 174 | 154 | 548 | 319 | 23 | 3 | 24 | 1340 |
| 2013 | 1942 | 1290 / 66% | 148 | 156 | 494 | 287 | 33 | 4 | 24 | 1346 |
| 2014 | 1777 | 1261 / 70% | 142 | 165 | 499 | 300 | 36 | 3 | 24 | 1352 |
| 2015 | 1693 | 1170 / 69% | 127 | 108 | 497 | 278 | 18 | | 24 | 1358 |
| 2016 | 1432 | 997 / 69% | 111 | 137 | 389 | 206 | 18 | 2 | 21 | 1364 |

24 months is the average of median for 7 years

Steven Zinnel, #66138-097
Federal Correctional Institution, Terminal Island
P.O. Box 3007
San Pedro, CA 90733-3007

_____ BACKGROUND _____

This submission arises out of a federal criminal bankruptcy fraud case that went horribly wrong. The offending DOJ attorneys charged more offenses than warranted, deliberately misstated the evidence, allowed witnesses they knew were not truthful to testify, made improper and misleading statements to the jury, and made unsubstantiated statements to the media that were designed to arouse public indignation. In short, the government prosecutors struck foul blows and won at all costs. The trial was in Sacramento, California and the resulting appeal is pending in the Court of Appeals for the Ninth Circuit. The criminal defendants are Steven Zinnel ("Zinnel") and attorney Derian Eldson ("Eldson") and the courts and case numbers are:

United States v. Steven Zinnel & Derian Eldson, United States District Court, Eastern District of California no. 2:11-cr-00234
United States v. Steven Zinnel & Derian Eldson, United States Court of Appeals for the Ninth Circuit nos. 14-10141/14-10196

Steven Zinnel (BS 6971) was the only defendant who filed bankruptcy, over a decade ago. The triggering event was Enron filing bankruptcy owing Zinnel's corporations a significant amount of money. (ER 1246-1247).

Zinnel is now 54 years old, a father of two, highly educated including a MBA, was a holder of many professional licenses, a serial entrepreneur, and was the Chief Executive Officer of a holding company that owned various businesses including several large electrical contractors. (ZSER 21-41). As a result of his position and businesses, Zinnel personally guaranteed corporate construction bonds two decades ago. (ER 1246-1247). Zinnel's wife at the time, Michelle Zinnel, also personally guaranteed the corporate construction bonds. Enron's unprecedented massive fraud in 2001 and resulting non-payment to the electrical contractors, caused bond claims in 2002 on the corporate construction bonds that Mr. and Mrs. Zinnel had personally guaranteed during the marriage which ended in 1999 as a result of Michelle Zinnel's extramarital affair. After Mr. and Mrs. Zinnel defended themselves against the bonding companies' lawsuits against them for three years, they both threw in the towel and both filed bankruptcy. Mrs. Zinnel filed personal bankruptcy in January 2005 (ER 1226, RFJN Ex. 13, ZJN 123-124) and Mr. Zinnel followed six months later filing bankruptcy in July 2005. (SER 185). Both of the Zinnels' bankruptcy estates were closed by September 2006 with the bankruptcy estates fully administered. (SER 238).

The criminal case began based on a tip to the FBI from Mr. Zinnel's unfaithful, greedy, and vindictive ex-wife Michelle Zinnel. (Clerk's Record containing the Docket No., hereinafter "CR," #310, p. 18, BS 6094). Based on information Michelle Zinnel provided the FBI, the government agents found a business associate of Mr. Zinnel's, Tom Wilbert and his wife Julia, who had engaged in criminal conduct, i.e. bank fraud, wire fraud, mail fraud, tax fraud, insurance fraud, money laundering, obstruction of justice, and perjury. The government promised the Wilberts non-prosecution and the retention of their millions of dollars in ill-gotten wealth, if they would not only sing like a nightingale whenever it whistled the tune, but compose as well. The Wilberts and their lying attorney Frank Radoslovich, advanced the government's fantasy theory of bankruptcy fraud and money laundering against Mr. Zinnel and collaterally Ms. Eldson. The offending DOJ lawyers and government special agents staged a sting operation under the guise of confidentially protected settlement negotiations in a law office conference room and circumvented that confidentiality by including attendance at those negotiations in its indictment as "charged conduct" and as evidence at trial, even though no settlement was reached and no money changed hands. (ER 671, 674-676, 840, 1564, 1565, ER 791, 881, 1450).

Mr. Zinnel was indicted for bankruptcy fraud and money laundering on June 8, 2011 (CR 1) which was 90 days before the five-year statute of limitations would have expired. Derian Eldson, an attorney, was also indicted with the government alleging she assisted Mr. Zinnel with his purported transgressions. Count 1 of the indictment purposely omitted and/or was vague concerning alleged transfers and concealments of unspecified assets in contemplation of bankruptcy to confuse the defendants and the jury. Thus, the indictment was unconstitutionally vague as to what property Zinnel allegedly pre-petition transferred or post-petition concealed making preparation of his defense impossible. In contradiction, Count 2 was specific in alleging post-petition concealment of six (6) properties, identified by name, none of which included Zinnel's personal WAMU checking account, that allegedly belonged to the bankruptcy estate and were concealed from the bankruptcy court and creditors. The money laundering counts were based on nine checks written from one corporation to another corporation and deposited into the

corporation's bank account. The checks were a mere transfer of money from one account to another, easily traceable by law enforcement, that cleared, with no one losing any money. By charging "money laundering" consisting of a check in the amount of $4,826.20 (ER 1402), the government was able to circumvent the five-year statutory maximum imprisonment for bankruptcy fraud (ER 214 & 488A) and seek 20 years in prison which government lawyer AUSA Matthew Segal requested at Zinnel's sentencing (ER 1231).

EX 101                                      Page 1                    5:25-mc-30
                                                                      5:25-mc-31          DEF EX 138



## PLEA OFFERS

Pre-trial, Zinnel and Eldson were offered two written plea offers by the government. (ER 1240-1241). The first one, the government offered to allow Ms. Eldson to plea to misdemeanor "extortion," so she would lose her livelihood as a 24-year attorney, and accept a sentence of a year and a day in prison which would have resulted in incarceration of around seven months. In the same plea offer, the government offered Zinnel just under five (5) years in prison. In the plea offer, the government detailed the base Offense Level and the enhancements the government represented applied to Zinnel which was represented to be Offense Level 26. (ER 1240). In the second written plea offer, the government raised Eldson's offer to five (5) years, but the Zinnel plea offer remained five (5) years in prison. With the second plea offer, the government actually included a draft Plea Agreement that was ready-to-file with the court that represented to the court, defense counsel, and the parties that "five years in prison was the appropriate sentence in this case." (ER 1241). Neither plea offer included a fine.

## PRE-TRAIL MOTIONS

Before trial, Zinnel moved to exclude evidence of settlement negotiations between Zinnel and Tom Wilbert and their respective lawyers Derian Eldson and Frank Radoslovich, and to exclude an email from Zinnel to his ex-wife, as violations of Federal Rule of Evidence 408. (CR 79). The offending DOJ attorneys vehemently opposed Zinnel's motion and the court sided with the government attorneys and denied the motion to exclude evidence of settlement negotiations.

## TRIAL

Trial started on July 1, 2013 before Judge Troy L. Nunley who was presiding over his first jury trial as a newly appointed federal judge. The offending DOJ attorneys created fictional theories for which they had no evidence such as "Zinnel faked his financial death," "Zinnel's motive was to file bankruptcy to dodge paying child child support," "Zinnel created shell companies," and Zinnel concealed millions of dollars worth of property from his bankruptcy estate. It is noteworthy that child support is not dischargeable in bankruptcy as a matter of law. (ER 494, 11 U.S.C. 523(a)(15)). Further, Zinnel did not file bankruptcy to shield from family law, reduce child support, or cheat creditors. (ER 1247).

During the trial, the Wilberts delivered what the offending DOJ lawyers requested. The Wilberts not only sang, but they composed as well by their lies under oath while testifying as witnesses at the trial. The offending DOJ attorneys suborned perjury by allowing their witnesses to commit perjury. Further, the offending DOJ attorneys allowed an attorney named Frank Radoslovich to testify wherein he admitted under oath that he lied to attorney Eldson during the confidential settlement negotiations in his law office conference room that were secretly recorded by the FBI. (ER 204, 791, 881, 1458). Neither Zinnel or Eidson testified at trial and no new facts came out at trial.

Over Zinnel's objections, the offending DOJ lawyers insured that the bankruptcy fraud jury instructions were fatally flawed because the DOJ prosecutors insisted on "the alleged" and "the above" items of concealed property with no items listed. Further, the government attorneys' drafted money laundering instructions gave inadequate guidance on "specified unlawful activity" and the meaning of proceeds, and improperly instructed that a simple transfer of cash from one corporation to another constituted money laundering in violation of 18 U.S.C. 1956.

The offending DOJ lawyers presented evidence that Zinnel concealed three properly interests not charged in the indictment. (ER 890, SER 47, ER 915, BS 6824, 6930, & 6933). The prosecutors' argument that jurors could convict Zinnel of bankruptcy fraud based on those uncharged concealments (ER 1053, 1054, 114, 119, BS 6934-6937), and the inadequate jury instructions enabled jurors to convict based on conduct not charged by the grand jury. (ER 221-225). This is a Constructive Amendment and/or a Variance.   A Constructive Amendment is thought to be bad because it deprives the defendant of his right to be tried only upon the indictment as found by the grand jury. A Variance is thought to be bad because it deprives the defendant of notice of the details of the charges and protection against re-prosecution.  The hallmark of due process is (1) notice of what crimes he is going to be tried for and (2) fair hearing. As a result of the court's and prosecutors' reversible errors, Zinnel was surprised at trial and unprepared to defend the previously undisclosed allegations.  The constructive amendment and/or prejudicial variance requires reversal of all convictions because it is impossible to know whether the jury convicted Zinnel on the uncharged conduct.  Reversal is also required on the money-laundering counts, which depend on the predicate offenses charged in Counts 1 and 2.

Zinnel objected to the jury instructions for Counts 1 and 2 and requested specification of the property interests charged in the indictment, citing the risk that without such clarification, the jury could convict on conduct not charged in the indictment. The court overruled the objection.

EX 102

INADMISSIBLE SETTLEMENT NEGOTIATIONS

The DOJ lawyers virtually forced the trial judge to error in allowing the secretly recorded evidence of settlement negotiations in a law office conference room between attorneys, based on improper pretrial findings of guilt. The evidence was used to prove the invalidity of disputed claims and to establish criminal liability, in violation of Federal Rule of Evidence 408. This evidence was prejudicial because the offending DOJ attorneys used it pervasively throughout the trial and arguments, and it impacted every count of conviction.

A central issue in this case is whether secret recordings of settlement discussions between two attorneys (one being defendant Eidson) in the sanctity of a law office were erroneously admitted into evidence in the criminal trial in violation of Federal Rule of Evidence 408 ("FRE 408"). Over a motion to suppress and trial objections, the government's evidence at trial consisted in large part of secret recordings of settlement negotiations. Both Zinnel and Eidson filed a motion to suppress the recordings under FRE 408 (ECF #79). In the government's opposition, the offending DOJ attorneys cited Ausherman v. Bank of America, 212 F. Supp. 2d 435 (U.S.D.C., District of Maryland) (ECF #102, p. 2, line 7). The case does discuss FRE 408, but it really holds that an attorney can never lie to another attorney or party in a settlement negotiation. During the trial, the government's agent, civil attorney Frank Radoslovich, admitted under oath on the witness stand, that he lied to attorney Eidson and that the two meetings in his conference room secretly recorded by the FBI were valid settlement discussions. Thus, the offending DOJ attorneys staged a private civil attorney lying in a settlement meeting. Further, Magistrate Judge Frank R. Zapata captured the essence of Rule 408 when he ruled: "It should be assumed that the law has written over the door of every such conference room the words 'ye who enter here do so without prejudice'...The court finds that the alleged statements made during the private confidential settlement negotiations are excludable under both Rule 408 and Rule 403. Defendant's motion in limine #1 is granted." (see Nomo Agroindustrial SA DE CV v. Enza Zaden North America, Inc., U.S.D.C. for the District of Arizona, case no. CV 05-351-TUC-FRZ, 2009 U.S. Dist. Lexis 8657; 2 Weinstein's Federal Evidence, 2d Ed. 2017). These cases confirm that the offending DOJ attorneys should not have condoned and encouraged lying by attorney Frank Radoslovich. (ER 791, 881, 1458).

If the government attorneys' interpretation of FRE 408 were allowed to stand, then no attorney could safely engage in settlement discussions where there is any claim of alleged fraud, past unlawful conduct, or untruthfulness by either party to the negotiations. Confidential settlement discussions are a fundamental aspect of the judicial system, and without the protections offered by FRE 408, the court system would grind to a halt. Every attorney in America should be concerned with the offending DOJ attorneys using a private civil attorney like Frank Radoslovich as their agent, telling him to lie in settlement meetings, secretly record the settlement discussions, charge attendance at the meetings in its indictment, and then use the recordings extensively at trial to establish guilt and argue for conviction.

The offending DOJ attorneys elicited prejudicial, inadmissible expert testimony from two lawyers, Radoslovich and Gee, on conclusions of law, including the disclosure obligations of bankruptcy debtors, Zinnel's alleged commission of bankruptcy fraud, and that paying Zinnel would constitute money laundering. Attorney Radoslovich was not disclosed or qualified as an expert, and the improper testimony invaded the province of the jury and denied Zinnel's Sixth Amendment rights.

Because of the offending DOJ lawyer's misconduct, Zinnel and Eidson were erroneously convicted of conspiracy to commit money laundering. The government lawyers failed to present sufficient evidence as to any of the elements of money laundering --a "financial transaction" or "monetary transaction" affecting interstate commerce, knowledge that the funds at issue represented the proceeds of bankruptcy fraud, and the transactions were done with the purpose of laundering the proceeds of bankruptcy fraud. Perhaps most fundamentally, the DOJ offending lawyers failed to prove any transaction that in fact involved the proceeds of bankruptcy fraud because the supposed settlement negotiations would never have led to money changing hands, much less laundering of that money, but were instead a government sting involving a government agent lawyer blatantly lying to attorney Eidson in his law office conference room. Further, the government lawyers failed to prove any agreement between Zinnel and attorney Eidson.

On July 16, 2013, a jury convicted Zinnel of concealment or transfer of property allegedly belong to the bankruptcy estate (ER 251-256), which according to the government was required to be disclosed on Zinnel's bankruptcy schedules filed with the bankruptcy court in 2005. Zinnel was also convicted of money laundering based on checks from System 3, Inc. to Done Deal, Inc. that were deposited into Done Deal's bank account and cleared with no one losing any money. One of the money laundering convictions was for a check in the amount of $4,826.20. (ER 1402). This one transaction, allowed the government to circumvent the statutory maximum of five (5) years in prison for bankruptcy fraud (SER 222), and seek the maximum of twenty (20) years in prison for money laundering which the government ultimately requested (ER 1231).

EX 103

Even though Zinnel had two years of perfect pre-trial release conduct and was not a flight risk or danger to the community, Zinnel was remanded into Sacramento County Jail from the courtroom and never went back to the Zinnel Family Home. Zinnel spent over nine months in a concrete box for a cell locked inside for 23 hours per day, including a period of 56 hours straight, over the New Years holiday.

Prior to sentencing, Zinnel submitted to the court over 260 bankruptcy fraud cases (ER 416, 419, 422, 424-431, 440-447, 1173-1207, BS 6977-6978) that detailed that if Zinnel received more than a twenty-two (22) month prison sentence, there would be unwarranted disparity in violation of the law codified in 18 U.S.C. 3553(a)(6). One of the cases Zinnel presented to the court was Letantia Bussell who after being convicted at trial for bankruptcy fraud with loses exceeding $3,000,000, received a prison sentence of 36 months (ER 424, 1240, BS 6977).

After representing twice pre-trial that five (5) years in prison was the appropriate sentence for this case (ER 1241) and that Zinnel was Offense Level 26 (ER 1240), the government represented to the court that after trial Zinnel was an Offense Level 41 (27 to 33 years in prison) (ER 294, ECF 296-1 p. 6) and Ms. Eldson was an Offense Level 38 (19 to 24 years in prison). The government lawyers urged the new judge to sentence Zinnel to the money laundering statutory maximum of 20 years in prison. The same offending DOJ attorneys urged the court to sentence Eldson to 15 years in prison representing to the court that "in the Luong case, Judge Shubb gave a near life sentence for money laundering so [15 years] is relatively short." (ER 1319, BS 6081). This was just another blatant misrepresentation by the offending DOJ attorneys in this case as John That Luong, an Asian Triad gang leader, was convicted for causing death in a crime of violence, robbing computer chip companies, and being a large heroin dealer, but NOT money laundering. Judge Shubb actually sentenced Mr. Luong to life in prison plus 85 years in Sacramento. (BS 6082-6083; United States v. John That Luong, U.S.D.C. ED CA no. 99-cr-00433). In a similar case in the Northern District of California, Mr. Luong was sentenced after appeal to 65 years. (BS 6084-6085; see United States v. John That Luong, U.S.D.C. ND CA no. 96-0094 MHP). In neither case, was Mr. Luong charged with or convicted of money laundering (BS 6082-6085). Further, Eldson is convicted of attempted money laundering as a result of an illegal government sting wherein the government agent offered Ms. Eldson $4 million dollars, a figure to garner a nine-year sentencing enhancement, that she did not accept, which is just another example of the offending DOJ lawyers willful misleading a judge in this case and single-minded focus on winning at all costs.

The offending DOJ attorneys told the court twice during sentencing that the sentencing was "academic because we had a trial here." (ER 1176, 1180-1181). The offending DOJ attorneys represented to the court that Zinnel caused a loss of $3,615,758 comprising of eleven victims. (BS 6975-6976, Reply Brief). Loss and number of victims were hotly contested as all listed on Zinnel's bankruptcy schedules were disputed (Reply Brief pgs. 33 & 34, BS 6975-6976). That is what Zinnel admitted under penalty of perjury eight years before sentencing (BS 6975-6976). However, at sentencing, the offending government lawyers did not call a single witness or submit evidence to refute Zinnel's objections on loss and number of victims. The government lawyers relied on Zinnel's bankruptcy schedules and verdicts. The offending DOJ lawyers ignored the glaring facts that Zinnel disputed every unsecured debt he listed on his bankruptcy schedules. To provide a complete picture of the offending DOJ attorneys' propaganda in loss and number of victims, in his Reply Brief filed in his appeal, Zinnel provided excerpts of his bankruptcy schedules copied and pasted for the eleven claims that the DOJ attorneys speciously represented to the District Court and the Court of Appeals comprised the loss amount and number of victims in Zinnel's case for sentencing purposes (BS 6975-6976). The proven loss in Zinnel's case is zero and the number of victims is zero. The DOJ lawyers have not proved otherwise. Incredibly, these two enhancements for Loss and Number of Victims, erroneously applied based on no evidence, shockingly raised Zinnel's sentence from 2 years to 17.67 years in prison.

The government prosecutors persuaded the trial judge to overstate Zinnel's Sentencing Guidelines by 28 Offense Levels. The jury, with their convictions, found Zinnel to be Offense Level 8 which should have been 0 to 12 months in prison. However, at sentencing, the offending DOJ lawyers represented to the court that Zinnel was Offense Level 36 with a Sentencing Guideline range of 188-235 months in prison and urged the new judge to sentence Zinnel to an above-guideline term of imprisonment of 240 months (20 years). (ER 1231).

A SENTENCE OVER 22 MONTHS WOULD RESULT IN UNWARRANTED DISPARITY WHEN COMPARED TO SIMILARLY SITUATED DEFENDANTS

Federal sentencing courts are explicitly directed to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. 3553(a)(6).

Zinnel challenged the government lawyers' requested sentence of 20 years (ER 1231) on disparity grounds as well. Congress has told sentencing courts that they MUST avoid unwarranted sentencing disparities as codified in 18 U.S.C. 3553(a)(6).

EX 104                                    Page 4

However, the offending DOJ attorneys misstated the law by representing to the new judge that under United States v. Treadwell, 593 F.3d 990 (CA 9, 2010), the judge could ignore Zinnel's disparity challenge "if you calculate the guidelines correctly." (ER 1229). The DOJ attorneys argued that Treadwell trumps section 3553(a)(6). (ER 1229). This flies in the face of 3553(a)(6) and the Supreme Court's holding that the guideline range is but one of the 3553(a) sentencing factors that must be considered. Kimbrough v. United States, 552 U.S. 85, 90 (2007). The government lawyers' misstatement of well-settled law misled the trial judge to not consider avoiding unwarranted disparity in violation of 18 U.S.C. 3553(a)(6).

In the Ninth Circuit, a landmark sentencing case is U.S. v. Carty, 520 F. 3d 984 (9 CA, 2008) (en banc) which holds that there is a three-step sentencing requirement: (1) properly calculate the guideline range, (2) the parties must be given a chance to argue for a sentence they believe is appropriate, and (3) the district court should consider the 3553(a) sentencing factors to decide if they support the sentence suggested by the parties. Id. 992-994. Carty also holds that the guidelines ARE NOT presumptively reasonable.

The government often shoots big cannons at small birds. Zinnel's sentencing, in which the government admitted was a typical mill run bankruptcy fraud case (AB 154), with no loss or number of victims proven by the government (BS 6975-6976), became an erroneous sentencing argument on child support with a liberal dousing of name calling; rhetoric won over reason. However, the government lawyers never even mentioned any alleged victim other than their manufactured "victim" of Zinnel's bitter and greedy ex-wife of 13 years previous. The PSR, albeit erroneously, identifies the largest "victims" in this case as being two big insurance companies and Wells Fargo Bank, this nation's third largest by assets, with an alleged loss of $8,506. The government's sentencing memorandum spewed the DOJ attorneys' unsupported propaganda that Zinnel was a bad dad and had an untrue and unproven motive to file bankruptcy to dodge paying child support which is not dischargeable as a matter of law. (ER 494, 11 U.S.C 523(a)(15)). AUSA Matthew D. Segal resorted to venomous name calling, writing that Zinnel was "incorrigible, a wicked man, and a vile man with nothing redeeming." The government lawyer's rancor was entirely refuted by the numerous positive character letters regarding Zinnel that were transmitted to the court and prosecutors. At sentencing, the prosecutor requested that Zinnel be given an above-guideline sentence of 20 years in prison, characterizing it as an "extremely deterrent sentence." (ER 1231). So is life plus cancer. AUSA Matthew Segal informed the court that "this was one of the longest sentences that he had ever asked for in 17 years as a prosecutor recognizing it is a very long sentence, but [Zinnel] did a terrible thing and deserves to suffer for it." The DOJ attorneys made a big deal in their sentencing memorandum that Zinnel told his son on the phone on his first day in jail ever, that "daddy got railroaded." Zinnel's appeal exposes how prophetic Zinnel's words were as he was "railroaded" by the Reading, Pennsylvania, B&O, and the Short Line.

Zinnel was sentenced on March 4, 2014. During the sentencing, the court cumulatively added 28 objected-to levels of enhancements. The court found that Zinnel was just like Letantia Bussell (ER 1182-1183), and the court did not even mention the word disparity. Even though Zinnel had no criminal history and similarly situated defendants were sentenced to twenty-two (22) months in prison (BS 6977-6978), the court imposed a 212-month prison sentence (17.67 years), near the statutory maximum of 20 years that the government requested, the maximum of three years of supervised release, the maximum $500,000 fine, $2,513,319 in restitution, and $1,297,158.20 in a forfeiture judgment. On April 2, 2014, attorney Derian Eidson was sentenced to over ten (10) years in prison, with no criminal history, loss, victims, or restitution.

As Zinnel informed the court at his sentencing, Zinnel filed bankruptcy because Zinnel personally guaranteed corporate construction bonds, two decades ago, and his company could not complete construction jobs in large part because Enron filed bankruptcy owing Zinnel's company around $800,000 (ER 1246-1247). Former Enron CEO Jeffrey Skilling and others, systematically defrauded investors and siphoned money from millions of people by manipulating prices and employing false accounting. Among the Enron corporate officers' many crimes, the Enron officers defrauded the State of California out of billions of dollars during the 2000-2001 energy crisis by creating artificial energy shortages and jacking up prices. At one time, based on its market capitalization, Enron was the 8th largest corporation in the United States of America. Enron's bankruptcy in December 2001 led to thousands of layoffs, the collapse of the company's stock price and loss of billions of dollars by investors, including many of the company's own employees. Enron's unprecedented collapse wiped out two billion dollars in employee pension, as well as $60 billion in stock. Five thousand employees lost their jobs, and 20,000 people lost their entire savings.

Page 5

EX 105

During Jeff Skilling's tenure as CEO of Enron, between 1999-2001, Mr. Skilling received over $151 million dollars in salary and bonuses, or more than 60 times the bogus fictitious restitution of $2,513,319 ordered in Zinnel's case. By contrast, Zinnel received none of the $2,513,319 in ordered restitution because the completely disputed creditors in Zinnel's bankruptcy case are primarily as the result of his personal guarantee of corporate insurance policies in the form of corporate construction bonds. Enron's unprecedented collapse, will likely go down as the white collar crime of the century. However, ironically, for an alleged loss of $2,513,319 with an alleged eleven (11) victims, miniscule when compared to the $2,000,000,000.00 ($2 billion) in Enron losses and 20,000 Enron victims, Zinnel is currently sentenced to prison 11 years more than Enron CFO Andrew Fastow, the true architect of the fraud within Enron, 15 years more than Fastow's corrupt protege Michael Kopper, 4 years more than Fastow's boss Enron CEO Jeff Skilling, 15 years more than Charles Ponzi, and 7 years longer than Al Capone. Any rational jurist, prosecutor, or citizen would consider 18 years in prison and a decade in prison in a bankruptcy fraud case as draconian and unprecedented.

In a government press release issued on March 4, 2014 within hours of Zinnel's sentencing (ZJN 175; Exhibit 16), the government bragged that Zinnel received the longest prison sentence for bankruptcy fraud in the history of the Eastern District of California thus demonstrating the offending DOJ attorneys' advanced knowledge of unwarranted disparity. Zinnel's research reveals that he actually received the longest prison sentence for bankruptcy fraud in the history of the United States by almost double (BS 6131-6134). In the same press release, the offending DOJ attorneys lied by stating that Zinnel's motive in filing bankruptcy was to avoid paying child support. Steven Zinnel was not charged with not paying child support, the criminal indictment does not contain the words "child support," and child support is not dischargeable in bankruptcy as a matter of law (ER 494; 11 U.S.C. 523(a)(15)). Zinnel was completely current on child support when the trial started and had been for years, and not a shred of evidence was presented at trial that Zinnel's motive was to avoid paying child support (ER 1247). It is tragic and unconscionable that Mr. Zinnel's teenage children have read the government attorneys' lies in their press release. (ZJN 175; Exhibit 16).

In aggravation, it appears that the longest prison sentence in the history of the Sixth Circuit for bankruptcy fraud is the case of U.S. v. Dale, 429 Fed. Appx. 576 (6 CA, 2011). (BS 6134). Dale went to trial and was convicted of bankruptcy fraud for violating 18 U.S.C. 152(1) like Zinnel. Unlike Zinnel's case, in Dale, the indictment actually alleged that Dale filed the bankruptcy petition for the purpose of executing a concealing scheme to defraud his child's mother of child support. (BS 6134). Dale was sentenced to prison for 21 months (BS 6134), 90% less than Zinnel, and no fine.

Trial Tax

The law is well-settled. An accused must not be subjected to more severe punishment for exercising his constitutional right to stand trial. U.S. v. Stockwell, 742 F.2d 1186 (9 CA, 1973). However, as all criminal practitioners, law professors, and defendants know, the trial penalty is the outrageous tax that is imposed upon the accused who dares to seek trial. The trial tax is a product of many factors that imbue prosecutors with virtually unbridled authority to punish criminal defendants disproportionally simply for exercising a fundamental constitutional right. The resulting injustice is pervasive, when a prosecutor concluded that justice will be served by sending a person to prison for one or two years, but then seeks 15 to 20 years just because the person exercised the right to let a jury decide the question of guilt--that is a travesty of justice. If these practices are not restrained, the Sixth Amendment right to a trial will soon be extinct.

If Eidson and Zinnel would have taken a plea, the offending DOJ attorneys would have represented to the district court that I was O.L. 26 and urged a prison sentence of 57 months and 12 months for Eidson. Thus, the federal prosecutors were either lying in their written plea offers when they represented the Offense Levels or lying to the court at sentencing. Under Carty, there can only be one guideline calculation and government attorneys, as officers of the court, are never allowed to misrepresent in settlement offers or misrepresent to the court.

Absurdity of Economic Crime sentences

The sentences urged by the offending DOJ attorneys are long and wrong. As Zinnel's Appellant's Opening Brief recites under the Substantive Unreasonable argument, Justice Bea in U.S. v. Edwards wrote five years ago that "Sooner or later our circuit [Ninth] must come to the final question of...what term of incarceration is unreasonable."

In their consolidated appeal, appellants in their fifties, with no criminal history, but a long history as dedicated parents, decent human beings, an entrepreneur job-creator, and a seasoned attorney, appeal both their convictions and record-setting sentences, resulting in appellants being sent to prison six times longer than similarly situated defendants. After rejecting two five-year plea offers and a one year plea offer, which were represented by the government as being the appropriate sentences in this case, Zinnel was convicted by a jury for bankruptcy fraud and related money laundering predicated on one alleged concealed property. Thereafter, after spending eight months in Sacramento County jail, Zinnel was sentenced by the first-time judge to a miscalculated guideline mid-range sentence of 17.67 years in prison and a $500,000 maximum fine without sufficient explanation.

EX 106

MASS INCARCERATION IN AMERICA IS CAUSED IN PART, BY VENGEFUL, CHEATING, AND UNETHICAL PROSECUTORS SUCH AS AUSA MATTHEW D. SEGAL, AUDREY B. HEMESATH, AND KEVIN C. KHASIGIAN WHO THUS FAR, REMAIN UNCHECKED BY THE DOJ, STATE BAR, OR JUDGES

"Because we can: The motto of power since the idea of power over others was born in our kind."

"Distrust all in whom the impulse to punish is strong." Friedrich Nietzsche

"The degree of civilization in a society can be judged by entering its prisons."
Russian writer Fyodor Dostoyevski

Freedom is the United States' founding creed. "Every spot of the old world is overrun with oppression," cried Thomas Paine, but America promises "asylum for the persecuted lovers of civil and religious liberty." Andrew Jackson later told his countrymen, "Providence has showered on this favored land blessings without number, and has chosen you as the guardians of freedom, to preserve it for the benefit of the human race." Subsequent presidents, in wartime and peace, have renewed this sacred charge, proclaiming freedom as America's supranational mission, its unifying cause. In his inaugural address, Barack Obama cast the tradition forward. "Let it be said by our children's children," he said, that "we carried forth that great gift of freedom and delivered it safely to future generations."

America purports to be "the land of the free," yet by one vital measure, it is less free than any other country on earth: It incarcerates a greater portion of its citizenry than any other, about 1 out of every 100 adults. With some 2.4 million person under lock and key, the United States manages the largest penal system in the world, the grandest ever conceived by a democratic government. Just as slavery once stood as a glaring exception to the American promise, so does imprisonment more than two centuries after the birth of the republic.

The United States, by far, incarcerates more of its citizens, for longer periods of time, than any other nation on the planet. The United States is home to 5% of the world's population, but has 25% of the world's prisoners. The United States' incarceration rate is 57% higher than Russia and 36% higher than Cuba, both repressive regimes. No other liberal democracy has an incarceration rate anything like the United States, which is more than 370% higher than the United Kingdom's, almost 800% higher than Germany, and 10 times most other European countries. In fact, we keep more people behind bars that the top 35 European countries combined. The United States has a population of around 350 million and China has around 1.3 billion people. However, communist China with a billion more people, locks up 700,000 people LESS than that United States. Thus, our incarceration rate is four times higher than China's.

The prison population in the United States has increased from 300,000 people in the early 1970s to 2.2 million today. Over the last 30 years, the female prison population has grown by over 800% while the male prison population grew 416% during the same time frame. Sixty-eight percent of the women in prison left behind minor children. According to USA Today, 1 in 14 children in America has a parent in prison. There are nearly six million people on probation or on parole. There's an estimated sixty-eight million Americans with criminal records. One in every fifteen people born in the United States in 1997 is expected to go to jail or prison; one in every three black male babies born in this century is expected to be incarcerated. The United States is the only country in the world that condemns minor children to death behind bars i.e. life in prison without the possibility of parole. The United States, with a highly productive economy, but a troubled society, now has 960,000 farmers and 2.2 million prison inmates--more than twice as many people in jail as live on the land.

Hundreds of thousands of nonviolent offenders have been forced to spend decades in prison. We've created laws that make writing a bad check an offense that can result in life in imprisonment. There are more than a half-million people in state or federal prisons for drug offenses today, up from just 41,000 in 1980. We have abolished parole in many states and in the entire federal system. We've institutionalized policies that reduce people to their worst acts and permanently label them a "criminal." We also make terrible mistakes. Scores of innocent people have been exonerated after being sentenced to long prison terms or even death. Presumptions of guilt and political dynamics have created a system that is defined by error, a system in which thousands of innocent people now suffer in prison. Mass incarceration is one of the biggest social problems the United States faces today. Every year the United States spends $80 billion to keep people locked up, yet one in five kids in America goes to bed hungry every night.

EX 107

Imprisonment in the United States has achieved unprecedented scale. Combining law enforcement, courts, and prisons, the U.S. criminal justice system consumes $212 billion a year and employs 2.4 million people, more than Wal-Mart and McDonalds combined, the nation's two largest private employers. A new research study has estimated the total cost of incarceration in the United States has surged to a staggering $1 trillion per year--eleven times the $80 billion spent annually on corrections alone, and 6% of the nation's gross domestic product (GDP). For many families across the United States, the high cost of incarceration is nothing new. Many affected families live beneath the federal poverty line and are struggling to pay for raising the children of incarcerated parents, jail phone calls, and placing money on prisoners' institutional accounts. Then there is the "opportunity cost" on the incarcerated person, and his family, because he is not earning money, paying for his children's college, or saving money for retirement. According to the study, an estimated $923 billion in incarcerated-related costs are not factored into annual government budgets. Those hundreds of billions of "invisible dollars" are an enormous drain on overall social welfare, and account for more than 90% of the overall costs of incarceration. There are more than eighteen hundred separate prisons in operation across the country--not counting local jails, juvenile lockups, and immigration facilities. Concrete and concertina wire have become integral features of the American landscape.

So what makes for the madness of American incarceration? According to a new book, "Locked In" by law professor John F. Pfaff, there is a simple explanation: America's prosecutors. Few people in the criminal justice system are as powerful, or central to prison growth, as the prosecutor. Yet here's the remarkable thing. For all their power, prosecutors are almost completely ignored by the public, the DOJ, State Bars, and Courts. If the public were able to observe how often federal prosecutors incarcerate Americans for relatively minor crimes, there would be a backlash. While the police, DEA, FBI, IRS, and other alphabet agencies most often determine who "enters" the criminal justice process, prosecutors have complete control over which cases they file and which ones they pass on. Prosecutors decide sentences until they become judges. Prosecutors can use their discretion to be lenient, but there is basically no limit to how prosecutors can use the charges and sentencing enhancements available to them to imprison Americans for any length of time they want.

It is even more so today, than it was almost 80 years ago, when in 1940 the U.S. Attorney General, Robert Jackson, stated:

"The prosecutor has more control over life, liberty, and reputation, than any other person in America. If the prosecutor is obliged to choose his case, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor; he will pick the people that he thinks he should get, rather than cases that need to be prosecuted. With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone. In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him. It is in this realm--in which the prosecutor picks some person whom he dislikes or desires to embarrass, then looks for an offense, that the greatest danger or abuse of prosecuting power lies. It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular or being personally obnoxious to or in the way of the prosecutor himself."

Much of what the United States Attorney's office does isn't open to public scrutiny or judicial review. See United States v. Redondo-Lemos, 955 F.2d 1296 (9 CA, 1992). It is therefore particularly important that the DOJ attorneys discharge their responsibilities fairly, consistent with due process. But the temptation is always there: It's the easiest thing in the world for people trained in the adversarial ethic to think a prosecutor's job is simply to win. "It is disturbing to see the Justice Department change the color of its stripes to such a significant degree, portraying an individual as virtuous and honorable or as corrupt and perfidious, depending on the strategic necessities of the separate litigations." U.S. v. Katter, 840 F.2d 118, 137 (1 CA, 1988).

According to a report by the Project on Government Oversight, the Department of Justice identified more than 650 instances of federal prosecutors violating the profession's rules and ethical standards between 2002 and 2013. More than 400 of these were "at the more severe end of the scale." Prosecutors have been and remain the engines driving mass incarceration in America. This especially true when the prosecutors cheat, lie, and win at all costs like AUSAs Segal, Hemesath, and Khasigian did in Zinnel's case.

Department of Justice prosecutors are supposed to be wearing white hats and riding white stallions. Assistant United States Attorneys are required to act beyond reproach. Government lawyers should not even be in gray areas or come close to crossing legal and ethical lines. Unfortunately, throughout Zinnel's case, AUSA Segal and Hemesath have dressed in all black and have dipped so far below the legal and ethical lines to warrant Ninth Circuit, DOJ OPR, and State Bar intervention.

From the halls of Congress to the classrooms in our schools, we pledge allegiance to one nation under God with liberty and justice for all. Justice means that the punishment must fit the crime. Steven Zinnel and Derian Eldson were prosecuted, remanded into county jail, and sentenced to prison as if they were repeat violent offenders, drug cartel, mafia, or bigger than

EX 108                                          Page 8

this nation's biggest financial fraudsters. In this case, no one was killed, disfigured, raped, assaulted, had their innocence stolen, poisoned by drugs, had their identity stolen, or had their house burned down. In this case, there was no trust abused, no loss of someone's livelihood, no psychological scars, no violence, no loss of reputation, no life irreparably scared, no life changing event, or no life destroyed except for Zinnel's and Eidson's. Since being at Federal Correctional Institution, Terminal Island (BS 6971-6972), Zinnel has shared a prison cell with two convicted murderers who each were sentenced to less time in prison than Zinnel. This is one of those cases in which calculations under the sentencing guidelines lead to a result so patently unreasonable as to require the court to place a substantially greater emphasis on other sentencing factors to derive at a sentence that comports with federal law.

As the court and prosecution was aware, similarly situated defendants received between 2 to 4 years in prison (ER 416, 419, 422, 424-431, 440-447; BS 6977-6978). At sentencing, the district court compared Zinnel to Letantia Bussell, who after being convicted of sophisticated bankruptcy fraud by a jury, was sentenced to 3 years in prison (ER 1182-1183; BS 6977). The prison sentences and maximum fine are far beyond the norm for the offenses of conviction. Something is wrong in Denmark; The convictions and record-setting draconian sentences "strike as more than probably wrong, they strike as wrong with the force of a five-week old unrefrigerated dead fish."
U.S. v. Bussell, 504 F.3d 956, 962 (9 CA, 2007).

As Justice Douglas once warned, "The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right people as expressed in the laws and give those accused of crime a fair trial." "Donnelly v. DeChristofra, 416 U.S. 637, 648-49 (1974). Judge T.S. Ellis put it this way in his Virginia courtroom on May 4, 2018 in the Paul Manafort case: "What we don't want in the country is anyone with unfettered power" referring to prosecuting special counsel Robert Mueller.

The reality is that over criminalization and vague federal criminal laws combined with ambitious, prison-thirsty prosecutors, passive, rubber-stamping judges, corporate profit motives and ungodly harsh, cruel sentencing has created a prison industrial complex that gives America the dubious distinction of being the incarceration nation. We have become far too punitive as a society, mistakenly believing that prison is the answer for all transgressions of law. Rather than skinning every defendant, eradicating his hope and decimating his life, sanctions should include some mechanism through which offenders can work to redeem themselves.

The longer an individual languishes in prison, the less effective the intended punishment becomes. As the months turn into years, and the years turn into decades, the prisoner becomes alienated from society and retreats into a kind of hibernation, accepting the prison environment as the only world he knows. For nonviolent offenders it doesn't serve any interest other than vengeance. And who wins when the pursuit is vengeance? History has shown vengeance does not work to the benefit of anyone. It is not the Christian way, and yet it is frequently those who proclaim to uphold the Christian faith that call for the pound of flesh. Shakespeare illustrated the errors of vengeance in his timeless play "The Merchant of Venice" more than 400 years ago, yet the United States continues to perpetuate them today.

EX 109

ZINNEL'S BANKRUPTCY TRUSTEE DID NOT MAKE A SINGLE CLAIM THAT ANY OF THE ALLEGED CONCEALED ASSETS BELONGED TO ZINNEL'S BANKRUPTCY ESTATE AND CREDITORS DID NOT BENEFIT FROM THE PROSECUTION

Even though there was an indictment and conviction, Zinnel's bankruptcy trustee never made a single claim that even one of the alleged concealed assets was actually part of Zinnel's bankruptcy estate and creditors did not receive any significant recovery as a result of Zinnel's bankruptcy fraud convictions.

After Zinnel's bankruptcy was closed with the estate fully administered for almost five years, in an obviously well-choreographed move, Zinnel's bankruptcy was reopened within days of him being indicted on June 8, 2011 with allegations of six (6) concealed property interests allegedly belonging to Zinnel's bankruptcy estate. The appointed bankruptcy trustee's first act was to to retain seasoned bankruptcy attorneys and a Certified Public Account who stopped at nothing to create billing opportunities. The trustee, her attorneys, and accountants, investigated and litigated in an attempt to marshal additional property for creditors. The trustee's attorneys issued lots of subpoenas, took depositions, and received all the government's 40,000 plus pages of discovery produced in Zinnel's criminal case. The trustee and her attorneys attended Zinnel's trial and sentencing. Zinnel's bankruptcy remained opened from June 2011 through November 2016. Therefore, Zinnel's bankruptcy was open for 65 months, almost five and a half years, which included 25 months pre-trial and 40 months post-conviction. During the 65 months, the trustee, her attorneys, and accountants were relentless in tracking down "concealed property" and were paid $313,195.35 for their work.

At trial, the offending DOJ attorneys put on evidence of the alleged six concealed properties contained in the indictment plus an additional three uncharged allegedly concealed properties by Zinnel. One of the uncharged allegedly concealed properties was Zinnel's one and only Washington Mutual checking account with a balance of $256 that was actually listed on Zinnel's bankruptcy schedules as Zinnel's property. The offending DOJ lawyers argued vigorously to the jury that they could find Zinnel guilty of concealment of the WAMU checking account and two other uncharged properties which created a Constructive Amendment. The jury instructions and verdict form the offending DOJ attorneys created, did not list the six charged concealed properties or the the three uncharged properties. The verdict form simply requested that the jury check a box of GUILTY / NOT GUILTY of bankruptcy fraud concealment in violation of 18 U.S.C. 152(1). It is likely Zinnel was convicted by the jury finding him guilty of concealing the uncharged WAMU checking account with a value of $256 as a result of the offending DOJ attorneys drive to win at all costs.

As Zinnel was found guilty by the jury and sentenced to almost 18 years in prison, the jury evidently believed the offending DOJ attorneys' propaganda and unanimously agreed that Zinnel concealed some piece of property that belonged to Zinnel's bankruptcy estate. However, incredibly, even though Zinnel was convicted and has been incarcerated for over 57 months, in the 65 months while Zinnel's bankruptcy remained open, the bankruptcy trustee who had a fiduciary duty to marshal assets, never made a single claim on the six properties charged concealed or the three uncharged properties Zinnel was likely convicted on, based on the DOJ lawyers unlawful evidence and argument. This is because none of the property the offending DOJ attorneys accused Zinnel of unlawfully concealing was actually part of Zinnel's bankruptcy estate. Thus, as a result of the criminal prosecution, conviction, and imprisonment of Zinnel, the government lawyers alleged victims are receiving no additional money.

The only people enriched by Zinnel's prosecution and conviction are the offending DOJ attorneys' egos and careers, for now, and the trustee's and her professionals' bank accounts.

EX 110                                          Page 10

Zinnel's sentence is so excessively severe that it takes one's breath away. In a DOJ press release issued within hours of sentencing, the government bragged that Zinnel's sentence was the longest for bankruptcy fraud in the history of the Eastern District of California (ZJN 175; Exhibit 16), thus demonstrating the prosecutors' advanced knowledge of disparity. In fact, Zinnel's 212 month sentence is the longest in the history of the United States for bankruptcy fraud by almost double. (BS 6131-6134). Almost two decades long because the sentencing guidelines for economic crime cases are absurd, fatally flawed, and abused by vengeful prosecutors if not tamed by an experienced judge. Further, the district court erroneously calculated appellants' guidelines with the unproven enhancements supersizing Zinnel's sentence from 12 months to 212 months in prison. Appellants could be the poster children of the absurdity of sentencing for economic crimes, based on the piling on of enhancements based on judge-found facts determined in about an hour without any clear and convincing evidence by the government. Zinnel received 30 levels of enhancements with each 2 level enhancement adding 42 months in prison. Therefore, with Zinnel's 11th alleged victim making an unsubstantiated claim of $141, a claim that was objected to, Zinnel was enhanced 2 levels for 11-50 victims and sentenced to an additional 3.5 years in prison over $141. Moreover, even though the bedrock of all sentencing is the 18 U.S.C. 3553(a) sentencing factors, at the offending DOJ lawyers' urging, the first-time judge did not consider a single 18 U.S.C. 3553(a) factor, including 3553(a)(6) avoiding unwarranted disparity, which Zinnel alerted the district court of with flashing neon lights. Additionally, Zinnel was denied his rite and right to a meaningful allocution, and received a mid-range guideline sentence without sufficient explanation for meaningful appellate review. The court pre-announced its sentence twice and provided the following statement of reasons for the 7,540 day record-setting sentence: "due to the nature, circumstances, and seriousness of the offense."

Steven Zinnel and Derian Eidson received record-setting sentences in an era of purported sentencing reform. The prison sentences and fine in this case not just high, they are shockingly high for a run-of-the-mill bankruptcy fraud and questionable "money laundering" convictions. Questionable, because with the money laundering convictions, the "criminal conduct" was endorsing nine checks (ER 1399-1408), only five by Zinnel as an employee of a corporation, issued from one corporation to another, and depositing them into a bank account that cleared. However, this simple act, allowed the prosecutors to circumvent the five year statutory maximum for bankruptcy fraud by 3.5 times, adding thirteen years eight months to the sentence because of the money laundering convictions. Further, Zinnel had his sweetheart and children taken from him, the Zinnel family home seized by the government, Zinnel lost all of his professional licenses, and over $4.3 million in erroneous monetary obligations assessed against him. Simply said, Zinnel and Eidson have unlawfully and unjustly lost their reputations, freedom, family, friends, future, life, life savings, and livelihoods.

We must stop sentencing people by numbers. Federal sentencing law must be implemented in a manner that coherently and fairly advances its purpose. Justice has never been easy to achieve, but it's always worth fighting for. Zinnel fights for justice now, in a highly unjust case thus far. Zinnel's case can be summarized in a few words: wrongful convictions, shockingly high unsupportable sentences, and prosecutors trying to win at all costs. What happened in Zinnel's case, certainly leaves a bad taste on one's mouth on how justice was served. Zinnel's trial was infected with errors requiring reversal of all convictions and his 212 month sentence was fundamentally flawed as it was based on failures of proof that mirrored the government's failures of proof at trial. The procedural errors at sentencing coupled with the fact that the sentences are substantively unreasonable also requires vacating the sentences and remanding for resentencing.

According to Bill Nettles, former U.S. Attorney for South Carolina, "the goal of any legal preceding is for the community to have faith in the outcome." Here there is more than enough to undermine the confidence in the fairness of the proceedings.

EX 111



CORPORATE '97 PERFORMANCE

# Power Providers



E xponential growth doesn't happen by accident, according to Power Providers' CEO, Steve Zinnel. "It takes exceptional forethought, tremendous planning, and a lot of confidence that your vision is exactly where the future market needs will be."

For Power Providers, Zinnel's "growth ingredients" mixed well. Three years ago, he predicted the confusion and market needs of a deregulated electric industry. Then he recruited a PG&E utility executive, a construction marketing specialist, a 35-year veteran of utility maintenance, and an operational systems expert. Together with his existing team, they focused on creating a new market niche.

**Be careful of your vision.** As the executive management team held its 1997 annual planning session, Zinnel led the charge. "We'll double our sales on backlog alone this year. But we won't excel unless we stay in front of the market." As a result of vision and perseverance, Power Providers continues to offer innovation, expertise, and proven reliability in providing power.

**Private Industrial Facilities.** From feasibility studies to economic analysis to engineering and construction, Power Providers offers every facet of power distribution to industrial facilities.

**Packaged Cogeneration.** As the fastest-growing source for power in a deregulated market, Power Providers offers packaged cogeneration for small and medium-sized facilities with high electric and hot water usage. By installing these small on-site "power plants," companies save thousands of dollars annually.

**Deregulation.** Given a lack of clear direction regarding deregulation, many companies want to position themselves for maximum savings in regard to electric utility sources over the next few years. Power Providers' utility experience and expertise enables it to guide or "coach" large companies through the process.

**Utility Construction and Maintenance.** California utility costs are currently 50 percent higher than the rest of the nation; as a result, investor-owned utilities and municipalities must turn to competitive solutions in order to survive. With Power Providers' design and construction costs averaging 30 percent below those of local utility companies, their services have quickly become a primary alternative for maintaining competitive costs. One large western utility recently asked if the company could effectively handle $30-$40 million over the next few years as they enter the California market. Zinnel quickly responded, "Yes."

*"We are fast and competitive."*

**Steve Zinnel**
**CEO**
**Power Providers**

## Company Scorecard

| TYPE OF BUSINESS | 1993 SALES | KEY COMPETITIVE ADVANTAGE | KEY PROJECTS |
|---|---|---|---|
| Power industry | $400,000 | Fast and competitive | Utility maintenance for the Presidio, San Francisco; 230kV Substation for the City of Roseville; power system engineering and construction for Foster Farms, Eureka, and the Idaho Maryland gold mine. |
| FOUNDER / CEO | 1995 SALES | | |
| Steve K. Zinnel | $2,000,000 | KEY CHALLENGE | |
| | | Capitalizing on available opportunities | |
| YEAR FOUNDED | 1997 BACKLOG/ PROJECTED SALES | | |
| 1987 | $10,200,000 | | |
| COMPANY'S PRIMARY FOCUS | | | |
| Reducing clients' utility costs. | | | |



**POWER PROVIDERS**

PO Box 1450
Rancho Cordova, CA 95741
(916) 638-4088
Fax: (916) 638-8550
www.powerproviders.com

5:25-mc-30
5:25-mc-31

DEF EX 139

Business Journal 8/5/96

# Breakthrough

# Business plan paid off by leaving a lot of the details open

By ROBERT CELASCHI

The classic 80- or 100-page business plan is a waste of time, says Steve Zinnel. Even the people who write it won't remember the contents, he says. For his firm, Power Providers, a 17-page strategic plan has been more than adequate. In fact, it has propelled the 9-year-old electrical contracting firm from revenues of $455,000 in 1993 to a projected $4 million this year.

The keys to implementing the plan have been focus and perseverance. Focus is probably the bigger part, Zinnel says. Back in '93, the company was going in too many directions at once. It even had included a computer software store for a couple of years. Planning out his company's future, Zinnel decided to shut down the software end.

"You've got to focus on what you love, and I learned I don't love retail," he says. At Power Providers, "everybody eats, sleeps, breathes the power business."

And within the general area of electric power, the company focuses on high-voltage distribution work.

But within that focus, there is still room for flexibility. And that's one reason the company's plan can be so short. For instance, while most of Power Providers' work is traditional contracting, the company also will design and build substations, or even negotiate rates with an electric utility on behalf of a customer. And this coming fall, the company plans to put on a conference of city managers from throughout the state to discuss the impending deregulation of electric utilities.

"We may have nine or 10 avenues that go toward one goal," says Jason Weckworth, the company's director of marketing and business development. If one or two of the avenues prove to be dead ends,



**Steve Zinnel: "You've got to focus on what you love"**

Photo by Dennis McCoy

the others should still get the company where it wants to go.

Power Providers has changed probably 70 percent of the way it conducts its business since the new strategic plan went into effect, says Zinnel. Even the name has changed from Hi-Voltage Wire Works.

Where a lot of small businesses trip up is in placing too much emphasis on day-to-day tasks and not the end results, he says. "You can't look at the end of the year and say 'I did all the tasks, why didn't I meet my goal?'"

The other key element — perseverance — helped compensate for what

## CHALLENGE:

*Educate the marketplace about your special services*

Zinnel now realizes was severe undercapitalization in the company's early years. The attitude continues.

In 1994, for example, Power Providers won a contract to install a 115-kilovolt substation for Owens-Brockway Glass Containers in Oakland. But a warehouse stood between the power supply and the substation, and the firm didn't want any disruptions to the warehouse operation. And there was a two-month deadline to finish the job.

Power Providers elected to drill underneath the warehouse — 800 feet across and 20 feet down — and pull four lines of six-inch plastic conduit under the building. Crews had the pilot hole through in half a day. By the next day they'd widened the hole and were pulling conduit through. But then the conduit got stuck halfway through. After 17 hours of sweating with it, the lines still wouldn't budge.

Had there been time or a fatter budget, they might have aborted the effort and started over. Instead, the company brought in a big diesel tow truck the next day to pull the conduit through from the other side — with only enough maneuvering room to pull it about a dozen feet at a time.

That 17-page plan contains a few other elements besides focus and perseverance. The company insists its staff get additional education, for instance.

"You can train people and risk that they will go to work for your competition, or you can not train them and have them for life," Zinnel says. And hiring the right people is a key element as well. In 1994, Power Providers hired former Pacific Gas and Electric Co. exec Jim Trudeau, who specialized in large industrial accounts in Northern California.

"Jim immediately put us into a niche all by ourselves," Zinnel says. "Almost overnight, our firm became experts in utility negotiations because of Jim's knowledge of utility engineering charges, billings, rules, tariffs and interconnection costs."

And, of course, the plan hasn't completely played out yet. Zinnel expects to have a $20 million company in another few years. He realizes that fast growth comes with its own perils, but notes that most fast-growing companies develop a weakness in cash flow. With zero debt and plenty of cash on hand, Power Providers stands a good chance of delivering on its promise.

Case 5:25-mc-00030-CBK   Document 203-1   Filed 11/21/25   Page 104 of 187 PageID #: 456

Volume 10, Number 114

# Daily Pacific Builder

Wednesday, June 12, 1996

# Powering to $4 Million in Sales Since '93



A POWER PROVIDERS splicing van takes the firm's distinctive logo to the site of the 60 kv substation the firm built for P W Pipe near El Dorado Hills.



ZINNEL

SACRAMENTO—What recession? Power Providers (formerly Hi-Voltage Wire Works, Inc.) in 1993 was a six-year-old electrical contracting firm that specialized in utility work — high voltage splicing, terminating and maintenance — with annual sales of $455,000. The company jumped to $1.6 million in 1994 and $1.9 million in 1995.

According to first quarter results, 1996 sales are expected to reach $4 million.

"It hasn't been an easy process by any means," says CEO Steve Zinnel. "But our goal is to build a company based on proven reliability. Our values remain a steadfast commitment to learn with our employees, to be the best at what we do, and to market specifically toward developing relationship with customers as our top priority."

Utility deregulation and finding a niche as a specialty contractor has helped.

In addition to the normal bidding process and negotiated projects with existing customers, Zinnel gained a new vision to mold his company into the best high voltage market — experts in every faze of high voltage distribution and design.

For this, he developed a three-tier plan: 1) Personal education and experience, 2) Attract the best people — and keep them, and 3) position Power Providers through niche marketing.

In education, Zinnel sets the example by pursuing a master's degree. And, in addition to technical expertise, he insists that everyone in the company participate in a personal development seminar each quarter. The technical aspects range from substation design seminars to manufacturers' training programs. The company has also spent countless hours in research and application of the electric utility market and high voltage distribution.

Regarding people, "It all comes down to our vision," according to Zinnel. "Everyone in the company has a passion for excellence, so we only attract the best. As a result, I have no doubt that we have the best cable splicers, the best

managers and estimators, the best marketers — even the best helpers in the industry."

As a case in point, he cites Power Providers' chief estimator, Marilyn Acheson. Despite being one of the few women estimators in the electrical industry, Zinnel praises her "high level of respect and remarkable results" with peers, customers and vendors due to her knowledge of the high voltage market.

In 1994, Zinnel recruited Jim Trudeau, a PG&E executive who specialized in large industrial accounts for Northern California. "Almost overnight, our firm became experts in utility negotiations because of Jim's knowledge of utility engineering charges, billings, rules, tariffs and interconnection costs," says Zinnel. "It was like hiring PG&E!"

Early this year, Power Providers filled two more critical positions. First was Bill Lewis, former manager of the electric power construction and maintenance division for the Los Angeles Department of Water & Power, where he managed more than 550 employees. He also managed the Los Angeles Civic Center power infrastructure redevelopment project. Notably, he wrote the emergency operations/disaster recovery plans that were implemented following the 1994 Northridge earthquake, saving two days in restoring power to the City of Los Angeles.

Most recently, Power Providers acquired Jason Weckworth, a marketing and business development expert with years of estimating experience. Weckworth was formerly marketing director for service and special projects division of Rex Moore Electrical Contractors

& Engineers, the nation's 19th largest electrical contractor.

A proponent of the design-build process, Weckworth states, "One of the most important ingredients of selling conceptually, or even introducing your company to potential clients, is your confidence in the entire team, from design to management to field installation.

"We are in an extremely competitive industry with a huge amount of risk," he continues, "but that competitiveness does not mean we can't find opportunity, growth and continued profitability. We just need to look in the right places." Power Providers now seeks those places through at least 10 different avenues at any one time, from feasibility studies to design-build proposals to utility negotiation strategy seminars.

The firm provides expertise in high voltage splicing, terminations and testing; power transmission and distribution lines, substation design and construction, high voltage systems maintenance, conceptual design, and utility negotiations.

Power Providers changed its named from Hi-Voltage Wire Works in order to facilitate alliances with major utilities, yet maintain its market share with other contractors — and expand growth potential with future utility deregulation. Nevertheless, Weckworth says, "Just don't forget your relationships as the primary target of any marketing. You win some projects and you lose others. But your relationships last for a lifetime."

DEF EX 141
5:25-mc-30
5:25-mc-31

FEB-23-1995  09:40        PLANT ENGINEERING              419 247 8414    P.01/02

**OWENS·BROCKWAY**
GLASS CONTAINERS
a unit of Owens·Illinois

February 23, 1995

Steve Zinnel, CEO
Hi-Voltage Wire Works, Inc.
P.O. Box 1450
Rancho Cordova, CA. 95741

Dear Mr. Zinnel,

I want to express Owens-Brockway's appreciation for the excellent outcome of the 115KV substation project your firm recently completed at our Oakland, Ca. facility.

When we began this project we had the normal questions about project cost and timely completion. We wondered if the results would meet our expectations. I am pleased to say that all of our questions were answered by Hi-Voltage's competitive pricing, first class attention to detail and excellent follow through.

Owens-Brockway had an Engineering firm design this project and put it out to bid with 132 pages of specifications and 19 stamped engineered drawings. Since we supplied all of the major substation components, the bids were for labor and direct job expense only. Even though there was a clearly defined scope of work the bid spread was substantial. Your firm was the low bidder at $344,000. The other bidders were considerably higher. Hi-Voltage Wire Works was awarded the contract on November 1, 1994, and despite a very aggressive time frame, energized on December 30, 1994 to meet our schedule.

Initially we were concerned about your low bid, but you quickly won us over with your innovative construction techniques. Directionally drilling under 800 feet of warehouse avoided significant disruptions to our plant operations that the other bidders had planned on.

Whenever you work with another firm you hope that the project gets finished with as few problems and hassles as possible, and this was certainly the case with Hi-Voltage Wire Works. Changes in the scope  that might have caused problems with other firms were handled quickly, professionally and never slowed your team down. I was extremely impressed with Hi-Voltage Wire Works very positive " Can Do " attitude, especially from your  Foreman Lee Raby. The open communications that your firm maintained with Owens-Brockway from the start to finish was a key component in the success of this project.

**DEF EX.142**

One SeaGate  Toledo, Ohio 43666  (419) 247-5000

Glass Recycles

5:25-mc-30
5:25-mc-3

I look forward to working with Hi-Voltage Wire Works on other projects in the future.

Sincerely,

Randy L. Sharp
Electrical Project Engineer


cc:     E.J. Contreras - Oakland
        R.C. Barber   - Oakland
        M.G. Perreira - Pleasanton
        D.W. Leidy    - 30L/GC
        P.E. Blood    - 30L/GC
        G.R. Sparks   - 30L/GC



Steve Zinnel "Back in the Day"


















11276 Fifth St, Suite 100
Rancho Cucamonga, CA 91730

PHONE 909.854.2880
WEB parwlc.com

October 27, 2022

Steve Zinnel
Orange County, CA

**RE: Offer of Employment**

Dear Steve:

I am pleased to extend to you an offer of employment with PAR Western Line Contractors, LLC (dba QUES).  This offer is for the exempt position of Project Manager reporting directly to Jimmy Skinner, Business Manager in the Escondido, CA branch/division office. Your tentative first day of employment with PAR West, and the effective date of this letter will be on or about Monday, November 7, 2022, depending on completion of pre-employment activities.

The following information outlines the terms of your employment:

- **Salary:** $6,875.00 rate semi-monthly (annual equivalent of $165,000)

- **Bonus:** Participation in the PAR West Short Term Incentive Program, based upon your performance, company performance and market conditions.

- **Vehicle Allowance:** The company will provide a vehicle allowance.  This may change given scope for future roles, company discretion and adherence to the terms of the Company Vehicle Agreement (following acceptance).

- **PTO:** You will be eligible for Paid Time Off under the guidelines of the policy, accruing at 40 hours annually then following the tenured based tiers outlined in the policy. In addition, you will receive pay for the remaining company recognized holidays. Further details are outlined in employee handbook.

- **401 (k):** The current 401(k) plan offered includes a company match of 100% on the first 3% of your contribution and 50% of the next 3% contributed. (employee contributes 6%, the Company matches 4.5%)

- **Insurance Coverage:** Your effective date of insurance coverage (Medical, Dental, Vision, short-term disability, and long-term disability) begins on the first of the month following 30 days of employment, unless otherwise noted.

This offer is contingent upon your successful completion of any pre-employment qualification that we have identified to you (e.g., background checks, drug testing, as applicable). We may ask you to begin employment prior to completion of the pre-employment qualification, in which case we reserve the right to end your employment if the results of any remaining employment qualification are not acceptable. In either case we will notify you as soon as the employment qualification process has been completed.

5:25-mc-30
5:25-mc-31

**DEF EX 144**

#WEAREPARWEST

**PAR WEST**
PAR WESTERN LINE CONTRACTORS, LLC
A QUANTA SERVICES COMPANY

11276 Fifth St, Suite 100
Rancho Cucamonga, CA 91730

PHONE 909.854.2880
WEB parwlc.com

This letter represents an offer of employment and is not an employment contract or guarantee of employment for any period of time. The probationary period for a new employee shall be ninety (90) calendar days. Although PAR West has the right to end the employment of probationary employees for any reason, that PAR West also reserves the right to terminate employees who have completed their probationary period either with or without cause. In accepting this offer of employment, you acknowledge that you will be an "at will" employee throughout your relationship with PAR West; meaning that either you or the company can terminate the relationship at any time, with or without cause. PAR West also reserves the right to modify or amend the terms of your employment at any time for any reason.

This offer is contingent upon your compliance with the Immigration Reform and Control Act of 1986. In essence, the act requires you to establish your identity and employment eligibility. If you accept this offer, you will be required to complete Section 1 of the Employment Eligibility Verification Form (I-9) and present the documents identified to an authorized representative of PAR West.

We also ask that, if you have not already done so, you disclose to PAR West any agreements, including ones with your prior employers, that may affect your eligibility to be employed by PAR West or that may limit the manner in which you may be employed. It is our understanding that any such agreements will not prevent you from performing the duties of this position, and by signing below you represent that such is the case. You also agree that, during your employment with PAR West, you will not engage in any other employment, consulting, or other business activity related to the business in which PAR West is now involved or becomes involved during your employment, nor will you engage in any other activities that conflict with your obligations to PAR West. Similarly, you agree not to bring any third-party confidential information to PAR West, including that of any former employer, and that in performing your duties for PAR West you will not in any way utilize such information.

This letter, along with any agreements relating to proprietary rights between you and PAR West, supersedes and replaces any previous discussion, representations or agreement you may have had about the terms of your possible employment with PAR West. If you choose to accept this offer, you will receive the Company's Code of Business Conduct. Adherence to the policies contained therein, including subsequent changes and other policies is required of all employees.

If you agree with the offer of employment and terms described above, please return a signed and dated copy to my attention via email (lijo.joseph@parwlc.com) by October 31, 2022. We look forward to you joining our team and are confident your skills and expertise will make an immediate contribution to the growth of our company.

Regards,

Lijo V. Joseph
Director, Human Resources

Signature                                    Date

#WEAREPARWEST



11276 Fifth Street, Unit 100
Rancho Cucamonga, CA 91730

PHONE 909-554-2550
WEB parelectric.com
NYSE-PWR

## NOTICE TO EMPLOYEE AS TO CHANGE IN RELATIONSHIP
(Issued pursuant to provisions of Section 1089
of the California Unemployment Insurance Code)

Name:  Steven K. Zinnel

Social: ***-**- 9073

1. You were/will be laid off/discharged or resigned on
   01/25/2023
   (date)

2. You were/will be on leave of absence starting_____
   (date)

3. On_____. employment status changed/will change to
   (date)

Separated.

_____

_____

_____

Employee signature:  (Information only)

Lijo Joseph
Director, Human
Resources



5:25-mc-30
5:25-mc-31

DEF
EX
145

PAR Western Line Contractors LLC
4770 N Belleview Avenue, Ste. 100
Kansas City MO 641162190

Bank of America,
Dallas, TX

32-2/1110

01/25/2023    46894

FOUR THOUSAND FOUR HUNDRED FIFTEEN AND 18/100•••••••••••••••••••••••••••••••••••••••••••••••••    $•••••4,415.18

TWO SIGNATURES REQUIRED OVER 25,000.00. VOID AFTER 120 DAYS
NOT VALID FOR AMOUNTS IN EXCESS OF 250,000.00

PAY TO THE
ORDER OF

Steven K Zinnel
11 Verdin Ln
Aliso Viejo CA 92656-1864

James M Stop

⑈0000046894⑈ ⑆⬤⬤⬤⬤⬤25⑆ ⬤⬤⬤⬤⬤⬤⬤266⑈

5:25-mc-30
5:25-my-31

DEF
EX 146

EMPLOYMENT DEVELOPMENT DEPT
UI CENTER BUENA PARK
PO BOX 5007
BUENA PARK        CA 90622


EDD  Employment Development Department
State of California

### N O T I C E    O F    D E T E R M I N A T I O N

DATE MAILED        02/15/23
BENEFIT YEAR BEGAN 01/22/23

S K ZINNEL                1800
11 VERDIN LN
ALISO VIEJO          CA 92656-8376

EDD TELEPHONE NUMBERS:
ENGLISH      1-800-300-5616
SPANISH      1-800-326-8937
CANTONESE    1-800-547-3506
MANDARIN     1-866-303-0706
VIETNAMESE   1-800-547-2058
TTY          1-800-815-9387

FOR OFFICE USE ONLY 147665910922

YOU ARE NOT ELIGIBLE TO RECEIVE BENEFITS UNDER CALIFORNIA UNEMPLOYMENT
INSURANCE CODE SECTION 1256 BEGINNING 01/22/23 AND CONTINUING UNTIL YOU
RETURN TO WORK AFTER THE DISQUALIFYING ACT AND EARN $2110.00 OR MORE IN
BONA FIDE EMPLOYMENT, AND YOU CONTACT THE ABOVE OFFICE TO REOPEN YOUR
CLAIM.

YOU WERE DISCHARGED FROM YOUR LAST JOB WITH QUANTA ELECTRIC POWER SER
BECAUSE YOU KNOWINGLY FAILED TO PROVIDE ACCURATE INFORMATION ON YOUR WORK
APPLICATION.  AFTER CONSIDERING AVAILABLE INFORMATION, THE DEPARTMENT FINDS
THAT YOU DO NOT MEET THE LEGAL REQUIREMENTS FOR PAYMENT OF BENEFITS.
SECTION 1256 PROVIDES - AN INDIVIDUAL IS DISQUALIFIED IF THE DEPARTMENT
FINDS HE VOLUNTARILY QUIT HIS MOST RECENT WORK WITHOUT GOOD CAUSE OR WAS
DISCHARGED FOR MISCONDUCT FROM HIS MOST RECENT WORK.  SECTION 1260A
PROVIDES - AN INDIVIDUAL DISQUALIFIED UNDER SECTION 1256 IS DISQUALIFIED
UNTIL HE/SHE, SUBSEQUENT TO THE DISQUALIFYING ACT, PERFORMS SERVICES IN
BONA FIDE EMPLOYMENT FOR WHICH HE/SHE RECEIVES REMUNERATION EQUAL TO OR IN
EXCESS OF FIVE TIMES HIS OR HER WEEKLY BENEFIT AMOUNT.

APPEAL:

YOU HAVE THE RIGHT TO FILE AN APPEAL IF YOU DO NOT AGREE WITH ALL OR PART
OF THIS DECISION.

TO APPEAL, YOU MUST DO ALL OF THE FOLLOWING:

A. COMPLETE THE ENCLOSED APPEAL FORM (DE 1000M) OR WRITE A LETTER STATING
THAT YOU WANT TO APPEAL THIS DECISION.  IF YOU WRITE A LETTER TO APPEAL,
EXPLAIN THE REASON WHY YOU DO NOT AGREE WITH THE DEPARTMENT'S DECISION.
WRITE YOUR SOCIAL SECURITY NUMBER ON EACH DOCUMENT YOU SUBMIT TO THE
DEPARTMENT.  (TITLE 22, CALIFORNIA CODE OF REGULATIONS (CCR), SECTION
5008).

5:25-mc-30
5:25-mc-31


DEF EX 147



B. MAIL THE DE 1000M OR YOUR LETTER TO THE ADDRESS OF THE OFFICE LISTED ON THE FIRST PAGE OF THIS DECISION.

C.  FILE YOUR APPEAL WITHIN THIRTY (30) DAYS OF THE MAIL DATE OF THIS NOTICE OR NO LATER THAN 03/17/23.

YOUR HANDBOOK, "A GUIDE TO BENEFITS AND EMPLOYMENT SERVICES," GIVES MORE INFORMATION ABOUT APPEALS. IF YOU DO NOT HAVE A HANDBOOK, YOU CAN READ OR ORDER THE HANDBOOK ONLINE BY VISITING THE DEPARTMENT'S WEBSITE AT WWW.EDD.CA.GOV. TO ORDER A HANDBOOK, VISIT WWW.EDD.CA.GOV/FORMS, ENTER PUBLICATION NUMBER "DE 1275A" IN THE FORM LOCATOR, AND FOLLOW THE ONLINE INSTRUCTIONS.

APPEAL INFORMATION:

WHEN YOUR APPEAL IS RECEIVED, YOUR CASE WILL BE REVIEWED. IF THE DECISION REMAINS THE SAME, THE DEPARTMENT WILL SEND YOUR APPEAL TO THE OFFICE OF APPEALS. IF YOU APPEAL AFTER THE 30 DAYS, YOU MUST INCLUDE THE REASON FOR THE DELAY. THE ADMINISTRATIVE LAW JUDGE WILL DETERMINE WHETHER YOU HAD GOOD CAUSE FOR THE DELAY. IF THE ADMINISTRATIVE LAW JUDGE DETERMINES YOU DID NOT HAVE GOOD CAUSE FOR SUBMITTING YOUR APPEAL LATE, YOUR APPEAL WILL BE DISMISSED.

THE OFFICE OF APPEALS WILL SEND YOU A LETTER WITH THE DATE, PLACE, AND TIME OF YOUR HEARING AND A PAMPHLET EXPLAINING APPEAL HEARING PROCEDURES.  AT THE HEARING, THE ADMINISTRATIVE LAW JUDGE WILL LISTEN TO YOU, EXAMINE THE FACTS, AND ISSUE  A DECISION. YOU MAY HAVE A REPRESENTATIVE OR SOMEONE ELSE HELP YOU DURING THE HEARING.

CONTINUING CERTIFICATION:

IF YOU ARE ELIGIBLE TO CONTINUE TO CERTIFY FOR BENEFITS WHILE YOU WAIT FOR THE ADMINISTRATIVE LAW JUDGE'S DECISION, THE DEPARTMENT WILL ISSUE CONTINUED CLAIM FORMS AND YOU MUST CONTINUE TO CERTIFY FOR BENEFITS ON TIME. IN SOME CASES, YOU WILL NOT BE ABLE TO CERTIFY FOR BENEFITS UNTIL THE ADMINISTRATIVE LAW JUDGE ISSUES A DECISION. IF THE ADMINISTRATIVE LAW JUDGE DECIDES YOU ARE ELIGIBLE FOR BENEFITS, THE DEPARTMENT WILL ISSUE CONTINUED CLAIM FORMS. BENEFITS CAN ONLY BE PAID FOR WEEKS THAT YOU HAVE CERTIFIED FOR BENEFITS AND ARE OTHERWISE ELIGIBLE TO RECEIVE BENEFIT PAYMENTS.

OTHER SERVICES:
VISIT WWW.EDD.CA.GOV FOR INFORMATION ABOUT (1) JOB REFERRALS, (2) DISABILITY INSURANCE, (3) OTHER EDD SERVICES (4) SERVICES OFFERED BY OTHER AGENCIES.

DE1080 CZ  REV. 2 (08-21)                    (DLO)

Steven Zinnel

Protection. Privacy. Peace of mind.

Q All   Images   News   Videos   More ⌄      ⇉ Search Assist     Ⓓ Duck.ai   ⚙

Protected ⌄     All regions ⌄     Safe search: moderate ⌄     Any time ⌄

⇉ Search Assist      ⓘ ⚙

Generate an answer

Ⓡ  U.S. Department of Justice
https://www.justice.gov › usao-edca › pr › businessman-sentenced-17-years-8-months-prison-ban... •••

## Eastern District of California | Businessman Sentenced To 17 Yea...

SACRAMENTO, Calif. — **Steven** K. **Zinnel**, 50, of Gold River, was sentenced today by United States District Judge Troy L. Nunley to 17 years and eight months in prison and a $500,000 fine, for 15 counts of bankruptcy fraud and money laundering, United States Attorney Benjamin B. Wagner announced....

🖾 Images for **Steven Zinnel**                          AI images: show ⌄




Businessman jailed for 17 years for declaring bankrup...
🗓 dailymail.co.uk                    •••



Divorce & Hidden Money: 4 Ways Steven Zinnel Coul...
◎ assetsearchblog.com              •••



Board of Supervisors - Boone ...
Ⓑ boonecounty.iowa.gov     •••



Ivory House in the Wild sighting of ...
🖾 linkedin.com            •••



Jon Zinnel on LinkedIn: Working to ...
🖾 linkedin.com          •••

### More Images ›

Was this helpful? 👍 👎

Ⓙ  Justia Law
https://law.justia.com › cases › federal › appellate-courts › ca9 › 22-16128 › 22-16128-2025-06-09... •••

## United States v. Zinnel, No. 22-16128 (9th Cir. 2025) :: Justia

Jun 9, 2025 · **Steven Zinnel** was convicted of bankruptcy fraud, money laundering, and other financial crimes. He was sentenced to 152 months in prison and ordered to pay over $2.5 million in restitution and fines. The government sought to garnish funds from **Zinnel's** TD Ameritrade Individual Retirement...

T  TIME
https://time.com › 14250 › man-who-avoided-child-support-by-faking-bankruptcy-gets-17-years    •••

## Man Who Avoided Child Support By Faking Bankruptcy Gets 17 ...

And he'll have to pay back his family. According to the Sacramento Bee, **Steven** K. **Zinnel**, now 50, and his wife split in 1999. They had two sons.

Ⓕ  FindLaw Caselaw
https://caselaw.findlaw.com › court › us-9th-circuit › 117373732.html     •••

## UNITED STATES v. Steven Zinnel, Defendant-Appellant.

Jun 9, 2025 · Case opinion for US 9th Circuit UNITED STATES v. **Steven Zinnel**, Defendant-Appellant.. Read the Court's full decision on FindLaw.

5:25-mc-30
5:25-mc-3(



DEF EX 148

Share Feedback

Case 5:25-mc-00030-CBK    Document 203-1    Filed 11/21/25    Page 122 of 187 PageID #: 474

Scarinci Hollenbeck
https://scarincihollenbeck.com › law-firm-insights › gold-river-businessman-gets-17-years-bankru...   •••

## Gold River businessman gets 17 years for bankruptcy fraud

Gold River businessman **Steven Zinnel** and his wife were divorced in 1999, and as proceedings dragged on, things got ugly. According to the Sacramento Bee, **Zinnel** told his wife in an angry email in 2001 that he intended to file for bankruptcy, and that she and the ex-couple's two teenage children...

GovInfo
https://www.govinfo.gov › content › pkg › USCOURTS-caed-2_21-mc-00098 › pdf › USCOURTS-c...   •••

## PDF Case 2:21-mc-00098-TLN-AC Document 89 Filed 07/20/21 P...

ellaneous motions brought by **Steven** Zinn gned denies the motions at ECF Nos. 70, 71, 72, 77, 85, and 87. The court further withholds a determination on third-party David **Zinnel's** Request for an Evidentiary Hearing and sets a status conference with David **Zinnel** and plaintiff, the United States of merica, on...

CourtListener
https://www.courtlistener.com › docket › 67783315 › united-states-v-steven-zinnel   •••

## United States v. Steven Zinnel, 21-16737 - CourtListener.com

Docket for United States v. **Steven Zinnel**, 21-16737 — Brought to you by Free Law Project, a non-profit dedicated to creating high quality open legal information.

Allmand Law Firm
https://allmandlaw.com › california-business-man-convicted-of-15-counts-of-bankruptcy-fraud   •••

## California Business Man Convicted of 15 Counts of Bankruptcy F...

**Steven Zinnel**, 49, of Gold River and attorney Derian Eidson, 49, of Yorba Linda, will both be sentenced later this year their roles in the scheme that included concealing funds and using different names of corporations in order to keep their transactions secret. **Zinnel** was convicted of 15 counts of bankruptc...

archives.fbi.gov
https://archives.fbi.gov › archives › sacramento › press-releases › 2014 › businessman-sentenced...   •••

## Businessman Sentenced to More Than 17 Years for Bankruptcy F...

SACRAMENTO, CA—Steven K. **Zinnel**, 50, of Gold River, was sentenced today by United States District Judge Troy L. Nunley to 17 years and eight months in prison and a $500,000 fine for 15 counts of bankruptcy fraud and money laundering, United States Attorney Benjamin B. Wagner announced.

cases.justia.com
https://cases.justia.com › federal › district-courts › california › caedce › 2:2021mc00098 › 391794...   •••

## PDF ORDER signed by Chief District Judge Troy L. Nunley on 8/8...

After a jury convicted **Steven Zinnel** ("Zinnel") of bankruptcy fraud, money laundering, and other financial crimes, the United States filed an application for writ of garnishment under the Federal Debt Collection Procedures Act of 1990 (FDCPA) seeking to recover funds from **Zinnel's** TD Ameritrade...

**More Results**



**See What's DuckDuckNew**
Explore DuckDuckGo's latest product updates.

**Learn More**

**Learn More**

Compare Privacy
Help Pages
Search Shortcuts

**Get More**

Email Protection
Newsletter

11/2/2025, 12:43 PM

**Share Feedback**

Case 5:25-mc-00030-CBK    Document 203-1    Filed 11/21/25    Page 123 of 187 PageID #: 475



**PRESS RELEASE**

# Businessman Sentenced To 17 Years, 8 Months In Prison For Bankruptcy Fraud And Money Laundering

Tuesday, March 4, 2014

**For Immediate Release**

U.S. Attorney's Office, Eastern District of California

SACRAMENTO, Calif. — Steven K. Zinnel, 50, of Gold River, was sentenced today by United States District Judge Troy L. Nunley to 17 years and eight months in prison and a $500,000 fine, for 15 counts of bankruptcy fraud and money laundering, United States Attorney Benjamin B. Wagner announced. Judge Nunley also ordered Zinnel to forfeit to the United States real estate and corporate interests worth over $2.8 million.

U.S. Attorney Wagner stated: "Mr. Zinnel attempted to escape his financial responsibilities through the fraudulent misuse of the Bankruptcy Court. Today's sentence, believed to be the longest prison sentence ever imposed in a bankruptcy fraud case in this district, holds him responsible for his crimes and helps protect the integrity of the federal bankruptcy process."

"Zinnel knowingly broke laws in a spiteful attempt to deprive his former spouse and children of his support," said Special Agent in Charge Monica M. Miller of the FBI's Sacramento field office. "Today he is seeing the cost of his creative scheme to intentionally conceal his assets."

"Today's sentencing sends a clear message to those who use the bankruptcy system to evade their debt obligations to the government and their creditors," said José M. Martínez,

5.25 mc30
5.25-mc31



1 of 5

11/2/2025, 12:43 PM

Special Agent in Charge, IRS-Criminal Investigation. "This was a serious, long-running crime committed by a man who gave it a lot of thought and purpose. Mr. Zinnel's crimes were filled with fraud and deceit, and he deserves the punishment handed down today."

Trial testimony established that Zinnel concealed assets from the bankruptcy court by putting his property in other people's names. One of the things that Zinnel hid from the bankruptcy court was an investment in an electrical infrastructure company in which he had invested as a "silent partner." Zinnel invested hundreds of thousands of dollars and prepared the corporate filings, but his name did not appear in any public filing of this company. For years, the company paid distributions to Zinnel as an owner, but those distributions were disguised as payments to a shell company, Done Deal, Inc., held in the name of co-defendant Derian Eidson. The court noted that the purpose of establishing Done Deal was to "raid the coffers" of the electrical infrastructure company without being identified anywhere. The court ordered Zinnel's interest in that company forfeited, and the government is to receive $2.8 million from its sale to its records owner.

After the successful concealment of the property and the discharge of Zinnel's bankruptcy, Zinnel laundered funds back to himself through attorney Derian Eidson's company, Done Deal Inc., her attorney-client trust account, and her personal bank account. Zinnel throughout this time used several different corporations registered in others' names, including one registered with a forged signature, to disguise his control of property and to direct the disposition of money. Eidson gave Zinnel signature authority over her company's bank account, which he used for his personal expenses.

At today's sentencing hearing, Zinnel's ex-wife explained how the investigation of Steven Zinnel began with Zinnel's call to the FBI asking that the FBI investigate her. According to papers on file with the court, when agents followed up on Zinnel's call to the FBI, his own bankruptcy crimes were discovered.

Calling Zinnel "narcissistic," Judge Nunley cited Zinnel's repeated deception of the bankruptcy court, the bankruptcy trustee, and family court as evidence of Zinnel's culpability in the complex bankruptcy fraud and money laundering scheme. Even after the bankruptcy, Zinnel laundered his money through shell corporations in order to disguise income that otherwise would have affected his child support obligations.

"You don't lie before a court of law," Judge Nunley admonished Zinnel. "You don't continue to lie, which is what you did." Judge Nunley found that Zinnel's gifts of being articulate and charismatic were used toward promoting Zinnel's "own selfish ends."

This case is the product of an investigation by the FBI and IRS Criminal Investigation. Assistant United States Attorneys Matthew D. Segal and Audrey B. Hemesath prosecuted

the case. The Office of the U.S. Trustee provided important support and expertise in the course of the prosecution.

Zinnel's restitution hearing is set for March 31, 2014, at 9:00 a.m. At that time, Judge Nunley will also sentence Zinnel's co-defendant, attorney Derian Eidson, for her role in Zinnel's scheme.

*Updated April 8, 2015*

**Component**

USAO - California, Eastern

Press Release Number: Docket #: 2:11-CR-234 TLN

# Related Content

ADVERTISEMENT



MONEY > PERSONAL FINANCE

# Trump Orders DOJ To Purge Press Releases Of J-6 Offenders

By <u>Walter Pavlo</u>, Contributor. I am a consultant on white-collar crime and forme...    ∨    [ Follow Author ]

Jan 28, 2025, 10:35am EST



≪    🔖 Save Article        📰 Comment  0



5.25-mc-30
5.25-mc-31



DEF EX 150



WASHINGTON DC, UNITED STATES • JANUARY 22: The families and friends of prisoners awaiting release ... [+]   ANADOLU VIA GETTY IMAGES

Donald Trump's decision to remove Department of Justice (DOJ) press releases for individuals convicted in the January 6, 2021, Capitol riot has sparked a broader conversation about the lasting impact of publicizing criminal convictions. Critics argue that deleting these press releases is an attempt to rewrite history, but it also highlights the challenges faced by all returning citizens in overcoming the stigma of their past convictions.

For many individuals who have served their sentences in federal prison, reentry into society is an uphill battle. Employers and landlords often rely on background checks that reveal felony convictions, making it difficult for former prisoners to secure jobs or housing. Adding to this challenge is the lasting presence of DOJ press releases, which frequently appear at the top of search engine results. These announcements, often written with harsh language, can overshadow the steps individuals have taken to rehabilitate and reintegrate into society.

The DOJ's practice of publicizing convictions is not new. Press releases detailing arrests, plea deals, and sentencing outcomes often circulate widely, providing fodder for news outlets. Local newspapers, operating with limited resources, frequently republish these releases without independent investigation. These stories remain online indefinitely, even in cases where convictions are overturned or sentences are commuted, as was seen with David Blaszczak and others whose insider trading convictions were ultimately vacated. The DOJ press release from 2018 detailing their charges remains online, unamended, perpetuating misinformation about their cases.

Both presidents Donald Trump and Joe Biden have commuted the sentences or pardoned nearly 5,000 individuals in the past month, the most in our country's history over such a short period of time. Biden's commutation of 1,500 CARES Act prisoners who were serving their terms on home confinement and another 1,500 for various drug offenders marked two of the largest groups of commutations since the Jimmy Carter pardoned nearly 200,000 people who refused to join the military draft during the Vietnam War. Trump drew criticism for his pardon of over 1,000 prisoners and former prisoners who were part of the January 6, 2021 riots associated with his failed presidential run in 2020. Putting politics aside, these actions, while welcome for those who received them, are only part of the story.

Trump's move to erase press releases for January 6 participants is not entirely unprecedented. In 2021, *The Boston Globe* launched its "Fresh Start" initiative, allowing individuals to request updates or anonymization of past crime coverage to reduce its lasting impact. Similarly, Massachusetts is exploring legislation, "Clean Slate Massachusetts," to automate the sealing of criminal records for eligible individuals. These initiatives acknowledge the harm caused by publicizing past convictions indefinitely and aim to promote second chances.

MORE FOR YOU

### Here's Where Trump's Government Layoffs Reportedly Are—Social Security Administration, FEMA, IRS And More

### Supreme Court Backs Trump In USAID Case: Here's Where Trump Is Winning—And Losing—In Court

### Trump Places Freeze On Federal Credit Cards In Newest DOGE Executive Order

I spoke with a few of the people who received a commutation from Biden under the CARES Act and they still face many obstacles including completing their term of supervised release post prison and making restitution payments. However, a common challenge is overcoming the stories written about them, particularly those press releases from DOJ. Sam (name withheld) was convicted of a white-collar crime involving securities fraud and told me that when he Googles his name that the first story about his past is a DOJ press release. "I get that I made a mistake," Sam told me in an interview, "but I also went to prison and paid fines and a significant amount of restitution." Sam's DOJ press release about his case is over 15 years old.

**Investing Digest: Know what's moving the financial markets and what smart money is buying with Forbes Investing Digest.**

| Email address | Sign Up |
|---|---|

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates' offerings, our Terms of Service (including resolving disputes on an individual basis via arbitration), and you acknowledge our Privacy Statement. Forbes is protected by reCAPTCHA, and the Google Privacy Policy and Terms of Service apply.

Sam believes that he has paid a price for his mistakes and the continued public shaming does nothing more than seek to embarrass him and any employer that is willing to overlook his criminal record. He added that the Securities and Exchange Commission inquired of him recently to seek a voluntary lifetime ban from being in any security-related business. At first he refused based on the fact that nobody would hire him anyway and he had no interest in reentering the industry. Upon refusal, an old press release by the SEC about his case was once again at the top of the search when he Googled his name. "Do I think it was a coincidence," Sam said, "no I don't."



Using media to further the DOJ's cases is not new. Starting in April 2013, stories about the investigation into famed-gambler and entrepreneur Billy Walters began appearing in *The Wall Street Journal* and *The New York Times* NYT -0.3% , with confidential grand jury information attributed to "people briefed on the probe." Walters, who was convicted of insider trading and spent time in federal prison before Trump commuted his sentence filed a lawsuit claiming the illegal leaks were intended to "tickle the wire" by enticing targets of their investigation to implicate themselves on wiretaps. While Walters' case against the Southern District of New York was eventually dismissed, the US Attorneys Office admitted that a rogue FBI Agent had leaked information to the press that was used to create stories about Walters.

Critics of the DOJ's practices argue that the agency should adopt measures to limit the lasting harm caused by its press releases. The ongoing use of these announcements years after sentences are served does little more than perpetuate public shaming and deter employers from offering opportunities to rehabilitated individuals. Trump's actions, while controversial, could serve as a blueprint for broader reform, benefitting a wide range of returning citizens beyond the January 6 participants.

*Follow me on Twitter or LinkedIn. Check out my website or some of my other work.*

### *It is hard to find a job if you have been in prison*

*Los Angeles Times*, 3/9/23

https://www.latimes.com/california/story/2023-03-02/how-to-connect-formerly-incarcerated-people-with-jobs-in-l-a-county

The tight job market has made it easier for millions of Americans to find work in recent years — unless they have a criminal record.

Take, for example, what happened to John Rodriguez after he was released from prison in 2017, having served nine years for shooting and wounding a man as a 17-year-old in Venice. After returning home, he got offered a job as his grandmother's caretaker, which he could do while taking classes in college. But the offer was rescinded when the employer found out about his criminal record.

Later, he said, the owner of a cafe hired him to work in the kitchen without running a background check, so she didn't know about his conviction. But it was a hard secret to keep, given that his parole officer could have dropped into the cafe at any time to check on him.

Those experiences made him realize that even though he'd served his term, he couldn't simply put the mistake he'd made as a teenager behind him. "It feels like you have a stamp on your forehead that you'll never be able to remove," Rodriguez said.

According to a 2022 study by Rand Corp., more than half of unemployed men in their 30s had been arrested at least once. Overall, more than a quarter of all formerly incarcerated people are unemployed, including 44% of Black women and 35% of Black men, a 2018 report by the Prison Policy Initiative found.

The inability to find work, in turn, feeds the vicious spiral of recidivism, in which 2 out of 3 people coming out of California prisons return within three years (often for parole violations), said Quan Huynh, executive director of Defy Ventures' Southern California operations. How can they earn a living, Huynh asked, when employers are offering them only "menial jobs where there's no career trajectory, and they're not feeling like they're contributing to anything?"

That's why Los Angeles County launched its second Fair Chance Hiring Program this year to promote the hiring of "system impacted" individuals — that is, Californians with criminal records and their close relatives. The program builds on the *Fair Chance Act*, a 2017 state law that bars most employers with five or more workers from rejecting applicants just because they have a criminal record.

The county offers financial incentives to help persuade companies to hire formerly incarcerated people, while also partnering with several community-based services to help prepare formerly incarcerated people for the job market. One of those services is Root & Rebound, where Rodriguez now works as the Fair Chance employment specialist.

5:25-mc-30
5:25-mc-31

DEF
EX 151

On Tuesday, the county Board of Supervisors also agreed to develop a Fair Chance ordinance that tracks the state's requirements, but adds teeth: Employers could be fined up to $2,000 per violation, with half the money going to the job-seeker who brought the complaint.

Here is a breakdown of the legal requirements and incentives for employers and the opportunities for Fair Chance job-seekers in L.A. County.

What the law requires

As of Jan. 1, 2018, most companies with five or more workers cannot ask job applicants upfront whether they have any arrests or convictions on their record (the exceptions being law enforcement agencies, farm labor contractors and other employers required by law to make these inquiries). Nor can they conduct background checks, **do internet searches** or take any other steps aimed at unearthing the criminal histories of their applicants.

This mandate is often referred to as "banning the box," meaning that job application forms could no longer include a box for prospective hires to mark if they had a criminal record. The law's goal is to end employers' blanket refusal to hire formerly incarcerated people, requiring employers to judge applicants and their records individually, in the context of the work they would be doing.

Notably, the law doesn't bar employers from considering a person's criminal record; it only forces them to delay that issue until after offering the person a job. They can later withdraw the offer, but only if they discover convictions that have "a direct and adverse relationship with the specific duties of the job that justify denying the applicant the position," according to the Fair Chance Act.

That individualized assessment must consider at least three things, according to state regulations:

The nature and gravity of the offense or conduct;
The time that has passed since the offense or conduct and/or completion of the sentence; and
The nature of the job held or sought.

What, exactly, an individualized assessment entails hasn't been well defined, said Nicole Jeong, Southern California regional director of advocacy for Root & Rebound. But the state Civil Rights Department is in the latter stages of revising the regulations to clarify what is and isn't involved in an assessment. Among many other details, it would state that if an applicant holds a professional license to do the job, then that person's criminal record is not relevant.

The law also requires employers who tentatively withdraw a job offer to give applicants the chance to submit new evidence of rehabilitation or mitigating circumstances before making a final decision.

Other state laws bar employers from considering arrests that don't lead to convictions. California law doesn't allow the companies that do background checks to show such information; nor can they reveal expunged convictions, sealed records or convictions whose sentences were completed

more than seven years ago. Public employers, however, have access to an applicant's full rap sheet, Jeong said, and it can be hard for people to unsee the arrest records they see there.

Root & Rebound offers a comprehensive guide to the law's requirements as a download from its website.

Benefits for employers and workers

Kelly LoBianco, director of the L.A. County Department of Economic Opportunity, said the county's Fair Chance Hiring Program tries to match employers with formerly incarcerated workers who have the requisite skills and experience. The direct benefits for employers include a federal tax credit of $1,200 to $9,600 per Fair Chance applicant hired and a state tax credit of $2,500 to $10,000 per participant who had been homeless at some point in the previous six months, as many formerly incarcerated people are. The state also has a new employment credit that can cover 35% of the wages paid to qualified hires.

The county offers payroll subsidies that cover up to 90% of the cost of training someone hired through the program, among other grants to offset the cost of a new employee. And up to $10,000 worth of bonding insurance is available at no charge to cover any losses that might be caused by a Fair Chance program hire in the first six months on the job.

For job-seekers, LoBianco said, the 19 regional America's Job Centers overseen by the county will offer résumé building, interview preparation and career counseling. The county can also connect these applicants to the services that many people need to hold down a job, such as transportation, work clothes and cash assistance. It also offers grants for training programs in high-growth industries at community colleges and trade schools, and is working with the building trades to provide apprenticeships in construction, she said.

The county didn't create these programs from scratch for Fair Chance applicants; instead, it adapted existing efforts to this population, LoBianco said. But the county is placing a higher priority than before on the residents who are most in need of help, which includes homeless people, veterans and LGBTQ individuals as well as formerly incarcerated job-seekers.

The goal is to find jobs for 2,000 formerly incarcerated people and close relatives affected by the justice system, up about 5% from the previous four years' results, LoBianco said. To that end, the county has partnered with service providers such as Root & Rebound and LeadersUp to reach out to more "system impacted" individuals and employers in high-growth sectors.

Defy Ventures does seven-month training programs inside prisons to create "entrepreneurs in training," Huynh said. The point isn't to launch a bunch of start-ups, he said, but to teach lessons in grit, resilience and pivoting to new opportunities. "We're not breeding complainers, these are problem-solvers," he said.

The group is also focused on changing employers' mindsets, exploring the assumptions and fears underlying their reluctance to hire people with criminal records. "Listen, we're not asking you to

give any jobs here," he said. "If you're looking for the best possible candidate, you should hire the best possible candidate" — even if that person happens to have spent time behind bars.

Rodriguez said Root & Rebound helps its clients become better applicants, giving them tips and tools and preparing them for what they'll encounter as job-seekers. But it also educates them about their rights under the Fair Chance Act, as well as providing legal help. (For a more in-depth description, see Root & Rebound's comprehensive reentry toolkit for formerly incarcerated people.)

Jeong, Rodriguez and Huynh, who spent 22 years behind bars for a murder he committed when he was 21, said one issue for this group is learning how to convey to potential employers the value of the professional and interpersonal skills they learned behind bars. While they may not have a lot of traditional job experience, Jeong said, many have held multiple jobs while incarcerated. "In addition to that," she said, "I think a lot of them have done a lot of work on themselves."
Where things stand

According to the county Department of Economic Opportunity, seven out of 10 employers are unaware of the Fair Chance Act, and six out of 10 were not at all familiar with the county's incentives. That's one of the main reasons L.A. County is launching another Fair Chance program (its first was in 2019), which LoBianco said includes a "really robust marketing campaign" to make sure employers know about the law's requirements and benefits. The county's goal is to bring 500 more employers into the effort, up from the 202 that pledged to take part in 2019.

Jeong said she's still hearing about employers whose initial job applications ask about an applicant's criminal record, contrary to the Fair Chance Act. Nor has she seen much of a reduction in complaints from formerly incarcerated people about employment-related problems.

"I think in people's minds there is still a lot of negative connotations of being somebody who is formerly incarcerated," Jeong said. "It was maybe harder for employers to see individuals applying as full human beings before the law was passed."

Even when employers follow the law, formerly incarcerated people may have gaps in their resumes that make it harder for them to stand out from competing job-seekers. And they know employers will ask them to explain the gap, which presents a dilemma, Rodriguez said — to be forthcoming or to keep silent about the time spent incarcerated? "It feels like you're on trial again, even though you're technically not," he said.

Root & Rebound advises its clients to initiate the discussion and give their potential employer a fuller context than what they'll see on a background check. "What they're not going to see are all the steps that you took to address those past actions," he said.

There is a movement among employers to shift to "skills-based hiring" that focuses less on degrees and more on the applicant's ability to perform the tasks at hand, LoBianco said. And that shift can help formerly incarcerated people. Nevertheless, she said, the biggest hurdle isn't persuading employers to consider these applicants — it's getting employers to hire them.

Fair Chance advocates say the value of these employees is borne out by research. For example, the Society for Human Resource Management found that more than 80% of hiring managers and top business executives said that formerly incarcerated people performed as well as or better than their co-workers. This group also tended to stay in their jobs longer, while being at least as productive as their peers, the county Office of Economic Opportunity says.

Which is not to suggest that these folks are perfect. Huynh said the recidivism rate for the people who go through Defy Ventures' Entrepreneurs in Training program is far lower than the average, but some do reoffend or violate their paroles. Less than 15% return to prison within three years, he said, compared with about 66% for all of California's formerly incarcerated population.

The key to changing attitudes is for managers to hire more formerly incarcerated people, Jeong said, adding, "Once an employer employs somebody who does have a record and sees how hardworking they are, how dedicated they are, how capable they are, that is something that has really helped shift culture in companies."
CaliforniaBusinessAdvice, Resources & Guides





5:25-mc-30
5:25-mc-31

DEF
EX 152



**Medi-Cal**
CalOptima Health

caloptima.org
CalOptima Health, A Public Agency

**Steven Zinnel**
Member ID: ●●●●●319G        Eff Date: 06/16/2022
                            DOB: 12/31/1963

CalOptima Community Network    1-714-246-8500
PCP: KCS Health Center         1-714-503-6550

**Providers: Eligibility must be verified at time of service. Failure to obtain authorization may result in non-payment.**

5:25-mc-30
5:25-mc-31

**DEF EX 153**



**ORANGE COUNTY'S CREDIT UNION℠**
*with you all the way™*

P.O. Box 11777, Santa Ana, CA 92711-1777
(888) 354-6228
OrangeCountySCU.org

**STATEMENT OF ACCOUNT** 0

| Account No. | Statement Period | Page |
|---|---|---|
| ●●●●●220 | 09/01/25 Thru 09/30/25 | 1 of 1 |

**2025 Relationship Rewards Level - Premier**
Visit our Web site for a list of benefits and free services.

| ACCOUNT SUMMARY | | |
|---|---|---|
| 0001  REGULAR SAVINGS | $ | 0.00 |
| 0040  BASIC CHECKING | $ | 3.00 |

STEVEN K ZINNEL
~~~~~~~~~~~
~~~~~~~~~~~

# Annual Privacy Notice (Federal)

As a courtesy to our Members, we disclose how we collect, share, and protect your personal information. Our privacy policy has not changed and can be reviewed with respect to your personal information at **www.orangecountyscu.org** — or give us a call at (888) 354-OCCU (6228) and we'll mail you a free copy upon request.



**REGULAR SAVINGS # 0001**

| Beginning Balance | Deposits/Credits | Withdrawals/Debits | Ending Balance | Y-T-D Dividends |
|---|---|---|---|---|
| $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

**No Activity this Period**

**BASIC CHECKING # 0040**

| Beginning Balance | Deposits/Credits | Withdrawals/Debits | Ending Balance | Y-T-D Dividends |
|---|---|---|---|---|
| $ 3.00 | $ 0.00 | $ 0.00 | $ 3.00 | $ 0.00 |

**No Activity this Period**

**YTD ACCOUNT SUMMARIES:**

Total Dividends Paid Year to Date:          $          0.00

*with you all the way™*

DEF
EX
154

5:25-mc-30
5:25-mc-31

No. _____

IN THE SUPREME COURT OF THE UNITED STATES

---

STEVEN ZINNEL

Petitioner

v.

UNITED STATES OF AMERICA

Respondent

---

On Petition for Writ of Certiorari

to the United States Court of Appeals for the Ninth Circuit

## PETITION FOR WRIT OF CERTIORARI

---

Steven Zinnel,  X-1858541
Sacramento County Main Jail
651 I Street
Sacramento, CA 95814
Petitioner In Pro Se



DEF
EX
155

5:25-mc-30
5:25-mc-31

## Questions Presented

### Question 1

Whether there was an unconstitutional constructive amendment or prejudicial variance that tainted all counts, caused by the confluence of the government's introduction of evidence and arguments that Zinnel committed bankruptcy fraud by hiding three property interests, one of which was Zinnel's one and only WAMU personal checking account that was actually listed on his bankruptcy schedules, twice, with a correct balance of $250, that were not charged in the indictment transferred and/or concealed, in violation of the Fifth, Sixth, and Fourteenth Amendments and the Supreme Court's holdings in *Stirone v. United States*, 361 U.S. 212 (1960).

### Question 2

Whether it is Constitutionally required in a bankruptcy fraud prosecution under 18 U.S.C. § 152(1) and 18 U.S.C. § 152(7), that a complete description of the property charged transferred and/or concealed in the indictment, must be in the jury instructions as six other Circuits require and two previous Eastern District of California bankruptcy fraud cases have done.

### Question 3

Whether a judge-determined Sentencing Guidelines Offense Level of 36 (188-235 months imprisonment), affirmed by the Ninth Circuit, is unconstitutional because the facts giving rise to 28 levels of the hotly contested sentencing enhancements, were not found by the jury or admitted to by the defendant, but were in fact used to increase Petitioner's penalty because the judicial fact-finding at sentencing changed Petitioner's Guideline range from 0-6 months imprisonment found by the jury, to 188-235 months imprisonment, and the sentencing judge, as he was predisposed to do, treated the Guidelines as mandatory and mechanically imposed a midrange within-Guideline sentence, in violation of Zinnel's right under the Sixth Amendment.

## List of Parties

Those individuals who appeared in the criminal proceedings brought in the District Court for the Eastern District of California by the United States of America are:

Steven Zinnel

Derian Eidson

The following parties are before the United States Supreme Court: Steven Zinnel, Petitioner and the United States of America, Respondent.

## Table of Contents

Questions Presented ....................................................................................................ii

List of Parties ............................................................................................................iii

Table of Contents ......................................................................................................iv

Table of Authorities ................................................................................................viii

OPINIONS BELOW.................................................................................................. 1

JURISDICTION......................................................................................................... 1

CONSTITUTIONAL AND OTHER PROVISIONS INVOLVED............................. 2

STATEMENT............................................................................................................. 4

   A. Introduction...................................................................................................... 4

   B. Statement of the Case ...................................................................................... 6

REASONS FOR GRANTING PETITION................................................................ 17

THE DECISION BELOW IS WRONG .................................................................... 19

  I. THE COURT AND PROSECUTORS CREATED A CONSTRUCTIVE AMENDMENT OR PREJUDICIAL VARIANCE ON COUNTS 1 AND 2 THAT TAINTED ALL COUNTS.................................................................................................... 19

    A.   Pre-Indictment.............................................................................................. 20

    B.   The Indictment, Trial Evidence, and Jury Instructions ................................ 20

    C. The Jury Instructions and the Government's Arguments, Allowed the Jury to Convict Zinnel Unconstitutionally on Uncharged Conduct........................................ 25

D.  Adding Uncharged Concealed Properties Impermissibly Broadened the Indictment ....27

E.  The Money Laundering Counts Must Fall because their Predicates were Constructively Amended ...............................................................................................29

II.  THE COURT PREJUDICIALLY ERRED IN INSTRUCTING THE JURY ...................30

A.  The Jury Instructions on Bankruptcy Fraud Were Fatally Flawed .................................30

B.  It is impossible to know beyond a reasonable doubt whether uncharged or charged property was unanimously agreed upon by the jury as fraudulently transferred or concealed and this requires reversal of all of Zinnel's convictions ...............................32

III.  THE JUDGE-DETERMINED SENTENCING GUIDELINES OFFENSE LEVEL OF 36 IS UNCONSTITUTIONAL BECAUSE 28 LEVELS OF THE HOTLY CONTESTED SENTENCING ENHANCEMENTS WERE NOT FOUND BY THE JURY OR ADMITTED TO BY THE DEFENDANT, BUT WERE USED TO INCREASE PETITIONER'S PENALTY IN VIOLATION OF THE SIXTH AMENDMENT ...........32

A.  Distressing Facts ...............................................................................................32

B.  The Supreme Court and the majority of the Court of Appeals have side-stepped around this issue ...............................................................................................34

C.  Because post-Booker, the majority of judges, including the sentencing judge in this case, still improperly slavishly impose Guideline sentences, every fact the judge finds that adds a sentencing enhancement does increase the punishment and thus must be found by the jury or admitted by the defendants, including Petitioner here .................37

CONCLUSION...............................................................................................40

Appendix...............................................................................................1a

Appendix A:   Opinion of the United States Court of Appeal for the Ninth Circuit, *United States v. Steven Zinnel*, 2018 U.S. App. LEXIS 3220 (9 CA, 2018) .......................1a-17a

Appendix B:   United States Court of Appeal for the Ninth Circuit order denying Zinnel's petition for rehearing and rehearing en banc ...............................................18a-19a

Appendix C   Supreme Court of the United States Office of the Clerk letter extending the time within which to file a petition for writ of certiorari to December 23, 2018 ........20a

Appendix D   Supreme Court of the United States Office of the Clerk letter directing Petitioner to correct his petition for writ of certiorari and resubmit by May 27, 2019 .......21a

Appendix E   Selected district court transcripts and exhibits, from trial, concerning the emphasis on Zinnel's uncharged WAMU personal checking account and uncharged Done Deal.................................................................................22a-32a

Appendix F   Representative check, in the amount of $4,826.20, which was the evidence for one of the money laundering counts ...........................................33a

Appendix G   Declaration of Steven Zinnel in support of his Petition for Rehearing and Rehearing En Banc filed with the Court of Appeals for the Ninth Circuit.................................................................................................34a-52a

Appendix H   Pattern Criminal Jury Instructions for Bankruptcy Fraud, Concealment, 18 U.S.C. § 152(1) for the six Circuits that require a description of the property the indictment alleges concealed in the jury instructions...............53a-59a

Appendix I   Jury Instructions in the Eastern District of California bankruptcy fraud cases of *United States v. Burke* and *United States v. Klassy* for Bankruptcy Fraud, post-petition concealment, 18 U.S.C. § 152(1), that provided the jury in those cases with a description of the property the indictment alleged concealed as required by the Constitution....................60a-65a

Appendix J   Transcripts of the Jury Instructions actually given by the district court in *United States v. Zinnel* for Bankruptcy Fraud, pre-petition transfers and post-petition concealment, 18 U.S.C. §§ 152(1) and 152(7), that did not provided the jury with a description of the property the indictment alleged was transferred and/or concealed................................65a1-70a

Appendix K   Selected district court transcripts of the closing arguments by AUSA Audrey B. Hemesath, Zinnel's attorney, and AUSA Matthew D. Segal concerning the emphasis on Zinnel's uncharged WAMU personal checking account, uncharged Done Deal, and uncharged Corporate Control. ..............................................................71a-77a

Appendix L    Verdict Forms in the Eastern District of California bankruptcy fraud cases of *United States v. Burke* and *United States v. Klassy* for Bankruptcy Fraud, Post-petition concealment, 18 U.S.C. § 152(1), provided the jury with a description of the property the indictment alleged concealed......................78a-81a

Appendix M    Verdict Forms in *United States v. Zinnel* for Bankruptcy Fraud, pre-petition transfers and post-petition concealment, 18 U.S.C. §§ 152(1) and 152(7), that <u>did not</u> provided the jury with a description of the property the indictment alleged concealed .....................................................................82a-83a

Appendix N    Selected district court transcript of Zinnel's sentencing wherein Judge Troy L. Nunley, recalled Zinnel's uncharged WAMU personal account, uncharged Done Deal, and uncharged Corporate Control eight months later.................................................................................................84a

Appendix O    Hotly contested judge-determined Sentencing Enhancements totaling Sentencing Guidelines Offense Level of 36 in *United States v. Zinnel* ..............85a

Appendix P    Pages 33 and 34 of Zinnel's Reply Brief on direct appeal filed in the Court of Appeals for the Ninth Circuit in case no. 14-10141, that are relevant portions of Zinnel's bankruptcy schedules relied on by the district court at sentencing for 20 levels of disputed sentencing enhancements ...................86a-87a

Appendix Q    United States Sentencing Commission Quick Facts for 2017 that reveals post *Booker* more than half (50.4%) of offenders in the federal prison population were sentenced within the recommended guidelines range ..................................88a-89a

Appendix R    Relevant documents that demonstrate it is Department of Justice Policy to federal prosecutors to always seek sentences within the range established by the Sentencing Guidelines.........................................................................90a-100a

Appendix S    Responses of Troy L. Nunley to written questions of Senator Chuck Grassley In 2012 before he became a district court judge in the Eastern District of California ........................................................................................101a-105a

## Table of Authorities

### Cases

*Alleyne v. United States*, 570 U.S. 99 (2013)..................................................................34, 37

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)..................................................................34, 37

*Bode v. Pan Am. World Airways, Inc.*, 786 F.2d 669 (5 CA, 1986)................................30

*Cunningham v. California*, 549 U.S. 270 (2007)................................................................ 34

*Donnelly v. DeChristofra*, 416 U.S. 637 (1974) ................................................................ 29

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................................ 35

*Glover v. United States*, 531 U.S. 198 (2001) ................................................................ 40

*Jones v. United States*, 135 S. Ct. 8 (2014)................................................................18, 35

*Kimbrough v. United States*, 552 U.S. 85 (2007) ............................................................ 33

*Lassiter v. Department of Soc. Servs.*, 452 U.S. 18 (1981)..............................................29

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) .................................... 3

*Ring v. Arizona*, 536 U.S. 584, (2002)............................................................................ 19

*Stirone v. United States*, 361 U.S. 212 (1960)................................................2, 17, 23, 24, 25, 27

*United States v. Adamson*, 291 F.3d 606 (9 CA, 2002).....................................................25

*United States v. Agurs*, 427 U.S. 97 (1973)......................................................................29

*United States v. Burke*, CR 05-365-JAM................................................12, 14, 22, 28, 31, 32

*United States v. Bussell*, 504 F.3d 956 (9 CA, 2007)..................................................4, 16, 34

*United States v. Christensen*, 801 F.3d 971 (9 CA, 2015)................................................30

*United States v. Dennis*, 237 F.3d 1295 (11 CA, 2001)................................................... 26

*United States v. Gigante*, 94 F.3d 53 (2 CA, 1996)........................................................ 38

*United States v. Gupta*, 904 F.Supp. 2d 349 (S.D.N.Y. 2012). ...................................... 39

*United States v. Hickey*, 580 F.3d 922 (9 CA, 2009).......................................................36

*United States v. Houston*, 217 F.3d 1204 (9 CA, 2000) .................................................. 39

*United States v. Kojayan*, 8 F.3d 1313 (9 CA, 1993).................................................14, 28

*United States v. Pazsint*, 703 F.2d 420 (9 CA, 1983)...................................................... 26

*United States v. Pierre*, 254 F.3d 872 (9 CA, 2001)....................................................30, 31

*United States v. Rivera-Gallegos*, 692 Fed. Appx. 428 (9 CA, 2017) ........................................... 14

*United States v. Rodrigues*, 678 F.3d 693 (9 CA, 2012) ............................................................ 21

*United States v. Sabillon-Umana*, 772 F.3d 1328 (10 CA, 2014) ................................................ 35

*United States v. Shipsey,* 190 F.3d 1081 (9 CA, 1999) .........................................................27, 30

*United States v. Stewart Clinical Laboratory, Inc.,* 652 F.2d 804 (9 CA, 1981) .................... 25, 26

*United States v. Treadwell*, 593 F.3d 990 (9 CA 2010) ...................................................... 33, 35, 36

*United States v. Tsinhnahijinnie,* 112 F.3d 988 (9 CA, 1997) ............................................... 2, 25

*United States v. Zinnel*, 2018 U.S. App. LEXIS 3220 (9 CA, 2018) ................................................ 1

**Statutes**

18 U.S.C. § 152(1) ........................................................................................................ passim

18 U.S.C. § 152(7) ........................................................................................................ passim

18 U.S.C. § 1956 .................................................................................................................. 30

18 U.S.C. § 1957 ............................................................................................................29, 30

18 U.S.C. § 3231 .................................................................................................................... 1

18 U.S.C. § 3553(a) ....................................................................................................33, 36, 39

18 U.S.C. § 3742 .................................................................................................................... 1

28 U.S.C. § 1254(1) ............................................................................................................... 2

28 U.S.C. § 1291 .................................................................................................................... 1

## Other Authorities

Eighth Cir. Model Crim. Jury Instr. .................................................................................... 31

Eleventh Cir. Pattern Jury Instr. ........................................................................................ 31

First Cir. Pattern Crim. Jury Instr. ..................................................................................... 31

Seventh Cir. Pattern Crim. Jury Instr. ............................................................................... 31

Tenth Cir. Pattern Crim. Jury Instr. ................................................................................... 31

Third Cir. Manual of Model Crim. Jury Instr. .................................................................... 31

## Constitutional Provisions

Fifth Amendment .......................................................................................................... passim

Fourteenth Amendment .................................................................................................... 2, 3

Sixth Amendment ......................................................................................................... passim

No. _____

IN THE SUPREME COURT OF THE UNITED STATES

_____

STEVEN ZINNEL

Petitioner

v.

UNITED STATES OF AMERICA

Respondent

_____

ON PETITION FOR WRIT OF CERTIORARI

TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

Steven Zinnel ("Zinnel" or "Petitioner") respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Ninth Circuit in this case.

**OPINIONS BELOW**

The Court of Appeals for the Ninth Circuit's opinion (Petition Appendix A, 1a-17a) is reported at *United States v. Zinnel*, 2018 U.S. App. LEXIS 3220 (9 CA, 2018). The Ninth Circuit denied Zinnel's petition for rehearing and rehearing en banc. (Appendix B, 18a-19a).

**JURISDICTION**

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. The Court of Appeals had jurisdiction under 28 U.S.C. § 1291; 18 U.S.C. § 3742. The Court of Appeals entered its judgment February 9, 2018. (Appendix A, 1a-17a). Zinnel timely filed a petition for rehearing which was denied on July 26, 2018. (Appendix B, 18a-19a). Zinnel received an extension of time from this Court to file this petition to December 23, 2018. (Appendix C, 20a). Zinnel timely

Page 1

mailed his petition to the Court on December 17, 2018. In a letter dated March 28, 2019, Zinnel received notice that corrections needed to be made to his petition a corrected petition must be submitted to the Supreme Court within 60 days of the letter. (Appendix D, 21a). Therefore, this corrected petition is timely because it was submitted to the Supreme Court by mail from a county jail before May 27, 2019. The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

## CONSTITUTIONAL AND OTHER PROVISIONS INVOLVED

1. Unconstitutional Constructive Amendment

A person is entitled under the Fifth Amendment not to be held to answer for a felony except on the basis of facts which satisfied a grand jury that he should be charged. He is entitled to fair notice of what he is accused of, and not to be twice put in jeopardy on the accusation." *United States v. Tsinhnahijinnie,* 112 F.3d 988, 992 (9 CA, 1997); Fifth Amendment. Just as in *Tsinhnahijinnie,* the problem in this case is thus not that the government failed to prove an element of the crime, but that it failed to comply with the requirements of the Constitution." *Id.* The variation between pleading and proof, the prosecutors' arguments emphatically urging jurors to convict Zinnel on Counts 1 and 2 based on concealing uncharged assets, and the defective jury instructions affected Zinnel's substantial rights under the Fifth and Sixth Amendments. *Stirone v. United States*, 361 U.S. 212, 218-219 (1960).

Zinnel's due process rights under the Fourteenth Amendment of the Constitution were also violated because, as in *Stirone,* (1) Counts 1 and 2 charged that specific assets were transferred and/or concealed at different times either in contemplation of bankruptcy (Count 1) or from the bankruptcy trustee post-petition (Count 2), (2) the trial evidence included uncharged alleged asset transfers and concealments, (3) the prosecutors argued that uncharged transfers and concealment of assets not listed in Counts 1 and 2 were among the bases the jury could use to convict on those counts, and (4) the jury instruction failed to provide -assurance . . . requiring the jury to find the conduct charged in the indictment before it may convict."

2. Unconstitutional Jury Instructions

The jury instructions on Bankruptcy Fraud violated Zinnel's Fifth and Sixth Amendment rights to be tried only on charges in the indictment and to notice of the charges against him, and were also prejudicially confusing. The Fourteenth Amendment requires that notice be -reasonably calculated,

under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

### 3. Judge-Found Facts of Sentencing Enhancements

Zinnel challenges the Court of Appeal's affirmation of his Sentencing Guidelines Offense Level of 36, based almost entirely on judge-found facts in violation of his Sixth Amendment right to a jury trial.

### Fifth Amendment

–No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

### Sixth Amendment

–Rights of the accused.
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

### Fourteenth Amendment, Section 1

–All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

## STATEMENT

### A. Introduction

- *It's hard to fight when the fight'in ain't fair.* Taylor Swift

- *For every wrong there is a remedy.* California *Civil Code* § 3523

- *Because we can: The motto of power since the idea of power over others was born in our kind.*

This is a bankruptcy fraud case that went horribly wrong below, and continues to do so. The convictions and sentencing enhancements are flat wrong and do not promote respect for the law. Zinnel, a fifty year-old entrepreneur and job-creator with no criminal past, but a long history as a productive, decent human being and devoted father of two, was convicted by a jury for bankruptcy fraud and related money laundering counts. After rejecting two five-year plea offers, which were represented by the government as a reasonable and appropriate sentence in this case, Zinnel was convicted at trial and was mechanically sentenced by a first-time judge, who treated the Guidelines as mandatory, to a mid-range Guideline sentence of 212 months (17.67 years), three years supervised release, $2,513,319 in restitution, $1,297,158 in a forfeiture money judgment, and the maximum $500,000 fine, for a total monetary judgment in excess of $4.3 million dollars. Zinnel's prison sentence was six times longer than what similarly situated defendants received and was the longest sentence in the history of the United States for bankruptcy fraud by almost double. Almost two decades long because the sentencing guidelines for economic crime cases are absurd, flawed, and abused by vengeful prosecutors if not tamed by a seasoned judge.

The prison sentence and fine in this case is not just high, but shockingly high for a run-of-the-mill bankruptcy fraud and money laundering convictions that consisted of a mere transfer of funds from one corporate account to another. The convictions are wrong and the sentence was too long. Nevertheless, the three-judge panel affirmed Zinnel's convictions for bankruptcy fraud and money laundering and reversed and remanded for resentencing in a memorandum opinion. (Appendix A, 1a-17a). The convictions and draconian sentence –strike as more than probably wrong, they strike as wrong with the force of a five-week old unrefrigerated dead fish." *United States v. Bussell*, 504 F.3d 956, 962 (9 CA, 2007) (–Bussell").

Page 4

Because of the constructive amendment that tainted all counts and the unconstitutional jury instructions, there is no way any one, or any Court, can say beyond a reasonable doubt that the jury did not convict Zinnel solely on an uncharged and disclosed WAMU personal checking account, that Zinnel listed on his bankruptcy schedules twice, with a correct balance of approximately $250, and that is a constructive amendment requiring reversal of the bankruptcy fraud convictions. All of Zinnel's money laundering convictions (Counts 4-12, 15-18) must also be reversed as well because they were predicated on the defective bankruptcy fraud convictions.

Then, based on an alleged $256 property concealment, the government claims, and the Court of Appeals has affirmed, that there is over $3.6 million in judge-found loss in this case with eleven judge-found victims, and a total of judge-found 28 levels of sentencing enhancements that mechanically increased Zinnel's within-Guideline sentence from 6 months to almost 18 years in prison. The $3.6 million invalid —Claims Register," the government and the Court of Appeals erroneously claim was the amount scheduled for discharge, was never before the district court at sentencing and is entirely disputed by Zinnel under penalty of perjury. In aggravation, post-indictment and post-conviction, a total period of over five years, neither the bankruptcy trustee nor the bankruptcy court made a claim that there were any —concealed" property that was part of Zinnel's bankruptcy estate and thus needed to be administered for the benefit of creditors. Further, the bankruptcy court did not determine a single debt on Zinnel's bankruptcy schedules was valid.

This case is an important case because the Ninth Circuit three-judge panel has so far departed from the accepted and usual course of a criminal judicial proceeding and sanctioned the departure by the district court, as to call for an exercise of this Court's supervisory power. Further, the Ninth Circuit has entered a decision that is conflict with six other Circuits. Moreover, the Ninth Circuit has decided an important federal question in a way that conflicts with relevant decisions of this Court. This Court should exercise its supervisory powers to correct the Ninth Circuit's departure that allowed a constructive amendment to the indictment and fatally flawed jury instructions, to unlawfully convict Zinnel of allegedly concealing from the bankruptcy court his uncharged WAMU personal bank account, with a balance of with $250, that Zinnel actually disclosed twice on his bankruptcy schedules.

Zinnel implores this Court not to view Zinnel as a number or just another case. Zinnel hopes that mathematically bad odds will not deny the reversal of his unconstitutional convictions and judge-found facts of sentencing enhancements, as this case warrants. This case does not involve a routine business dispute with only money or property at stake and no one's liberty interest. This case involves two federal prosecutors cheating to unlawfully convict Zinnel and twice seeking twenty (20) years of imprisonment of Zinnel and a life-sentence of financial obligations and collateral consequences in a bankruptcy fraud case that the sentencing *court found nothing atypical about*. The Constitutional errors below are clear and Zinnel urges the Solicitor General, looking through a different lens and vantage point than the line prosecutors, to do the right thing and concede error. Zinnel pleads with the Supreme Court to right this wrong and correct the horror that has already been inflicted on Zinnel because his first-half life has been utterly destroyed and he has been incarcerated thus far, for over 3,000,000 minutes, 50,000 hours, 2,100 days, 69 months, or 5.8 years.

## B. Statement of the Case

Zinnel was charged in a 19-count superseding indictment ("indictment") on December 7, 2011. (CR #63). [1] In Count 1 of the indictment, Zinnel was charged with bankruptcy fraud by pre-petition transfer of property in anticipation of bankruptcy in violation of 18 U.S.C. § 152(7). The indictment in Count 1 was unconstitutionally vague as to what property Zinnel allegedly transferred pre-petition because no specific property was identified as the indictment simply alleged that the defendant "fraudulently transferred *some of his property and the property of said corporation*." (CR #63, p, 3, lines 15-16). Thereafter, the indictment alleged steps of alleged pre-petition transfers and concealments in paragraphs 4(a)-(n) of the indictment. In the government's trial brief, filed a mere 24 days before trial, the government, for the first time, specifically identified only one property that it alleged to be the fraudulent pre-petition transfer: "*Zinnel used these shells to transfer the Luyung Property, a commercial lot*." (CR 169, p. 14, line 12).

In Count 2 of the indictment, Zinnel was charged with bankruptcy fraud by post-petition concealment in violation of 18 U.S.C. § 152(1). Count 2 specifically listed six property interests that were allegedly concealed from the bankruptcy trustee:

---

[1] "CR" refers to the Clerk's Record and the docket # in the underlying district court, ED CA no. 11-cr-00234-TLN

a. System 3
b. Payments from System 3 through Done Deal
c. Zinnel's interest in Done Deal's bank account
d. 4Results
e. Auto & Boat Store
f. The Luyung Property      (CR 63, p. 7, lines 1-8).

In the government's trial brief, the government reaffirmed the exact same six properties listed above, as being the properties allegedly concealed post-petition in Count 2 of the indictment. (CR 169, p. 15). None of the properties listed in the indictment or the government's trial brief as allegedly transferred or concealed, were Zinnel's Washington Mutual personal checking account ending in account number "5442" ("WAMU"), Corporate Control, Inc., or the entire company Done Deal, Inc. (CR 63 & 169). The rest of the counts in the indictment were for money laundering with Count 2 being the predicate bankruptcy fraud offense.  (CR 63).  Therefore, just 24 days before trial, Zinnel was given notice by the government that in Count 1 he had to defend at trial against the pre-petition transfer of the Luyung Property and in Count 2, the post-petition concealment of the six itemized properties listed in the indictment and trial brief. (i.e. a-f above).

All nine of the money laundering counts 4 - 12  were the mere transfer of funds via checks from one corporate account to another easily traceable by law enforcement. (Appendix F is a representative example). It is noteworthy, that a single check in the amount of $4,826.00, allowed the government to circumvent the five-year statutory maximum for bankruptcy fraud and seek 20 years for "money laundering" with the "criminal conduct" being depositing a check. Justice Breyer criticized this government tactic in *United States v. Santos*, 553 U.S. 507, 530 (2008): "the Government can seek a heavier money laundering penalty (say, 20 years), even though the only conduct at issue is conduct that warranted a lighter penalty (say, 5 years for [bankruptcy fraud]."

During the two years from indictment to trial, Zinnel believes that government provided around 100,000 pages of documents in discovery in this case and if the image of System 3's computer hard drive image is counted, the government provided the Zinnel defense over a million pages. (Appendix G, 36a). The government produced several years of Zinnel's WAMU personal account records for his account ending in "5442," twice, because the government had obtained the records from both Washington Mutual and Zinnel's bankruptcy trustee Stephen Reynolds. (Appendix G, 36a & 37a).   The WAMU bank records included the bank statement for the period ending on 6/13/05 and the government marked this statement with Bates Number "ZBK002318."

Page 7

(Appendix G, 36a; Appendix E, 22a).   Zinnel viewed his WAMU bank statements as irrelevant because Zinnel was not charged with concealing his WAMU personal checking account ending in -5442." (Appendix G, 37a).   Zinnel remembers that the government did mark as Exhibit 30, his WAMU Master Account Agreement for his one and only WAMU account ending in account number 5442, as a possible trial exhibit.   However, the prosecutor's marked  lots of exhibits  that they never sought to admit at trial.   (see CR #230; Appendix G, 37a). The government **never** provided the Zinnel defense with any discovery relating to a WAMU checking account titled in Zinnel's name or otherwise, with an account number ending in -9842." (Appendix G, 35a).

> In ruling on Zinnel's Constructive Amendment issue on appeal, the Ninth Circuit stated:
>
> We additionally conclude that even if **the personal bank account** constituted a variance, the variance was nonfatal because it did not affect Zinnel's substantial rights. Evidence of the bank account was provided during discovery [2] and marked as a trial exhibit, and **Zinnel did not object when it was introduced at trial.** Cf. *Brulay v. United States*, 383 F.2d 345, 351 (9th Cir. 1967) (**finding variance nonfatal where "at no time did the defendant claim surprise"**). (emphasis added) (Appendix A, 3a & 4a)

The government also provided the Zinnel defense with voluminous documents in pretrial discovery pertaining to Done Deal and other irrelevant companies.  (Appendix G, 37a).

Trial began on July 1, 2013 with Judge Troy L. Nunley presiding over his first trial as a federal judge after being appointed by President Obama. During the trial, the government solicited testimony on three uncharged alleged concealments of the WAMU account (Appendix E, 26a, 27a, & 32a), Corporate Control, Inc., and the entire company Done Deal, Inc. Right off the bat, government attorney AUSA Audrey B. Hemesath stressed Zinnel's uncharged personal WAMU checking account that he actually listed on his bankruptcy schedules, not the Done Deal account. AUSA Hemesath started her direct examination of Zinnel's first bankruptcy trustee Stephen Reynolds, by asking the following questions:

---

[2] This Court cannot allow the government to evade its obligation to only try Zinnel on property charged by the grand jury as concealed or transferred in the indictment, by simply providing Zinnel with thousands upon thousands of pages of documents in discovery for him to glean whatever might be learned from the mountain of paper. Put differently, "if there is a needle in this haystack [of discovery], it is [not] up to Zinnel to find it." *Caneva v. Sun Cmtys. Operating Ltd.* (*In re Caneva*), 530 F.3d 755 (9 CA, 2008). It is error to hold Zinnel to a mythical requirement that he must search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack of what he must defend against at trial. Zinnel was given no notice by either the indictment, or the government's trial brief, that he would have to defend against concealment of the three uncharged properties, including his WAMU personal account, in addition to the six properties actually specified in the indictment and the government's trial brief.

Q. ―Government moves to admit Exhibit 30." (Appendix E, 26a)

Q. ―This is a signature card for Washington Mutual Bank account.

    Whose bank account is it?" (Appendix E, 26a)

A. ―It appears to be Steven Zinnel's." (Appendix E, 26a)

Q. ―And put side by side with Exhibit 202 page 3." (Appendix E, 26a; 23a & 25a)

Q. ―Were you aware that Steven Zinnel, had another personal bank account not listed on Schedule B?" (Appendix E, 26a)

A. ―NO." (Appendix E, 26a)

Q. ―If you had been aware, what would you have done? (Appendix E, 27a)

A. ―I would have investigated it. **I would have wanted to know what the balance was**. I might have asked for bank records. But if it had simply been disclosed he had **two bank accounts, I would have looked at the balances** and see if they were **exempt** [3] or **worthwhile administering**." (emphasis added) (Appendix E, 27a)

To <u>deceive</u> the jury and the Court, AUSA Audrey B. Hemesath only showed the signature card (Master Account Agreement) (Appendix E, 25a) to the testifying bankruptcy trustee and the jury rather than the actual bank statement (Appendix E, 22a) that indicated the same $250 balance as the account listed on Zinnel's bankruptcy schedules twice. (Appendix E, 23a & 24a). This deception prevented the jury and the district court from comparing the $250 balances and allowed the government lawyers to insinuate that this was a multi-million dollar asset concealed by Zinnel.

The prosecutor then moved on to the next uncharged property of Done Deal:

Q. ―May we please see Exhibit 202, page 4. Do you see any reference here to a company called Done Deal?" (Appendix E, 27a)

A. ―No." (Appendix E, 27a)

Q. ―Move to admit what has been market as Government's Exhibit 140, a certified business record. (Appendix E, 27a & 28a)

During the government's direct examination of bankruptcy trustee Stephen Reynolds, Zinnel was perplexed because he knew he had listed his one and only WAMU personal checking account

---

[3] Zinnel did properly and legally claim his WAMU personal checking account as ―Exempt." (Appendix E, 24a)

on Schedule B of his bankruptcy schedules (Appendix G, 38a-40a). The government ended its direct examination of bankruptcy trustee Stephen Reynolds at lunch. During the lunch court recess, Zinnel frantically went through the government produced discovery at his attorney Tom Johnson's office and discovered for the first time, that he made a mistake with two digits of the account number of his WAMU personal checking account listed on Schedule B, that no one had caught for eight years. (Appendix G, 38a-40a).

With the government's introduction of Exhibit 30, which Zinnel's only WAMU personal checking account Master Account Agreement, and Zinnel's lunch-time research, Zinnel discovered that he got the last two digits of –42" correct, but for some unknown reason, made a typographical error of typing –98" instead of –54." (Appendix E, 39a). Also during the court recess, Zinnel electronically searched all of the government produced discovery in this case, and as expected, did not find a single document that the government produced in discovery with a WAMU bank account ending in –9842." (Appendix E, 39a). Therefore, Zinnel realized he had mistakenly listed his one and only WAMU personal checking account on Schedule B of his bankruptcy schedules as –9842" instead of –5442," and for eight (8) years, nobody caught the mistake until the government surprised Zinnel at trial by soliciting erroneous testimony that Zinnel –*had another personal bank account* [at WAMU] *not listed on Schedule B*." (Appendix G, 35a; Appendix E, 23a & 26a). To this day, Zinnel has no idea how he made a mistake with two digits of the bank account number of his one and only WAMU personal checking account listed on Schedule B. (Appendix G, 39a).

Zinnel told his lawyer to cross-examine the bankruptcy trustee after the lunch recess on the 6/13/05 WAMU bank statement to show the jury and the Court that the government lawyers were cheating because Zinnel was not charged with concealing any WAMU personal checking account ending in either –9842" or –5442." (Appendix G, 39a-40a). Despite his preparation, after the lunch court recess, all that Zinnel's attorney asked the bankruptcy trustee Stephen Reynolds relating to Zinnel's WAMU personal account was:

Q. –So did he list a checking account for Washington Mutual?

A. –He did." (Appendix E, 29a)

Zinnel sat in shock when his lawyer did not cross-examine bankruptcy trustee Stephen

Page 10

Reynolds regarding the mistake Zinnel made in two digits of the WAMU bank account number or the fact that Zinnel had only one WAMU personal checking account that he listed on Schedule B of his bankruptcy schedules. Zinnel was also shocked and dismayed that his lawyer did not point out to the jury or the Court that Zinnel was not charged by the grand jury with concealing any WAMU personal checking account ending in either "9842" or "5442." (Appendix G, 40a).

On Redirect of Zinnel's bankruptcy trustee Stephen Reynolds, AUSA Audrey B. Hemesath, immediately began hammering Zinnel's one and only personal WAMU checking account in order to leave an indelible impression on the jury and the district court that Zinnel concealed his only WAMU personal account:

Q . "Please put up side by side Exhibit 202, page 3. Schedule B is the personal property where the bank accounts are to be listed correct?" (Appendix E, 32a).

A. "Correct." (Appendix E, 32a)

Q. "Can you box in the second exhibit. Are those the same bank account numbers?"

A. "No." (Appendix E, 32a)

Q. "So this second bank account on the right-hand side, Government's Exhibit 30, is not listed on Schedule B correct?" (Appendix E, 32a, 23a)

A. "That's correct." (Appendix E, 32a)

Q. "Can we see just Exhibit 30?" (Appendix E, 32a, 23a)

Q. "Whose bank account is this?" (Appendix E, 32a)

A. "Mr. Zinnel's." (Appendix E, 32a)

AUSA Hemesath did not ask anything related to Done Deal's WAMU bank account actually belonging to Zinnel. AUSA Hemesath started her presentation of evidence by soliciting erroneous evidence that Zinnel concealed his personal WAMU checking account and the entire company of Done Deal, both uncharged properties in the indictment and not mentioned in the government's trial brief as concealed. (Appendix E, 26a, 27a, 32a; CR 169, p. 15).

The indictment was never read or given to the jury and the district court never told the jury what property indictment charged transferred and concealed. Zinnel objected to the jury instructions for Counts 1 and 2 and requested specification of the property interests charged in the indictment and detailed in the government's trial brief, citing the risk that without such clarification, the jury

could convict on conduct not charged in the indictment including the WAMU account. (Appendix J, 65A1 & 65A2).   The court denied this request.   *Id.*    Zinnel also challenged the general verdict form not listing the properties, because the government proposed verdict form simply required the jury to determine "Not Guilty" or "Guilty" on all the counts.

As explained below, the jury instructions given, allowed the jury to find Zinnel guilty of Counts 1 and 2 based on transfers and concealments not charged by the grand jury because the jury was instructed: "The law does not require that the government prove that each and every one *of the above items of property* was concealed. You may find the defendant guilty if you find that all of the above elements have been proven beyond a reasonable doubt as to *at least one of the above items of property* for each defendant and you unanimously agree to that item." (Appendix J, 69a-70a). However, neither the jury instructions nor the verdict form identified the "above items." (Appendix J and Appendix M).   The jurors were not limited, as the Constitution required, to the properties charged in the indictment.

Pattern Jury Instructions in six other Circuits for 18 U.S.C. § 152(1) and 18 U.S.C. § 152(7) require a description of the property alleged to be pre-petition transferred and/or post-petition concealed as alleged in the indictment. (Appendix H).   Unbelievably, the Ninth Circuit has no Model Jury instructions for bankruptcy fraud concealment or prepetition transfers in violation of 18 U.S.C. § 152(1) and 18 U.S.C. § 152(7). [4]   However, jury instructions and verdict forms in similar bankruptcy fraud cases in the Eastern District of California have complied with the law by itemizing specific property concealments that were charged in the indictment, directing jurors to agree unanimously on at least one misstatement or asset listed, and check a box next to the asset(s) agreed on.[5] (Appendix I & L).   However, the government and the court refused to use that format here.

---

[4] Strangely, the Ninth Circuit has only one jury instruction for bankruptcy fraud and that is 8.11 for a scheme or artifice to defraud in violation of 18 U.S.C. § 157 which is no aid in the majority of bankruptcy fraud prosecutions because bankruptcy fraud prosecutions are almost always for alleged violations of 18 U.S.C. § 152.

[5] E.g. *United States v. Burke,* CR 05-365-JAM; *United States v. Klassy,* CR 05-503-MCE.  The jury instructions and verdict forms in these cases specified the charged interests. (Appendix I & L).

After the jury was instructed, without identifying a single property alleged transferred or concealed in Counts 1 & 2 of the indictment (Appendix J), AUSA Audrey B. Hemesath began the government's closing argument by again hammering Zinnel's uncharged personal WAMU checking account:

> All legal interests. **That's something with your name is on**. For example, a bank account. This is Government Exhibit 30. (Appendix K, 71a).
>
> **Steven Zinnel's personal bank account**. (Appendix K, 71a)

AUSA Audrey B. Hemesath actually waved Exhibit 30 in front of the jury. AUSA Audrey B. Hemesath then told the jury they should convict on uncharged Done Deal:

> Equitable interests. That's the big bag in this case of hidden property. Done Deal." (Appendix K, 71a).
>
> Equitable control of Done Deal. And listed personal bank account. Just as in Count 1, any one item of concealed property is sufficient.   (Appendix K, 72a)
>
> And listed **personal bank account**. (Appendix K, 72a)
>
> **Any one item of concealed property is sufficient**.   (Appendix K, 72a)

When it was the defense's turn for closing argument, Zinnel's attorney Tom Johnson ineffectively attempted to explain the two-digit mistake in the WAMU account number:

> One thing that, you [need to] know, concerns the WAMU check[ing account].  Ms. Hemesath is right.  It's a different account [number].  (Appendix K, 73a- 74a)
>
> Is it possible that [Zinnel] made a mistake in [two digits of] the account [number]? Certainly.  (Appendix K, 73a- 74a)
>
> If he's going to hide WAMU, why put WAMU on the form at all?  But she's right. That check[ing account] doesn't match the account number [on Zinnel's bankruptcy schedules.]  (Appendix K, 74a)
>
> Is it possible and reasonable that was a mistake?  Absolutely.  Why else [would he] even put WAMU on the [bankruptcy schedules] at all? (Appendix K, 74a)

In the government's rebuttal closing argument, AUSA Matthew D. Segal first chastised Zinnel's attorney's WAMU account explanation and then picked up right where his co-counsel started and ended, by emphasizing uncharged concealment of property:

And the big defense here is, well, he put one account at Washington Mutual down on the bankruptcy schedules, but, you know, just forgot about the fact that **he didn't put his own bank account**. **That's silly**. (Appendix K, 75a)

Now, so what's really the centerpiece of this case?  Let's put up Government Exhibit 202, the bankruptcy schedules, because this is a bankruptcy fraud case. The centerpiece of this case is truth versus the lies.  (Appendix K, 76a)

Let's look at page 3, please. Number 2. The checking account. Where is Done Deal? Done Deal is nowhere."  (Appendix K, 76a).

**Zinnel's personal account is not disclosed.** (Appendix K, 76a; Appendix E, 22a)

But AUSA Matthew D. Segal is not done hammering uncharged property to the jury: You remember, I think the first or second Mission Impossible movie where they've got these masks and they tear them off and there you have the real person. That's how Steven Zinnel uses corporations. Like he creates **Done Deal**...**Corporate Control**. Well, those are the big ones in this case...That's the centerpiece of this case. (Appendix K, 77a)

As one Justice of the Ninth Circuit forcefully wrote: –Evidence matters; closing argument matters; statements from the prosecutor matter a great deal." *United States v. Rivera-Gallegos*, 692 Fed. Appx. 428 (9 CA, 2017) citing *United States v. Kojayan*, 8 F.3d 1315 (9 CA, 1993).

AUSA Segal barely mentions System 3. Instead, he names two uncharged properties as –the centerpiece of the case." **Both prosecutors emphasized Zinnel's one and only WAMU personal checking account** and the company Done Deal to the jury as –the big ones" and the –centerpiece of the case." (Appendix K, 71a, 72a, 75a-77a). Thereafter, the jury was simply  given a verdict form that only required the jury to check –Not Guilty" or –Guilty." (Appendix M, 82a & 83a).  This is in stark contrast to the verdict forms used in the two previous Eastern District of California bankruptcy fraud cases of *Burke* and *Klassy* (Appendix L, 78a-81a) where the jury was required to check lines next to the properties they unanimously agreed were concealed.

ASUA Segal's and AUSA Hemesath's arguments about uncharged assets were so forceful and memorable that Judge Troy L. Nunley, who presumably read the indictment and the government's trial brief, and thus knew Zinnel's WAMU personal account, Done Deal, and Corporate Control were not charged concealed, recalled them at sentencing eight months later:

In the bankruptcy proceeding, I believe Mr. Reynolds testified that **you didn't list a bank account**... You didn't list any interest on Corporate Control.  Done Deal." (Appendix N, 84a)

Page 14

1. During oral argument before the Ninth Circuit, the prosecutor misrepresented the emphasis put on the three uncharged properties <u>during the trial and closing argument</u>

At oral argument before the Ninth Circuit panel on November 16, 2017, AUSA Segal began his argument with the following blatant misrepresentations to the Ninth Circuit:

—They say we hammered these uncharged properties." Time-stamp 17:20;

—This was a System 3 trial and a System 3 closing." Time-stamp 17:50;

—If this was a real variance, the government would have stood up and said Aha! We've got this personal checking account [AUSA Segal raising his right hand during oral argument like he is holding a piece of paper]. That is not what happened at all." Time-stamp 18:15;

These are lies to the Court of Appeals by AUSA Matthew D. Segal. During closing argument, the government lawyer in fact did stand up, wave Exhibit 30 in her hand, and tell the jury in effect: Aha! We've got this personal checking account: —Exhibit 30."

—<u>Steven Zinnel's personal bank account</u>. That bank account isn't here on schedule B." (Appendix K, 71a)

—<u>Zinnel's personal account is not disclosed</u>." (Appendix K, 76a)

Contrary to AUSA Segal's representation to the Ninth Circuit, neither of the government prosecutors ever referred to Exhibit 140 (Appendix K, 71a, 72a, 75a,-77a) which is Done Deal's WAMU bank account. (Appendix E, 28a). AUSA Hemesath and AUSA Segal erroneously told the jury and the judge that Zinnel's WAMU personal checking account is —the big one" and the —centerpiece of the case." (Appendix K, 76a-77a).

At oral argument below, Judge Wilken asked the following question:

Q. —The complaint seems to be this WAMU personal checking account. Which I guess is not the Done Deal WAMU checking account that had a couple of hundred dollars in it. Was that emphasized in any way?" Time-stamp 19:03

Judge Wilken's question was and is significant. However, AUSA Matthew D. Segal's response to her caused the Court of Appeals panel to erroneously believe that the prosecutors were referring to Done Deal's WAMU bank account, not Zinnel's personal WAMU checking account.

This is not supported by the record or the actual exhibits the prosecutors held up for the jury to reference.   AUSA Segal answered Judge Wilken's question by lying to the panel and disingenuously claiming a business account was a personal account, but both prosecutors asserted to the jury at trial that an uncharged personal WAMU account was concealed:

A. ―NO! And I think that is the source of the confusion. As both of those accounts were at WAMU. And we spent just a ton of time with witness Kimberly Barr showing that the Done Deal account was Zinnel's personal account. That was his personal account." Time-Stamp 19:13;

A. ―And if you look at the excerpts of records (Appendix K, 75a & 76a), I'm holding up the bankruptcy schedule and saying personal account. Where is Done Deal? Look at all the money he spent out of it. This is the personal account." Time-stamp 19:31

A. ―You need to look at the exhibits that are actually being referred to during the closing." [Judge Wilken again nodded her head] Time-stamps 19:51

These are blatant misrepresentations to the Court of Appeals by AUSA Matthew D. Segal. The trial testimony the government solicited stressed Zinnel's uncharged personal WAMU checking account that he actually listed on his bankruptcy schedules, not the Done Deal account. The government lawyers hammered uncharged properties including Zinnel's one and only personal WAMU checking account.   (see pages 9-14 above for the government's emphasis during trial and closing argument).

At Zinnel's March 4, 2014 sentencing, the court cumulatively added 28 objected-to levels of enhancements. (Appendix O). The court imposed a 212-month sentence (17.67 years). The savage sentence drastically exceeded similarly situated defendants who received an average of 19 months incarceration and was 6 times the sentence of Letantia Bussell who Judge Troy L. Nunley found at Zinnel's sentencing was ―factually similar."

> 2. Even after conviction, neither the trustee nor the bankruptcy court
> has ever made a claim that any property was concealed or was
> <u>part of Zinnel's bankruptcy estate</u>

The bankruptcy trustee had a legal duty to collect and reduce to money the property of estate.   (11 U.S.C. § 704(a)(1)). As AUSA Audrey B. Hemesath correctly stated the law during her closing argument, ―<u>it is up to the bankruptcy court to determine which assets belong to the estate.</u> (Appendix K, 72a). During the over five years Zinnel's bankruptcy case remained reopened

after the indictment in this case, the bankruptcy trustee expended $313,195 in attorney's fees and accounting fees, which the trustee used in part to completely review all the government provided discovery in this case, issue subpoenas, and search for property of the bankruptcy estate. (Appendix G, 51a). Further, even though Zinnel is ostensibly convicted of concealing one or more properties that belonged to his bankruptcy estate, in the 65 months that Zinnel's bankruptcy case remained reopened, including 40 months after conviction, the bankruptcy trustee did not make a single claim that any property not listed on Zinnel's bankruptcy schedules belonged to Zinnel's bankruptcy estate. (Appendix G, 51a).

The bankruptcy trustee did not claim charged property such as System 3 or Luyung was property of Zinnel's bankruptcy estate. The trustee did not claim uncharged property such as Zinnel's WAMU personal checking account ending in number 5442, the entire company of Done Deal, Inc., or the entire company of Corporate Control, Inc. was part of Zinnel's bankruptcy estate. Likewise, during the 65 months Zinnel's bankruptcy case remained reopened after indictment, the bankruptcy court never made a single finding that any of the property charged concealed in the indictment was property of Zinnel's bankruptcy estate. (Appendix G, 51a & 52a). The reason the bankruptcy trustee did and the bankruptcy court did not make a claim on any property charged in the indictment, or the uncharged three properties, is because the property is not part of Zinnel's bankruptcy estate. This is the position Zinnel has consistently held to this day. Therefore, contrary to the government's assertions, Zinnel's creditors are not getting ―millions" because of Zinnel's criminal convictions. In fact, the creditors are receiving just $36,807.

Petitioner now challengers the Constitutionality of all of his convictions and the judicial fact-finding that determined his sentencing guideline was Offense Level 36.

## REASONS FOR GRANTING PETITION

The variation between pleading and proof, the prosecutors' arguments encouraging jurors to convict Zinnel on Counts 1 and 2 based on concealing three uncharged assets, and the defective jury instructions affected Zinnel's substantial rights under the Fifth and Sixth Amendments. *Stirone v. United States*, 361 U.S. 212, 218-219 (1960); *United States v. Lloyd*, 807 F.3d 1128, 1164 (9 CA, 2015). This allowed Zinnel to be unconstitutionally convicted on transfers and concealments he was

not charged with and prevents Zinnel from pleading double jeopardy if he was later indicted for concealment of the three uncharged assets.

The jury instructions on bankruptcy fraud violated Zinnel's Fifth and Sixth Amendment rights to be tried only on charges in the indictment and to notice of the charges against him, and were also prejudicially confusing. There is a circuit split on jury instructions for bankruptcy fraud pre-petition transfer and post-petition concealment. 18 U.S.C. § 152(1) and 18 U.S.C. §152(7). A defendant can be found guilty of bankruptcy fraud only upon proof that he knowingly transferred or concealed the property stated in the indictment.

Justice Scalia, dissenting from denial of Certiorari in *Jones v. United States*, 135 S. Ct. 8 (2014), expressed his frustration with judge-found facts that increase a defendant's prison time. Petitioner puts Justice Scalia's question again before this Court. The facts that the jury found beyond a reasonable doubt mandated a sentencing Guideline Offense Level of 8; 0-6 months in prison. Zinnel did not admit to the next 28 levels of sentencing enhancements nor did the jury ever consider them, let alone find them, beyond a reasonable doubt. Over Zinnel's spirited objections, the sentencing judge solely determined the Sentencing Guidelines Offense Level of 36 (Appendix O) which was affirmed by the Ninth Circuit. Judge Nunley then imposed a midrange within-guideline sentence of 212 months based solely on the sentencing guidelines. This cannot be the starting point at any resentencing. [6]

Even though it would be reversible error and would instantly trigger another Zinnel appeal, given the government's posture and Judge Nunley's predisposition, Zinnel does face the possibility of a hollow victory on appeal at resentencing by marching down only to climb right back up and receive the same midrange within-guideline sentence of almost 18 years because Zinnel's judge-found Offense Level of 36 (188 – 235 months) has not changed. Judge-found facts to support 28 levels of enhancements are unconstitutional because the hotly contested sentencing enhancements were not found by the jury, not admitted by the defendant, but were used to increase Zinnel's penalty from 6 months to 212 months in prison in violation of Zinnel's right under the Sixth Amendment as applied.

---

[6] As the United States Supreme Court explained in *Rita v. United States*, 501 U.S. 338 (2007), a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.

*United States v. Booker*, 543 U.S. 220 (2005) excised 18 U.S.C. § 3553(b)(1) and 18 U.S.C. § 3472(e) in order to remedy the Sixth Amendment violation created by the mandatory nature of the Guidelines. However, with 50.4% of offenders still receiving within-Guideline sentences post-*Booker* (Appendix Q) based on sentencing enhancements not admitted by the defendant or found by the jury, there is still a Sixth Amendment violation. This is an issue of national importance because so many people with a liberty interest are affected and it is a reoccurring issue because over 80,000 men and women get sentenced annually in federal cases alone. Therefore, the Supreme Court should hold that if a defendant receives a within-Guideline range sentence, he or she must admit to all the facts giving rise to all of the sentencing enhancements, or all the facts giving rise to all of the sentencing enhancements must be found by the jury.

## THE DECISION BELOW IS WRONG

## I. THE COURT AND PROSECUTORS CREATED A CONSTRUCTIVE AMENDMENT OR PREJUDICIAL VARIANCE ON COUNTS 1 AND 2 THAT TAINTED ALL COUNTS

Whether deemed an unconstitutional constructive amendment or prejudicial variance, the error here was unconstitutional and prejudicial because it enabled the jury to convict Zinnel on Counts 1 and 2 based on uncharged concealment of three assets.    This resulted in unconstitutional convictions and makes it so Zinnel cannot plead double jeopardy if he were to be indicted for concealing his WAMU personal checking account, Done Deal, or Corporate Control.

The bankruptcy fraud Jury instructions were inadequate because the omitted the property allegedly transferred or concealed. A defendant can be found guilty of bankruptcy fraud only upon proof that he knowingly transferred or concealed the property stated in the indictment. 18 U.S.C. §§152(1) and 152(7).   Under determinative-type sentencing schemes, the Sixth Amendment demands that any fact that increases the ‑prescribed range of penalties to which a criminal defendant is exposed" must be treated as an element to be found by the jury or admitted by the defense. ‑The fundamental meaning of the jury-trial guarantee of the *Sixth Amendment* is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt." [7]

---

[7] *Ring v. Arizona*, 536 U.S. 584, 610 (2002) (Scalia, J., concurring).

## A. Pre-Indictment

In his entire life, Zinnel has had only one Washington Mutual personal checking account and that account number was 490-00004975442. ("WAMU"). (Appendix G, 34a & 35a; Appendix E, 22a & 25a). The Master Account Agreement to open Zinnel's WAMU account was the government's Exhibit 30 admitted at trial. (Appendix E, 25a). When filling out his bankruptcy schedules in pro se, Zinnel used the most recent WAMU bank statement he had, which was for the period ending 6/13/05. (Appendix E, 22a; Appendix G, 35a &36a). Zinnel listed his only WAMU personal checking account on his bankruptcy schedules with a correct ending balance of approximately $250. (compare Appendix E, 22a to 23a; Appendix G. 35a-37a). Zinnel has **never** had a personal bank account at Washington Mutual ending in "9842." (Appendix G, 35a). Zinnel, mistakenly listed his one and only WAMU personal checking account on Schedule B of his bankruptcy schedules as "9842" instead of "5442." (Appendix G, 35a; (compare Appendix E, 22a to 23a). On Schedule C of his bankruptcy schedules, Zinnel claimed his WAMU personal checking account as exempt from administration by the bankruptcy court under California *Code of Civil Procedure* § 704.070(b)(2) which means as a matter of law the bank account was not part of Zinnel's bankruptcy estate. (Appendix E, 24a). During the pendency of Zinnel's bankruptcy, Zinnel voluntarily produced several years of his WAMU bank statements for his account ending in "5442" to bankruptcy trustee Stephen Reynolds. Mr. Reynolds never once told Zinnel that the account numbers did not match. Zinnel did not catch the mistake either. (Appendix G, 37a).

## B. The Indictment, Trial Evidence, and Jury Instructions

The indictment and the government's trial brief provided Zinnel with actual notice that he would have to defend against at trial an alleged pre-petition transfer of the Luyung Property in Count 1 and the alleged concealment of the following six properties in Count 2: System 3, Payments from System 3 through Done Deal, Zinnel's use of Done Deal bank account as his personal account, 4Results, Auto & Boat Store, & the Luyung Property. (CR 169, p. 14, line 12, p. 15, lines 13-16; CR 63, p. 7, lines 1-8). None of the properties listed in the indictment or the government's trial brief as allegedly transferred or concealed, were Zinnel's Washington Mutual personal checking account ending in account number "5442" ("WAMU"), Corporate Control, Inc., or the entire company Done Deal, Inc. (CR 63 & 169).

Page 20

Count 1, ¶4(a)-4(n) listed specific actions as "ways and means" of concealing unspecified property to defeat the bankruptcy laws, and then alleged in ¶5 that Zinnel excluded from his bankruptcy "interests in assets transferred or concealed as alleged in ¶4(a)-4(n) above." However, in the government's trial brief, filed a mere 24 days before trial, the government, for the first time, specifically identified one property that was alleged to be the fraudulent pre-petition transfer: "Zinnel used these shells to transfer the Luyung Property, a commercial lot." (CR 169, p. 14, line 12). The government's trial brief functioned as a Bill of Particulars. *United States v. Rodrigues*, 678 F.3d 693, 702 (9 CA, 2012). Count 2 alleged fraudulent concealment of Zinnel's interests six specific properties including System 3 and the Luyung Property. (CR 169, p. 15, lines 13-16; CR 63, p. 7, lines 1-8).

The defense moved unsuccessfully for a bill of particulars.    (CR #83).  For both Counts 1 & 2, Zinnel asked the Court to order the government to identify the specific property transferred and/or concealed along with Zinnel's alleged interest in the property. (CR #83). The government attorneys staunchly opposed Zinnel's motion for a bill of particulars, which would have given him some little warning of what he was to be tried for, by initially arguing that the indictment was sufficiently detailed.  (CR #99). What can now only be viewed as foreshadowing, the government's spirited opposition stated: "One reason why a bill of particulars is disfavored is because the government must strictly adhere to its answers filed in response." (CR #99, p. 3). Zinnel's Motion for a Bill of Particulars was never ruled on the merits.

After calling Zinnel's bankruptcy trustee Stephen Reynolds as a witness trial, AUSA Audrey B. Hemesath instantly began hammering the Zinnel's personal WAMU checking account ending in account number "5442." (Appendix E, 26a). Zinnel was completely surprised at trial when the government moved to admit Exhibit 30  (Appendix E, 26a) because he knew he was not charged with concealing his one and only WAMU personal checking account with an account number of 490-4975442 and Zinnel knew he had disclosed his WAMU personal checking account on Schedule B.  (Appendix E, 23a & 24a).  When the government moved to admit Exhibit 30, Zinnel emphatically told his lawyer Tom Johnson to object on relevancy grounds and Fed.R.Evid. 403 because Zinnel was not charged with concealing his WAMU personal checking account. (Appendix G, 38a-40a). Zinnel's  lawyer did not object. (Appendix G, 38a-40a).

This Court should question why the government lawyers did not move to admit into evidence the WAMU bank statement for the period ending 6/13/05 in their effort to flaunt to the jury that two digits of the account number were different. (Appendix E, 22a). Zinnel emphatically believes it was a deliberate attempt by the government lawyers to deceive the jury and the Court, because the government lawyers knew full well that Zinnel had simply made a mistake with two digits in the account number of his WAMU personal account, and the $250 account balance actually matched Zinnel's bankruptcy schedules. (compare Appendix E, 22a to 23a & 24a). Further, Zinnel believes the government did not want to introduce the 6/13/05 bank statement because the lawyers wanted to imply to the jurors and the Court, that Zinnel had concealed from the bankruptcy court a multi-million dollar bank account.

As to Count 1, the jury was instructed *inter alia*: ―You may find the defendant guilty if you find that all of the above elements have been proven beyond a reasonable doubt as to at least one *of the alleged items of property* for each defendant and you unanimously agree to that item," without explaining what interests comprised the ―alleged items of property." (Appendix J, 66a-68a). As to Count 2, the jury was instructed *inter alia*: ―The law does not require that the government prove that each and every one *of the above items of property* was concealed. You may find the defendant guilty if you find that all of the above elements have been proven beyond a reasonable doubt as to *at least one of the above items of property* for each defendant and you unanimously agree to that item." (Appendix J, 66a-68a).

Prior to trial and during trial, Zinnel told his attorney Tom Johnson that we needed a verdict form that listed the property charged transferred and concealed like the verdict forms used in *United States v. Burke* and *United States v. Klassy*. (Appendix G, 40a & 41a; Appendix L). Zinnel's concern was that without a Verdict Form listing the property actually charged transferred or concealed, Zinnel could be found guilty by the jury on property not charged in the indictment. (Appendix G, 41a). Zinnel's attorney, told him he would take care of it. (Appendix G, 41a). Thereafter, Zinnel drafted a verdict form for his lawyer that contained a list of the property the indictment actually charged concealed. (Appendix G, 41a).

However, neither the instructions nor the verdict form identified the ―above items," and the jury was never read or given the indictment. (Appendix J & M). The verdict forms did not itemize property interests alleged in Count 1 or 2. (Appendix M). The jurors were not limited, as the

Constitution required, to the properties charged in the indictment. This is in light of the fact that as Zinnel knew prior to trial, jury instructions and verdict forms in similar bankruptcy fraud cases in the Eastern District of California have complied with the law by itemizing specific misstatements or property concealments that were charged in the indictment, directing jurors to agree unanimously on at least one misstatement or asset listed, and check a line next to the asset(s) agreed on. (Appendix I). However, the government and the court declined to use that format here.

In opposition, the prosecutor pointed to the phrase ―among others" in Count 1, implying that it included unstated property interests. This was inaccurate for two reasons. First, the government's trial brief limited the government to one specifically identified property that was alleged to be the fraudulent pre-petition transfer: ―Zinnel used these shells to transfer the *Luyung Property, a commercial lot*." (CR 169, p. 14, line 12). Second, while Count 1 had the phrase ―among others" in the ―ways and means" section, ¶5 of Count 1 referred to the omitted interests listed in ¶4(a)-4(n), without the qualifier ―among others." In her arguments, the AUSA failed entirely to address Count 2, which nowhere used the term ―among others," and explicitly listed the property interests allegedly concealed.

This Court's and the Ninth Circuit's precedent defeats the government's argument that it could offer the jury a smorgasbord of ―the specific items of property…listed in the indictment and also others." If the government opts to specify factual bases for an offense in the indictment, even if it could have instead issued a generic charge, the Fifth Amendment limits the government to the specified bases for conviction. In *Stirone*, the indictment charged interference with sand shipments, but the trial evidence proved interference with steel shipments. *Id*. at 214. The Supreme Court held in *Stirone*:

> ―When only one particular kind of commerce is charged to have been burdened, a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened." *Id*., 361 U.S. at 218.

The Ninth Circuit as applied this rule consistently. In *Howard v. Daggett*, 526 F.2d 1388 (9 CA, 1975), the indictment charged the defendant with bringing a named woman over state lines for prostitution, but evidence was introduced at trial of the defendant's actions regarding other women

in addition to the woman named in the indictment. The generic jury instructions did not mention any name. *Id.* at 1390. The Ninth Circuit held in *Howard* at 1390 (citing Stirone at 217):

> The grand jury might have indicted appellant in a general allegation, without specifying the women to whom his alleged illegal acts or purposes related. But it did not do so. To allow the jury to consider the evidence respecting the other alleged prostitutes was to allow the jury to convict of a charge not brought by the grand jury.

Therefore, in this case, the government could convict only on the specific properties charged.

The court refused petitioner's requests to instruct the jury it was limited to charged property interest as a basis for Counts 1 and 2. During the jury instructions conference, the district court acknowledged the problem of leaving jurors without guidance on which property interests they could consider, asking if the verdict forms and closing arguments would –specify which companies relate to which count." (Appendix J, 65A1 & 65A2). The prosecutor revealed that the verdict forms would not so specify, but assured the court that closing argument would do so. *Id.* The judge was wrong to rely on the prosecutor's closing argument to protect Zinnel from this constructive amendment.

As explained above, the jury instructions given, allowed the jury to find Zinnel guilty of Counts 1 and 2 based on transfers and concealments not charged by the grand jury because the jury was instructed: –The law does not require that the government prove that each and every one *of the above items of property* was concealed. You may find the defendant guilty if you find that all of the above elements have been proven beyond a reasonable doubt as to *at least one of the above items of property* for each defendant and you unanimously agree to that item." (Appendix J, 69a-70a). However, neither the jury instructions nor the verdict form identified the –above items," and the jury was never read or given the indictment. (Appendix J and Appendix M). The verdict forms did not itemize property interests alleged in Count 1 or 2 (Appendix M). The jurors were not limited, as the Constitution required, to the properties charged in the indictment.

Jury Instructions and verdict forms in similar bankruptcy fraud cases in the Eastern District of California have complied with the law by itemizing specific misstatements or property concealments that were charged in the indictment, directing jurors to agree unanimously on at least one misstatement or asset listed, and check a line next to the asset(s) agreed on. (Appendix L). In closing and rebuttal arguments, government counsel argued that Zinnel concealed the WAMU

Page 24

personal account, Corporate Control, and the entire company of Done Deal, and that concealment of any of those assets could serve as the basis to find Zinnel guilty of Counts 1 and 2. (Appendix K, 71a, 72a, 75a-77a). For example, as to Count 1 the prosecutor argued: ―But does he have a beneficial interest in Done Deal? Absolutely. And as you heard in the jury instructions given by the judge, concealment of any one of these pieces of property is sufficient for conviction."

On Count 2, the prosecutor argued that Zinnel's WAMU account ―isn't here on Schedule B, personal property, from his bankruptcy schedules," (Appendix K, 71a) and that Zinnel concealed an equitable interest in Done Deal. (Appendix K, 71a). The prosecutor told the jury ―Just as in Count 1, any one item of concealed property is sufficient." (Appendix K, 72a).

In rebuttal, the other prosecutor displayed the bankruptcy schedules and argued: (1) ―Where is Done Deal? Done Deal is nowhere;" (Appendix K, 76a), (2) ―Zinnel's personal account is not disclosed;" (Appendix K, 76a) and (3) ―in the 341 hearing,…Zinnel says all the assets of Corporate Control were sold in 2002 and went to First Bank." Zinnel was not charged with transferring or concealing any of these three properties. The prosecutors' hammering uncharged property made it highly likely that jurors convicted Zinnel based on the uncharged transfer or concealment of the WAMU personal account, Corporate Control, and Done Deal, and it is impossible, to ascertain that they did not.

C. The Jury Instructions and the Government's Arguments, Allowed the
Jury to Convict Zinnel Unconstitutionally on Uncharged Conduct

―A person is entitled under the Fifth Amendment not to be held to answer for a felony except on the basis of facts which satisfied a grand jury that he should be charged. He is entitled to fair notice of what he is accused of, and not to be twice put in jeopardy on the accusation." *United States v. Tsinhnahijinnie*, 112 F.3d 988, 992 (9 CA, 1997). ―In federal court a defendant may not be convicted of an offense different from that specifically charged by the grand jury." *United States v. Stewart Clinical Laboratory, Inc.*, 652 F.2d 804, 807 (9 CA, 1981). ―The indictment's charges may not be broadened by amendment, either literal or constructive, except by the grand jury itself." *United States v. Adamson*, 291 F.3d 606, 614 (9 CA, 2002) (citing *Stirone v. United States*, 361 U.S. 212, 215-16 (1960)). An amendment to an indictment occurs ―when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is

Page 25

contained in the indictment." *United States v. Dennis,* 237 F.3d 1295, 1299 (11 CA, 2001). Neither the statutory citation nor the heading in an indictment is considered part of the indictment. *United States v. Pazsint,* 703 F.2d 420, 423 (9 CA, 1983).

Amending the indictment to charge a new crime through the jury instructions constitutes per se reversible error. *Stewart Clinical Laboratory,* at 807. Whether deemed constructive amendment or prejudicial variance, the error here was unconstitutional and prejudicial because it enabled the jury to convict Zinnel on Counts 1 and 2 based on uncharged concealment of three properties.

This error violated Zinnel's constitutional rights to notice, freedom from double jeopardy, and to be convicted only on charges found by the grand jury. The indictment gave no notice that Zinnel was being charged in Counts 1 and 2 with transferring or concealing the WAMU account, Done Deal, and Corporate Control. Given the government's exhortations to jurors to convict based on any of these uncharged property interests, it is impossible to find that Zinnel was *not* convicted of Counts 1 and 2 based on concealment of property *not* charged by the grand jury.

In *Adamson,* the indictment charged that the defendant falsely stated —that upgrades to servers had been made," whereas the trial evidence proved that he told a different lie; —[about] how upgrades had been made." *Id.,* 291 F.3d at 616. The trial court instructed the jury in *Adamson* that it must agree unanimously on at least one falsehood, but did not specify the falsehoods charged in the indictment. *Id.* at 611. The Ninth Circuit held that this was a prejudicial variance, because the court instructed the jury —in such a way as to allow the defendant to be convicted on the basis of conduct other than that with which he was charged." *Id.* at 616.

In *Ward,* the Ninth Circuit reversed on nearly identical facts. While the indictment named two identity theft victims, the jury heard testimony evidence that Ward also victimized others. The trial court instructed the jury that it could convict if the defendant stole the identity of —a real person," without specifying any names. The Ninth Circuit reversed, reasoning that where the trial included evidence of both charged and uncharged conduct that would satisfy an element of an offense, the jury instructions did not limit the jury to the charged conduct, then —the defendant's conviction could be based on conduct *not* charged in the indictment. That possibility creates a constructive amendment of the indictment, requiring reversal, because it _destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment.'" *Ward,* 747 F.3d at 1186-1188, 1191 (*quoting* S*tirone,* 361

Page 26

U.S. at 217). *See also United States v. Shipsey,* 190 F.3d 1081, 1085 (9 CA, 1999). This is exactly what occurred here.

*Stirone, Ward,* and *Adamson* compel reversal of Zinnel's bankruptcy fraud convictions. The variation between pleading and proof, the prosecutors' arguments encouraging jurors to convict Zinnel on Counts 1 and 2 based on concealing uncharged assets, and the defective jury instructions affected Zinnel's substantial rights under the Fifth and Sixth Amendments. *Stirone,* at 218-219. See also *United States v. Lloyd,* 807 F.3d 1128, 1164 (9 CA, 2015).

### D. Adding Uncharged Concealed Properties Impermissibly Broadened the Indictment

Zinnel and his counsel were indeed surprised at trial, to Zinnel's detriment. (Appendix G, 38a-40a). Zinnel could easily have refuted the government's contentions that he knowingly concealed the WAMU account. Had Zinnel known that the prosecution would argue that he had concealed this account, he would have offered evidence that (1) he had listed a WAMU personal account on Schedule B as account number ―.9842" with a balance of $250 (Appendix E, 23a), (2) he had only WAMU account, account no. ending in ―5442" as shown by the bank signature card admitted into evidence (Appendix E, 25a; Appendix G, 34a & 35a), and (3) this real account had a balance of $256.41 in June 2005. (Appendix E, 22a). This readily available evidence would have proven his counsel's argument that he mistakenly misstated the account number on Schedule B. (compare Appendix E, 29a, Appendix K, 73a & 74a).

The government selectively related that the ―trustee testified that if he had been aware of this account, he would have investigated." (Appendix E, 27a). The trustee added, however, that he ―would have wanted to know what the balance was…[to see if the accounts] were exempt or worthwhile administrating." (Appendix E, 27a). In fact, on Schedule C of his bankruptcy schedules, Zinnel claimed his WAMU personal checking account as exempt from administration by the bankruptcy court under California *Code of Civil Procedure* § 704.070(b)(2) which means as a matter of law the bank account was not part of Zinnel's bankruptcy estate. (Appendix E, 24a). Even if the WAMU account was not exempt, it is doubtful the trustee would have found $256.41 worth administrating, making any omission immaterial.

Zinnel did everything he could to prevent being surprised at trial, to no avail. He moved for a bill of particulars on Counts 1-2, sought jury instructions that spelled out the assets charged in

Counts 1-2, and complained that it was fundamentally unfair to require the defendant to defend against a charge or a factual basis not charged in the indictment. The prosecutors resisted filing a bill of particulars, because the government was loath to commit itself to prove a disclosed set of facts it was claiming violated 18 U.S.C. §§152(1) and 152(7).

In evaluating the constructive amendment and flawed jury instructions questions presented, the Court should ask itself, and the government, the following key question: **What property did the jury actually convict Zinnel of transferring and/or concealing?**

Did the jury unanimously agree on Zinnel's uncharged WAMU personal account and/or uncharged Done Deal, and then simply put an "X" on the "Guilty" line for Counts 1 and 2, and move on to Count 3? Or did the jury unanimously agree that the charged Luyung Property was concealed and put an "X" on the Guilty line? The verdict form does not answer the question because the jury simply put an "X" under "Guilty." (Appendix M, 82a-83a). In aggravation, the government drafted, and Judge Troy L. Nunley approved, verdict form reflects that the jury convicted Zinnel in Counts 1 and 2 for violating 18 U.S.C. § 157(7) and § 157(1), but Zinnel is not charged with violating those two statutes in the indictment. (Appendix M, 82a-83a).

In this case, the government lawyers opposed Zinnel's jury instructions and verdict form listing the properties charged transferred and concealed in the indictment like the same U.S. Attorney's Office did in *Burke* and *Klassy*. Judge Troy L. Nunley, as he has done all along in this case, sided with the government. With this enormous <u>unconstitutional</u> advantage secured, both prosecutors hammered the uncharged property during closing argument, waving Exhibit 30 and Zinnel's bankruptcy schedules before the jury, implying that the WAMU personal account held millions, saying Zinnel's mistake defense was "silly," and urged the jury to find Zinnel guilty of bankruptcy fraud for not disclosing his own WAMU personal account.

Like *Kojayan* twenty-five years ago, the prosecutor made "factual assertions he well knew were untrue. This is the difference between fair advocacy and misconduct." *United States v. Kojayan*, 8 F.3d 1313, 1321 (9 CA, 1993). "[The Ninth Circuit] has made plain when a prosecutor makes unsupported factual claims, it is definitely improper." *Kojayan* at 1318-19. This case is *Kojayan* on steroids. When the government deprives a person of life, liberty, or property, it is required to use fundamental fair processes. This Court has long emphasized our

Page 28

Constitution's overriding concern with the justice of finding guilt." *United States v. Agurs*, 427 U.S. 97, 112 (1973). In particular, the Due Process Clause guarantees for every defendant the right to a trial that comports with basic tenets of fundamental fairness. *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 24-25 (1981).

Zinnel wholeheartedly believes he is convicted of concealing his uncharged WAMU personal account that he in fact listed on his bankruptcy schedules twice, with the correct $250 balance, but simply made a typographical mistake with two digits in the account number. (Appendix G, 44a). This is because both prosecutors cheated by jumping on Zinnel's minor immaterial mistake and hammered Zinnel's WAMU personal checking account, both during trial and in closing argument. In aggravation, the government attorneys deliberately and deceitfully, concealed from testifying bankruptcy trustee Stephen Reynolds, the jury, and the Court that Zinnel has never had a WAMU personal account ending in -9842," that Zinnel did not actually have a second WAMU account, or that Zinnel's one and only WAMU personal account ending in -5442" had an ending balance of a mere $256 the month prior to Zinnel filing bankruptcy that matched Zinnel's bankruptcy schedules in the two places where the WAMU personal account was listed. (Appendix E, 22a-24a). As a result, **Zinnel was sandbagged** by AUSA Matthew D. Segal and AUSA Audrey B. Hemesath and **the witness, jury, and the judge were hoodwinked**. As a result, in this case, **no one, or no Court, can say what property Zinnel is convicted of transferring and/or concealing, let alone say beyond a reasonable doubt.**

As Justice Douglas once warned, -the function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right people as expressed in the laws and give those accused of a crime a fair trial." *Donnelly v. DeChristofra*, 416 U.S. 637, 648-49 (1974).

E. The Money Laundering Counts Must Fall because their Predicates were Constructively Amended

This Court must also reverse all of Zinnel's money laundering convictions (Counts 4-12, 15-18) because they were predicated on the defective bankruptcy fraud convictions. *United States v. Garrido*, 713 F.3d 985, 998-999 (9 CA, 2013) (reversing §1957 convictions where the alleged

Page 29

criminally-derived property was derived from defective fraud conviction); *Shipsey*, 190 F.3d at 1083, 1088 (reversing § 1956 convictions predicated on reversed theft convictions).

No money laundering count specified which bankruptcy fraud count was the predicate ―specified unlawful activity‖ for 18 U.S.C. § 1956 and 18 U.S.C. § 1957. It is impossible to determine which bankruptcy fraud count the jury used as the predicate for any money laundering count. Thus, those money laundering convictions collapse with the reversal of Counts 1 and 2.

## II.  THE COURT PREJUDICIALLY ERRED IN INSTRUCTING THE JURY

### A.  The Jury Instructions on Bankruptcy Fraud Were Fatally Flawed

This claim incorporates Question 1 above.  The jury instructions on Bankruptcy Fraud (Appendix J) violated Zinnel‗s Fifth and Sixth Amendment rights to be tried only on charges in the indictment and to notice of the charges against him, and were also prejudicially confusing.  Zinnel timely objected.

The language and formulation of jury instructions is reviewed for abuse of discretion. *United States v. Christensen*, 801 F.3d 971, 990 (9 CA, 2015).  Omitting an element of an offense is constitutional error that requires reversal, unless the error was ―harmless beyond a reasonable doubt,‖ i.e., if there is no reasonable possibility that the error materially affected the jury‗s deliberations. *United States v. Pierre*, 254 F.3d 872, 877 (9 CA, 2001).  The Fifth Circuit has held that in fashioning instructions the trial courts are accorded substantial latitude, and their charge need not be faultless, but we must reverse when we have a substantial doubt that the jury has been fairly guided in its deliberations. *Bode v. Pan Am. World Airways, Inc.*, 786 F.2d 669, 672 (5 CA, 1986) (internal citations omitted). This Court should find that challenged instructions fall below this threshold of acceptable jury guidance.

### 1.  The Bankruptcy Fraud Instructions were Inadequate because they Omitted the Property Allegedly Transferred or Concealed

A defendant can be found guilty of bankruptcy fraud only upon proof that he knowingly transferred or concealed the property stated in the indictment. 18 U.S.C. §§ 152(1) and 152(7).  Of the seven circuits that have pattern instructions for sections 152(1) or 152(7), six require a

Page 30

description of the property the indictment alleged was transferred or concealed. [8] (Appendix H. The description of the property is critical to allow preparation of a defense. E.g., 10th Cir. Pattern Crim. Jury Instr. 2.10 (Rev. 2011), cmt. (—.the property should be sufficiently identified in the instructions") (quoting United States v. Arge, 418 F.2d 721, 724 (10 CA, 1969)).

In creating the bankruptcy fraud instructions given here (Appendix J), the government exploited *United States v. Klassy*, CR 05-503-MCE (E.D. Cal.). (Appendix I 62a-64a) However, the government omitted *Klassy's* list of the property charged. (Appendix I, 64a). The jury instructions in *United States v. Burke*, CR 05-365-JAM (E.D. Cal.), also authored by the same U.S. Attorney's Office, also listed the properties alleged in the indictment. (Appendix I, 60a-61a). By omitting which items of property the jury could consider, the jury instructions for Counts 1 and 2 were inadequate to guide the jury. Reversal is warranted, because it is impossible to determine if this error materially affected the verdicts.

### 2. The Instructions on Counts 1-2 Created Juror Confusion

In addition to omitting the property interests alleged in the indictment, the jury instructions for Counts 1 and 2 were prejudicially confusing because each instruction referred to property items as if they were identified elsewhere. The instructions made reference to —at least one of the alleged items of property" for Count 1 (Appendix J, 68a), and —as to at least one of the above items of property" as to Count 2. (Appendix J, 70a). These phrases were obviously lifted from the jury instructions in *Burke* and *Klassy* (Appendix I). However, unlike in those cases, here the district court never identified the —alleged items of property" or the —above items of property." (Appendix J). The jury never got the indictment, the court never told the jury what property the indictment alleged was transferred and concealed, and the verdict forms did not identify the interests. (Appendix M). The instructions created unresolvable jury confusion. Jurors were left to glean the possible items of property from the prosecutors' arguments, which urged them to convict on uncharged conduct. (Appendix K, 71a, 72a, 75a-77a). It cannot be said that there is no reasonable possibility that this error materially affected the verdict. *United States v. Pierre*, 254 F.3d 872, 877 (9

---

[8] *See* First Cir. Pattern Crim. Jury Instr. 4.18.152(1) and 4.18.152(7); Third Cir. Manual of Model Crim. Jury Instr. No. 6.18.152(1) (Rev. 2012); Seventh Cir. Pattern Crim. Jury Instr. 18 U.S.C. 152(1) (Rev. 2013); Eighth Cir. Model Crim. Jury Instr. No. 6.18.152A (Rev. 2014); Tenth Cir. Pattern Crim. Jury Instr. No. 2.10 (Rev. 2011); Eleventh Cir. Pattern Jury Instr.

CA, 2001).   Zinnel requested a verdict form with lines to check for the property actually charged in the indictment. (Appendix G, 40a-43a).   If the jury had in front of it the jury instructions and verdict forms used in *Klassy* and *Burke*   (Appendix L), it is highly probable that the jury would have had a question as to why the WAMU personal checking account, Done Deal, and Corporate Control were not listed on the verdict form so they could check the line that they unanimously agreed on one of those properties, because of the government lawyers' emphasis.

These instructional errors require reversal of all Zinnel's convictions.

B. It is impossible to know beyond a reasonable doubt whether uncharged or charged property was unanimously agreed upon by the jury as fraudulently transferred or concealed and this requires reversal of all of Zinnel's convictions

With regards to the Court's determination whether there is an unconstitutional constructive amendment and/or fatally flawed jury instructions, the Court should go no further than to recognize that it is impossible to determine, let alone determine beyond a reasonable doubt, by the jury instructions and verdict form deceivingly drafted by the two government lawyers, approved by the district court over Zinnel's emphatic objections, and given to the jury in this case, what property the jury unanimously agreed to convict Zinnel on under Count 1 for a pre-petition transfer and Count 2 for a post-petition concealment in order to be satisfied beyond a reasonable doubt that the jury did not unanimously agree solely on one or more of the three uncharged properties the government emphasized during trial and closing argument. (Appendix J & M)

## III. THE JUDGE-DETERMINED SENTENCING GUIDELINES OFFENSE LEVEL OF 36 IS UNCONSTITUTIONAL BECAUSE 28 LEVELS OF THE HOTLY CONTESTED SENTENCING ENHANCEMENTS WERE NOT FOUND BY THE JURY OR ADMITTED TO BY THE DEFENDANT, BUT WERE USED TO INCREASE PETITIONER'S PENALTY IN VIOLATION OF THE SIXTH AMENDMENT

A. Distressing Facts

- Petitioner received a mechanically applied within-Guideline draconian prison sentence of 212 months in prison (17.67 years) that is the longest sentence in the history of the United States for bankruptcy fraud by almost double when similarly situated defendants received around 19 months in prison;

- The hotly contested sentencing enhancements increased Petitioner's punishment from 6 months to 212 months in prison - a 3,400 % increase;

- Post-*Booker* the Department of Justice's prevailing policy is still *to actively seek sentences within the range established by the Sentencing Guidelines.*" (Appendix R, 90a, 95a-96a);

- Post-*Booker* half of federal sentencing judges still treat the guidelines as mandatory by slavishly adhering to the sentencing guidelines. According to a 2017 United States Sentencing Commission, almost all of the offenders in the federal prison population were sentenced post-*Booker*, yet 50.4% of the offenders in the federal prison population were still sentenced within the recommended Guideline range.   Thus the sad reality is that in half the cases still, the Guidelines are treated by judges as if they were still mandatory, which runs afoul of the Sixth Amendment. (Appendix Q, 89a);

- Probation officers have been called the *guardians of the guidelines;*"

- The Assistant United States Attorneys in the Eastern District of California, routinely insert in the plea agreements they draft the following language: *The defendant agrees that the application of the United States Sentencing Guidelines to his case results in a reasonable sentence and that the defendant will not request that the Court apply the sentencing factors under 18 U.S.C. § 3553 to arrive at a different sentence than that called for under the Sentencing Guidelines' advisory guideline range as determined by the Court;*"

- Prior to becoming a federal judge, with Petitioner's trial his first, the sentencing judge in this case, told Senator Chuck Grassley in written responses to the Senator's questions, that *If confirmed, I intend to give the Federal Sentencing Guidelines significant difference. The Federal Sentencing Guidelines create uniformity, consistency, and fairness while assuring similarly situated cases are treated the same.*" (Appendix S, 102a);

- Both prosecutors in this case have urged only Guideline sentences and have told the sentencing judge that *you've done your duty on unwarranted sentencing disparities if you calculate the guidelines correctly.*" citing *Treadwell*;

- Even though the law is well-settled that correctly calculating the applicable Guidelines range is the *starting point*" of any sentencing proceeding, and the Guidelines are not given any more weight than any 18 U.S.C. § 3553(a) factor, [9] the reality is, that post-*Booker*, in the

---

[9] *Kimbrough v. United States*, 552 U.S. 85 (2007)

majority of cases, the calculation of the defendant's —Guideline range" is the start and finish of the determination of the defendant's prison term. Thus, every single judge-found fact that increases the Guideline range directly increases the defendant's prison time;

- Barrels of ink have been spilled on how the Sentencing Guidelines for economic crimes are absurd. (e.g. Appendix R, 91a-100a);

- As of the date of this petition, Steven Zinnel has been unjustly incarcerated over 3,000,000 minutes, 50,000 hours, 2,100 days, 69 months, 5.8 years, 16% of his adult life thus far, and 2.8 times —factually similar" Letantia Bussell; [10]

- Emboldened by Ninth Circuit's erroneous opinion affirming the convictions and Guideline range of 188-235 months in prison (O.L. 36), the prosecutors have indicated that they intend to seek the same savage sentence at Petitioner's resentencing; [11]

- Judge Troy L. Nunley has noted that Zinnel's Guideline range has not changed;

- On April 4, 2019, Judge Troy L. Nunley again imposed a within-Guideline range sentence of nine years imprisonment on Zinnel's co-defendant Derian Edison at her resentencing.

### B. The Supreme Court and the majority of the Court of Appeals have side-stepped around this issue

Petitioner contends that, but for the judge's finding of facts, resulting in 28 levels of sentencing enhancements, increasing his guideline sentence from 6 months to 212 months, a 3,400% increase, his sentence would have been —substantively unreasonable" and therefore illegal. See *Rita v. United States,* 551 U.S. 338 (2007). If so, Zinnel's constitutional rights were violated. The Sixth Amendment, together with the Fifth Amendment's Due Process Clause, —requires that each element of a crime" be either admitted by the defendant, or —proved to the jury beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99 (2013). Facts that increase mandatory minimum sentences must be submitted to the jury. *Id.* Any fact that increases the penalty to which a defendant is exposed constitutes an element of a crime, *Apprendi v. New Jersey*, 530 U.S. 466, 483, n. 10, 490 (2000), and —must be found by a jury, not a judge," *Cunningham v. California*, 549 U.S.

---

[10] *United States v. Bussell*, 504 F.3d 956 (9 CA, 2007). At Zinnel's sentencing on March 4, 2014, Judge Troy Nunley made a finding that Zinnel's case was —factually similar" to Bussell, who was sentenced to 36 months in prison.

[11] Currently set for May 2, 2019.

270 (2007). This Court held that a substantively unreasonable penalty is illegal and must be set aside. *Gall v. United States*, 552 U.S. 38 (2007). It unavoidably follows that any fact necessary to prevent a sentence from being substantively unreasonable-thereby exposing the defendant to the longer sentence-is an element that must be either admitted by the defendant or found by the jury. It may not be found by a judge.

Justice Scalia, joined by Justice Thomas and Justice Ginsburg, dissenting from denial of Certiorari in *Jones v. United States*, 135 S. Ct. 8 (2014), expressed his frustration with judge-found facts that increase a defendant's prison time:

> ―For years, ... this Court has refrained from saying so."

> ―In *Rita v. United States*, we dismissed the possibility of Sixth Amendment violations resulting from substantive reasonableness review as hypothetical and not presented by the facts of the case. We thus left for another day the question whether the Sixth Amendment is violated when courts impose sentences that, but for a judge-found fact, would be reversed for substantive unreasonableness. *Rita*, 551 U.S., at 353. Nonetheless, the Courts of Appeals have uniformly taken our continuing silence to suggest that the Constitution does permit otherwise unreasonable sentences supported by judicial fact finding, so long as they are within the statutory range.

> ***

> We should grant certiorari to put an end to the unbroken string of cases disregarding the Sixth Amendment - or to eliminate the Sixth Amendment difficulty by acknowledging that all sentences below the statutory maximum are substantively reasonable."

Justice Gorsuch, then a Circuit Judge, authored the opinion in *United States v. Sabillon-Umana*, 772 F.3d 1328 (10 CA, 2014) wherein he challenged the district court's power to find facts at sentencing citing Justice Scalia's dissenting from denial of certiorari in *Jones v. United States*, 135 S. Ct. 8 (2014). Justice Gorsuch wrote in relevant part:

> ―We admit the proper order of [sentencing] operations we've outlined rests in part on a questionable foundation. It assumes that a district judge may either decrease or increase a defendant's sentence (within the statutorily authorized range) based on facts the judge finds without the aid of a jury or the defendant's consent. It is far from certain whether the Constitution allows at least the second half of that equation. See, e.g., *Jones, Id.*

In *Jones* supra., Justice Scalia cited *United States v. Treadwell*, 593 F.3d 990 (9 CA, 2010). In *Treadwell*,    all three defendants raised an as-applied Sixth Amendment challenge to their

sentences, arguing that their sentences would not be "reasonable" under 18 U.S.C. § 3553(a) without relying on judge-found facts, in violation of their Sixth Amendment right to a jury trial. The *Treadwell* defendants adopted an argument that Justice Scalia, writing separately, has encouraged litigants to raise in several Supreme Court sentencing decisions. The *Treadwell* defendants contended that "for every given crime there is some maximum sentence that will be upheld as reasonable [under § 3553(a)] based only on the facts found by the jury or admitted by the defendant." According to the defendants, the facts found by the jury at their trial warrant only a 1 to 7 month sentence under the Guidelines. This is Zinnel's position as well.

In *Treadwell*, the Ninth Circuit rejected the defendants' argument, and joined the Fourth, Sixth, and Seventh Circuits in holding that "this argument is too creative for the law as it stands."

> "in *Booker*, the Supreme Court rendered the Guidelines advisory, permitting a district court to impose a sentence anywhere within the range established by the statute of conviction without violating the Sixth Amendment...Accordingly, no constitutional violation occurred, even if the district court did rely on facts not found by the jury."

In another Ninth Circuit case, *United States v. Hickey*, 580 F.3d 922 (9 CA, 2009), the defendant argued that the district court impermissibly enhanced his sentence by fifteen levels based on the amount of the loss because the amount was not proven beyond a reasonable doubt to the jury. This is Zinnel's position as well. The Ninth Circuit held:

> "This argument fundamentally misunderstands the current state of constitutional law on sentencing. The relevant Sixth Amendment question is not, as Hickey claims:
>
> Whether judge found facts that were not proven beyond a reasonable doubt by the jury in the process of calculating the guidelines range.   Rather, the Sixth Amendment question . . . is whether the law forbids a judge to increase a defendant's sentence unless the judge finds facts that the jury did not find (and the offender did not concede). *Rita*, 551 U.S. 338, 352 (2007).
>
> Because the sentencing guidelines are advisory after *Booker*, the Sixth Amendment does not require that the loss be proved to a jury beyond a reasonable doubt. See *United States v. Booker*, 543 U.S. 220 (2005)."

Page 36

C. **Because post-Booker, the majority of judges, including the sentencing judge in this case, still improperly slavishly impose Guideline sentences, every fact the judge finds that adds a sentencing enhancement does increase the punishment and thus must be found by the jury or admitted by the defendants, including Petitioner here**

Current Supreme Court law is that facts that increase <u>mandatory minimum</u> sentences must be submitted to the jury. *Alleyne v. United States*, 570 U.S. 99 (2013). However, <u>in economic crime cases there are no mandatory minimums</u> and six circuits have interpreted the Supreme Court's holdings post-*Booker*, to mean that since the Guidelines are advisory, and no mandatory minimums in economic crime cases, *Alleyne's* holding is not triggered. *United States v. Booker*, 543 U.S. 220 (2005) excised 18 U.S.C. § 3553(b)(1) and 18 U.S.C. § 3472(e) in order to remedy the Sixth Amendment violation created by the mandatory nature of the Guidelines. However, in over half the defendants sentenced, including Zinnel, the Guidelines are strictly adhered to <u>which is a de facto mandatory minimum.</u> Thus, every Offense Level increase, increases over half the federal offenders' punishment, including Zinnel's. Zinnel's 28 levels of objected to enhancements (Appendix O) are comprised of five two-level enhancements and an eighteen-level mega-enhancement for loss with no evidence by the government except for Zinnel's disputed bankruptcy schedules. (Appendix P). Because the Guidelines are non-linear, there is a huge difference in prison time between two levels from 8 – 10 mid-range (a 6 month difference) and two levels from 34 to 36 mid-range (a 42 month difference). **Thus, for Zinnel, a 2-level enhancement adds 3.5 years in prison.** A flagrant example is the 2 level enhancement for number of victims. In this case, the objected-to Presentence Report ("PSR"), details two victims, with an alleged loss of $141 and $3,026, that triggered the 2-level enhancement (Appendix P, #3 & #5). Thus, Zinnel was sentenced to 3.5 years in additional prison time over $3,167 in fake losses that were completely disputed on Zinnel's bankruptcy schedules.

1. The district court erred by imposing sentence based on judicial fact-finding concerning loss and number of victims

Zinnel was sentenced to an <u>additional</u> 15 years and 8 months in prison based on the amount of loss and number of victims determined by the district court at sentencing. As discussed below, the amount of loss and number of victims was the single most important sentencing factor in this case, above all else. The amount of loss was determined by the district court at sentencing. The Sixth Amendment requires factual determinations to be made by the jury. *Apprendi v. New Jersey*,

530 U.S. 466 (2000).  The sentence here was imposed solely on alleged ―facts" contained in the objected-to-PSR    that was determined at sentencing by the district court itself under the preponderance of evidence standard, not beyond a reasonable doubt by the jury.    ―The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." *United States v. Gigante*, 94 F.3d 53 (2 CA, 1996). ―Quantified, the preponderance standard would be 50+% probable." *Id.*  Such a judicial determination of the facts is in violation of the Sixth Amendment and erroneous.

Only Zinnel's disputed bankruptcy schedules were before the courts below, and here. (Appendix P).  Every one of the eleven listed claims are listed as disputed. *Id.* As Zinnel objected to the loss calculation contained in the PSR, the district court was not permitted to rely on the PSR at all for loss or number of victims. Zinnel's factual objections triggered the government's obligation to submit clear and convincing evidence to support the 20-level mega -- enhancement for loss and number of victims. *Federal Rules of Criminal Procedure* 32(i)(3)(B). During Zinnel's sentencing, AUSA Matthew D. Segal announced twice that the loss calculation was ―all academic [because] there was a trial here...we proved it beyond a reasonable doubt," and called Zinnel's bankruptcy petition the ―gold standard of evidence." On pages 33 and 34 of his Reply Brief below, Zinnel copied and pasted the relevant portions of his bankruptcy schedules relied on by the government at sentencing. (Appendix P). Every one of the eleven listed claims are listed as disputed. *Id.* Neither the government, the trustee, nor any court evaluated any claim listed in the PSR, or Zinnel's bankruptcy schedules, for truth or validity. The government chose to rely solely on Zinnel's disputed bankruptcy schedules at sentencing and the court erroneously relied on the objected-to-PSR as ―evidence" of loss and number of victims adding 15 years 8 months  to Zinnel's mid-range ―Guideline" sentence.

Zinnel asserts that before he is enhanced 20 levels, adding 15 years 8 months to a ―Guideline sentence," the government proffered ―gold standard" of evidence should have been thoroughly vetted by the courts below. However, even a cursory review, shows the glaring problems with using the list of eleven creditors contained in PSR para. #21 for $3,615,758 as loss and number of victims. For example, listing #4 on the relevant portion of Zinnel's bankruptcy schedules, the PSR assigned a value of $115,000, but Zinnel scheduled the Amount of Claim as "unknown" and

Page 38

"disputed" the creditor. (Appendix P, 86a). Listing #7 on the relevant portion of Zinnel's bankruptcy schedules, the PSR assigned a value of $2,174,982.00, but Zinnel scheduled the Amount of Claim as ―0.00‖ and ―disputed‖ the creditor. (Appendix P, 87a). Listing #8 the PSR assigned a value of $780,147.00, but Zinnel scheduled the Amount of Claim as ―0.00‖ and "disputed the creditor. (Appendix P, 77a).  No court can ―guess‖ loss and number of victims. Especially when it adds 15 years 8 months to a mid-range Guideline sentence that Judge Nunley has expressed, albeit erroneously,  to Congress that he will impose. (Appendix S, 102a). ―Guessing is for contestants on television game shows, not for judges applying the law.‖ *United States v. Houston*, 217 F.3d 1204, 1208-1209 (9 CA, 2000).

Zinnel's bankruptcy schedules reflect a Total Claims amount of $2,008,369.97 with all of it **disputed**. (Appendix P, 87a). The PSR assigned a value of $3,615,758. *Id.* The relevant portions of Zinnel's bankruptcy schedules the government relied on to meet its burden, are hardly the ―gold standard‖ of evidence. Yet these two pages of phantom money and victims (Appendix P), added 15 years 8 months to a mid-range ―Guideline‖ sentence of 17 years 8 months for Zinnel. This cannot be the starting point at any resentencing; especially when the government's plan is to seek the same draconian sentence as before because Zinnel's ―Guidelines‖ have not changed.

As seasoned Judge Jed Rakoff observed: ―By making a Guidelines sentence turn, for all practical purposes on the single factor of loss, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account (18 U.S.C. § 3553(a)), and by contrast, effectively guaranteed that many such sentenced would be irrational on their face.‖ [12] (also see Appendix R, 91a-100a).   Judge Nunley's mechanical Guidelines application, coupled with his imprecise estimation of loss, produced a shockingly-high sentence. There is no way Zinnel is Offense Level 36. Subtracting 20 levels for nonexistent loss and number of victims, Zinnel would be Offense Level 16 (21-27 months in prison). Zinnel's extreme sentence, not being based on a jury's fact finding and being multiples of the norm for the offenses of conviction, simply subvert the Sentencing Reform Act's ―basic aim of ensuring similar sentences for those who have committed similar acts in similar ways.‖

---

[12] *United States v. Gupta*, 904 F.Supp. 2d 349, 350-351 (S.D.N.Y.  2012)

## 2. Zinnel's Fifth and Sixth Amendment rights are affected

Substantial rights are affected here because the issue concerns Zinnel's Fifth Amendment, Sixth Amendment, and Due Process rights. This Court has made it clear that "any jail time has Sixth Amendment significance." *Glover v. United States*, 531 U.S. 198, 203 (2001). Last year, Justice Sotomayor eloquently defined that actual jail time is significant. *Rosales-Mireles v. United States*, 138 S. Ct. 1897 (June 18, 2018)

There can be no rights more substantial than a defendant's explicit constitutional rights. Imposition of sentence based entirely upon facts that were never proved beyond a reasonable doubt, or admitted by the defendant, seriously affects the fairness and integrity of judicial proceedings. Zinnel's Offense Level should therefore be vacated and remanded at Offense Level 8 for Zinnel's re-sentencing.

## CONCLUSION

This Court has made it clear that when the government action "shocks the conscience," it violates due process. The underlying convictions and sentences reflect a serious, recurrent, and unconstitutional practices. Zinnel knows the parties and all the Courts below have labored long and hard over this case, and that this Court is likely reluctant to push the reset button. But fairness is (and must be) the hallmark of federal-court litigation, and the essence of fairness is the provision of a level playing field. Here, there is no way anyone, or any Court, can say, let alone beyond a reasonable doubt as required, that Zinnel was not convicted of transferring or concealing property uncharged by the grand jury; property that he was given no notice he would have to defend against. This Court and Zinnel, are "left guessing" as to what property the jury unanimously agreed on in order to convict on Counts 1 and 2 and the money laundering counts which mandates reversal. Therefore, the petition for a writ of certiorari should be granted.

Seeking Justice,

Steven Zinnel, Petitioner In Pro Se                     Dated: April 8, 2019

Page 40